Jonathan O. Hafen (6096) (jhafen@parrbrown.com)
Carissa A. Uresk (18114) (curesk@parrbrown.com)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, UT 84111
Telephone: (801) 532-7840

*Liaison Counsel for the Individual Users Track (Track 1)*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| **IN RE: INSTRUCTURE DATA BREACH LITIGATION**<br><br>*This Document Relates to Track 1* | **CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**PROPOSED CLASS ACTION**<br><br>**JURY TRIAL DEMANDED**<br><br>Case No. 2:26-cv-00374-RJS-CMR<br><br>District Judge Robert J. Shelby<br><br>Chief Magistrate Judge Cecilia M. Romero |

Plaintiffs Kyllia Bless; Madison Clark; Theresa M. Coelho; Colby Walker Darnell; Azrael Gabriela Delagarza; Olivia Gabrich; Crystal Jessica Hall; Ella Jacobs; Natalie Large; Q. Jane Miceli; Sam Mockert; Jeffrey Parker; Dana Reyes; Julianne Theobald; Brandi Nelson; Gerid Bowler; Carmen Brock; Plaintiff A.D., by and through their parent/guardian S.D.; Plaintiff E.D., by and through their parent/guardian S.D.; Plaintiff P.E., by and through their parent/guardian A.D.; Plaintiff N.M., by and through their parent/guardian N.G.; Plaintiff E.H., by and through their parent/guardian J.H.; Plaintiff A.N., by and through their parent/guardian A.N.; Plaintiff G.S.,

by and through their parent/guardian K.S.; Plaintiff J.U., by and through their parent/guardian J.M.; Plaintiff K.I., by and through their parent/guardian L.L.; and Plaintiff M.I., by and through their parent/guardian L.L. (collectively, “Plaintiffs”), bring this class action complaint against defendants Instructure, Inc. and Instructure Holdings, Inc. (collectively, “Instructure” or “Defendants”), individually and on behalf of all others similarly situated, and make their allegations as follows.

**TABLE OF CONTENTS**

**NATURE OF THE ACTION ... 5**

**PARTIES... 21**

A. Plaintiffs ... 21

1. Plaintiff Kyllia Bless ... 21
2. Plaintiff Bless's Experience and Injuries ... 22
3. Plaintiff Madison Clark ... 23
4. Plaintiff Clark's Experience and Injuries ... 23
5. Plaintiff Theresa M. Coelho ... 24
6. Plaintiff Coelho's Experience and Injuries ... 25
7. Plaintiff Colby Walker Darnell ... 26
8. Plaintiff Darnell's Experience and Injuries ... 26
9. Plaintiff Azrael Gabriela Delagarza ... 27
10. Plaintiff Delagarza's Experience and Injuries ... 27
11. Plaintiff Olivia Gabrich ... 28
12. Plaintiff Gabrich's Experience and Injuries ... 28
13. Plaintiff Crystal Jessica Hall ... 29
14. Plaintiff Hall's Experience and Injuries ... 30
15. Plaintiff Ella Jacobs ... 31
16. Plaintiff Jacobs's Experience and Injuries ... 31
17. Plaintiff Natalie Large ... 32
18. Plaintiff Large's Experience and Injuries ... 32
19. Plaintiff Q Jane Miceli ... 34
20. Plaintiff Miceli's Experience and Injuries ... 34
21. Plaintiff Sam Mockert ... 35
22. Plaintiff Mockert's Experience and Injuries ... 35
23. Plaintiff Jeffrey Parker ... 36
24. Plaintiff Parker's Experience and Injuries ... 36
25. Plaintiff Dana Reyes ... 37
26. Plaintiff Reyes's Experience and Injuries ... 37
27. Plaintiff Julianne Theobald ... 38

28. Plaintiff Theobald's Experience and Injuries ........ 39
29. Plaintiff Brandi Nelson ........ 40
30. Plaintiff Nelson's Experience and Injuries ........ 40
31. Plaintiff Gerid Bowler ........ 41
32. Plaintiff Bowler's Experience and Injuries ........ 42
33. Plaintiff Carmen Brock ........ 43
34. Plaintiff Brock's Experience and Injuries ........ 43
35. Plaintiff A.D., by and through their parent/guardian S.D. ........ 44
36. Plaintiff A.D.'s Experience and Injuries ........ 45
37. Plaintiff E.D., by and through their parent/guardian S.D. ........ 45
38. Plaintiff E.D.'s Experience and Injuries ........ 46
39. Plaintiff P.E., by and through their parent/guardian A.D. ........ 47
40. Plaintiff P.E.'s Experience and Injuries ........ 47
41. Plaintiff N.M., by and through their parent/guardian N.G. ........ 47
42. Plaintiff N.M.'s Experience and Injuries ........ 48
43. Plaintiff E.H., by and through their parent/guardian J.H. ........ 49
44. Plaintiff E.H.'s Experience and Injuries ........ 49
45. Plaintiff A.N., by and through their parent/guardian A.N. ........ 50
46. Plaintiff A.N.'s Experience and Injuries ........ 51
47. Plaintiff G.S., by and through their parent/guardian K.S. ........ 51
48. Plaintiff G.S.'s Experience and Injuries ........ 51
49. Plaintiff J.U., by and through their parent/guardian J.M. ........ 52
50. Plaintiff J.U.'s Experience and Injuries ........ 53
51. Plaintiff K.I., by and through their guardian L.L. ........ 54
52. Plaintiff K.I.'s Experience and Injuries ........ 54
53. Plaintiff M.I., by and through their guardian L.L. ........ 54
54. Plaintiff M.I.'s Experience and Injuries ........ 55

B. Allegations Common to All Plaintiffs ........ 55

C. Defendants ........ 58

**JURISDICTION AND VENUE ........ 58**

**FACTUAL ALLEGATIONS ........ 59**

A. Instructure Promised to Protect Plaintiffs' and Class Members' Sensitive Information 59

B. Instructure is Obligated to Comply with FERPA, COPPA, and State Statutes Governing the Protection of Data and Educational Information, and Failed to Do So .......... 82

C. Instructure Failed to Comply with FTC Guidelines and Industry Standards ............... 85

D. Instructure Failed to Protect Plaintiffs' and Class Members' Personal and Private Data 89

E. The Data Breach Forced Canvas Offline During Final Exams, Further Harming Plaintiffs and the Class ........ 97

F. The Data Breach Could Have Been Prevented with Basic "Hardening" Measures that Instructure Implemented in the Aftermath of the Data Breach ........ 102

G. KKR & Co.'s Acquisition of Instructure Materially Contributed to the Data Breach 105

H. The Data Breach Caused Myriad Harms to Plaintiffs and the Class ........ 110

I. Plaintiffs and Class Members Face Significant Present and Continuing Risk ............ 111

J. The Stolen Data Is a Ready-Made Targeting Package for Those Who Prey on Students 112

K. Federal Law Enforcement and Schools Nationwide Have Warned That the Stolen Data Will Be Used to Target Students and Teachers ........ 113

L. Paying ShinyHunters Did Not, and Cannot, End the Risk ........ 114

M. The Stolen Data Exposes Children To Sextortion, Grooming, And Exploitation ....... 117

N. The Stolen Data Fuels Spear Phishing, Account Takeover, and the Assembly of Fuller Identity Profiles ........ 120

O. The Theft of Billions of Private Messages Inflicts a Permanent Loss of Privacy and Enables Targeted Extortion at Scale ........ 122

P. The Data Breach Has Diminished the Value of Plaintiffs' and Class Members' Sensitive Information ........ 124

Q. These Harms Require Years of Vigilance That Instructure Has Not Funded ............. 125

**CLASS ACTION ALLEGATIONS ........ 127**

**CAUSES OF ACTION ........ 132**

COUNT I Negligence ........ 132

COUNT II Negligence Per Se ........ 134

COUNT III Breach of Fiduciary Duty ........ 137

COUNT IV Breach of Implied Contract ........ 138

COUNT V Unjust Enrichment ........ 140

COUNT VI Violation of the Utah Consumer Sales Practices Act ..... 141
COUNT VII Violation of the California Unfair Competition Law ..... 144
COUNT VIII Violation of the California Consumer Legal Remedies Act ..... 147
COUNT IX Violation of the California Consumer Privacy Act of 2018 ..... 151
COUNT X Violation of the California Constitution's Right to Privacy ..... 154
COUNT XI Violation of the Michigan Consumer Protection Act ..... 156
COUNT XII Violation of the Minnesota Consumer Fraud Act ..... 160
COUNT XIII Violation of the Minnesota Uniform Deceptive Trade Practices Act ..... 163
COUNT XIV Violation of New York General Business Law § 349 ..... 166
**PRAYER FOR RELIEF ..... 169**
**JURY TRIAL DEMANDED ..... 169**

## NATURE OF THE ACTION

1. This class action arises out of a targeted cyberattack and data breach caused by Instructure's failure to secure and safeguard the names, email addresses, phone numbers, student identification numbers, course/enrollment details, and private Canvas messages (and their confidential contents including discussions of, for example, medical conditions and Individualized Education Programs ("IEPs")) (collectively, "Sensitive Information") of approximately 275 million individuals (the "Data Breach").

2. As a result of the Data Breach, Plaintiffs' and Class Members' Sensitive Information stored on Instructure's Canvas learning management system ("LMS") was accessed, exfiltrated, and exposed to third parties.[1]

3. Affected individuals include minor students, school and school district employees, and other Canvas users at educational institutions around the world.[2]

4. Instructure makes Canvas, the dominant learning management system in North America. It is used by roughly 41% of higher education institutions in North America and by millions of K-12 students.[3] Schools, students, and parents rely on Canvas to hold Sensitive Information including their names, email addresses, student ID numbers, enrollment records, and private messages between students and teachers.

---

[1] *Confirmed Security Incident*, INSTRUCTURE (May 2, 2026), https://status.instructure.com/.

[2] Ionut Arghire, *EdTech Firm Instructure Discloses Data Breach Amid Hacker Leak Threats*, SECURITY WEEK (May 4, 2026), https://www.securityweek.com/edtech-firm-instructure-discloses-data-breach/.

[3] Megan Divers, *Hackers breach Canvas learning platform, exposing data on millions of students and teachers*, ABC10 (May 7, 2026), https://www.abc10.com/article/news/nation-world/canvas-hack-shinyhunters-schools-students-teachers-data-exposed/507-0f3f5973-3d68-45af-b309-666561b2bd87.

5. This Data Breach comprises two separate, targeted attacks committed by notorious hacking group, ShinyHunters.

6. First, between approximately April 22 and April 30, 2026, cybercriminals affiliated with the extortion group ShinyHunters exfiltrated approximately 3.65 terabytes of data belonging to Plaintiffs and Class Members from Instructure's Canvas platform.

7. ShinyHunters claims the stolen data covers roughly 275 million students, teachers, and staff at more than 8,800 institutions worldwide.

8. The attack was carried out when the threat actors targeted and exploited Instructure's customer service team through malicious code embedded in a support ticket,[4] and gained entry to the Sensitive Information Instructure.

9. The second security incident occurred a week later, on May 7, 2026, during which ShinyHunters again targeted Instructure, and exploited a separate vulnerability in Instructure's systems, which enabled ShinyHunters to gain further unauthorized access to the Canvas Platform.[5]

10. Together, this extended, weeks-long, and multi-point access and exploitation amounted to the Data Breach.

11. The Data Breach was not the product of some novel or unstoppable attack. The attacker opened a free Canvas account and submitted a customer-support ticket containing malicious code.

12. When an Instructure customer-service agent opened the ticket, the code ran in the agent's browser, captured the agent's authorization token, and gave the attacker elevated access

---

[4] CROWDSTRIKE, INSTRUCTURE: INTERIM FACT SHEET 2 (May 13, 2026)

[5] *See id.*

inside the Canvas application.[6] From that single support agent's session, the attacker reached highly sensitive data belonging to thousands of learning institutions and hundreds of millions of individuals.

13. The Data Breach was the product of four elementary security failures, each a departure from baseline controls in the very standards Instructure told the public it met.

14. Instructure represents that it holds ISO 27001 certification and SOC 2 Type II attestations, and that "[r]egular audits and assessments are conducted to validate adherence to relevant frameworks, such as SOC 2 Type 2, ISO 27001, and NIST 800-53."[7]

15. In December 2025—three months after ShinyHunters first breached Instructure, and less than five months before the Data Breach—Instructure publicly touted the renewal of its ISO 27001 and SOC 2 Type II certifications covering Canvas.[8]

16. **Security Failure Number 1:** Instructure, could have implemented, but did not have mandatory multi-factor authentication ("MFA") on its systems. Before the Data Breach, MFA was merely an optional feature in Canvas, even for administrative accounts with the broadest privileges over student data.

---

[6] Instructure, https://www.instructure.com/incident-update/customers.

[7] *Instructure Trust Center: Compliance,* Instructure, https://www.instructure.com/trust-center/compliance (last visited Oct. 6, 2026).

[8] Instructure, https://www.instructure.com/press-release/instructure-strengthens-commitment-secure-trusted-learning-experience-renewal-iso (Dec. 9, 2025).

17. Requiring MFA on privileged accounts is among the most elementary precautions in modern information security. It is called for by NIST 800-53[9] and the SOC 2 Trust Services Criteria.

18. Instructure understood why this precaution was necessary: in a security overview *it* furnished to *its own* customers, Instructure described "[e]nabling multi-factor-authentication in front of all VPNs, bastions, and applications to prevent the reuse of any lost credentials."[10]

19. And in 2023, Instructure was one of the first education-technology companies to sign the Cybersecurity and Infrastructure Security Agency's ("CISA") K-12 Education Technology Secure by Design Pledge, committing to publish a roadmap explaining how it would "nudge all users, including students, towards MFA."[11]

20. Nearly three years later, Instructure still had not required MFA even for administrators. It announced that requirement only after the Data Breach.

21. **Security Failure Number 2:** Instructure could have, but did not implement adequate segmentation of its customer data or the principle of least privileged access. Rather,

---

[9] NIST, Special Publication 800-53 Rev. 5, Security and Privacy Controls for Information Systems and Organizations, 132-33 https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r5.pdf (Sept. 2020)

[10] *Instructure, Security Overview: Engineering, Security, and Operations 16 (June 2022),* Instructure, https://iser.mpc.edu/Standard-IIIC_Evidence_Folder/IIIC3-05_CanvasParticAgr.pdf.

[11] Press Release, *CISA Announces Secure by Design Pledge with K-12 Education Technology Providers*, CISA (Sept. 5, 2023), https://www.cisa.gov/news-events/news/cisa-announces-secure-design-pledge-k-12-education-technology-providers; CISA*, K-12 Education Technology Secure by Design Pledge*, https://cisa.gov/k-12-education-technology-secure-design-pledge; Anna Merod, *CISA Creates Voluntary Ed Tech Pledge to Boost K-12 Cybersecurity,* K-12 DIVE (Sept. 6, 2023), https://www.k12dive.com/news/CISA-ed-tech-pledge-k-12-cybersecurity/692830/.

before the Data Breach, Instructure allowed a single customer-support session to reach data of hundreds of millions of individuals across thousands of separate institutions.

22. Canvas runs on what Instructure calls a "single-instance, multi-tenant architecture,"[12] in which thousands of schools share a single application. In such a system, segregation and least-privilege controls are what keep one compromised account from becoming every customer's compromise.

23. Data segmentation means dividing data and systems into separate, isolated compartments, so that access to one does not give access to the others. In a multi-customer platform like Canvas, that should have meant each institution's data was walled off, and compromising one account or system could not expose every customer's data at once. Yet, Instructure has admitted that a single vulnerability and a compromised account enabled access across all 8,800 institutions.

24. Least privilege and restriction of privileged access are also core requirements of NIST SP 800-53, ISO/IEC 27001, and SOC 2. The principle of least privilege means each user, account, or system gets only the minimum access needed for its specific job, and nothing more. For example, a support agent helping one school with a support ticket would not be able to export that school's data, or access data from other schools unrelated to the task at hand.

---

[12] *Instructure Holdings, Inc., Annual Report (Form 10-K) (fiscal year ended Dec. 31, 2023)*, SEC, https://www.sec.gov/Archives/edgar/data/1841804/000095017024017904/inst-20231231.htm.

25. And, in September 2025, the FBI specifically directed organizations facing the Salesforce data-theft campaign publicly linked to ShinyHunters to "[e]nforce IP-based access restrictions," "monitor and detect API usage," and to "[a]pply the Principle of Least Privilege."[13]

26. A reasonable company holding the confidential records of millions of children, students, and teachers and acting according to basic industry standards would segment that data and limit each employee's access to what the job requires. That way, compromising one account would not expose every customer at once. Instructure did not. Only after the Data Breach, and too little too late, did Instructure restrict administrative access to trusted locations and locked down the internal paths its support tools used.

27. **Security Failure Number 3:** Instructure failed to implement basic real-time monitoring of data exfiltration that would have enabled it to detect and prevent the attacker's mass exfiltration here. Instead, the attackers here operated inside Canvas for days, and maintained the ability to exploit Instructure's security vulnerabilities for more than a week. Removing terabytes of data from a production system should trigger immediate alarms and a high level response at any company that monitors its outbound traffic. At Instructure it did not.

28. The Data Breach resulted in ShinyHunters being able to generate reports containing user data and transfer them to external infrastructure over a period of days, taking, by its own account, terabytes of data, including billions of private messages. Instructure did not detect the intrusion for approximately seven days, and the exfiltration continued through April 30, 2026, *after the date* on which Instructure says it first detected unauthorized activity. Continuous

[13] FBI, FLASH-20250912-001, *Cyber Criminal Groups UNC6040 and UNC6395 Compromising Salesforce Instances for Data Theft and Extortion*, IC3 (Sept. 12, 2025), https://www.ic3.gov/CSA/2025/250912.pdf.

monitoring for anomalous activity and data exfiltration is a baseline requirement of NIST SP 800-53, ISO/IEC 27001, and SOC 2, and it is exactly what Instructure promised when it touted that: "Instructure continually monitors system usage, performance, health, and security."[14] In 2025, Google and the FBI specifically urged organizations targeted by the ShinyHunters-linked Salesforce campaign to monitor for "large data downloads" and "indicators of data exfiltration."[15] Only after the Data Breach did Instructure announce that it would deploy "new logging and monitoring capabilities" and a web application firewall.

29. **Security Failure Number 4:** Instructure failed to implement any web application firewall to protect the data housed in its Canvas application. The Data Breach began with malicious code embedded in user-submitted content: the exact risk a web application firewall inspects, blocks, and protects against before such malicious content ever reaches the application or the employees who use it. Instructure, however, had no such protection in front of the relevant Canvas systems at the time of the Data Breach.

30. Instructure has effectively conceded each of these failures. Only in the weeks after the Data Breach, did it first announce a "comprehensive hardening program." The program required phishing-resistant MFA for administrative users, restricted administrative access, tightened API access controls, and deployed new logging, monitoring, and blocking tools, including CrowdStrike Falcon and a web application firewall. It also acknowledged redirecting engineering resources toward platform security.

---

[14] Instructure, https://web.archive.org/web/20260330162620/https://www.instructure.com/trust-center/security.

[15] *Google Threat Intelligence Group, The Cost of a Call: From Voice Phishing to Data Extortion*, Google Cloud (June 4, 2025), https://cloud.google.com/blog/topics/threat-intelligence/voice-phishing-data-extortion*; FBI FLASH-20250912-001, supra.*

31. Nothing prevented Instructure from adopting any of these measures before the Data Breach. It simply chose not to do so until hundreds of millions of individuals' (including students, minors, and educators) information had already been exploited by cybercriminals.

32. Instructure's failures are all the more serious because they contradict what it represented to schools, parents, and the public about its security. Instructure held itself out as a trusted custodian of student educational records, emphasizing its compliance with FERPA, COPPA, and state student-privacy laws. This was false.

33. In December 2025, just seven months before the Data Breach, Instructure publicly announced the renewal of its ISO 27001, SOC 2 Type II, and PCI DSS certifications across its product portfolio, including Canvas. Its Chief Information Security Officer declared that security is "a central pillar" of the trust Instructure builds with customers.[16]

34. These purported certifications and security-centric representations cannot be squared with the security failures including the absence of mandatory MFA on privileged accounts, data segmentation and principle of least privileges, real-time exfiltration monitoring, and application-layer filtering. Each of these is a baseline control under the very frameworks Instructure claimed to satisfy. Either Instructure's certifications did not reflect the controls operating on Canvas, or Instructure represented a level of security it did not provide. Either way, schools and families who entrusted information to Canvas in reliance on those assurances were misled and harmed.

---

[16] I*nstructure Strengthens Commitment to a Secure, Trusted Learning Experience with Renewal of ISO 27001, SOC 2 Type II, and PCI DSS 4.0.1 Certifications*, INSTRUCTURE (Dec. 9, 2025) https://www.instructure.com/press-release/instructure-strengthens-commitment-secure-trusted-learning-experience-renewal-iso.

35. Instructure was also on clear notice of this specific threat. In September 2025, the same hacking group, ShinyHunters, compromised Instructure's Salesforce environment, and Instructure publicly acknowledged that breach. That same month, the FBI issued a FLASH alert on intrusions tied to ShinyHunters-linked actors. The alert urged organizations to adopt many of the controls that Instructure was lacking including phishing-resistant MFA, IP-based access restrictions, least-privilege access, and monitoring for data exfiltration. And in late 2024, the breach of PowerSchool, another K–12 vendor and a fellow signatory of CISA's pledge, demonstrated across the education-technology industry how compromising a single support account with broad customer access could expose the data of tens of millions of students. Instructure did not heed any of these warnings.

36. Instructure's failures compounded after the initial intrusion and exfiltration that occurred in its own systems in late April. On May 6, 2026, Instructure declared that Canvas was "fully operational" and that it saw no ongoing unauthorized activity. But the very next day, the same attackers regained access through a second, unpatched vulnerability of the same type, defaced login pages at hundreds of institutions with a ransom demand, and forced Instructure to take Canvas offline nationwide.[17] The shutdown came in the middle of many students' final exams. It disrupted universities and K–12 districts across the country and confronted students, many of them minors, with the attackers' extortion message.

37. These failures are egregious. None required new or costly technology; each is a basic precaution that any reasonable company entrusted with the data of millions of children would

[17] A.J. Vicens, *Schools reach out to Canvas hackers as breach hits US classrooms, source says*, Reuters (May 8, 2026), https://www.reuters.com/legal/litigation/schools-reach-out-hackers-canvas-breach-hits-us-classrooms-source-says-2026-05-08/.

have taken. And Instructure had every warning a company could receive. ShinyHunters had already breached Instructure's own Salesforce environment in September 2025. The PowerSchool breach had shown the world that student data is a prime target. And the FBI and Google had publicly warned about the ShinyHunters-linked Salesforce campaign and prescribed the very controls—phishing-resistant MFA, IP-based access restrictions, least privilege, and monitoring for bulk data exports—that Instructure lacked.

38. But Instructure's failures continued even after it discovered the intrusion. After declaring the incident "contained" on May 2, 2026, Instructure left Canvas exposed to a second attack on May 7, 2026, forcing it to take the platform offline during final exams. Instructure then finally agreed to pay ShinyHunters a ransom in order to have the group purportedly delete the data. But attackers cannot be trusted and often, even after companies pay off extortionist hackers, the data is still released on the Dark Web or elsewhere. This is one of the reasons the FBI recommends not paying such extortion demands.

39. The people who bear the consequences are, in large part, children who had no choice but to use Canvas. And Instructure's failure to implement such elementary controls calls into serious question its representations that its security program had been independently audited and certified against the very standards that require them.

40. Plaintiffs and Class Members, including students, teachers, staff, and the parents of minor children, now face a present and continuing risk of phishing, impersonation, fraud, and identity theft. The stolen data links names and email addresses to student IDs, school affiliations, enrollment data, and private communications, which makes it especially valuable for targeted attacks. Minors whose data was stolen face that risk for the rest of their lives. Yet Instructure has

still not provided individual notice to all affected individuals, leaving them unable to take timely steps to protect themselves.

41. In the face of these highly publicized and well-known events, Instructure continues to market its Canvas product as a secure platform for K-12 schools, higher education institutions, and other organizations.[18]

42. Instructure's business revolves around, and depends upon, receiving and maintaining sensitive personal data from minor schoolchildren, their families, and school and school district personnel.

43. Indeed, as a result of a student's enrollment and participation at an educational institution or by a condition of employment with a school or school district, millions of individuals are required to input or have their personal data input into Canvas simply because the educational institution utilizes Canvas. Instructure profited from collecting, storing, and using this information but failed to implement and maintain reasonable and appropriate data security safeguards to protect it, despite its representations it would do so.

44. The treasure trove of data collected and maintained by Instructure includes: names, email addresses, student ID numbers, phone numbers, social media profile links, "descriptive information," and assessment records.[19]

[18] Instructure, https://www.instructure.com/canvas ("Create secure and managed teaching and learning spaces that adapt to different user groups and reflect your institution's branding, hierarchy, and roles.").

[19] *Institutions & Educators Privacy | FAQ*, Instructure, https://www.instructure.com/privacy-security/institutions-educators-faq#:~:text=System%20Data,technical%20and%20system%20analytics%20purposes.

45. Instructure also stores electronic communications—i.e., private messages about mental and physical health, financial information, personal issues, and academics.

46. Plaintiffs' and Class Members' Sensitive Information—which was entrusted to Instructure for safekeeping—was compromised and unlawfully accessed in the Data Breach.

47. Instructure owed a non-delegable duty to Plaintiffs and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their Sensitive Information.

*48.* Instructure recognizes this duty in multiple ways, such as a blog post entitled Our Foundation of Privacy, Instructure represented:

> **Privacy and the protection of personal and customer information are of paramount importance**. Cyberattacks and I.D. theft can alter lives. The privacy and usage of data is appropriately in discussion in nearly every industry. **Instructure takes its responsibility of protecting your data seriously. . . . Instructure protects personal information and continuously takes measures to keep it safe**.[20]

49. Despite its public representations, Instructure negligently and recklessly maintained and ultimately shared this information with a known cybercriminal, ShinyHunters, who conducts targeted attacks like the Data Breach with the specific intent of misusing the information it steals, such that it is likely ShinyHunters has already used and will continue to use the stolen Sensitive Information for nefarious and criminal purposes.

50. The Sensitive Information compromised in the Data Breach was of high value and included highly sensitive student data and communications, representing a gold mine for data thieves, and creating serious and ongoing risks of targeted phishing, impersonation, extortion, and

[20] Matt Kaminer, *Our Foundation of Privacy*, Instructure, https://www.instructure.com/resources/blog/our-foundation-privacy.

fraud that will remain for Plaintiffs' and Class Members' respective lifetimes. Some victims have already experienced these risks.

51. Armed with the Sensitive Information accessed in the Data Breach, data thieves can and do commit (and in some cases have already committed) a variety of crimes, including: using names, school affiliations, and the contents of personal communications to craft highly convincing phishing emails and text messages ("smishing") that impersonate schools, teachers, and school IT staff; taking over Class Members' school, email, and other online accounts; targeting minors, who are particularly susceptible to grooming, sextortion, and other manipulation that is difficult to detect and prevent; extorting Class Members by threatening to expose their private messages; harassing and doxxing Class Members using their names and direct contact information; and exposing the contents of private communications that Class Members shared in confidence. Even the FBI has warned that data stolen from Canvas could be used to "craft highly sophisticated spearphishing campaigns using real-world context to deceive students and faculty" and to "impersonate school faculty, IT support, financial aid offices or others in future attacks."[21]

52. As a result of the Data Breach, in addition to actual harm, including the loss of privacy in their personal communications and damages resulting from Canvas being taken offline, Plaintiffs and Class Members face a clear and present risk of imminent and certainly impending harm, including, but not limited to, a loss of their valuable data, time and opportunity costs, and mitigation expenses over the misuse of their Sensitive Information.

[21] *Public Service Announcement, ShinyHunters: Cyber Criminal Group Attacks Learning Management System*, FBI, https://www.ic3.gov/PSA/2026/PSA260515 (May 15, 2026).

53. Even those Class Members who have yet to experience misuse of their Sensitive Information have had to spend valuable time responding to the Data Breach and have an immediate and heightened risk of targeted phishing, impersonation, account takeover, extortion, and other fraud as a direct and proximate result of the Data Breach.

54. Plaintiffs and Class Members have incurred, and will continue to incur, damages in the form of, among other things, fraud and attempted fraud, phishing and impersonation attempts, lost time and expenses mitigating harms, increased risk of harm, diminished value of their Sensitive Information, loss of privacy, loss of benefit of the bargain, nominal damages, and/or additional damages as described below.

55. Plaintiffs and Class Members include children and young adults whose schools have adopted Canvas as the mandatory, and frequently exclusive, means of receiving assignments, submitting work, taking tests, and communicating with their teachers.

56. These children had no choice but to have their Sensitive Information stored by Canvas. But they did not select Canvas, and did not negotiate its terms.

57. Defendants knew that a substantial portion of their users were minors who could not meaningfully consent to their data practices, could not evaluate their security, and could not avoid their platform. Defendants therefore owed these users a heightened duty of care, and their failure to safeguard their information is all the more egregious.

58. The compromise of children's data is especially serious. Children cannot change their names, their schools, or their teachers, and they are far less equipped than adults to recognize when someone who seems to know them is a stranger using stolen information. For children, the most dangerous misuse of the data stolen here is not a fraudulent credit card. It is the exploitation

of their trust by people who now know who they are, where they go to school, who their friends and teachers are, and how to reach them directly.

59. Children are also uniquely susceptible to phishing, impersonation, and manipulation. This can occur through messages that appear to come from a trusted school platform or teacher, the commission of which is facilitated by the personal communications compromised in the Data Breach.

60. Children are also vulnerable to phishing and manipulation attempts from people who use information that a child would assume only a trusted person would have, or who have information that causes the child to fear the person could harm the child or their family. Information such as the name of a child's teacher, the name of their school, the child's grade, etc. can all be used to create the impression that the sender knows the child or is in a position of power.

61. Moreover, children are not experienced users of email, and children's email addresses are not widely published in the way that some adults' email addresses are. Children are unused to receiving spam or obvious solicitation emails, so even emails that an adult would recognize as suspicious, such as offers of free candy or toys may be very appealing to a child and cause the child to respond by providing additional personal information or engaging with the sender. Online predators also use purported online games, such as quizzes about a child's pets' names, to gain access to personal information they can use for further manipulation.[22]

62. One particular vulnerability faced by minors are online sextortion schemes, where scammers "gain [kids'] trust, then manipulate them into sharing personal details or sending money.

---

[22] *Beware of Common Scams Targeting Kids and Teens Online*, KEYBANK, https://www.key.com/about/security/scams-targeting-kids.html (last visited Oct. 7, 2026).

Some even convince kids to send explicit images of themselves, and then threaten to share them publicly if payment demands are not met — a scheme known as "sextortion."[23]

63. The U.S. Department of Homeland Security's Know2Protect campaign warns that online predators "work to earn [a child's] trust."[24] A predator who can name a child's school, teacher, and classmates, and who knows what the child has privately confided, no longer has to work to earn that trust; the Data Breach handed it to him.

64. And the information at issue here goes beyond names and identifiers: the threat actor threatened to release billions of private messages among students and teachers, communications that, for minors, may reveal academic struggles, disciplinary matters, sensitive health or family records, IEPs, and other confidential details that children shared in confidence with the adults responsible for their education. Children and their parents will bear the burden of guarding against the misuse of this information for years to come.

65. Companies, like Instructure, entrusted with this type of Sensitive Information are required by state and federal law to take steps to protect it. Instructure knows this, which is why it represents through its privacy policies, practices, and postings on its website that it actively took steps to protect the user data in its care.

66. For example, Instructure's website confirmed that "[w]e protect the information we receive **by ensuring it's used only to support students, institutions, and education**."[25]

---

[23] *Id.*

[24] *Know the Threats*, U.S. DEP'T OF HOMELAND SEC., https://www.dhs.gov/know2protect/know-the-threats (last updated July 14, 2026).

[25] *Privacy*, INSTRUCTURE, https://www.instructure.com/privacy-security (last visited Oct. 7, 2026) (emphasis added).

Instructure further represented that "**[w]e believe that privacy is a fundamental human right** and take our responsibility very seriously. We are committed to protecting your privacy and have a dedicated privacy and security program. **Our customers (educational institutions and companies) entrust us as data stewards for their users' information**."[26]

67. The Data Breach was the direct result of Instructure's failure to adequately maintain network security and the security of the platform and software used by its customers, rendering its data systems easy prey for cybercriminals.

68. Plaintiffs bring this action to hold Instructure accountable for its failure to implement basic, widely recognized security measures, asserting claims for: (i) negligence, negligence *per se*; (ii) breach of implied contract; (iii) unjust enrichment; (iv) breach of fiduciary duty; and (v) violation of state consumer protection laws. Through this action, Plaintiffs seek damages in an amount to be proven at trial and/or nominal damages, as well as injunctive and other equitable relief, including improvements to Instructure's data security systems, policies, and practices, future annual audits, and adequate credit monitoring services funded by Instructure.

## PARTIES

### A. Plaintiffs

#### 1. *Plaintiff Kyllia Bless*

69. Plaintiff Kyllia Bless is a citizen and resident of Cedar City, Utah.

[26] *Welcome to the Instructure Privacy Notice Center*, INSTRUCTURE, https://www.instructure.com/privacy-center (last visited Oct. 7, 2026) (emphasis added).

70. At all relevant times, Plaintiff Bless was a student at Southern Utah University, where she was required to use Canvas. To use Canvas, Plaintiff was required to provide her Sensitive Information to Instructure.

**2. *Plaintiff Bless's Experience and Injuries***

71. In connection with using Canvas, Plaintiff Bless entrusted Defendants to keep secure her Sensitive Information including, but not limited to, her name, preferred name, username, email address, phone number, date of birth, address, student ID number, course names, enrollment information, academic discipline or other academic issues, video or voice recording, photographs, medical information, and financial information.

72. Plaintiff Bless also sent and received messages in Canvas, which contained sensitive information relating to, for example, disability accommodations, and other matters which Plaintiff reasonably believed would be kept private.

73. Plaintiff Bless received an email dated May 8, 2026, from Southern Utah University stating that Canvas was experiencing a nationwide outage due to an apparent security incident and that Canvas was inaccessible.

74. Plaintiff suffered harm as a result of the outage, including, for example, inability to submit assignments to her summer session internship module.

75. As a result of the Data Breach, Plaintiff Bless has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. Her efforts include, for example, reviewing credit card and financial account statements, obtaining replacement cards, activating spam blocker on her phone, activating payment tracker apps, and dealing with an increase in spam calls referring to her by her preferred name, which is on Canvas.

76. Plaintiff Bless has spent approximately five hours addressing the effects of the Data Breach thus far.

77. As a result of the Data Breach, Plaintiff Bless has experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing her Sensitive Information, particularly her financial and disability accommodation information. Plaintiff understandably fears that criminals will use her Sensitive Information to commit identity theft. This risk will follow Plaintiff for her lifetime. Plaintiff Bless is also concerned about her minor younger sister who also uses Canvas at her school, and unsure of any further mitigation steps she should take or advise her parents to take on her sister's behalf.

**3. *Plaintiff Madison Clark***

78. Plaintiff Madison Clark is a citizen and resident of Virginia Beach, Virginia.

79. At all relevant times, Plaintiff Clark was a student at Old Dominion University in Norfolk, Virginia, where he was required to use Canvas. To use Canvas, Plaintiff was required to provide his Sensitive Information to Instructure.

**4. *Plaintiff Clark's Experience and Injuries***

80. In connection with using Canvas, Plaintiff Clark entrusted Defendants to keep secure his Sensitive Information including, but not limited to, his name, email address, course names, grades, GPA, academic course schedule, and academic discipline or other academic issues.

81. Plaintiff Clark also sent and received messages in Canvas, which contained sensitive information relating to for example: academic records and other matters which Plaintiff reasonably believed would be kept private.

82. Plaintiff Clark received emails dated May 9, 2026, from Old Dominion University stating that Canvas was experiencing a nationwide outage due to an apparent security incident and that Canvas was inaccessible. Canvas remained inaccessible for at least a few hours.

83. Plaintiff suffered harm as a result of the outage, including, for example, losing ability to access course materials during finals period.

84. As a result of the Data Breach, Plaintiff Clark has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach.

85. Plaintiff Clark has spent approximately four to five hours addressing the effects of the Data Breach thus far. His efforts include researching the data breach online and checking his credit report.

86. As a result of the Data Breach, Plaintiff Clark has experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing his Sensitive Information. Plaintiff understandably fears that criminals will use his Sensitive Information to commit identity theft. This risk will follow Plaintiff for his lifetime.

**5. *Plaintiff Theresa M. Coelho***

87. Plaintiff Theresa M. Coelho is a citizen and resident of Framingham, Massachusetts.

88. Plaintiff Coelho was a student at Massasoit Community College in Brockton, Massachusetts, from 2017 to 2019, and Bridgewater State University in Bridgewater, Massachusetts, from 2020 to 2021, where she was required to use Canvas. To use Canvas, Plaintiff was required to provide her Sensitive Information to Instructure.

**6. *Plaintiff Coelho's Experience and Injuries***

89. In connection with using Canvas, Plaintiff Coelho entrusted Defendants to keep secure her Sensitive Information including, but not limited to, her name, email address, phone number, date of birth, mailing address, student ID number, course names, grades, GPA, academic course schedule, photographs, and medical information.

90. Plaintiff Coelho also sent and received messages in Canvas, which contained sensitive information relating to, for example, absences relating to medical appointments, and disability-related information for accommodations and other matters which Plaintiff reasonably believed would be kept private.

91. As a result of the Data Breach, Plaintiff Coelho has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach.

92. Her efforts include, for example, dealing with an increase in spam calls, text messages, and emails, monitoring and investigating fraudulent activity, and submitting a police report to the Framingham Police Department. She receives about a hundred spam text messages and 50 scam phone calls a week.

93. In August 2026, Plaintiff Coelho received a notification that her Rockland Trust bank account had been logged into from Georgia, Alabama, and Florida. Plaintiff Coelho did not authorize those log-ins. This happened again the following week.

94. Plaintiff Coelho also incurred nearly ten unauthorized charges in her Rockland Trust bank account.

95. Plaintiff Coelho has spent approximately five to ten hours per week addressing the effects of the Data Breach thus far.

96. As a result of the Data Breach, Plaintiff Coelho has experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing her Sensitive Information. Plaintiff also has experienced acute distress, depression, anxiety, thoughts of self-harm, difficulty sleeping (including entire sleepless nights), and difficulty focusing as a result of the Data Breach. Plaintiff understandably fears that criminals will use her Sensitive Information to commit identity theft. This risk will follow Plaintiff for her lifetime.

**7. *Plaintiff Colby Walker Darnell***

97. Plaintiff Colby Walker Darnell is a citizen and resident of Norman, Oklahoma.

98. At all relevant times, Plaintiff Darnell was a student at the University of Oklahoma, where he was required to use Canvas. To use Canvas, Plaintiff was required to provide his Sensitive Information to Instructure.

**8. *Plaintiff Darnell's Experience and Injuries***

99. In connection with using Canvas, Plaintiff Darnell entrusted Defendants to keep secure his Sensitive Information including, but not limited to, his name, email, course names, grades, GPA, videos or voice recordings, and photographs.

100. Plaintiff Darnell also sent and received messages in Canvas, which contained sensitive information relating to, for example, announcements from professors, communications with classmates, and other matters which Plaintiff reasonably believed would be kept private.

101. Plaintiff Darnell received an email dated May 7, 2026, from the University of Oklahoma stating that Canvas was experiencing a nationwide outage due to an apparent security incident and that Canvas was inaccessible. Canvas remained inaccessible for several days.

102. Plaintiff suffered harm as a result of the outage, including, for example, inability to view grades or access course materials, loss of time to study, and emotional distress caused by this lost time.

103. As a result of the Data Breach, Plaintiff Darnell has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. His efforts include, for example, reviewing his accounts and credit score.

104. Plaintiff Darnell has spent approximately two to five hours addressing the effects of the Data Breach thus far.

**9. *Plaintiff Azrael Gabriela Delagarza***

105. Plaintiff Azrael Gabriela Delagarza is a citizen and resident of San Antonio, Texas.

106. At all relevant times, Plaintiff Delagarza was a student at G.W. Brackenridge High School, where she was required to use Canvas. To use Canvas, Plaintiff was required to provide her Sensitive Information to Instructure.

**10. *Plaintiff Delagarza's Experience and Injuries***

107. In connection with using Canvas, Plaintiff Delagarza entrusted Defendants to keep secure her Sensitive Information including, but not limited to, her name, email address, course names, enrollment information, grades, GPA, academic course schedule, and photographs.

108. Plaintiff Delagarza received an email dated approximately the day after the Data Breach from G.W. Brackenridge High School stating that Canvas was experiencing a nationwide outage due to an apparent security incident and that Canvas was inaccessible.

109. Plaintiff suffered harm as a result of the outage, including, for example, inability to log in to submit assignments, and inability to submit her final exams. Plaintiff Delagarza was anxious about failing her courses.

110. As a result of the Data Breach, Plaintiff Delagarza has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. Her efforts include, for example, contacting her teachers to identify how to submit assignments and exams and how to adjust her daily schooling from the break in access to her Canvas account.

111. Plaintiff Delagarza has spent approximately several hours addressing the effects of the Data Breach thus far.

112. As a result of the Data Breach, Plaintiff Delagarza has experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing her Sensitive Information. Plaintiff Delagarza understandably fears that criminals will use her Sensitive Information to commit identity theft. This risk will follow Plaintiff for her lifetime.

**11. *Plaintiff Olivia Gabrich***

113. Plaintiff Olivia Gabrich is a citizen and resident of Winona Lake, Indiana.

114. At all relevant times, Plaintiff Gabrich was a student at Ball State University, where she was required to use Canvas. To use Canvas, Plaintiff was required to provide her Sensitive Information to Instructure.

**12. *Plaintiff Gabrich's Experience and Injuries***

115. In connection with using Canvas, Plaintiff Gabrich entrusted Defendants to keep secure her Sensitive Information including, but not limited to, her name, username, email address,

phone number, date of birth, home address, student ID number, course names, enrollment information, grades, GPA, academic and course schedules, video or voice recordings, and photographs.

116. Plaintiff Gabrich received an email dated May 8, 2026, from Ball State University stating that Canvas was experiencing a nationwide outage due to an apparent security incident and that Canvas was inaccessible.

117. Plaintiff suffered harm as a result of the outage, including, for example, having to turn in assignments late because Canvas was not operational.

118. As a result of the Data Breach, Plaintiff Gabrich has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. Her efforts include, for example, researching the Data Breach and reviewing credit card and financial account statements.

119. Plaintiff Gabrich has spent approximately 15 hours addressing the effects of the Data Breach thus far.

120. As a result of the Data Breach, Plaintiff Gabrich has experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing her Sensitive Information. Plaintiff understandably fears that criminals will use her Sensitive Information to commit identity theft. This risk will follow Plaintiff for her lifetime.

**13. *Plaintiff Crystal Jessica Hall***

121. Plaintiff Crystal Jessica Hall is a citizen and resident of Nashville, Tennessee.

122. At all relevant times, Plaintiff Hall was a student at the University of Tennessee - Knoxville, where she was required to use Canvas. To use Canvas, Plaintiff was required to provide her Sensitive Information to Instructure.

**14. *Plaintiff Hall's Experience and Injuries***

123. In connection with using Canvas, Plaintiff Hall entrusted Defendants to keep secure her Sensitive Information including, but not limited to, her name, username, email address, date of birth, phone number, address, student ID number, course names, enrollment information, grades, GPA, academic and course schedules, academic discipline or other matters, Social Security number, and financial information.

124. Plaintiff Hall received an email dated May 7, 2026, from the University of Tennessee - Knoxville stating that Canvas was experiencing a nationwide outage due to an apparent security incident and that Canvas was inaccessible.

125. As a result of the Data Breach, Plaintiff Hall has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. Her efforts include, for example, reviewing her Canvas account, reviewing credit card and financial account statements, and dealing with an increase in spam calls.

126. Plaintiff Hall has spent approximately 20 hours addressing the effects of the Data Breach thus far.

127. As a result of the Data Breach, Plaintiff Hall has experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing her Sensitive Information. Plaintiff understandably fears that criminals will use her

Sensitive Information to commit identity theft and cause her financial harm. This risk will follow Plaintiff for her lifetime.

**15. *Plaintiff Ella Jacobs***

128. Plaintiff Ella Jacobs is a citizen and resident of Los Angeles, California.

129. At all relevant times, Plaintiff Jacobs was a student at Pierce College, where she was required to use Canvas. To use Canvas, Plaintiff was required to provide her Sensitive Information to Instructure.

**16. *Plaintiff Jacobs's Experience and Injuries***

130. In connection with using Canvas, Plaintiff Jacobs entrusted Defendants to keep secure her Sensitive Information including, but not limited to, her name, username, email, student ID number, course names, enrollment information, grades, GPA, academic and course schedules, academic discipline or other academic issues, video or voice recordings, medical information, Social Security number, and financial information.

131. Plaintiff Jacobs also sent and received messages in Canvas, which contained sensitive information relating to, for example, academic matters, communications with her professors and classmates, and other matters which Plaintiff reasonably believed would be kept private.

132. Plaintiff Jacobs heard about the nationwide Canvas outage from a family friend on or around May 9, 2026.

133. Plaintiff suffered harm as a result of the outage, including, for example, inability to access and complete assignments during the outage.

134. As a result of the Data Breach, Plaintiff Jacobs has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. Her efforts include, for example, reviewing her Canvas accounts, reviewing her emails, and dealing with an increase in spam calls relating to fraudulent job offers.

135. Plaintiff Jacobs has spent approximately two hours addressing the effects of the Data Breach thus far.

136. As a result of the Data Breach, Plaintiff Jacobs has experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing her Sensitive Information. Plaintiff understandably fears that criminals will use her Sensitive Information to commit identity theft. This risk will follow Plaintiff for her lifetime.

**17. *Plaintiff Natalie Large***

137. Plaintiff Natalie Large is a citizen and resident of Chula Vista, California.

138. At all relevant times, Plaintiff Large was a student at Embry-Riddle Aeronautical University Worldwide, where she was required to use Canvas. To use Canvas, Plaintiff was required to provide her Sensitive Information to Instructure.

**18. *Plaintiff Large's Experience and Injuries***

139. In connection with using Canvas, Plaintiff Large entrusted Defendants to keep secure her Sensitive Information including, but not limited to, her name, username, email address, phone number, date of birth, address, student ID number, course names, enrollment information, grades, GPA, academic and course schedules, academic discipline or other academic issues, video or voice recordings, photographs, medical information, and Social Security number.

140. Plaintiff Large also sent and received messages in Canvas, which contained sensitive information relating to, for example, her diagnosis and treatment information as requested by her university, her child's health condition, pregnancy status, documentation of pregnancy, and other matters which Plaintiff reasonably believed would be kept private.

141. Plaintiff Large received an email dated May 8, 2026, from Embry-Riddle Aeronautical University Worldwide stating that Canvas was experiencing a nationwide outage due to an apparent security incident and that Canvas was inaccessible.

142. Plaintiff suffered harm as a result of the outage, including, for example, inability to complete her final exams during finals week, inability to access prior assignments which were never recovered, and having to re-do these assignments.

143. Plaintiff received a message from a purported Canvas account to her personal email saying that her credit card information was compromised and that she needed to click a link to review account settings and to call the provided number if the link does not work.

144. Plaintiff received a credit alert from Navy Federal Credit Union stating that her first and last name were used.

145. Around May, Plaintiff received a call from an individual purporting to be from a bank called Canvas Inc. This individual requested money for a purported insurance policy.

146. Plaintiff received a text message from an unknown number requesting money. This individual threatened to text her emergency contact that she was failing her classes if she did not pay the requested amount.

147. As a result of the Data Breach, Plaintiff Large has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. Her efforts

include, for example, reviewing credit monitoring, monitoring unauthorized activity, filing reports with credit bureaus, checking text messages, emails, accidentally answering spam calls, deleting voicemails from spam calls, and blocking numbers.

148. Plaintiff Large has spent approximately two-and-a-half hours addressing the effects of the Data Breach thus far.

149. As a result of the Data Breach, Plaintiff Large has experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing her Sensitive Information. Plaintiff understandably fears that criminals will use her Sensitive Information to commit identity theft. This risk will follow Plaintiff for her lifetime.

**19. *Plaintiff Q Jane Miceli***

150. Plaintiff Q Jane Miceli is a citizen and resident of Arlington, Virginia.

151. At all relevant times, Plaintiff Miceli was a student at George Mason University, where she was required to use Canvas. To use Canvas, Plaintiff was required to provide her Sensitive Information to Instructure.

**20. *Plaintiff Miceli's Experience and Injuries***

152. In connection with using Canvas, Plaintiff Miceli entrusted Defendants to keep secure her Sensitive Information.

153. Plaintiff Miceli received an email dated May 7, 2026, from George Mason University stating that Canvas was experiencing a nationwide outage due to an apparent security incident and that Canvas was inaccessible.

154. As a result of the Data Breach, Plaintiff Miceli has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. Her efforts

include, for example, researching the Data Breach, reviewing credit card and financial account statements, and investigating and mitigating fraudulent activity.

155. On July 4, 2026, Plaintiff Miceli incurred fraudulent charges on her USAA account.

156. Plaintiff Miceli has spent approximately an hour addressing the effects of the Data Breach thus far.

**21. *Plaintiff Sam Mockert***

157. Plaintiff Sam Mockert is a citizen and resident of Minneapolis, Minnesota.

158. At all relevant times, Plaintiff Mockert was a student at the University of Minnesota, where he was required to use Canvas. To use Canvas, Plaintiff was required to provide his Sensitive Information to Instructure.

**22. *Plaintiff Mockert's Experience and Injuries***

159. In connection with using Canvas, Plaintiff Mockert entrusted Defendants to keep secure his Sensitive Information including, but not limited to his name, username, email address, course and enrollment information, grades, GPA, academic and course schedule, video or voice recordings, and photographs.

160. Plaintiff Mockert received a banner notification in Canvas from the University of Minnesota stating that Canvas was experiencing a nationwide outage due to an apparent security incident and that Canvas was inaccessible. Canvas remained inaccessible for a few days.

161. Plaintiff suffered harm as a result of the outage, including, for example, inconvenience and delay during the week of final exams.

162. Plaintiff Mockert has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. His efforts include, for example, regularly reviewing credit card and financial account statements.

163. As a result of the Data Breach, Plaintiff Mockert has experienced stress and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing his Sensitive Information. Plaintiff understandably fears that criminals will use his Sensitive Information to commit identity theft. This risk will follow Plaintiff for his lifetime.

**23. *Plaintiff Jeffrey Parker***

164. Plaintiff Jeffrey Parker is a citizen and resident of Philadelphia, Pennsylvania.

165. At all relevant times, Plaintiff Parker was a student at Montgomery County Community College in Blue Bell, Pennsylvania, where he was required to use Canvas. To use Canvas, Plaintiff was required to provide his Sensitive Information to Instructure.

**24. *Plaintiff Parker's Experience and Injuries***

166. In connection with using Canvas, Plaintiff Parker entrusted Defendants to keep secure his Sensitive Information including, but not limited to, his name, username, date of birth, address, course names, enrollment information, and academic and course schedule.

167. Plaintiff Parker also sent and received messages in Canvas, which contained sensitive information, including conversations with other students and teachers about course assignments. He reasonably believed that sensitive information such as his personal messages would be kept private when stored on Canvas.

168. On or around May 2026, Montgomery County Community College posted a notice to the Canvas student portal stating that Canvas features were inaccessible.

169. As a result of the Data Breach, Plaintiff Parker has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. He has spent approximately 4-5 hours responding to the breach. His efforts include signing up for credit protection services and periodically reviewing his credit report.

170. As a result of the Data Breach, Plaintiff Parker has experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing his Sensitive Information. Plaintiff understandably fears that criminals will use his Sensitive Information to commit identity theft. This risk will follow Plaintiff for his lifetime.

**25. *Plaintiff Dana Reyes***

171. Plaintiff Dana Reyes is a citizen and resident of Pace, Florida.

172. At all relevant times, Plaintiff Reyes was a student at the University of West Florida, where she was required to use Canvas. To use Canvas, Plaintiff was required to provide her Sensitive Information to Instructure.

**26. *Plaintiff Reyes's Experience and Injuries***

173. In connection with using Canvas, Plaintiff Reyes entrusted Defendants to keep secure her Sensitive Information including, but not limited to, her name, username, email address, phone number, date of birth, student ID number, course names, enrollment information, grades, GPA, class schedule, personal messages, and medical information.

174. Plaintiff Reyes also sent and received messages in Canvas, which contained sensitive information relating to, for example, medical information such as doctors' notes with descriptions of medical conditions, medical records, an obituary of a relative, and other matters which Plaintiff reasonably believed would be kept private.

175. Plaintiff Reyes never received notification that Canvas was experiencing a nationwide outage due to an apparent security incident and that Canvas was inaccessible. However, the University of West Florida notified Plaintiff Reyes that Canvas was once again operational on May 8, 2026.

176. Plaintiff suffered harm as a result of the outage, including, for example, losing the ability to access coursework, tests, or grades during the week of final exams.

177. As a result of the Data Breach, Plaintiff Reyes has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. Her efforts include, for example, dealing with an increase in spam calls, text messages, and emails.

178. Plaintiff Reyes has spent approximately 12 hours addressing the effects of the Data Breach thus far.

179. As a result of the Data Breach, Plaintiff Reyes has experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing her Sensitive Information, that her student email address could be publicly accessible and misused by scammers, and the possibility that her medical information is not in her control. Plaintiff understandably fears that criminals will use her Sensitive Information to commit identity theft. This risk will follow Plaintiff for her lifetime.

**27. *Plaintiff Julianne Theobald***

180. Plaintiff Julianne Theobald is a citizen and resident of Portland, Oregon.

181. At all relevant times, Plaintiff Theobald was a student at Portland State University, where she was required to use Canvas. To use Canvas, Plaintiff was required to provide her Sensitive Information to Instructure.

**28. *Plaintiff Theobald's Experience and Injuries***

182. In connection with using Canvas, Plaintiff Theobald entrusted Defendants to keep secure her Sensitive Information including, but not limited to, her name, username, email address, phone number, date of birth, home address, student ID number, course names, enrollment information, grades, GPA, assignments, academic and course schedules, academic discipline or other academic matters, medical information, Social Security number, financial information, communications with classmates, coursework, and FERPA info to faculty members.

183. Plaintiff Theobald also sent and received messages in Canvas, which contained sensitive information relating to, for example, academic discipline, requested disability accommodations due to the lack of closed captioning in some videos, which Plaintiff required to access course materials, and other matters which Plaintiff reasonably believed would be kept private.

184. Plaintiff Theobald received an email dated May 7, 2026, from Portland State University stating that Canvas was experiencing a nationwide outage due to an apparent security incident and that Canvas was inaccessible. Canvas remained inaccessible for several days.

185. Plaintiff suffered harm as a result of the outage, including, for example, inability to access grades and coursework for several days.

186. As a result of the Data Breach, Plaintiff Theobald has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. Her efforts include, for example, researching privacy policies, obtaining technical support due to increased spam, inquiring about the potential negative effects and harms arising from the Data

Breach, changing passwords, filing a public records request for documents from Portland State University, and researching and collecting proof of her Personally Identifiable Information.

187. Plaintiff Theobald has spent approximately 38 hours addressing the effects of the Data Breach thus far.

188. Plaintiff Theobald has also spent $349.99 purchasing a LifeLock security subscription due to the Data Breach.

189. As a result of the Data Breach, Plaintiff Theobald has experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing her Sensitive Information. Plaintiff Theobald is especially concerned about the potential exfiltration of her financial aid information, payment information, sensitive medical information, and FERPA-mandated information. Plaintiff understandably fears that criminals will use her Sensitive Information to commit identity theft. This risk will follow Plaintiff for her lifetime.

**29. *Plaintiff Brandi Nelson***

190. Plaintiff Brandi Nelson is a citizen and resident of Williamson County, Tennessee.

191. At all relevant times, Plaintiff Nelson was a student at the University of Kentucky, where she was required to use Canvas. To use Canvas, Plaintiff was required to provide her Sensitive Information to Instructure.

**30. *Plaintiff Nelson's Experience and Injuries***

192. In connection with using Canvas, Plaintiff Nelson entrusted Defendants to keep secure her Sensitive Information including, but not limited to, her name, username, email address,

phone number, student ID number, course names, enrollment information, grades, GPA, academic and course schedules, video or voice recording, and photographs.

193. Plaintiff Nelson also sent and received messages in Canvas, which contained sensitive information relating to, for example, coursework, and other matters which Plaintiff reasonably believed would be kept private.

194. Plaintiff Nelson received a letter dated May 7, 2026, from the University of Kentucky stating that Canvas was experiencing a nationwide outage due to an apparent security incident and that Canvas was inaccessible.

195. As a result of the Data Breach, Plaintiff Nelson has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. Her efforts include, for example, researching the Data Breach, reviewing credit card and financial account statements, and dealing with an increase in spam calls, text messages, and emails.

196. Plaintiff Nelson has spent approximately four hours addressing the effects of the Data Breach thus far.

197. As a result of the Data Breach, Plaintiff Nelson has experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing her Sensitive Information. Plaintiff understandably fears that criminals will use her Sensitive Information to commit identity theft. This risk will follow Plaintiff for her lifetime.

**31. *Plaintiff Gerid Bowler***

198. Plaintiff Gerid Bowler is a citizen and resident of Tecumseh, Michigan.

199. At all relevant times, Plaintiff Bowler was a student at Siena Heights University where he was required to use Canvas. To use Canvas, Plaintiff was required to provide his Sensitive Information to Instructure.

**32. *Plaintiff Bowler's Experience and Injuries***

200. In connection with using Canvas, Plaintiff Bowler entrusted Defendants to keep secure his Sensitive Information including, but not limited to, his name, username, email address, phone number, date of birth, home address, student ID number, course names, enrollment information, grades, GPA, academic and course schedule, video or voice recordings, and photographs.

201. Plaintiff Bowler received an email on or around May 7, 2026, from Siena Heights University stating that Canvas was experiencing a nationwide outage due to an apparent security incident and that Canvas was inaccessible.

202. Plaintiff suffered harm as a result of the outage, including, for example, delays in assignment deadlines and exams, and inability to access Canvas for one or two days.

203. As a result of the Data Breach, Plaintiff Bowler has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. His efforts include, for example, researching the Data Breach, placing a credit freeze through credit bureaus, monitoring their credit information, and signing up for identity or other monitoring services.

204. Plaintiff Bowler has spent approximately five hours addressing the effects of the Data Breach thus far.

205. As a result of the Data Breach, Plaintiff Bowler has experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and

misusing his Sensitive Information. Plaintiff understandably fears that criminals will use his Sensitive Information to commit identity theft. This risk will follow Plaintiff for his lifetime.

**33. *Plaintiff Carmen Brock***

206. Plaintiff Carmen Brock is a citizen and resident of Cincinnati, Ohio.

207. At all relevant times, Plaintiff Brock was a student at University of Arizona Global Campus where she was required to use Canvas. To use Canvas, Plaintiff was required to provide her Sensitive Information to Instructure.

**34. *Plaintiff Brock's Experience and Injuries***

208. In connection with using Canvas, Plaintiff Brock entrusted Defendants to keep secure her Sensitive Information including, but not limited to, her name, username, email address, phone number, student ID number, course names, enrollment information, grades, GPA, academic and course schedule, video or voice recordings, photographs, and medical information.

209. Plaintiff Brock also sent and received messages in Canvas, which contained sensitive information relating to for example, medical diagnosis and treatment information, pregnancy status, and other matters which Plaintiff reasonably believed would be kept private.

210. Plaintiff Brock received an email dated May 7, 2026, from University of Arizona Global Campus stating that Canvas was experiencing a nationwide outage due to an apparent security incident and that Canvas was inaccessible.

211. Plaintiff suffered harm as a result of the outage, including, for example, inconvenience and stress caused by delays in completion of assignments, inability to access assignments during the outage, and then having all pending assignments due the day Canvas was back online. She considered dropping out from school due to the stress caused by the Data Breach.

212. As a result of the Data Breach, Plaintiff Brock has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. Her efforts include, for example, researching the Data Breach, reviewing credit card and financial account statements, and dealing with an increase in spam calls, text messages, and emails.

213. In or around May 2026, Plaintiff Brock also incurred unauthorized charges from her Navy Federal Credit Union bank account, which was linked to her student loans. She closed this bank account two to three months ago.

214. Plaintiff Brock has spent approximately 10 hours addressing the effects of the Data Breach thus far.

215. As a result of the Data Breach, Plaintiff Brock has experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing her Sensitive Information. She is nervous that Canvas is still not secure after the Data Breach. Plaintiff understandably fears that criminals will use her Sensitive Information to commit identity theft. This risk will follow Plaintiff for her lifetime.

**35. *Plaintiff A.D., by and through their parent/guardian S.D.***

216. Plaintiff A.D. is a citizen and resident of San Antonio, Texas.

217. At all relevant times, Plaintiff A.D. was a student at Eloise Japhet Elementary, where they were required to use Canvas. To use Canvas, Plaintiff was required to provide their Sensitive Information to Instructure.

**36. *Plaintiff A.D.'s Experience and Injuries***

218. In connection with using Canvas, Plaintiff A.D. entrusted Defendants to keep secure their Sensitive Information including, but not limited to, their name, email address, course names, enrollment information, grades, GPA, academic and course schedules, and photographs.

219. Plaintiff suffered harm as a result of the outage, including, for example, their teachers stopped using Canvas for their daily work and so their daily routine had to be completely changed to accommodate this. Their teachers used Canvas to give assignments and to send alerts and other communications. The Data Breach was a great inconvenience to their schooling.

220. As a result of the Data Breach, Plaintiff A.D.'s parent, on behalf of her minor child A.D., has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. Their efforts include, for example, contacting the school to identify what information was breached, attempting to contact Instructure, and dealing with an increase in spam calls, text messages, and emails.

221. Plaintiff A.D.'s parent, on behalf of her minor child A.D., has spent approximately four to five hours addressing the effects of the Data Breach thus far.

222. As a result of the Data Breach, Plaintiff A.D.'s parent, on behalf of her minor child A.D., has experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing their Sensitive Information. Plaintiff A.D.'s parent, on behalf of her minor child A.D., understandably fears that criminals will use A.D.'s Sensitive Information to commit identity theft. This risk will follow Plaintiff for their lifetime.

**37. *Plaintiff E.D., by and through their parent/guardian S.D.***

223. Plaintiff E.D. is a citizen and resident of San Antonio, Texas.

224. At all relevant times, Plaintiff E.D. was a student at Eloise Japhet Elementary, where they were required to use Canvas. To use Canvas, Plaintiff was required to provide their Sensitive Information to Instructure.

**38. *Plaintiff E.D.'s Experience and Injuries***

225. In connection with using Canvas, Plaintiff E.D. entrusted Defendants to keep secure their Sensitive Information including, but not limited to, their name, email address, course names, enrollment information, grades, GPA, academic and course schedules, and photographs.

226. Plaintiff suffered harm as a result of the outage, including, for example, their teachers stopped using Canvas for their daily work and so their daily routine had to be completely changed to accommodate this. Their teachers used Canvas to give assignments and to send alerts and other communications. The Data Breach was a great inconvenience to their schooling.

227. As a result of the Data Breach, Plaintiff E.D.'s parent, on behalf of her minor child E.D., has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. Their efforts include, for example, contacting the school to identify what information was breached, attempting to contact Instructure, and dealing with an increase in spam calls, text messages, and emails.

228. Plaintiff E.D.'s parent, on behalf of her minor child E.D., has spent approximately four to five hours addressing the effects of the Data Breach thus far.

229. As a result of the Data Breach, Plaintiff E.D.'s parent, on behalf of her minor child E.D., has experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing their Sensitive Information. Plaintiff E.D.'s

parent, on behalf of her minor child E.D., understandably fears that criminals will use E.D.'s Sensitive Information to commit identity theft. This risk will follow Plaintiff for their lifetime.

**39. *Plaintiff P.E., by and through their parent/guardian A.N.***

230. Plaintiff P.E. is a citizen and resident of South Elgin, Illinois.

231. At all relevant times, Plaintiff P.E. was a student at School District U-46, where they were required to use Canvas. To use Canvas, Plaintiff was required to provide their Sensitive Information to Instructure.

**40. *Plaintiff P.E.'s Experience and Injuries***

232. In connection with using Canvas, Plaintiff P.E. entrusted Defendants to keep secure their Sensitive Information including, but not limited to, their name, email address, course names, and enrollment information.

233. Plaintiff P.E. received an email dated May 7, 2026, from School District U-46 stating that Canvas was experiencing a nationwide outage due to an apparent security incident and that Canvas was inaccessible.

234. As a result of the Data Breach, Plaintiff P.E.'s parent, on behalf of her minor child P.E., has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. Her efforts include, for example, researching the Data Breach and freezing her credit.

235. Plaintiff P.E.'s parent, on behalf of her minor child P.E., has spent approximately two hours addressing the effects of the Data Breach thus far.

**41. *Plaintiff N.M., by and through their parent/guardian N.G.***

236. Plaintiff N.M. is a citizen and resident of Houston, Texas.

237. At all relevant times, Plaintiff N.M. was a student at Harmony Online School, where they were required to use Canvas. To use Canvas, Plaintiff was required to provide their Sensitive Information to Instructure.

**42. *Plaintiff N.M.'s Experience and Injuries***

238. In connection with using Canvas, Plaintiff N.M. entrusted Defendants to keep secure their Sensitive Information including, but not limited to, her name, username, email address, student ID number, course names, enrollment information, grades, GPA, and academic and course schedules.

239. Plaintiff N.M. also sent and received messages in Canvas, which contained sensitive information relating to, for example, coursework and academic information, and other matters which Plaintiff reasonably believed would be kept private.

240. Plaintiff N.M. received a pop-up notification on their Canvas account portal dated May 9, 2026, from Harmony Online School stating that Canvas was experiencing a nationwide outage due to an apparent security incident and that Canvas was inaccessible.

241. As a result of the Data Breach, Plaintiff N.M.'s parent, on behalf of her minor child N.M., has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. Her efforts include, for example, monitoring her and N.M.'s email accounts, researching and purchasing credit monitoring, and reviewing credit card and financial account statements.

242. Plaintiff N.M.'s parent, on behalf of her minor child N.M., has spent approximately 25 hours as well as out-of-pocket costs, which are ongoing, addressing the effects of the Data Breach thus far.

243. As a result of the Data Breach, Plaintiff N.M.'s parent, on behalf of her minor child N.M., has experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing N.M.'s Sensitive Information. Plaintiff N.M.'s parent understandably fears that criminals will use N.M.'s Sensitive Information to commit identity theft. This risk will follow Plaintiff for their lifetime.

**43. *Plaintiff E.H., by and through their parent/guardian J.H.***

244. Plaintiff E.H. is a citizen and resident of Daleville, Alabama.

245. At all relevant times, Plaintiff E.H. was a student at Alabama Destination Career, where they were required to use Canvas. To use Canvas, Plaintiff was required to provide their Sensitive Information to Instructure.

**44. *Plaintiff E.H.'s Experience and Injuries***

246. In connection with using Canvas, Plaintiff E.H. entrusted Defendants to keep secure their Sensitive Information including, but not limited to, their name, username, email address, phone number, date of birth, home address, student ID number, course names, enrollment information, grades, GPA, academic and course schedules, academic discipline or other academic issues, video or voice recordings, photographs, medical information, and Social Security number.

247. Plaintiff E.H. also sent and received messages in Canvas, which contained sensitive information relating to, for example, photographs of her medical appointment confirmations, and other matters which Plaintiff reasonably believed would be kept private.

248. Plaintiff E.H. received an online news board notification dated May 16, 2026, from Alabama Destination Career stating that Canvas was experiencing a nationwide outage due to an

apparent security incident and that Canvas was inaccessible. Canvas remained inaccessible for a week.

249. Plaintiff suffered harm as a result of the outage, including, for example, missing assignments, and inability to access Canvas for a week. Plaintiff E.H. was nervous about failing their classes as a result of the Data Breach.

250. As a result of the Data Breach, Plaintiff E.H.'s parent, on behalf of his minor child E.H., has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. His efforts include, for example, reviewing credit card and financial account statements, reviewing Canvas accounts, and contacting Alabama Destination Career.

251. Plaintiff E.H.'s parent, on behalf of his minor child E.H., has spent approximately 150 hours addressing the effects of the Data Breach thus far.

252. As a result of the Data Breach, E.H., and Plaintiff E.H.'s parent, on behalf of his minor child E.H., have experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing E.H.'s Sensitive Information. Plaintiff understandably fears that criminals will use their Sensitive Information to commit identity theft. This risk will follow Plaintiff for their lifetime.

**45. *Plaintiff A.N., by and through their parent/guardian A.N.***

253. Plaintiff A.N. is a citizen and resident of South Elgin, Illinois.

254. At all relevant times, Plaintiff A.N. was a student at School District U-46, where they were required to use Canvas. To use Canvas, Plaintiff was required to provide their Sensitive Information to Instructure.

**46. *Plaintiff A.N.'s Experience and Injuries***

255. In connection with using Canvas, Plaintiff A.N. entrusted Defendants to keep secure their Sensitive Information including, but not limited to, their name, email address, course names, and enrollment information.

256. Plaintiff A.N.'s parent, on behalf of her minor child A.N., received an email dated May 7, 2026, from School District U-46 stating that Canvas was experiencing a nationwide outage due to an apparent security incident and that Canvas was inaccessible.

257. As a result of the Data Breach, Plaintiff A.N.'s parent, on behalf of their minor child A.N., has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. Their efforts include, for example, researching the Data Breach and freezing their credit.

258. Plaintiff A.N.'s parent, on behalf of their minor child A.N., has spent approximately two hours addressing the effects of the Data Breach thus far.

**47. *Plaintiff G.S., by and through their parent/guardian K.S.***

259. Plaintiff G.S. is a citizen and resident of Shawnee, Kansas.

260. At all relevant times, Plaintiff G.S. was a student at De Soto High School, where they were required to use Canvas. To use Canvas, Plaintiff was required to provide their Sensitive Information to Instructure.

**48. *Plaintiff G.S.'s Experience and Injuries***

261. In connection with using Canvas, Plaintiff G.S. entrusted Defendants to keep secure their Sensitive Information including, but not limited to, their name, username, date of birth, address, course names, enrollment information, and academic and course schedules.

262. Plaintiff G.S. received an email dated May 9, 2026, from De Soto Unified School District 232 stating that Canvas was experiencing a nationwide outage due to an apparent security incident and that Canvas was inaccessible.

263. Plaintiff suffered harm as a result of the outage, including, for example, losing the ability to access coursework during the outage.

264. As a result of the Data Breach, Plaintiff G.S.'s parent, on behalf of her minor child G.S., has spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. Her efforts include, for example, reviewing credit card and financial account statements and reviewing Canvas accounts.

265. Plaintiff G.S.'s parent, on behalf of their minor child G.S., has spent an hour addressing the effects of the Data Breach thus far.

266. As a result of the Data Breach, Plaintiff G.S.'s parent, on behalf of their minor child G.S., and Plaintiff G.S. have experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing G.S.'s Sensitive Information. Plaintiff G.S.'s parent and G.S. understandably fear that criminals will use G.S.'s Sensitive Information to commit identity theft. This risk will follow Plaintiff for their lifetime.

**49. *Plaintiff J.U., by and through their parent/guardian J.M.***

267. Plaintiff J.U. is a citizen and resident of Yonkers, New York.

268. At all relevant times, Plaintiff J.U. was a dual enrollment student at Embry-Riddle Aeronautical University, where they were required to use Canvas. To use Canvas, Plaintiff was required to provide their Sensitive Information to Instructure.

**50. *Plaintiff J.U.'s Experience and Injuries***

269. In connection with using Canvas, Plaintiff J.U. entrusted Defendants to keep secure their Sensitive Information including, but not limited to, their name and email address.

270. Plaintiff J.U. received an email dated May 7, 2026 from Embry-Riddle Aeronautical University stating that Canvas was experiencing a nationwide outage due to an apparent security incident and that Canvas was inaccessible. Canvas remained inaccessible until May 8, 2026.

271. On May 11, 2026, J.U. received an email from Embry-Riddle's information technology department that Embry-Riddle students, staff, and faculty were increasingly being targeted by phishing attempts after the Data Breach.

272. On May 12, 2026, J.U. received an email from Embry-Riddle's information technology department that Embry-Riddle students, staff, and faculty were increasingly being targeted by fraudulent text messages purporting to be from university leaders after the Data Breach

273. As a result of the Data Breach, J.U.'s parent, on behalf of his minor child Plaintiff J.U., and Plaintiff J.U., have spent time and made reasonable efforts to deal with the consequences of, and mitigate the impact of, the Data Breach. Their efforts include, for example, researching the Data Breach.

274. J.U.'s parent, on behalf of his minor child Plaintiff J.U., and Plaintiff J.U. have spent approximately three hours addressing the effects of the Data Breach thus far.

275. As a result of the Data Breach, J.U.'s parent, on behalf of his minor child Plaintiff J.U., and Plaintiff J.U. have experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing J.U.'s Sensitive Information.

J.U.'s parent, on behalf of his minor child Plaintiff J.U., and Plaintiff J.U. understandably fear that criminals will use J.U.'s Sensitive Information to commit identity theft. This risk will follow Plaintiff J.U. for their lifetime.

**51. *Plaintiff K.I., by and through their guardian L.L.***

276. Plaintiff K.I. is a citizen and resident of Stone Mountain, Georgia.

277. At all relevant times, Plaintiff K.I. was a student at Stone Mountain Elementary, where they were required to use Canvas. To use Canvas, Plaintiff was required to provide their Sensitive Information to Instructure.

**52. *Plaintiff K.I.'s Experience and Injuries***

278. In connection with using Canvas, Plaintiff K.I. entrusted Defendants to keep secure their Sensitive Information including, but not limited to, their name, parent's email, home address, date of birth, parent phone number, student ID number, grades / GPA.

279. K.I's guardian, on behalf of Plaintiff K.I., received an email dated May 8, 2026, from National Healthcareer Association, stating that Canvas was experiencing a nationwide outage due to an apparent security incident and that Canvas was inaccessible.

280. As a result of the Data Breach, K.I's guardian, on behalf of Plaintiff K.I., has experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing Plaintiff K.I.'s Sensitive Information. Plaintiff K.I's guardian, on behalf of Plaintiff K.I., understandably fears that criminals will use Plaintiff K.I.'s Sensitive Information to commit identity theft. This risk will follow Plaintiff K.I. for their lifetime.

**53. *Plaintiff M.I., by and through their guardian L.L.***

281. Plaintiff M.I. is a citizen and resident of Stone Mountain, Georgia.

282. At all relevant times, Plaintiff M.I. was a student at Stone Mountain Elementary, where they were required to use Canvas. To use Canvas, Plaintiff was required to provide their Sensitive Information to Instructure.

**54. *Plaintiff M.I.'s Experience and Injuries***

283. In connection with using Canvas, Plaintiff M.I. entrusted Defendants to keep secure their Sensitive Information including, but not limited to, their name, parent's email, home address, date of birth, parent phone number, student ID number, grades, and GPA.

284. M.I.'s guardian, on behalf of Plaintiff M.I., received an email dated May 8, 2026, from National Healthcareer Association, stating that Canvas was experiencing a nationwide outage due to an apparent security incident and that Canvas was inaccessible.

285. As a result of the Data Breach, M.I.'s guardian, on behalf of Plaintiff M.I., has experienced stress, anxiety, and concern due to the loss of privacy and concern over the impact of cybercriminals accessing and misusing Plaintiff M.I.'s Sensitive Information. M.I.'s guardian, on behalf of Plaintiff M.I., understandably fears that criminals will use Plaintiff M.I.'s Sensitive Information to commit identity theft. This risk will follow Plaintiff M.I. for their lifetime.

**B. Allegations Common to All Plaintiffs[27]**

286. Instructure required Plaintiffs to provide their Sensitive Information as a condition of obtaining and using its services. Instructure used that Sensitive Information in its regular course of business.

[27] These allegations are common to all Plaintiffs and are alleged in addition to the Plaintiff-specific allegations above.

287. Plaintiffs (and, for minor Plaintiffs, their guardians) are very careful about sharing their Sensitive Information. For example, Plaintiffs would not post publicly information that they intended to share privately.

288. Plaintiffs provided their Sensitive Information to Instructure because they understood that Instructure would take reasonable measures to protect it, consistent with state and federal law and industry standards.

289. Plaintiffs also reasonably relied on the security of Instructure to keep their messages—which Plaintiffs intended to remain private—secure.

290. As a result of its inadequate cybersecurity, Instructure exposed Plaintiffs' Sensitive Information to theft by cybercriminals.

291. Plaintiffs' Sensitive Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

292. Plaintiffs have suffered actual injury from the exposure and theft of their Sensitive Information—which violates their right to privacy.

293. Plaintiffs also suffered actual injury in the form of damages to and diminution in the value of their Sensitive Information.

294. Sensitive Information is a form of durable, intangible property—property that Instructure was required to adequately protect.

295. Instructure deprived Plaintiffs of the earliest opportunity to guard themselves against the Data Breach's effects by failing to promptly notify them about the Data Breach.

296. Plaintiffs are now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from their Sensitive Information being placed in the hands of unauthorized

third parties. This risk is particularly harmful to the minor Plaintiffs whose Sensitive information can be exploited for years before detection given their lack of credit and financial history. This risk is particularly harmful to the minor Plaintiffs, whose Sensitive Information—including private messages written as children—can be exploited for years, and who are especially vulnerable to the targeted phishing, impersonation, and extortion schemes that such information enables.

297. This injury was worsened by Defendants' failures to inform Plaintiffs about the Data Breach in a timely fashion.

298. Plaintiffs have a continuing interest in ensuring that their Sensitive Information, which remains in Instructure's possession, is protected and safeguarded from future breaches.

299. Plaintiffs have each suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiffs' valuable Sensitive Information; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiffs' Sensitive Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiffs' Sensitive Information that was entrusted to Instructure; (d) damages unjustly retained by Instructure at the cost to Plaintiffs, including the difference in value between the protection Plaintiffs' Sensitive Information should have received from Instructure and the defective and deficient protection that Instructure actually provided; (e) lost time and money spent in response to the Data Breach reviewing various accounts and financial information to detect potential fraud and ID theft, and the purchase of monitoring software and products; and (f) continued risk to Plaintiffs' Sensitive Information, which remains in the possession of Instructure and will remain vulnerable to further breaches so long as Instructure fails to take appropriate and adequate measures to protect it.

**C. Defendants**

300. Defendant Instructure Holdings, Inc., formerly known as Instructure, Inc., is a Delaware corporation headquartered at 6330 South 3000 East, Suite 700, Salt Lake City, Utah 84121.

301. On November 13, 2024, Instructure Holdings, Inc. was acquired by and became a wholly owned subsidiary of KKR & Co. Inc. ("KKR").

302. Instructure is the developer, owner, and operator of the Canvas learning management system, one of the most widely used educational technology ("EdTech") platforms in the United States. Instructure serves over 30 million users and 9,000 educational institutions, encompassing approximately 40% of U.S. K-12 school districts and 50% of higher education institutions in North America.

303. Defendant Instructure, Inc. was the predecessor to Defendant Instructure Holdings, Inc., and, prior to March 2020, developed, owned, and operated Canvas.

304. To the extent Defendant Instructure, Inc. is a distinct legal entity from Defendant Instructure Holdings, Inc., references and allegations to "Instructure" include both entities, as applicable.

## JURISDICTION AND VENUE

305. This Court has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because Plaintiffs, including, for example, Plaintiffs A.N. and G.S., and at least one member of the putative Class, as defined below, are citizens of a different state than any Defendant, there are more than 100 putative Class Members, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

306. This Court has general personal jurisdiction over Instructure because Instructure has its principal place of business in this District. Additionally, specific personal jurisdiction exists here because Instructure regularly transacts business in this District and has directed many of the acts and omissions complained of herein in this District, thereby purposefully availing itself of the forum.

307. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Instructure's principal place of business is located in this District and a substantial portion of the events giving rise to the claims took place in this District, including corporate decisions concerning Defendants' data security policies and practices as well as the contractual relationships with its customers, and Defendants have harmed Class Members residing in this District.

## FACTUAL ALLEGATIONS

### A. Instructure Promised to Protect Plaintiffs' and Class Members' Sensitive Information

308. Instructure is an EdTech company that owns and operates Canvas, an LMS that provides services to thousands of K-12 schools, colleges, universities, and school districts for managing coursework, assignments, messaging, grading systems, and other educational records. It is used by tens of millions of students, parents, educators, and administrators.

309. On November 13, 2024, Instructure was acquired by KKR in a transaction valued at $4.8 billion.

310. Instructure markets Canvas as the "#1 LMS in [ ] North America," representing that the platform provides "100% uptime" and is "always on," emphasizing reliability, accessibility,

and uninterrupted access to educational records and communications.[28] Through these representations, Instructure emphasized that cybersecurity, reliability, and data protection were essential and integrated features of the Canvas platform.

311. Instructure further markets Canvas as having a "modern, cloud-native foundation" which purportedly delivers superior "performance, security, and reliability for large, multi-campus deployments."[29]

312. Through these representations, Instructure conveyed that Canvas centrally managed and governed integrations with Student Information Systems (SIS), user permissions, templates, and related educational data systems across institutions, thereby reducing the need for individual schools or departments to independently administer and oversee those controls manually.[30]

313. Instructure's customers include educational institutions across the United States and around the world. Through Canvas, Instructure handles highly sensitive data relating to students, teachers, and staff, including in communications between teaching faculty and students or their parents containing:

(a) Names;

(b) Dates of birth;

(c) Addresses or other location information;

---

[28] *Canvas by Instructure: World leading LMS for teaching & learning*, INSTRUCTURE, https://www.instructure.com/canvas (last visited May 11, 2026).

[29] *Canvas: The LMS Built for What's Next*, INSTRUCTURE, https://www.instructure.com/resources/ebooks/canvas-lms-built-whats-next (last visited May 11, 2026).

[30] *See id.*

(d) Email addresses;

(e) Student and employee identification numbers;

(f) IP addresses;

(g) Persistent or unique device identifiers;

(h) Phone numbers; and

(i) Gender or preferred pronouns.[31]

314. In the regular course of its business, Instructure collects and maintains the personal data of Canvas users, whether provided directly by the user or through the learning institution with which the user is affiliated.

315. Instructure required Plaintiffs and Class Members to provide their personal data as a condition of receiving products and services from Instructure.[32]

316. Instructure markets Canvas as a trusted, reliable, and secure platform. In doing so, Instructure implicitly and explicitly acknowledges the sensitivity and confidential nature of the data it collects and stores and represents that it takes the security and privacy of that data seriously.

317. Instructure is well aware that student data and educational records are subject to heightened privacy expectations and regulatory obligations, and that exposure of such data can cause severe and long-lasting harms to affected individuals, particularly minors.

318. Instructure has acknowledged the importance of protecting the sensitive educational and personal information entrusted to it through Canvas. Indeed, Instructure states:

---

[31] *Product Privacy Notice*, INSTRUCTURE, https://www.instructure.com/policies/product-privacy-policy (effective date Oct. 31, 2025).

[32] *Id.*

> **If student data isn't protected, the LMS loses all credibility**. Strong security and clear role-based access help districts balance transparency with responsibility. With defined permissions, students, educators, administrators, and families each see the information that's relevant to them—and nothing more. This reduces risk, supports compliance, and builds trust across the learning community. Just as importantly, **security should never get in the way of teaching and learning**. A well-designed LMS keeps data protected in the background while instruction and communication move forward.[33]

319. Further, Instructure holds itself out as a company where security is "built . . . into the fabric of our cloud platform, infrastructure, and processes, so you can rest assured that your data is safeguarded."[34] Instructure claims to meet SOC 2 and ISO 27001 security standards in its own policies, to have active security monitoring for threats, and to encrypt data in transit and at rest.[35] Instructure also operates vulnerability disclosure and bug bounty programs and touts its use of the Amazon Web Services' logging and detection capabilities to identify potential vulnerabilities or unauthorized access.[36]

320. Instructure additionally represented, "All data is encrypted in transit," "All data is stored at rest within encrypted volumes," and "Data is replicated in real-time for your protection."[37]

---

[33] Eli Johnson, *11 Ways an LMS Supports Students, Educators, and Districts*, INSTRUCTURE (Dec. 17, 2025), https://www.instructure.com/resources/blog/11-ways-lms-supports-students-educators-districts (emphasis added).

[34] *Instructure Trust Center: Security*, INSTRUCTURE, https://www.instructure.com/trust-center/security (last visited May 5, 2026).

[35] *Id.*

[36] *Id.*

[37] *Instructure Trust Center: Legal*, INSTRUCTURE, https://www.instructure.com/trust-center/legal (last visited May 15, 2026).

321. In its Privacy Policy, Instructure also promises to take "reasonable steps to help protect personal information collected about you in an effort to prevent unauthorized access, use, or disclosure."[38]

322. Instructure additionally represented that Canvas maintained robust security infrastructure, oversight, monitoring, and operational safeguards designed to host and manage sensitive educational data at scale securely:[39]




---

[38] *Product Privacy Notice*, INSTRUCTURE, https://www.instructure.com/policies/product-privacy-policy (effective date Oct. 31, 2025).

[39] *The Cheap LMS Isn't Cheap*, INSTRUCTURE, https://www.instructure.com/en-au/resources/infographic/cheap-lms-isnt-cheap (last visited May 15, 2026).




323. Instructure also made extensive public representations regarding Canvas's purported security architecture, monitoring capabilities, access controls, and compliance.

324. Through its publicly available "Trust Center," Chief Executive Officer Steve Daly represented that Instructure was committed to "building products that are secure and private by design" and promised customers that Instructure would "build security and privacy into all our products and all areas of our business." Instructure further stated that its dedication to data security and privacy professedly "begins at the highest levels of [the] organization– –starting with [Daly], and [the] board."[40]

[40] *Instructure Trust Center: Overview*, INSTRUCTURE, https://www.instructure.com/trust-center (last visited May 15, 2026).

325. As recently as April 20, 2026, just days before the Data Breach, Instructure's CEO advertised Instructure's commitment to "exercise full transparency surrounding our privacy and security processes" and "design our products to gather only the necessary data to deliver our services," acknowledging that these commitments were provided expressly in exchange for "learners, educators, and all in the learning community entrust[ing] [Instructure] with the responsibility of safeguarding their data."

326. Similarly, Matt Kaminer, Instructure's Chief People and Legal Officer, emphasized Instructure's "rigorous [focus on] data privacy and protection," and that Instructure holds itself "to high standards of governance and compliance," and "will protect what's entrusted to us."[41] These representations conveyed to students, educators, families, and their educational institutions that Instructure maintained comprehensive and effective safeguards designed to protect sensitive educational and personal information from unauthorized access, disclosure, and misuse.

327. Instructure represented that its platform is protected by a comprehensive access control framework:

> The Instructure Learning Platform is protected by a comprehensive access control framework. Access to the platform is secured by authentication, authorization, and 2FA (where applied). Access to the cloud infrastructure is protected by a comprehensive access control framework with multiple layers, including VPN, 2FA, SSH, and digital certificates. Access to our systems is granted based on principle of least privilege and need to know and supported by regular user access reviews and auditing processes.[42]

---

[41] *Instructure Trust Center: Legal,* INSTRUCTURE, https://www.instructure.com/trust-center/legal (last visited May 15, 2026).

[42] *Instructure Trust Center: Security,* INSTRUCTURE, https://www.instructure.com/trust-center/security (last visited May 15, 2026).

328. These statements are particularly significant given that ShinyHunters allegedly exploited weaknesses in Instructure-controlled systems and accounts associated with the "Free-for-Teacher" environment, thereby gaining unauthorized access to institutional data and user information. The Data Breach thus demonstrated that Instructure failed to adequately segregate, restrict, monitor, and govern access across various platform environments, integrations, and privileged systems, despite publicly representing that comprehensive access-control frameworks, least-privilege restrictions, and layered authentication protections were in place.

329. Instructure also represented that, "[a]s a fully hosted SaaS solution," the Canvas platform is "actively monitored by Instructure's Operations and Security teams on behalf of all customers," and that Instructure "continually monitors system usage, performance, health, and security."[43]

330. According to Instructure, its operations teams used "internal and external industry-standard monitoring and alerting systems as well as custom alerting systems to ensure maximum coverage," and that security alerts were routed to appropriate personnel through PagerDuty.[44] Instructure further represented that it maintained "robust and considerable network and security monitoring to protect our customers and detect potential threats before they have a chance to have any impact," including through the use of AWS GuardDuty and centralized logging systems for "further analysis and alert generation."[45]

---

[43] *Id.*

[44] *Id.*

[45] *Id.*

331. Instructure additionally represented that it maintained extensive compliance, auditing, and risk-management programs, including "continuous monitoring," "regular audits and assessments," "external assessments and audits conducted by independent experts," and compliance certifications and frameworks including "SOC 2 Type 2," "ISO 27001," "NIST 800-53," "TX-RAMP," "Cyber Essentials Plus," and PCI DSS-related assessments.[46] Instructure further represented that it maintained "stringent processes" to evaluate third-party risks and annually assess vendors with access to sensitive or personal data.[47] Through these statements, Instructure represented that it maintained mature governance, auditing, and risk-management structures designed to identify vulnerabilities, assess risks, monitor compliance, and protect educational data against unauthorized access and compromise.

332. Instructure reaffirmed those certifications just months before the Data Breach. On December 9, 2025—roughly three months after ShinyHunters breached Instructure's Salesforce environment and less than five months before the Data Breach—Instructure publicly announced the "Renewal of ISO 27001, SOC 2 Type II and PCI DSS 4.0.1 Certifications" covering Canvas, describing its SOC 2 Type II report as evaluating "the effectiveness of controls related to security, availability and confidentiality over an extended period." Instructure's Chief Information Security Officer declared that "[s]ecurity is a central pillar of the trust we build with our customers."[48]

---

[46] *Instructure Trust Center: Compliance*, INSTRUCTURE, https://www.instructure.com/trust-center/compliance (last visited May 15, 2026).

[47] *Id.*

[48] Press Release, *Instructure Strengthens Commitment to a Secure Trusted Learning Experience with Renewal of ISO 27001, SOC 2 Type II and PCI DSS 4.0.1 Certifications*, Instructure (Dec. 9, 2025), https://www.instructure.com/press-release/instructure-strengthens-commitment-secure-trusted-learning-experience-renewal-iso.

333. Instructure made the same promises to investors. In its final annual report filed with the Securities and Exchange Commission before KKR took it private, Instructure represented that it "adhere[s] to industry-standard best information security practices to protect our servers and our customers' critical data," and described Canvas as running on a "single-instance, multi-tenant architecture."[49]

334. Instructure made the same representations directly to the institutions that contract for Canvas. In a Security Overview furnished to institutional customers, Instructure represented that its security program was "built based [on] internationally-recognized standards such as ISO 27001, NIST's Cyber Security Framework, AICPA's Trust Services Principles and Criteria, and SANS' CIS Critical Security Controls."[50] The AICPA's Trust Services Criteria are the criteria against which SOC 2 reports are issued; and "NIST 800-53" refers to the National Institute of Standards and Technology's ("NIST") Special Publication 800-53, the federal government's catalog of security and privacy controls. Each of these frameworks—like ISO/IEC 27001—requires the basic safeguards Instructure failed to implement: multi-factor authentication, at a minimum for privileged and administrative accounts; segregation of data and systems, least-privilege access, and restriction of administrative access; and monitoring capable of detecting anomalous activity, including the bulk exfiltration of data.

335. Instructure also made a specific public commitment to the federal government regarding multi-factor authentication. By September 2023, Instructure was one of the first six

---

[49] Instructure Holdings, Inc., 2023 Annual Report (Form 10-K) at 4, 9 (Feb. 21, 2024), https://www.sec.gov/Archives/edgar/data/1841804/000095017024017904/inst-20231231.htm.

[50] Instructure, *Security Overview: Engineering, Security, and Operations* (June 2022), https://iser.mpc.edu/Standard-IIIC_Evidence_Folder/IIIC3-05_CanvasParticAgr.pdf.

education-technology companies to sign the Cybersecurity and Infrastructure Security Agency's ("CISA") K-12 Education Technology Secure by Design Pledge (the "K-12 Pledge"). CISA's Director publicly thanked "ClassLink, Clever, D2L, GG4L, Instructure, and PowerSchool who have already signed this pledge."[51] The K-12 Pledge called on each signatory to publish a roadmap addressing measurable increases towards MFA adoption, reducing vulnerability classes across products, increase the installation of security patches, publish a vulnerability disclosure policy, demonstrate transparency in vulnerability reporting, and demonstrate a measurable increase in the ability for customers to gather evidence of cybersecurity intrusion.[52]

336. Despite Instructure's extensive representations regarding security, monitoring, access controls, encryption, compliance, and risk management, the Data Breach nevertheless occurred. Instructure failed to implement, maintain, and enforce the safeguards it publicly represented as fundamental to Canvas's operation.

337. In particular, Instructure failed to implement even the most basic safeguards in modern information security, each of which is expressly required by the very standards Instructure claimed to meet: (1) it did not require multi-factor authentication, even for administrator accounts, and did not otherwise limit where and how privileged credentials and tokens could be used; (2) it

[51] Press Release, *CISA Announces Secure by Design Pledge with K-12 Education Technology Providers*, CISA (Sept. 5, 2023), https://www.cisa.gov/news-events/news/cisa-announces-secure-design-pledge-k-12-education-technology-providers; *see also Secure by Design Pledge*, CISA, https://www.cisa.gov/sites/default/files/2024-05/CISA%20Secure%20by%20Design%20Pledge_508c.pdf.

[52] *Secure by Design Pledge*, CISA, https://www.cisa.gov/securebydesign/pledge (last visited Oct. 7, 2026); Anna Merod, *CISA creates voluntary ed tech pledge to boost K-12 cybersecurity,* K-12 DIVE (Sept. 6, 2023), https://www.k12dive.com/news/CISA-ed-tech-pledge-k-12-cybersecurity/692830/.

did not segregate its customers' data or restrict privileged access, so that a single compromised account and authorization token reached data belonging to users at all 8,800 customer institutions; and (3) it did not detect and stop the bulk exfiltration of Sensitive Information in a timely manner, notwithstanding its representations concerning continuous monitoring, layered defenses, and comprehensive security governance.

338. *Multi-factor authentication.* Multi-factor authentication ("MFA") requires a user to present something in addition to a password—such as a one-time code or a physical security key—before gaining access to an account, so that a stolen password or other single credential is not enough to take over the account. CISA advises that "[u]sers who enable MFA are significantly less likely to get hacked."[53] In its guidance to the K-12 sector, CISA identified "deploy[ing] multifactor authentication [(MFA)]" as an initial priority investment and urged schools to "[e]xpect and call for technology providers to enable strong security controls by default for no additional charge."[54]

339. The security frameworks Instructure claimed to follow, widely require MFA. NIST 800-53, against which Instructure claimed to be audited, requires organizations to "[i]mplement multi-factor authentication for access to privileged accounts" (control IA-2(1)) and "for access to non-privileged accounts" (control IA-2(2)). The CIS Critical Security Controls direct organizations to "[r]equire MFA for all administrative access accounts" (Safeguard 6.5) and to "[r]equire all externally-exposed enterprise or third-party applications to enforce MFA, where supported" (Safeguard 6.3). The Trust Services Criteria underlying Instructure's SOC 2 Type 2

---

[53] *More than a Password*, CISA, https://www.cisa.gov/MFA (last accessed Oct. 7, 2026).

[54] *Protecting Our Future: Partnering to Safeguard K–12 Organizations from Cybersecurity Threats*, CISA, https://www.cisa.gov/protecting-our-future-partnering-safeguard-k-12-organizations-cybersecurity-threats.

reports require that "[p]ersons, infrastructure, and software are identified and authenticated prior to accessing information assets" (CC6.1) and that "[a]dditional authentication information or credentials are required when accessing the system from outside its boundaries" (CC6.6). ISO/IEC 27001:2022, under which Instructure is certified, likewise includes Annex A controls governing secure authentication (control 8.5) and the restriction and management of privileged access rights (control 8.2).[55]

340. Instructure understood why MFA mattered. It told customers that it was "[e]nabling multi-factor-authentication in front of all VPNs, bastions, and applications to prevent the reuse of any lost credentials," and that Canvas offered built-in MFA that could be set to "required for admins, required for all users, or optional for all users."[56] Yet Instructure left MFA optional in Canvas—even for the administrator accounts that controlled entire institutions' data—and its Trust Center promised only "2FA (where applied)." As alleged below, Instructure required MFA for Canvas administrators only after the Data Breach, more than two and a half years after it pledged to CISA to "nudge all users, including students, towards MFA."

[55] *Security and Privacy Controls for Information Systems and Organizations*, NIST Special Publication 800-53, Rev. 5 (Sept. 2020), https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r5.pdf; *Control Baselines for Information Systems and Organizations*, NIST Special Publication 800-53B (Oct. 2020), https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53B.pdf; *CIS Controls Assessment Specification for Controls v8*, CENTER FOR INTERNET SECURITY, https://controls-assessment-specification.readthedocs.io/en/latest/ (last accessed Oct. 7, 2026); *2017 Trust Services Criteria for Security, Availability, Processing Integrity, Confidentiality, and Privacy (with Revised Points of Focus, 2022)*, Am. Inst. of Certified Pub. Accts. (Sept. 30, 2023), https://www.aicpa-cima.com/resources/download/2017-trust-services-criteria-with-revised-points-of-focus-2022.

[56] *Security Overview, supra, at 15–16.*

341. The need for MFA and related controls against this particular threat actor was no secret. Salesforce—the platform on which Instructure maintained customer-support data, and through which ShinyHunters breached Instructure in September 2025—has contractually required its customers to use MFA since February 1, 2022, explaining that MFA protects against "phishing attacks, credential stuffing, and account takeovers."[57] In June 2025, Google's Threat Intelligence Group warned of a voice-phishing and data-extortion campaign against Salesforce customers by a group that "has consistently claimed to be the threat group ShinyHunters," and urged organizations to "[e]nforce Multi-Factor Authentication (MFA) universally."[58] On September 12, 2025—the same month ShinyHunters breached Instructure's Salesforce environment—the Federal Bureau of Investigation ("FBI") issued a FLASH alert about the same campaign directing organizations to "[r]equire phishing-resistant multi-factor authentication (MFA) for as many services as possible."[59] And on September 30, 2025, Google's Mandiant unit advised that "[p]hishing-resistant MFA must be enforced for all users accessing SaaS applications," calling it "a foundational requirement to defend against credential theft and account takeovers."[60]

---

[57] Laura Pelkey, *Everything Admins Need to Know About the MFA Requirement,* SALESFORCE ADMINS (Feb. 3, 2021, updated June 27, 2024), https://admin.salesforce.com/blog/2021/everything-admins-need-to-know-about-the-mfa-requirement.

[58] *Google Threat Intelligence Group, The Cost of a Call: From Voice Phishing to Data Extortion*, GOOGLE CLOUD (June 4, 2025), https://cloud.google.com/blog/topics/threat-intelligence/voice-phishing-data-extortion.

[59] FBI, FLASH-20250912-001, *Cyber Criminal Groups UNC6040 and UNC6395 Compromising Salesforce Instances for Data Theft and Extortion*, IC3 (Sept. 12, 2025), https://www.ic3.gov/CSA/2025/250912.pdf.

[60] Omar ElAhdan et al., *Cybercrime Observations from the Frontlines: UNC6040 Proactive Hardening Recommendations,* GOOGLE CLOUD (Sept. 30, 2025), https://cloud.google.com/blog/topics/threat-intelligence/unc6040-proactive-hardening-recommendations.

342. MFA is one layer of a layered authentication regime, and the same standards and warnings pair it with controls that limit what a stolen credential or session token can do. They direct organizations to restrict logins and privileged access to trusted network locations—a control that, as Mandiant explained, "prevents credential misuse from unauthorized networks, effectively blocking access even if an attacker has stolen valid user credentials."[61] They require limits on repeated automated authentication attempts: NIST provides that "the verifier SHALL implement controls to protect against online guessing attacks," and the OWASP API Security Top 10 identifies as a critical vulnerability any interface that "[p]ermits attackers to perform a brute force attack on the same user account, without presenting captcha/account lockout mechanism."[62] And Instructure itself now requires any employee accessing a customer instance to "re-authenticate through Okta when performing any sensitive operations."[63] Nothing prevented Instructure from implementing these layered controls before the Data Breach. Together, they would have prevented, or sharply limited, the use of an authorization token obtained through a support agent's session to generate and export reports from attacker-controlled infrastructure.

343. To be sure, MFA is relevant at the point of login *as well as at later points in an access system* before the performance of sensitive actions. This form (or subset) of MFA is also called "step-up authentication" which requires a user to re-verify their identity, typically with a

---

[61] *ElAhdan et al., supra.*

[62] *NIST, Special Publication 800-63B, Digital Identity Guidelines: Authentication and Lifecycle Management § 5.2.2*, NIST, https://pages.nist.gov/800-63-3/sp800-63b.html; *OWASP API Security Top 10, API2:2023 Broken Authentication*, OWASP API Security, https://owasp.org/API-Security/editions/2023/en/0xa2-broken-authentication/.

[63] *Instructure Trust Center: Security, Instructure Holdings, Inc.*, INSTRUCTURE, https://www.instructure.com/trust-center/security (last visited Oct. 6, 2026) (revised after May 15, 2026).

fresh MFA challenge, before performing especially sensitive actions within an already-authenticated session.[64] Such actions include accessing customer data, acting as another user, exporting data, or generating new access tokens. Step-up authentication ensures that a stolen session token alone cannot be used to carry out high-risk operations, as occurred here with ShinyHunters' mass export of terabytes of Plaintiffs' and Class Members' Sensitive Information, through the support ticket exploit.

344. Instructure did not require step-up authentication for its customer-support personnel before the Data Breach. According to Instructure, the attacker submitted a support ticket containing malicious code, which, when opened by an Instructure customer-service agent, allowed the attacker to obtain that agent's authorization token and gain elevated access within Canvas. On May 7, 2026, the attacker again obtained access by using Canvas's authorization flow to generate a new token. Had Instructure required support personnel to re-authenticate before accessing customer instances or performing sensitive operations, the attacker, who possessed only a stolen token and not the agent's authentication device, would have been prevented from using that token to reach data belonging to thousands of institutions.

345. Instructure's failure to require MFA (including in the form of step-up authentication) as to its own internal employees directly led to the Data Breach.

346. *Segregation and least privilege.* Instructure built Canvas on what it calls a "single-instance, multi-tenant architecture," in which thousands of schools and universities share the same application rather than each operating a separate system.[65] In a multi-tenant system, segregation is

[64] Omer Cohen, *Step-Up Authentication: What Is It & When to Use It*, DESCOPE (Apr. 17, 2025), https://www.descope.com/learn/post/step-up-authentication.
[65] *Form 10-K, supra.*

what keeps the compromise of one tenant—or of one employee account—from becoming the compromise of every tenant. Segregation means logically isolating each customer's data; granting each account, employee, and process only the access its role requires; separating user-facing functions (such as viewing a support ticket) from system-management functions (such as generating platform-wide data reports); and restricting where and how privileged accounts may be used.

347. The standards Instructure claimed to meet require exactly that. NIST SP 800-53 requires organizations to "[e]mploy the principle of least privilege, allowing only authorized accesses for users (or processes acting on behalf of users) that are necessary to accomplish assigned organizational tasks" (AC-6); to "[r]estrict privileged accounts on the system" to designated personnel or roles (AC-6(5)); to "[e]nforce approved authorizations for controlling the flow of information within the system and between connected systems" (AC-4); and to "[s]eparate user functionality, including user interface services, from system management functionality" (SC-2). The CIS Critical Security Controls require organizations to "[c]onfigure data access control lists based on a user's need to know" (Safeguard 3.3), to "[s]egment data processing and storage, based on the sensitivity of the data" (Safeguard 3.12), and to maintain a network architecture that "must address segmentation, least privilege, and availability, at a minimum" (Safeguard 12.2). The SOC 2 Trust Services Criteria require that logical access to information assets, including data and administrative authorities, be "restricted through the use of access control software and rule sets," and identify network segmentation, which "permits unrelated portions of the entity's information system to be isolated from each other," as a point of focus (CC6.1). ISO/IEC 27001:2022 likewise

includes Annex A controls on access control (control 5.15), information access restriction (control 8.3), privileged access rights (control 8.2), and segregation of networks (control 8.22).[66]

348. Instructure represented that it complied, telling the public that access to its systems was "restricted to authorized users based on their roles and responsibilities."[67] The Data Breach proved otherwise. ShinyHunters began with a Free-for-Teacher Canvas account and a support ticket. When an Instructure customer-service agent opened that ticket, the malicious code gave ShinyHunters an authorization token with elevated access to the Canvas application, which ShinyHunters used to generate reports containing user data and exfiltrate them to external infrastructure.[68] As Instructure has since admitted, a single vulnerability and a compromised account enabled access across all 8,800 institutions. In a properly segregated system, a support agent's session would not carry authority over platform-wide reporting and export functions, and no single credential or token would unlock data belonging to users at every customer institution.

349. Instructure has further admitted that, before the Data Breach, it had not restricted administrative access to known locations, had not implemented rate limiting to prevent automated account enumeration, and had not locked down sensitive administrative paths with tightened API

---

[66] *NIST, Special Publication 800-53 Rev. 5, Security and Privacy Controls for Information Systems and Organizations*, NIST, https://csrc.nist.gov/pubs/sp/800/53/r5/upd1/final (Sept. 2020, updated Dec. 2020), *controls AC-4, AC-6, AC-6(5), SC-2*; *Center for Internet Security, CIS Critical Security Controls v8,* CENTER FOR INTERNET SECURITY, https://controls-assessment-specification.readthedocs.io/en/latest/, *Safeguards 3.3, 3.12, 12.2; 2017 Trust Services Criteria for Security, Availability, Processing Integrity, Confidentiality, and Privacy (with Revised Points of Focus, 2022)*, Am. Inst. of Certified Pub. Accts. (Sept. 30, 2023), https://www.aicpa-cima.com/resources/download/2017-trust-services-criteria-with-revised-points-of-focus-2022, *CC6.1 & points of focus; ISO/IEC 27001:2022, Annex A, controls 5.15, 8.2, 8.3, 8.22.*

[67] Instructure Trust Center: Security, Instructure Holdings, Inc., https://www.instructure.com/trust-center/security (last visited May 15, 2026).

[68] CROWDSTRIKE, INSTRUCTURE: INTERIM FACT SHEET 2–3 (MAY 13, 2026).

access controls. Each is a textbook access-restriction control. The FBI directed organizations targeted by this same threat-actor cluster to "[e]nforce IP-based access restrictions and monitor and detect API usage, looking for unusual or malicious behavior," and to "[a]pply the Principle of Least Privilege to user accounts and groups, allowing only the performance of authorized actions."[69] Google's Threat Intelligence Group likewise advised organizations to "[i]mplement IP address restrictions" by setting "login ranges and trusted IPs."[70] The OWASP API Security Top 10 warns that "[a]dministrative functions are key targets" for attackers and directs developers to "deny all access by default, requiring explicit grants to specific roles for access to every function."[71] Instructure now advertises that it has "restricted administrative access to trusted locations only and added rate limits to block automated attempts by unauthorized actors to identify valid accounts," and has "locked down sensitive admin functions and tightened API access controls."[72] None of these measures required new technology, and each was called for by the standards Instructure claimed to follow long before April 2026.

350. *Detection of mass exfiltration.* ShinyHunters did not take a handful of records. By its own account, it took more than 3.65 terabytes of data relating to approximately 275 million individuals, including "[s]everal billions of private messages."[73] According to CrowdStrike,

---

[69] *FBI FLASH-20250912-001, supra.*

[70] *Google Threat Intelligence Group, supra.*

[71] *OWASP API Security Top 10, API5:2023 Broken Function Level Authorization*, OWASP API Security, https://owasp.org/API-Security/editions/2023/en/0xa5-broken-function-level-authorization/.

[72] *Instructure Trust Center: Security (Oct. 6, 2026 version), supra.*

[73] *Instructure Holdings, Inc. (Canvas LMS, instructure.com),* Ransomware.live, https://www.ransomware.live/id/SW5zdHJ1Y3R1cmUgSG9sZGluZ3MsIEluYy4gKENhbnZhIExNUywgaW5zdHJ1Y3R1cmUuY29tKUBzaGlueWh1bnRlcnM (last visited May 21, 2026).

ShinyHunters generated reports containing user data and transferred them to external infrastructure over multiple days, between April 28 and April 30, 2026.[74] Extracting data at that scale from a production system generates precisely the signals—anomalous report generation, unusual API volume, and sustained outbound transfers to unfamiliar destinations—that a functioning monitoring program is designed to catch.

351. The standards Instructure claimed to meet require such monitoring. NIST SP 800-53 requires organizations to monitor systems to detect "[a]ttacks and indicators of potential attacks" (SI-4); to "[e]mploy automated tools and mechanisms to support near real-time analysis of events" (SI-4(2)); to monitor inbound and outbound communications traffic for "unusual or unauthorized activities or conditions" (SI-4(4)); and to review and analyze audit records for indications of inappropriate or unusual activity (AU-6). NIST further catalogs controls to "[p]revent the exfiltration of information" (SC-7(10)). The SOC 2 Trust Services Criteria require an entity to monitor "system components and the operation of those components for anomalies that are indicative of malicious acts" (CC7.2)—including anomalies arising from the "use of compromised identification and authentication credentials"—and to "restrict[] the transmission, movement, and removal of information to authorized internal and external users and processes"

[74] *CrowdStrike, supra, at 2–3.*

(CC6.7). ISO/IEC 27001:2022 likewise includes Annex A controls on data leakage prevention (control 8.12), logging (control 8.15), and monitoring activities (control 8.16).[75]

352. Monitoring for bulk data exports was also the specific defense that government and industry prescribed against this threat actor. Google's Threat Intelligence Group advised in June 2025 that Salesforce customers could "monitor activities like large data downloads . . . and automatically trigger alerts or block these actions."[76] The FBI's September 2025 FLASH alert directed organizations to "[m]onitor network logs and browser session activity for anomalous activity, to include indicators of data exfiltration."[77] Mandiant published ready-made detection logic for, among other things, "Bulk API Large Result Download" and "Sensitive Report Export by Non-Integration User"—the same report-generation-and-export pattern ShinyHunters used against Canvas.[78] And the OWASP API Security Top 10 identifies as a top API risk the failure to limit the "[n]umber of records per page to return in a single request-response," directing developers

---

[75] *NIST, Special Publication 800-53 Rev. 5, Security and Privacy Controls for Information Systems and Organizations (Sept. 2020, updated Dec. 2020), https://csrc.nist.gov/pubs/sp/800/53/r5/upd1/final, controls AU-6, SC-7(10), SI-4, SI-4(2), SI-4(4); Center for Internet Security, CIS Critical Security Controls v8,* CENTER FOR INTERNET SECURITY, https://controls-assessment-specification.readthedocs.io/en/latest/*, Safeguards 3.13, 8.11, 13.1; 2017 Trust Services Criteria for Security, Availability, Processing Integrity, Confidentiality, and Privacy (with Revised Points of Focus, 2022)*, Am. Inst. of Certified Pub. Accts. (Sept. 30, 2023), https://www.aicpa-cima.com/resources/download/2017-trust-services-criteria-with-revised-points-of-focus-2022, *CC6.7, CC7.2 & points of focus; ISO/IEC 27001:2022, Annex A, controls 8.12, 8.15, 8.16.*

[76] *Google Threat Intelligence Group, supra.*

[77] *FBI FLASH-20250912-001, supra.*

[78] *ElAhdan et al., supra.*

to "[i]mplement a limit on how often a client can interact with the API within a defined timeframe (rate limiting)."[79]

353. Instructure represented that it maintained "robust and considerable network and security monitoring to protect our customers and detect potential threats before they have a chance to have any impact," and told customers that it used AWS GuardDuty "to alert and inform on security incidents occurring against Instructure's services hosted in AWS" and sent all output "to Instructure's centralized logging management system for further analysis and alert generation."[80] Yet Instructure did not identify the attack until April 29, 2026, by which time ShinyHunters had held elevated access for days and had already begun exfiltrating data, contrary to its representations to the public. Only after the Data Breach did Instructure announce that it would "deploy new logging and monitoring capabilities, plus additional blocking tools including CrowdStrike Falcon and Fastly's Signal Sciences web application firewall."[81] But, those are the controls and security infrastructure the standards required all along.

354. Instructure's failures to require MFA, to segregate customer data and restrict privileged access, and to detect mass exfiltration were not shortfalls from aspirational best practice. They were departures from baseline requirements of the very standards Instructure publicly claimed to meet—and under which it had renewed its certifications just months earlier. Those

---

[79] *OWASP, API Security Top 10 2023, API4:2023 Unrestricted Resource Consumption,* https://owasp.org/API-Security/editions/2023/en/0xa4-unrestricted-resource-consumption/.

[80] https://web.archive.org/web/20260330162620/https://www.instructure.com/trust-center/security#panel-65344.

[81] *https://www.instructure.com/en-gb/resources/blog/6-ways-were-hardening-canvas-lms-after-security-incident.*

failures call into serious question the accuracy of Instructure's representations that its controls had been independently audited and certified as compliant with those standards.

355. Notably, although Instructure represented that data was encrypted in transit and at rest, the nature of the breach indicates that the stolen data was obtained in an unencrypted, readable, and usable form, demonstrating that it was not effectively protected against unauthorized access.

356. Moreover, Instructure was well aware of prior security incidents and vulnerabilities affecting its platform and related environments, including issues associated with access pathways and legacy or auxiliary systems, yet failed to timely remediate or fully eliminate the underlying security gaps that were later exploited in the Data Breach.

357. Instructure's certifications do not establish that its program conformed to those frameworks in practice.

358. In reality, a program that left MFA optional for its school customers, gave a support agent's session platform-wide reporting and export authority, and failed to detect and prevent bulk exfiltration and a secondary attack by the same malicious actor just days later, did not reasonably conform to those frameworks, and was inconsistent with the security commitments Instructure published.

359. Instructure failed to implement a reasonable security program tailored to the scale of Instructure's platform, the sensitivity of the data it held—much of it belonging to children—the resources available to it, and the availability of solutions to prevent the Data Breach.

360. Plaintiffs and Class Members entrusted Instructure with highly sensitive personal information that reveals extraordinarily granular details, including the innermost thoughts and

insecurities of themselves and/or their children—the disclosure of which invades and infringes upon their basic privacy rights and norms, as well as the Plaintiffs' and Class Members' ability to protect themselves and their children. In entering into the relevant contracts at issue, it was of utmost importance that Instructure do everything it was contractually obligated to do in order to protect this data and maintain secure, reliable, and uninterrupted access to the Canvas platform.

### B. Instructure is Obligated to Comply with FERPA, COPPA, and State Statutes Governing the Protection of Data and Educational Information, and Failed to Do So

361. Under the Family Educational Rights and Privacy Act1798 (FERPA) and its implementing regulations, education records are protected from unauthorized disclosure, and institutions in possession of education records are required to maintain reasonable security of those records.[82]

362. Education records may include, but are not limited to, transcripts, class lists, student course schedules, health records, student financial information, and student disciplinary records, and FERPA applies to records maintained by third parties acting on behalf of an educational institution.[83]

---

[82] *Responsibilities of Third-Party Service Providers under FERPA*, PRIVACY TECHNICAL ASSISTANCE CENTER (Aug. 2015), https://studentprivacy.ed.gov/sites/default/files/resource_document/file/Vendor%20FAQ.pdf.

[83] *Id.*; Lauren N. Watson and Evan J. Yahng, *President Trump Orders Closure of the Department of Education: What Schools and EdTech Companies Need to Know About FERPA*, OGLETREE DEAKINS (Apr. 14, 2025), https://ogletree.com/insights-resources/blog-posts/president-trump-orders-closure-of-the-department-of-education-what-schools-and-edtech-companies-need-to-know-about-ferpa/.

363. Instructure is also subject to the Children's Online Privacy Protection Act (COPPA), as evidenced by its own COPPA privacy policy.[84]

364. COPPA applies to the collection of personal information about children under the age of 13, where "personal information" includes, among other things: "first and last name;" "online contact information" of any kind, including a "screen or user name"; "a persistent identifier" such as IP address or unique device identifier; and "[a] photograph, video, or audio file where such file contains a child's image or voice."[85]

365. In addition to requiring verifiable parental consent before collecting this personal information, COPPA implementing regulations require covered entities to retain personal information "for only as long as is reasonably necessary to fulfill the specific purpose(s) for which the information was collected" and to "delete the information using reasonable measures to protect against unauthorized access to, or use of, the information in connection with its deletion."[86] These regulations also require covered entities to have a written data retention policy setting out their data retention and deletion practices.[87]

366. Defendants were also required to comply with various states' laws regarding the protection of educational data. For example, California's Student Online Personal Information Protection Act (SOPIPA) applies to any operator of an online service with knowledge that the

---

[84] *Instructure COPPA Privacy Policy*, INSTRUCTURE (effective date Apr. 1, 2021), https://www.instructure.com/policies/coppa-privacy.

[85] 16 CFR 312.2.

[86] 16 CFR 312.10.

[87] *Id.*

service is used primarily for K-12 school purposes and was designed and marketed for K-12 school purposes. Cal. Bus. & Prof. Code § 22584(a).

367. Defendants design, market, and sell Canvas to K-12 schools and school districts, including through a dedicated K-12 offering, and knows that K-12 students and teachers use it at the direction of their schools for classroom instruction, assignments, assessments, and communication. Defendants are therefore “operators” under SOPIPA.

368. SOPIPA protects “covered information,” which includes personally identifiable information and materials created or provided by a student, parent, or school employee in using the operator's service. That includes names, email addresses, student identifiers, text messages, and documents. Cal. Bus. & Prof. Code § 22584. The information compromised in the Data Breach, including students' names, email addresses, student ID numbers, and messages exchanged with teachers and classmates, is covered information.

369. SOPIPA required Defendants to “[i]mplement and maintain reasonable security procedures and practices appropriate to the nature of the covered information, and protect that information from unauthorized access, destruction, use, modification, or disclosure.” Cal. Bus. & Prof. Code § 22584(d)(1). Defendants violated this duty. They failed to secure the accounts through which the threat actor gained access, failed to detect and contain the intrusion, and declared the incident contained while the threat actor retained the ability to access and alter the platform. As a result, K-12 students' covered information was accessed and exfiltrated without authorization.

370. SOPIPA was enacted to protect K-12 students from precisely this harm: the unauthorized access to and disclosure of personal information they are required to provide to

education technology vendors as a condition of attending school. Plaintiffs and K-12 Class Members are within the class of persons SOPIPA was designed to protect, and their injuries are of the type SOPIPA was designed to prevent.

371. Due to the highly sensitive and personal nature of the information acquired and stored, Instructure knew or reasonably should have known it needed to comply with educational industry standards related to data security and all federal and state laws and regulations protecting student data. It also had a duty to provide adequate notice to customers if user data was disclosed without proper authorization.

372. Instructure could have prevented or mitigated the effects of the Data Breach—indeed, it was required to—by ensuring that it had implemented and followed appropriate data security measures or by better selecting its business associates to whom it intended to and did disclose user data. Its failure to do so constitutes a breach of its duties under FERPA, COPPA, and SOPIPA resulting in the exposure of Plaintiffs' and Class Members' Sensitive Information.

**C. Instructure Failed to Comply with FTC Guidelines and Industry Standards**

373. According to the Federal Trade Commission (FTC), the need for data security should be factored into all business decision-making.[88] To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, like Instructure, should employ to protect against unlawful exfiltration of personal data.

374. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices

[88] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (June 2015) ("*Start with Security*"), https://bit.ly/3uSoYWF.

for businesses.[89] The guidelines explain that businesses should: protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.

375. The guidelines also recommend that businesses watch for large amounts of data being transmitted from their systems and that they have a response plan ready in the event of a breach.

376. The FTC recommends that companies not maintain personal data longer than needed for authorization of a transaction; properly dispose of personal information no longer needed; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network to uncover unapproved activity; verify that privacy and security features function properly; update and patch third-party software; and verify that third-party service providers have implemented reasonable security measures.[90]

377. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act of 1914 ("FTC

[89] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://bit.ly/3u9mzre.

[90] *See Start with Security*, *supra* n.88.

Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

378. These FTC enforcement actions include actions against entities entrusted with vast swaths of consumers' personal data, like Instructure.[91]

379. Because these and similar actions, which further clarified the measures businesses must take to meet their data security obligations, were initiated before the Data Breach, Instructure knew or should have known that its data security protocols were inadequate and likely to result in the unauthorized access to and/or theft of user data.

380. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to user data constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

381. Further, Instructure made a public commitment to maintain a high level of privacy and security for the student data it collects and maintains, binding itself to comply with certain reasonable standards of data security, through the Future of Privacy Forum's Student Privacy Pledge (SPP).[92]

382. Among other things, Instructure committed to "not knowingly retain[ing] Student PII beyond the time period required to support the authorized educational/school purposes, or as

---

[91] *See, e.g.*, *In re LabMD, Inc.*, 2016 WL 4128215, at *32 (FTC July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.") (later vacated by *LabMD, Inc. v. FTC*, 894 F.3d 1221 (11th Cir. 2018)).

[92] Product Privacy | Policy. While the Future of Privacy Forum announced it was "sunsetting" the SPP as of April 25, 2025, it noted "participating companies remain legally bound by Pledge commitments with regard to data collected during the period they were signatories." Student Privacy Pledge - Future of Privacy Forum.

authorized by the parent/student;" "maintain[ing] a comprehensive security program that is reasonably designed to protect the security, confidentiality, and integrity of Student PII against risks – such as unauthorized access or use, or unintended or inappropriate disclosure – through the use of administrative, technological, and physical safeguards appropriate to the sensitivity of the information;" and "requir[ing] that our vendors with whom Student PII is shared in order to deliver the educational service, if any, are obligated to follow these same commitments for the given Student PII."[93]

383. An FAQ page explaining aspects of the SPP clarifies that signatories are required to have "[a]dministrative, technical, and physical safeguards . . . designed to protect against . . . external risks, such as a malicious hack or ransomware attack," and that a violation of the SPP's commitments was "an unfair or deceptive trade practice" in violation of Section 5 of the FTC Act.[94]

384. Federal guidance also specifically addressed the class of vulnerability ShinyHunters exploited to enter Canvas. In September 2024, CISA and the FBI issued a joint Secure by Design Alert to software manufacturers declaring that "cross-site scripting vulnerabilities are preventable and should not be present in software products," and urging manufacturers to "[u]se modern web frameworks that offer easy-to-use functions for output encoding to ensure proper escaping or quoting."[95] A year earlier, in the K-12 Pledge, Instructure

---

[93] Privacy Pledge - School Service Providers | Pledge to Parents & Students

[94] FAQs - Pledge 2020 | Pledge to Parents & Students

[95] *CISA & FBI, Secure by Design Alert: Eliminating Cross-Site Scripting Vulnerabilities (Sept. 17, 2024), https://www.cisa.gov/resources-tools/resources/secure-design-alert-eliminating-cross-site-scripting-vulnerabilities.*

had committed to document its actions to eliminate "entire classes of vulnerabilities," including through "web template frameworks." Canvas nevertheless contained at least two exploitable cross-site scripting vulnerabilities, which ShinyHunters used on April 25 and May 7, 2026.

### D. Instructure Failed to Protect Plaintiffs' and Class Members' Personal and Private Data

385. The Data Breach, which compromised Plaintiffs' and Class Members' Sensitive Information, including their private communications, and interfered with their bargained-for use of Instructure's Canvas product, occurred over the span of several weeks: between April 22, 2026, and May 7, 2026.

386. CrowdStrike—an American cybersecurity company known for handling incident response and forensic investigations in the aftermath of data security incidents—prepared an investigatory report for Instructure on or around May 13, 2026, which detailed the following incident timeline:[96]

- On **April 22, 2026,** the threat actor used a Free-for-Teacher Canvas account to create a support ticket with malicious code embedded in it.
- On **April 25, 2026**, a customer service agent accessed the support ticket, which resulted in the execution of the threat actor 's malicious code, targeting a cross-site scripting (XSS) vulnerability, which enabled the threat actor to gain unauthorized access to the Canvas Platform. Thereafter, CrowdStrike determined that, using the XSS exploit, the threat actor gained access to an authorization token which provided elevated access to the Canvas Application.

[96] CROWDSTRIKE, INSTRUCTURE: INTERIM FACT SHEET 2–3 (MAY 13, 2026).

- Between **April 28 and April 30, 2026**, the threat actor generated reports containing data, including *user data*, and exfiltrated those reports to external infrastructure.
- On **May 7, 2026,** a separate XSS exploit was executed by the threat actor, providing the threat actor access, which they leveraged to deploy a CSS file at 3:51 PM ET, which rendered a ransom note visible to certain Canvas users, and interrupted their expected use of Canvas's services. It is presently understood that this ransom message appeared on approximately 300 institutional login pages.
- In response to this vulnerability exploit, Instructure thereafter placed the Canvas Platform into maintenance mode to attempt to implement containment measures, further interrupting ordinary use of Canvas services.
- As of **May 13, 2026,** the investigation into the extent of data exfiltration remained ongoing.

387. Despite Instructure's repeated public representations concerning its purportedly robust cybersecurity architecture, it failed to detect the unauthorized intrusion for approximately seven days.

388. Instructure did not identify the attack until April 29, 2026, at which point it claims to have revoked the unauthorized party's access, retained outside forensic experts, and commenced an internal investigation.[97]

389. On May 1, 2026, Instructure publicly disclosed that it had suffered a cybersecurity incident and that data had been stolen in connection with an attack on its systems. While Instructure

[97] *Security Incident Update & FAQs*, INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/incident_update (last visited May 15, 2026).

has provided almost no information about the nature of the attack that led to the Data Breach, on April 30, 2026, it also publicly reported a service disruption "to tools relying on API keys,"[98] or keys that allow two computer programs to communicate with one another on the internet,[99] strongly indicating that this was the access point that allowed the attackers to access Canvas.

390. On May 2, 2026, Instructure provided limited additional details regarding the incident, stating that it had revoked "privileged credentials and access tokens associated with affected systems," deployed security patches, rotated certain internal keys, and implemented "increased monitoring across all platforms."[100] Instructure further disclosed that the information involved in the incident included "certain identifying information of users at affected institutions, such as names, email addresses, and student ID numbers, as well as messages among users."[101] Instructure would later disclose that it believed the incident also included usernames, course names, and enrollment information.[102]

391. The affected information is highly valuable to cybercriminals and can be readily weaponized for phishing attacks, impersonation schemes, credential attacks, identity theft, and further compromise and injury to Plaintiffs and Class Members.

---

[98] *Confirmed Security Incident*, Instructure (May 1, 2026), https://status.instructure.com/.

[99] *What is an API Key? Working and Types*, GEEKSFORGEEKS (July 23, 2025), https://www.geeksforgeeks.org/software-engineering/what-is-api-key/.

[100] *Security Incident Update & FAQs*, INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/incident_update (last visited May 15, 2026).

[101] *Id.*

[102] Incident Fact Sheet, INSTRUCTURE HOLDINGS, INC., May 13, 2026, https://www.instructure.com/sites/default/files/pdf/InstructurebyCanvas-Incident-Fact- Sheet-051326.pdf (last accessed May 21, 2026).

392. The threat actor responsible for the Data Breach was ShinyHunters, a notorious cybercriminal extortion gang. Almost immediately, the extortion group ShinyHunters claimed responsibility for the attack on its data leak site, claiming they were able to access Instructure's data through a vulnerability in Instructure's systems.[103] ShinyHunters asserted that nearly 9,000 schools worldwide were affected; data relating to approximately 275 million individuals—including students, teachers, and staff—was stolen; and the stolen dataset contained several billion




**Figure 1: Screen capture of ShinyHunters' announcement. Ionut Arghire, *EdTech Firm Instructure Discloses Data Breach Amid Hacker Leak Threats*, Security Week (May 4, 2026), https://www.securityweek.com/edtech-firm-instructure-discloses-data-breach/.**

private messages among students and teachers and between students and other students.[104]

---

[103] Lorenzo Franceschi-Bicchierai, *Hackers steal students' data during breach at education tech giant Instructure*, MSN (May 5, 2026), https://www.msn.com/en-us/money/other/hackers-steal-students-data-during-breach-at-education-tech-giant-instructure/ar-AA22rKmg?ocid=BingNewsSerp.

[104] Lawrence Abrams, *Instructure confirms data breach, ShinyHunters claims attack*, BLEEPINGCOMPUTER (May 3, 2026), https://www.bleepingcomputer.com/news/security/instructure-confirms-data-breach-shinyhunters-claims-attack/. \

393. On May 3, 2026, Ransomware.live posted the following ransom note from ShinyHunters:

> Nearly 9,000 schools worldwide affected. 275 million individuals data ranging from students, teachers, and other staff containing PII. Several billions of private messages among students and teachers and students and other students involved, containing personal conversations and other PII. Your Salesforce instance was also breached and a lot more other data is involved. Pay or Leak. This is a final warning to reach out by 6 May 2026 before we leak along with several annoying (digital) problems that'll come your way. Make the right decision, don't be the next headline. | Size: 3.65TB+ (uncompressed) | Updated: 3 May 2026 | Warning: FINAL WARNING PAY OR LEAK[105]

394. ShinyHunters' post included a "final warning" that Instructure needed to pay a ransom, or ShinyHunters would leak the data, with no indication of when ShinyHunters intended to make good on its threat. A member of ShinyHunters has shared sample data with a journalist that indicates names, email addresses, and phone numbers were impacted, as well as private messages sent on Canvas.[106] Plaintiffs and Class Members therefore have reason to believe their Sensitive Information, including their private messages, have been or will be imminently published or otherwise further disclosed to unknown parties who intend to misuse this sensitive and highly personal information.

395. According to Webinar FAQs shared by Instructure on May 15, 2026, Instructure ultimately agreed to pay the ransom to ShinyHunters.

---

[105] *Instructure Holdings, Inc. (Canvas LMS, instructure.com)*, RANSOMWARE.LIVE, https://www.ransomware.live/id/SW5zdHJ1Y3R1cmUgSG9sZGluZ3MsIEluYy4gKENhbnZhIExNUywgaW5zdHJ1Y3R1cmUuY29tKUBzaGlueWh1bnRlcnM (last visited May 21, 2026).

[106] Lorenzo Franceschi-Bicchierai, *Hackers steal students' data during breach at education tech giant Instructure*, MSN (May 5, 2026), https://www.msn.com/en-us/money/other/hackers-steal-students-data-during-breach-at-education-tech-giant-instructure/ar-AA22rKmg?ocid=BingNewsSerp.

396. In these same FAQs, Instructure admitted to falling short of its notice obligations to affected Plaintiffs and Class Members, acknowledging that communication about the breach was "delayed, inconsistent, and limited in distribution."

397. Instructure further admitted that *a single vulnerability and a compromised account* enabled access across *all 8,800 institutions* because, prior to the Data Breach, Instructure failed to implement basic preventative security measures including: restricting administrative access to known locations only, implementing rate limiting to prevent automated account enumeration, and locking down sensitive admin paths with tightened API access controls.

398. This is the second time that Instructure has been successfully attacked by ShinyHunters in a twelve-month period. In September 2025, Instructure disclosed a breach of its Salesforce instance affecting customer support data, for which ShinyHunters claimed responsibility.[107] Instructure therefore had good reason to be on high alert for exactly this kind of targeted attack. Indeed, ShinyHunters again claimed to have accessed Instructure's Salesforce instance, indicating they were able to reuse the same or similar vulnerabilities just months after a successful attack to get deeper into Instructure's networks and extract more data.[108]

399. Instructure had actual notice of this specific threat culminating in the Data Breach.

---

[107] *Instructure Discloses Cybersecurity Incident Affecting Canvas Platform*, Ciphers Security (May 2, 2026), https://cipherssecurity.com/instructure-canvas-security-incident-2026/; *Instructure Data Breach Exposes Canvas Users After ShinyHunters Attack*, Secure.com (May 4, 2026), https://www.secure.com/news/instructure-canvas-data-breach-shinyhunters?utm.

[108] Ionut Arghire, *EdTech Firm Instructure Discloses Data Breach Amid Hacker Leak Threats*, SECURITY WEEK (May 4, 2026), https://www.securityweek.com/edtech-firm-instructure-discloses-data-breach.

400. As mentioned, in September 2025, Instructure disclosed a breach of its Salesforce instance affecting customer-support data, and ShinyHunters claimed responsibility.

401. That same month, the FBI's September 12, 2025, FLASH alert identified the remedial measures: phishing-resistant MFA, IP-based access restrictions, least privilege, and monitoring for data exfiltration.

402. Instructure did not implement those measures in the seven months that followed.

403. It implemented them only after the Data Breach, when it required MFA for administrators, restricted administrative access to trusted locations, added rate limiting, tightened API access controls, and deployed new logging and monitoring capabilities.

404. The absence of those controls is what allowed ShinyHunters, again targeting Instructure's customer-support operation, to turn a single support agent's session into access to data at all 8,800 institutions.

405. In other words, the Data Breach was carried out by the same group, against the same part of the company, and succeeded because Instructure lacked the controls the FBI and Google had told organizations to implement against that group.

406. Instructure also had actual notice of this threat from the December 2024 breach of PowerSchool, a K–12 education-technology vendor whose student information system integrates directly with Canvas. In January 2025, PowerSchool publicly disclosed that an unauthorized actor had used a single compromised credential, belonging to an offshore technical-support subcontractor and not protected by multi-factor authentication, to access and exfiltrate data belonging to tens of millions students and teachers, entrusted to PowerSchool.

407. The PowerSchool breach thus put the education-technology industry, including Instructure, on notice of the precise risk that materialized here: the compromise of a single support account, unprotected by the myriad methods described above, allowed an attacker to extract data belonging to millions of individuals The PowerSchool breach was widely publicized, led to the attacker's federal prosecution and a state attorney general enforcement action, and prompted PowerSchool to publicly require SSO, MFA, VPN, and VDI for all employees and contractors accessing customer data. Instructure knew or should have known of these risks and yet still did not tighten security surrounding its own support personnel's cross-customer access until after the Data Breach.

408. The Sensitive Information compromised in the Data Breach was highly sensitive, confidential, and in some cases immutable. According to Instructure, the compromised data included: first names, last names, email addresses, and student ID numbers, as well as user messages.[109] While Instructure asserted on May 2, 2026, that no other information was involved "[a]t this time," given the volume of information exposed in various forms, it is unlikely that Instructure has a clear grasp on exactly what data of Plaintiffs and Class Members has been stolen.[110]

409. The compromised Sensitive Information was accessible, unencrypted, unprotected, and vulnerable for acquisition or exfiltration by the unauthorized threat actor—all in violation of myriad duties Instructure owed under state and federal statutory and common law.

---

[109] *Confirmed Security Incident*, Instructure (May 1, 2026), https://status.instructure.com/.

[110] *Id.*

410. To date, most of the affected individuals still have not been notified that their Sensitive Information has been compromised in the Data Breach. As a result, Plaintiffs and Class Members will suffer—indefinitely—from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

### E. The Data Breach Forced Canvas Offline During Final Exams, Further Harming Plaintiffs and the Class

411. Plaintiffs and Class Members rely on Canvas to access course materials, submit assignments, take examinations, view grades, and communicate with one another. Canvas is not optional: their institutions require them to use it to complete coursework and to earn credit and grades.

412. Instructure has acknowledged that it first detected unauthorized activity in Canvas on April 29, 2026. By May 2, Defendants represented that the situation had been "contained," and on May 6, Defendants stated that Canvas was back to normal operation.

413. But on May 7, 2026, the threat actors regained the ability to alter the Canvas platform. The actor did so by exploiting a vulnerability in Defendants' Free-for-Teacher accounts, an attack vector that Defendants had failed to secure despite having been on notice of an active intrusion for more than a week.

414. Instructure took Canvas offline that day, and users who accessed the platform were redirected to a message from ShinyHunters claiming responsibility for the Data Breach.

415. The disruption did not end with Defendants' restoration of service days later.

416. Outages were caused first by Defendants taking Canvas offline and then by institutions disconnecting from Canvas, as some schools continued to block students and teachers from accessing Canvas while they assessed the security threat.

417. Defendants' security failure could not have come at a worse time. The outage occurred at the end of the academic year for many institutions, including during final exam periods at colleges and universities.

418. Plaintiffs and Class Members were left without access to course materials and communications during the finals period, at the precise moment they most needed to study, review lecture materials, submit final projects, and sit for examinations.

419. By April 29, 2026, Instructure knew that ShinyHunters had exploited a cross-site scripting vulnerability reachable through a Free-for-Teacher support ticket.

420. The known remedial steps were to remediate that class of vulnerability or take the Free-for-Teacher environment offline.

421. Instructure did neither before declaring the incident contained on May 2.

422. It suspended Free-for-Teacher only after ShinyHunters executed a second cross-site scripting exploit on May 7.

423. The outage forced institutions across the country to cancel, postpone, and reorganize final examinations—impacting Plaintiffs and Class Members' study schedules, work schedules, and plans to travel after the end of the school year.

424. By way of example, Penn State canceled certain Thursday night and Friday exams; Boise State University canceled Friday's final exams and stated they would not be rescheduled; Mississippi State rescheduled Friday exams for Saturday; UT San Antonio postponed assignments and exams to a then unspecified future date; and James Madison University pushed Friday morning exams to the following Wednesday. The University of Tennessee postponed all exams scheduled for Friday, May 8. The University of Illinois at Urbana-Champaign postponed all final exams and

assignments scheduled for Friday, Saturday, and Sunday, regardless of whether the courses used Canvas. The University of Massachusetts at Dartmouth postponed exams scheduled for Friday and Saturday so students would have time to review course materials that had been inaccessible during the shutdown.

425. The Data Breach and its aftermath also directly disrupted K–12 school districts serving minor children. By way of example, Lexington City Schools in North Carolina, which operates schools from pre-kindergarten through high school, disabled Canvas districtwide on May 7, 2026, leaving teachers and students unable to access coursework until further notice. Broward County Public Schools in Florida blocked Canvas access districtwide and warned students and staff not to log in from personal devices or click on suspicious Canvas links or messages, leaving high school students unsure how to complete that day's classwork. Montgomery County Public Schools in Maryland continued to restrict Canvas access even after service was restored, pending confirmation that all services were safe to use.

426. And, minor students were also directly exposed to the extortion campaign itself. For example, on May 7, 2026, students logging into Canvas in districts including Knox County Schools in Tennessee and districts across Utah were confronted with ShinyHunters' ransom message, which threatened to leak data from affected schools.

427. ShinyHunters made light of Instructure's failure to contain the Data Breach, taking over victims' Canvas accounts with a pop-up stating, "ShinyHunters has breached Instructure (again)":




428. The outage was a direct, natural, and foreseeable consequence of Defendants' failure to implement reasonable data security measures, to remediate known vulnerabilities, and to fully contain an intrusion it had detected days earlier.

429. Had Defendants employed adequate safeguards, monitored and secured its platform and accounts, and accurately determined whether the threat actor retained access before declaring the incident contained, the unauthorized actor would not have been able to compromise the platform a second time, and Defendants would not have needed to take Canvas offline.

430. To the extent Instructure maintained any written security program, it either did not include adequate protocols for responding to a data breach and notifying affected individuals, or included such protocols and Instructure did not follow them.

431. Instructure allowed data theft to continue through April 30, after it claims to have revoked the attacker's access on April 29; declared the incident contained while the attacker retained the ability to alter the platform; and, by its own admission, communicated in a way that was "delayed, inconsistent, and limited in distribution."

432. More than five months after the Data Breach, Instructure still has not notified all affected individuals.

433. As a result of the outage caused by the Data Breach, Plaintiffs and Class Members suffered injury, including: (a) loss of access to course materials, assignments, grades, and communications for which they paid through tuition and fees; (b) lost time and lost study opportunity during the final examination period; (c) cancellation, postponement, and rescheduling of examinations and assignment deadlines, requiring them to re-prepare and, in some instances, sit for exams on short notice or on weekend dates; (d) out-of-pocket expenses, including costs to change travel arrangements, housing, and move-out plans, and lost wages from rearranged work schedules; (e) uncertainty regarding the completion and calculation of final grades; and (f) anxiety, stress, and emotional distress arising from the disruption of their academic work at a critical juncture, compounded by the knowledge that the criminals who disabled the platform held their personal information.

434. The outage further demonstrated, in a manner visible to every affected user, that the threat actor had the ability to manipulate the very platform Plaintiffs and Class Members were

required to log into, heightening their reasonable fear that their Sensitive Information had been and would continue to be accessed and misused, and causing them to spend additional time monitoring their accounts and communications.

435. Plaintiffs and Class Members did not receive the benefit of the bargain for which they and their institutions paid, namely, a secure and reliably available learning platform. The value of the services Plaintiffs and Class Members received was diminished by Defendants' failure to safeguard the platform and the resulting loss of access.

**F. The Data Breach Could Have Been Prevented with Basic "Hardening" Measures that Instructure Implemented in the Aftermath of the Data Breach**

436. Only after the Data Breach did Instructure act to implement basic security measures, like multi-factor authentication (MFA), that the security standards Instructure claimed to meet required to be in place long before the Data Breach, and that would have prevented or substantially reduced the impact of the Data Breach.

437. On its own community blog, Instructure announced that "[i]n response to the security incident that affected Canvas in May 2026," it had launched a "comprehensive hardening program" meant to make the platform more resilient to compromise and faster at detecting anomalous activity.[111]

[111] Steve Proud, *Mandatory MFA for admins coming to all Instructure products*, June 17, 2026, https://community.instructure.com/en/discussion/666375/mandatory-mfa-for-admins-coming-to-all-instructure-products.

438. Instructure has also acknowledged, elsewhere on its blog, that it redirected engineering resources "to strengthen platform security, resilience, and reliability."[112] Those resources were not previously devoted to security, but nothing prevented Instructure from dedicating them to that purpose before the Data Breach.

439. Among the first changes, Instructure said it would, for the first time, require phishing-resistant MFA for administrative users of Canvas.

440. Before the Data Breach, MFA was merely an optional feature in Canvas, even for accounts with administrative privileges. Instructure has now admitted that administrative users hold elevated permissions and are the most attractive target for credential-based attacks, and that requiring MFA ensures "a stolen password alone can't grant access." Instructure knew or should have known these facts long before May 2026. Mandatory MFA for privileged accounts is a basic, low-cost safeguard required by NIST SP 800-53 and the SOC 2 Trust Services Criteria, as alleged above. Even now, Instructure's remedial measures remain incomplete. They do not reach instructors or students, they are not enforced for institutions using third-party single sign-on, and they exclude several Instructure products altogether.

441. Instructure's new MFA requirement is the very measure Instructure committed to pursue in 2023, when it signed CISA's K-12 Pledge and agreed to publish a plan to "nudge all users, including students, towards MFA." Instructure had more than two and a half years to honor that commitment. It acted only after ShinyHunters had taken the Sensitive Information of millions of students, teachers, and staff.

---

[112] Ruth Thornton, *Canvas Roadmap Update: What We Heard and What's Next*, July 16, 2026, https://community.instructure.com/en/discussion/666626/canvas-roadmap-update-what-we-heard-and-what-s-next.

442. Even with this step towards greater security, Instructure's limitation of MFA requirements to only administrative users still leaves major security gaps that leave ordinary Canvas users like Plaintiffs and Class Members still vulnerable to attack by malicious actors.

443. Instructure has also disclosed other post-Breach "hardening" measures, including:[113] (1) efforts to "reduc[e] the attack surface" by "reducing the number of places or pathways an attacker could potentially exploit to get into, manipulate, or move through a system and further hardening our application defenses" and "patching the vulnerabilities used in the [2026] attack"; (2) "accelerating detection and response" by "improving real-time visibility into activity within Canvas by automating more of our security detection and response processes" and "deploy[ing] new logging and monitoring capabilities, plus additional blocking tools including CrowdStrike Falcon and Fastly's Signal Sciences web application firewall"; and (3) "testing our defenses (and assumptions) more frequently" including by "using new AI-enabled tools and practices to create faster feedback and response cycles as we validate security changes".

444. Of note, Instructure knew or should have known that these measures were necessary to prevent the Data Breach, *before* it occurred, as these measures—including real-time detection and response and centralized logging and monitoring—are required by the standards Instructure claimed to meet (including NIST SP 800-53 controls SI-4 and SI-4(2), CIS Safeguards 8.11 and 13.1, and SOC 2 criterion CC7.2), as alleged above, and are industry standard for entities of Instructure's size housing the sort of sensitive data Instructure was entrusted with.

---

[113] Zach Pendleton, *6 ways we're hardening Canvas LMS after the security incident*, https://www.instructure.com/en-gb/resources/blog/6-ways-were-hardening-canvas-lms-after-security-incident (last accessed Oct. 8, 2026).

445. Instructure's post-Breach measures are too little, too late. They do nothing to protect the Sensitive Information of Plaintiffs and Class Members that was already accessed and exfiltrated in the Data Breach. That information cannot be retrieved, and it remains exposed to criminals indefinitely.

446. Instructure's belated adoption of safeguards it could have implemented all along confirms that the Data Breach was preventable. Plaintiffs and Class Members now face an ongoing, heightened risk of identity theft and fraud that no after-the-fact security upgrade can undo.

### G. KKR & Co.'s Acquisition of Instructure Materially Contributed to the Data Breach

447. Instructure's security vulnerability issues started well before the breach and were exacerbated by private equity behemoth KKR's acquisition of Instructure on November 13, 2024, for approximately $4.8 billion.

448. Indeed, KKR's involvement with Instructure long pre-dated the culmination of the acquisition, with initial outreach between KKR and Instructure beginning as early as March 2024.[114]

449. Following that initial outreach, KKR was steadily involved with Instructure over the coming months, signing a confidentiality agreement, conducting financial and business diligence, and gaining data room access throughout April, May, and June of 2024.[115]

[114] Instructure Holdings, Inc. Schedule 14C Information, Sept. 5, 2024, https://www.sec.gov/Archives/edgar/data/1841804/000119312524214196/d886442ddefm14c.htm.

[115] *Id.*

450. KKR had significant influence over Instructure in the months preceding its acquisition and, after the acquisition, complete control over Instructure's expenditures and staffing decisions.

451. Once KKR took Instructure private with Dragoneer Investment Group, the private equity duo had complete ownership and control over Instructure's decisions, including cybersecurity and security strategies and staffing.

452. KKR dictates Instructure's strategic directives and uses Instructure's operations, including the Canvas learning management system, to further its private-investment purposes.

453. Following acquisition, KKR became closely involved with Instructure's operations, overseeing and controlling all of Instructure's operations, including controlling certain appointees to Instructure's board of directors.

454. For example, KKR's Saul Kopelowitz—a managing director at KKR—is currently listed as an Instructure board director.

455. With Instructure, KKR followed the private equity playbook of trimming costs and valuable resources in the name of increasing its own profits, which ultimately culminated in the Data Breach.

456. Anonymous employee accounts following KKR's acquisition of Instructure describe a shift towards cost-cutting, including the offshoring of key job roles, at the expense of delivering a quality end-product.

457. For example, in a December 2025 account, one employee described that: "After the private equity takeover, the company shifted entirely to shareholder-first thinking, not education or customers."[116]

458. Another former employee's account detailed that, "[a]fter getting bought out, several rounds of layoffs, and acquiring countless products, it became an unmanageable and unorganized challenge."

459. In August 2026, just months after the Data Breach, a former technical support supervisor, employed for over 10 years by Instructure, described that Instructure's "[c]aring culture [was] eroded by constant layoffs and low pay."[117] The employee pointed in part to the replacement of talented homegrown U.S. labor with cheaper labor from EMEA and APAC regions.[118]

460. Across various employee accounts, a story of replacement by cheaper offshore labor clearly emerges.

461. This story is bolstered by a 2025 report published by the Private Equity Stakeholder Project (PESP), which concluded that "despite KKR's public commitments to shared prosperity and employee ownership, the firm's companies have one of the worst labor track records among its peers."[119]

---

[116] *See* https://www.glassdoor.com/Reviews/Instructure-Reviews-E582803.htm.

[117] *Id.*

[118] *Id.*

[119] Matt Parr, *Report finds labor abuses and safety violations at KKR*, Nov. 6, 2025, https://pestakeholder.org/news/report-finds-labor-abuses-and-safety-violations-at-kkr/.

462. Of note, the PESP report documented a recurring pattern whereby: "KKR-owned companies repeatedly push costs and risks onto workers while extracting profits for investors," and earned KKR a failing grade in PESP's assessment of KKR in terms of its responsibility for mass layoffs at its portfolio companies.[120]

463. Following its acquisition by KKR, decisions directly impacting Instructure's data security became apparent.

464. Instructure's Security Officer was replaced just two months after the KKR acquisition.

465. Nine months after the KKR acquisition of Instructure, Instructure opened an offshore office in the Philippines, which included a Canvas support team.

466. Of note, ShinyHunters initially gained access to Plaintiffs' and Class Members' Sensitive Information by exploiting a support ticket addressed by Canvas's support team.

467. Meanwhile, KKR holds itself out as a sophisticated, tech-focused investor with the expertise to guide companies through digital transformation.

468. KKR publicly represents its commitment to "Protecting Data Security and Privacy." [121]

---

[120] *Id.*

[121] KKR 2024 Sustainability Report, available at https://www.kkr.com/content/dam/kkr/sustainability/pdf/2024-sustainability-report.pdf (last accessed Oct. 8, 2026).

469. This commitment is embodied through KKR's initiatives including "Project Shield," which KKR describes as its dedicated strategy to "improve information security and cyber defense capabilities across our portfolio."[122]

470. This commitment also manifests through KKR's self-expressed commitment to "cyber awareness," through which KKR claims it "continued fostering awareness and engagement among cybersecurity leads at portfolio companies . . . ."[123]

471. KKR further describes as one of its "focus areas" its intention to support the "majority-owned companies in our portfolio" (such as Instructure) by "Protecting data security and privacy" including by "[m]itigating cybersecurity risks, promoting a culture of cyber awareness, and handling personal or sensitive data responsibly."[124]

472. In 2024, the year KKR acquired Instructure, and 17 months before the Data Breach, KKR explicitly committed to "[c]ontinue working with portfolio companies [like Instructure] to facilitate performance improvements across . . . cybersecurity efforts."[125]

473. Altogether, KKR had responsibility, authority, and expertise to ensure that Instructure implemented the basic safeguards required by the security standards Instructure claimed to meet—including requiring the implementation of MFA on Instructure's products.

474. Yet, KKR failed to ensure that Instructure implemented even the most elementary precautions.

---

[122] *Id.*

[123] *Id.*

[124] *Id.*

[125] *Id.*

475. KKR knew or reasonably should have known that Instructure's failure to implement the cybersecurity safeguards required by the standards it claimed to meet would leave millions of its users vulnerable to exactly the kind of breach that occurred here.

**H. The Data Breach Caused Myriad Harms to Plaintiffs and the Class**

476. Plaintiffs and Class Members have been damaged by the exposure and exfiltration of their Sensitive Information in the Data Breach.

477. As a direct result of the Data Breach, Plaintiffs and other Class Members have suffered and will suffer injury, including, but not limited to: (a) the present and continuing risk of targeted phishing, impersonation, account takeover, extortion, and sextortion; (b) the loss of the opportunity to control how their Sensitive Information is used; (c) the compromise and theft of their Sensitive Information, and the resulting loss of privacy in their confidential communications; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from phishing, account takeover, fraud, extortion, or other unauthorized use of their Sensitive Information; (e) loss of productivity and lost opportunity costs associated with addressing and attempting to mitigate the present and continuing consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from phishing, impersonation, fraud, and extortion; (f) costs of protective measures, including changing school and personal account credentials and monitoring minors' online communications; (g) the continued and substantially increased risk to their Sensitive Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Sensitive Information; (h) present and continuing costs in terms of time, effort, and money that

have been and will be expended to prevent, detect, contest, and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; (i) the diminution in value of Plaintiffs' and Class Members' Sensitive Information; and (j) overpayment for the services that were received without adequate data security.

478. To date, Defendants have done nothing to provide Plaintiffs and Class Members with adequate relief for the damages they have suffered as a result of the Data Breach.

479. Moreover, Plaintiffs and Class Members have an interest in ensuring that their Sensitive Information, which remains in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Sensitive Information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

480. Further, as a result of Defendants' conduct, Plaintiffs and Class Members are forced to live with the anxiety that their Sensitive Information—including the contents of private messages they sent and received as students, parents, and teachers—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

### I. Plaintiffs and Class Members Face Significant Present and Continuing Risk

481. Plaintiffs and Class Members suffered injury from the mishandling of their Sensitive Information that can be directly traced to Defendants.

## J. The Stolen Data Is a Ready-Made Targeting Package for Those Who Prey on Students

482. The Data Breach did not expose the kind of data that can be cancelled, reissued, or neutralized with a credit freeze. ShinyHunters took the relationships that make up a school community: students' and teachers' real names, their email addresses, their phone numbers, and their student identification numbers, together with the contents of what ShinyHunters claims are "[s]everal billions of private messages" among students, teachers, and other school personnel. A new card number cannot fix any of this. A child cannot change her name, her school, her teachers, her classmates, or what she once told a teacher in confidence.

483. Taken together, these data elements tell a criminal, for each of up to 275 million people, who the person is, where that person goes to school or works, who that person's teachers and classmates are, and how to reach that person directly by email and text message. The messages add what the person was worried about, struggling with, or confiding. That is precisely the information that sextortionists, groomers, phishers, and extortionists otherwise must gather one victim at a time. The Data Breach delivered it to them in bulk.

484. Instructure knew that a substantial portion of its users were children who had no choice but to use Canvas, and it knew that ShinyHunters had already breached its Salesforce environment in September 2025. The harms described below are not speculative. They are the documented ways in which the specific categories of data stolen here are used against the specific population whose data was stolen.

### K. Federal Law Enforcement and Schools Nationwide Have Warned That the Stolen Data Will Be Used to Target Students and Teachers

485. On May 15, 2026, eight days after the second attack, the FBI issued a public service announcement about the attack titled *ShinyHunters: Cyber Criminal Group Attacks Learning Management System*. The FBI warned that ShinyHunters' "access to sensitive data could provide them an opportunity to sell the stolen data to other cyber criminals or reuse stolen data from education platforms to impersonate school faculty, IT support, financial aid offices or others in future attacks," and that the stolen data could be used to "craft highly sophisticated spearphishing campaigns using real-world context to deceive students and faculty."[126]

486. The FBI further warned that ShinyHunters' pressure tactics reach individuals, not just institutions: "To exert pressure on victims, SH actors commonly use harassment strategies, sending threatening text messages and phone calls to victims and their family members, and in some cases, swatting." The FBI also reported that ShinyHunters "ha[s] sometimes posted exfiltrated data to various iterations of the SH data leak site on the Tor network."[127] The phone numbers and contact information stolen here are precisely what those tactics require.

487. Schools across the country issued the same warning. Troy University told its community that "[t]he primary institutional risk continues to involve phishing, impersonation attempts, and exposure of certain Canvas-hosted communications."[128] Stanford University's

[126] Federal Bureau of Investigation, *Public Service Announcement, ShinyHunters: Cyber Criminal Group Attacks Learning Management System* (May 15, 2026), https://www.ic3.gov/PSA/2026/PSA260515 ("FBI Canvas PSA").

[127] *Id.* The PSA defines swatting as "reporting a false emergency situation with the intention of eliciting a law enforcement or SWAT response."

[128] Troy University Information Technology, *Instructure Security Incident (updates of May 6 and May 8, 2026)*, https://it.troy.edu/instructure-security-incident/.

Information Security Office warned of "[h]yper-personalized phishing emails using real names, course information, and enrollment details" and "[u]rgent calls, texts, or messages impersonating university faculty or staff."[129] School districts in Instructure's home state of Utah, including Box Elder, Daggett, Granite, and Kane County, sent similar warnings to students and parents.[130]

**L. Paying ShinyHunters Did Not, and Cannot, End the Risk**

488. As alleged above, Instructure paid ShinyHunters. It told its customers that it had received "digital confirmation" of the data's destruction in the form of "shred logs," yet conceded that "there is never complete certainty when dealing with cyber criminals."[131] Instructure also assured that "no Instructure customers will be extorted as a result of this incident."[132] Instructure's customers are schools; that assurance does not even purport to protect the students, parents, and teachers whose data was taken. And it rests on the word of criminals. As one security expert explained in response to the payment, "there is no reliable way to verify those claims, and history shows that data is often retained, resold, or used in future extortion attempts."[133]

---

[129] Stanford University IT, *Protect Your Identity After Canvas Security Breach*, May 20, 2026, https://uit.stanford.edu/news/protect-your-identity-after-canvas-security-breach.

[130] Aubree B. Jennings, *Utah schools warn of scams after cyberattack on Canvas causes massive data breach*, KUTV (May 8, 2026), https://kutv.com/news/local/utah-schools-warn-of-scams-after-cyberattack-on-canvas-causes-massive-data-breach.

[131] Kelvin Chan, *Deal reached with hackers to delete data stolen from the Canvas educational platform,* Associated Press, May 12, 2026, https://www.nbcnews.com/tech/tech-news/deal-reached-hackers-delete-data-stolen-canvas-educational-platform-rcna344693; CBS News, *Canvas' parent company strikes deal with hackers to delete data stolen from educational platform,* May 12, 2026, https://www.cbsnews.com/news/canvas-deal-hackers-delete-data-stolen-educational-platform/.

[132] Kathryn Palmer, *Instructure Pays Ransom to Canvas Hackers,* Inside Higher Ed, May 11, 2026, https://www.insidehighered.com/news/tech-innovation/administrative-tech/2026/05/11/instructure-pays-ransom-canvas-hackers.

[133] *Id.* (quoting Cliff Steinhauer, National Cybersecurity Alliance).

489. The education-technology industry's own recent history proves the point. In December 2024, hackers stole records of more than 60 million students and nearly 10 million teachers from PowerSchool, another provider of mandatory school software. PowerSchool paid a ransom in exchange for assurances that the data had been deleted.[134] Five months later, the same data resurfaced in extortion demands sent directly to school districts, and PowerSchool admitted it had known there was "a risk that the bad actors would not delete the data they stole, despite assurances and evidence that were provided to us."[135] The Toronto District School Board announced that "the data was not destroyed."[136] In North Carolina, the threat actors "reached out to a number of employees and public schools across the state," and a state education department spokesperson acknowledged: "We do know that data is not destroyed, and it is out there."[137] Even after the individual responsible was sentenced to four years in federal prison, prosecutors reported that "[m]ultiple school district customers of PowerSchool received follow-on extortion demands linked to the stolen same data."[138]

---

[134] Iain Thomson, *PowerSchool paid thieves to delete stolen student, teacher data. Looks like crooks lied*, The Register, May 8, 2025, https://www.theregister.com/2025/05/08/powerschool_data_extortionist/.

[135] Suzanne Smalley, *Despite ransom payment, PowerSchool hackers now extorting school districts*, The Record, May 7, 2025, https://therecord.media/despite-ransom-payment-powerschool-extorting.

[136] Thomson, *supra* n.134.

[137] Bianca Holman, *PowerSchool hackers attempt to extort money from North Carolina schools, staff*, ABC11, May 7 2025, https://abc11.com/16352928.

[138] Matt Kapko, *PowerSchool hacker sentenced to 4 years in prison*, CyberScoop, Oct. 15, 2025, https://cyberscoop.com/powerschool-hacker-matthew-lane-sentenced/; *see also* Sergiu Gatlan, *PowerSchool hacker gets sentenced to four years in prison*, BleepingComputer, Oct. 15, 2025, https://www.bleepingcomputer.com/news/security/powerschool-hacker-gets-sentenced-to-four-years-in-prison/.

490. ShinyHunters' own record is worse. It operates within a broader criminal alliance that calls itself "Scattered Lapsus ShinyHunters." In October 2025, after ransom deadlines passed, that alliance published millions of records stolen from Salesforce customers on a public leak site, including Qantas customers' names, birth dates, email addresses, and phone numbers.[139] Researchers who track the group report that it "has demonstrated a willingness to extort victims based on promises that it has no intention to keep," and that its playbook includes "threats of physical violence against executives and their families" and swatting.[140] Those researchers trace the group to "The Com," which the FBI describes as "a primarily English speaking, international, online ecosystem comprised of multiple interconnected networks whose members, many of whom are minors, engage in a variety of criminal violations," including "extortion/sextortion of minors."[141]

491. ShinyHunters showed in this very attack that it will go around Instructure to pressure the institutions and people behind the data. On May 7, 2026, it defaced the Canvas login pages of hundreds of schools with a message urging that "[i]f any of the schools in the affected list are interested in preventing the release of their data, please . . . contact us privately at TOX to

---

[139] Amar Ćemanović, *Scattered Lapsus$ Hunters leak first wave of Salesforce victim data,* CyberInsider, Oct. 13, 2025, https://cyberinsider.com/scattered-lapsus-hunters-leak-first-wave-of-salesforce-victim-data/.

[140] Brian Krebs, *Please Don't Feed the Scattered Lapsus ShinyHunters*, Krebs on Security, Feb. 2, 2026, https://krebsonsecurity.com/2026/02/please-dont-feed-the-scattered-lapsus-shiny-hunters/.

[141] Federal Bureau of Investigation, *Public Service Announcement I-072325-3-PSA, The Com: Theft, Extortion, and Violence are a Rising Threat to Youth Online* (July 23, 2025), https://www.ic3.gov/PSA/2025/PSA250723-3; *see* Krebs, *supra* n.140.

negotiate a settlement."[142] ShinyHunters has now breached Instructure three times: in September 2025 and twice in the spring of 2026. Instructure's payment does not make the Class's data safe. It signals to anyone holding a copy that this data has a buyer.

**M. The Stolen Data Exposes Children To Sextortion, Grooming, And Exploitation**

492. The gravest danger is to the children in the Class. Online sexual extortion of minors ("sextortion") is a rapidly escalating threat. The National Center for Missing & Exploited Children ("NCMEC") received more than 186,800 reports of online enticement, the category that includes sextortion, in 2023.[143] In 2025, it received 1.4 million such reports, an increase of more than 150% over 2024.[144] That same year, NCMEC "received more than 50,000 reports of financially motivated sextortion, which averaged 137 reports per day," up from more than 36,000 in 2024.[145]

493. The consequences are often fatal. The FBI reported that between October 2021 and March 2023 alone, financial sextortion of minors produced "over 13,000 reports," "at least 12,600

[142] Lawrence Abrams, *Canvas login portals hacked in mass ShinyHunters extortion campaign,* BleepingComputer, May 7, 2026, https://www.bleepingcomputer.com/news/security/canvas-login-portals-hacked-in-mass-shinyhunters-extortion-campaign/.

[143] NCMEC, *Sextortion*, https://www.missingkids.org/sextortion (last visited Oct. 8, 2026).

[144] NCMEC, *CyberTipline Report* (2025 data), https://www.missingkids.org/cybertiplinedata.

[145] Emma Henderson Vaughan, *NCMEC Releases New Sextortion Data*, NCMEC, June 25, 2026, https://us.missingkids.org/blog/2026/ncmec-releases-new-sextortion-data-2025.

victims—primarily boys," and "at least 20 suicides."[146] "[S]ince 2021, at least 36 teenagers have taken their own lives in response to the threat of their sexually explicit images being leaked."[147]

494. Sextortion depends on two things the Data Breach supplies: a believable approach and a credible threat. Predators "work to earn [a child's] trust . . . to develop a relationship where [a child] feel[s] comfortable doing things they wouldn't ordinarily do."[148] NCMEC warns that offenders typically "[a]pproach a child on social media after using it to learn about the child's interests, friends, school, family, etc."[149] FinCEN described one prosecuted sextortion ring that preyed on more than 100 victims, including minors: "[t]hey conducted online research about their victims to learn where they lived, attended school, worked, and the identities of their family and friends. They then solicited their minor victims to produce sexually explicit images of themselves."[150] The Canvas data makes that research unnecessary. It gives an offender a child's real name, school, email address, and phone number, the names of the child's teachers and classmates, and, through the messages, the child's interests, worries, and friendships. A message

---

[146] Special Agent Willie Creech, FBI Miami, *Sextortion: A Growing Threat Targeting Minors*, Jan. 16, 2024, https://www.fbi.gov/contact-us/field-offices/miami/news/sextortion-a-growing-threat-targeting-minors.

[147] U.S. Dept. of Treasury Financial Crimes Enforcement Network, *FIN-2025-NTC2, FinCEN Notice on Financially Motivated Sextortion*, at 1–2, Sept. 8, 2025, https://www.fincen.gov/system/files/2025-09/FinCEN-Notice-FMS-508C.pdf ("FinCEN Notice") (citing NCMEC Chief Legal Officer testimony); *see also* Emma Henderson Vaughan, *NCMEC Releases New Data: 2024 in Numbers*, NCMEC, May 8, 2025, https://www.missingkids.org/blog/2025/ncmec-releases-new-data-2024-in-numbers.

[148] U.S. Department of Homeland Security, Know2Protect, *Know the Threats*, (last updated Oct. 7, 2026), https://www.dhs.gov/know2protect/know-the-threats.

[149] NCMEC, *Sextortion, supra* n.143.

[150] FinCEN Notice at 5, *supra* n.147.

from a supposed classmate who names the child's actual teacher and course is, to a child, indistinguishable from the real thing.

495. The same data makes the threat that follows far more powerful. Threats to expose images to "family, friends, or followers are inherent to this issue," and offenders routinely threaten to send images to the victim's school (e.g., "or send this to ur school and u know u will be expelled from").[151] An offender who meets a child on social media may not know who that child's teachers and classmates are or how to reach them. Here, the offender does: the Canvas data contains the very teachers, classmates, and school email addresses that a sextortionist threatens to message, turning a generic threat into a specific, verifiable one. More than one in six sextortion reports describing impacts on the victim referenced self-harm or suicide.[152]

496. Private message content is especially dangerous in the hands of the most violent offenders. The FBI has warned that "764" and similar networks "target vulnerable populations to include children as well as those who struggle with a variety of mental health issues, such as depression, eating disorders, or suicidal ideation"; that their victims are "typically between the ages of 10 and 17 years old"; and that they "use extortion and blackmail tactics, such as threatening to swat or dox their victims."[153] Canvas Inbox is a channel through which students ask teachers

---

[151] Thorn & NCMEC, *Trends in Financial Sextortion: An Investigation of Sextortion Reports in NCMEC CyberTipline Data (June 2024)*, at 16, https://info.thorn.org/hubfs/Research/Thorn_TrendsInFinancialSextortion_June2024.pdf.

[152] Thorn, *New Research from Thorn: Financial Sextortion on the Rise, Targeting Teen Boys*, June 24, 2024, https://www.thorn.org/blog/new-research-from-thorn-financial-sextortion-on-the-rise-targeting-teen-boys/.

[153] Federal Bureau of Investigation, *Public Service Announcement I-030625-PSA, Violent Online Networks Target Vulnerable and Underage Populations Across the United States and Around the Globe (Mar. 6, 2025)*, https://www.ic3.gov/PSA/2025/PSA250306.

for extensions after a hospitalization, raise safety concerns with counselors, and discuss accommodations for anxiety or other conditions. Those messages are a map to exactly the children these networks seek out, and they are now held by a group that researchers trace to the same online ecosystem.

### N. The Stolen Data Fuels Spear Phishing, Account Takeover, and the Assembly of Fuller Identity Profiles

497. Every Class member is now a target for spear phishing: messages built from real names, real courses, and real conversations. As one security leader explained the day the attack became public, "[w]ith access to real names, email addresses and even teacher-student messages, the next wave of phishing will not be generic. It will reference real courses and real conversations, which makes it far more likely to succeed."[154] Students are conditioned to click on Canvas notifications about grades and deadlines. A message that appears to come from a student's actual professor, about the actual assignment they discussed, is nearly impossible to detect.

498. That wave has already begun. The Fashion Institute of Technology reported that "[w]ithin days after the breach, universities across the country reported a spike in phishing emails disguised as grade updates, course changes, and MFA alerts," and that "[a]t one Midwest university, students received a fake 'Your financial aid has been updated' alert that led to a flawless copy of the school's login page."[155] The University of Colorado warned that "other CU campuses

[154] Kathryn Palmer, *PAY OR LEAK: Hackers Target Big Higher Ed Vendor*, Inside Higher Ed, May 5, 2026, https://www.insidehighered.com/news/tech-innovation/administrative-tech/2026/05/05/pay-or-leak-hackers-target-big-higher-ed-vendor.

[155] Fashion Institute of Technology, Information Technology, *Phishing After the Canvas Breach: Why All .edu Accounts Need to Stay Alert (May 2026)*, https://it.fitnyc.edu/phishing-after-the-canvas-breach-why-all-edu-accounts-need-to-stay-alert/.

are reporting that their students are receiving scam messages that impersonate Canvas administrators."[156] At the University of Wisconsin–Oshkosh, campus police warned students "not to pay or respond if they are contacted by someone claiming to have their personal information."[157]

499. Student identification numbers make these attacks more dangerous still, because many schools use them as login credentials. State Center Community College District in California tells students that their username is "[y]our 7-digit student ID number followed by our student email domain," and that their default password combines their initials and "6-digit date of birth (MMDDYY)."[158] Freeport School District 145 in Illinois assigns K-12 students the username "studentid@students.fsd145.org," with a password that is "usually a student's birthdate."[159] Robeson Community College in North Carolina builds usernames from a student's initials and student ID number, and initial passwords from initials and birthdate.[160] For students at schools like these, the Data Breach handed criminals half of the login. The other half often derives from a birthdate that a single successful phishing message, or a birthday mentioned in a Canvas message,

---

[156] University of Colorado Office of Information Technology, *Beware of Canvas-related phishing scams*, May 13, 2026, https://oit.colorado.edu/node/32495.

[157] WBAY, *UW Oshkosh Police warn of a scam referencing recent hack of Canvas*, May 13, 2026, https://www.wbay.com/2026/05/13/uw-oshkosh-police-warn-scam-referencing-recent-hack-canvas/.

[158] State Center Community College District, *Logging Into Canvas*, https://support.scccd.edu/TDClient/259/ssscc/KB/ArticleDet?ID=2495 (last visited Oct. 8, 2026).

[159] Freeport School District 145, *Student Log In*, https://www.fsd145.org/for-parents/chromebooks-and-system-logins/student-log-in (last visited Oct. 8, 2026).

[160] Robeson Community College, *Login Instructions*, https://www.robeson.edu/wp-content/uploads/RCC_Login_Instructions_Student.pdf (last visited Oct. 8, 2026).

can supply. Taking over a student's school account opens that student's email, grades, and financial aid, and provides a trusted channel through which to target classmates and teachers.

500. The Sensitive Information is also a building block for identity fraud. Criminals assemble identity profiles in stages. Identity fraud combines "primary" identifiers, such as name, date of birth, and Social Security number, with "supplemental" elements such as "email address [and] phone number(s)" that "help substantiate or enhance the validity of an identity," and fraudsters target children in particular because they "are not aware of credit activity."[161] The Canvas data supplies the verified name, email, and phone layer for hundreds of millions of people, many of them children, along with the context needed to phish for the rest: a message that appears to come from a school's financial aid office or registrar, asking a student or parent to "confirm" a date of birth or Social Security number to keep an account active.

**O. The Theft of Billions of Private Messages Inflicts a Permanent Loss of Privacy and Enables Targeted Extortion at Scale**

501. The private messages stolen here are categorically different from the data in an ordinary breach. Canvas Inbox is where students and families communicate with schools about some of the most sensitive matters in a young person's life, including medical and mental-health circumstances, disability accommodations, discipline, family crises, bullying, harassment, and sexual misconduct. Reporting on the breach noted that the messages "could include 'medical

[161] Federal Reserve, FedPayments Improvement, *How Is a Synthetic Identity Created?*, https://fedpaymentsimprovement.org/wp-content/uploads/how-is-a-synthetic-identity-created.pdf (last visited Oct. 8, 2026).

circumstances, accessibility accommodations, disputes, sexual assault allegations,' and more."[162] A Georgia college official warned students that "[a]nything you discussed with your professors or classmates is potentially exposed."[163]

502. When school records of this kind escape, the harm is lasting. In 2023, after criminals published files stolen from Minneapolis Public Schools, the Associated Press reported that the dumped records documented "student sexual assaults, psychiatric hospitalizations, abusive parents, truancy — even suicide attempts," and an attorney for one affected family explained that the information was now "available in perpetuity on the internet for the child's future friends, romantic interests, employers, and others to discover."[164] Information copied by criminals cannot be recalled, as Instructure's own concession and PowerSchool's experience confirm.

503. Stolen private communications are also used to extort the individuals they describe, one by one. After criminals stole psychotherapy records from Finland's Vastaamo clinic, the attacker sent patients "targeted emails that threatened to publish their therapy notes online unless paid a 500 euro ransom," and "some 22,000 victims reported extortion attempts targeting them personally."[165] The FBI warned of the same tactic here, cautioning that ShinyHunters actors "may

---

[162] Jason Koebler, *'The Biggest Student Data Privacy Disaster in History': Canvas Hack Shows the Danger of Centralized EdTech*, 404 Media, May 8, 2026, https://404media.co/the-biggest-student-data-privacy-disaster-in-history-canvas-hack-shows-the-danger-of-centralized-edtech/.

[163] Jason Armesto, *Canvas hack puts thousands of Georgia students at risk*, Atlanta Journal-Constitution, May 12, 2026, https://www.ajc.com/education/2026/05/canvas-hack-puts-thousands-of-georgia-students-at-risk/.

[164] Associated Press, *Ransomware criminals are dumping kids' private files online after school hacks*, July 5, 2023, https://www.13abc.com/2023/07/05/ransomware-criminals-are-dumping-kids-private-files-online-after-school-hacks.

[165] Brian Krebs, *Man Who Mass-Extorted Psychotherapy Patients Gets Six Years*, Krebs on Security, Apr. 30, 2024, https://krebsonsecurity.com/2024/04/man-who-mass-extorted-psychotherapy-patients-gets-six-years/.

falsely claim to have sensitive or compromising information, including embarrassing photographs or videos of victims."[166] Because the Canvas messages are real, even a false claim will be anchored in true, verifiable details, which makes it terrifyingly credible to a teenager.

504. Mining billions of messages for that leverage no longer requires human effort. Criminals now use artificial intelligence to analyze stolen data and tailor extortion to each victim. In August 2025, Anthropic reported that a criminal had used its AI model to "analyze[] the exfiltrated financial data to determine appropriate ransom amounts" and to craft victim-specific extortion demands against at least 17 organizations.[167] The same tools can be turned on the Canvas messages to flag every student who mentioned self-harm, a diagnosis, an abusive parent, or a disciplinary incident, and to draft a personalized message to each.

505. Parents who communicated with teachers through Canvas face the same phishing, impersonation, and extortion risks, and they bear the added burden of protecting their children from all of the above.

### P. The Data Breach Has Diminished the Value of Plaintiffs' and Class Members' Sensitive Information

506. The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated,

---

[166] FBI Canvas PSA, *supra* n.126.

[167] Anthropic, *Detecting and Countering Misuse of AI: August 2025*, Aug. 27, 2025, https://www.anthropic.com/news/detecting-countering-misuse-aug-2025.

"[m]ost consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[168]

507. An active and robust consumer marketplace for personal data also exists. The global data brokering industry in 2026 was worth about $464.5 billion.[169] The data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[170]

508. As a result of the Data Breach, Plaintiffs' and Class Members' Sensitive Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the stolen Sensitive Information is now in criminal hands, and the rarity of the data has been lost, thereby causing additional loss of value.

**Q. These Harms Require Years of Vigilance That Instructure Has Not Funded**

509. None of these risks is fully addressed by the credit monitoring that is the standard data-breach remedy, and certainly not in the limited time frame that companies tend to offer victims of breaches. While credit and identity monitoring can detect certain instances of identity

---

[168] Federal Trade Commission Commissioner Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable* (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf, at 2.

[169] Knowledge Sourcing Intelligence LLP, *Global Data Broker Market*, https://www.knowledge-sourcing.com/report/global-data-broker-market (last visited Oct. 8, 2026).

[170] *See* Datacoup, https://datacoup.com/ (last accessed Oct, 8, 2026).

fraud or attempted identity fraud, it cannot detect everything. And even then, generic credit monitoring products do not fit the bill. For minors, special products are required.

510. First, parents/guardians of minors need to perform a deliberate check at all three nationwide consumer reporting agencies to confirm whether a credit file exists in the minor's name; because a child should have no credit file, any hit is itself a fraud alert. They must also place—and maintain on a constant, ongoing basis—a protective security freeze on the minor's credit file if one is found, exercised on the child's behalf by the parent or guardian under the Fair Credit Reporting Act and applicable state law.

511. Parents/guardians of minor children must also have access to the protection service they acquire so that they can monitor it on behalf of their minor children whom cannot do so on their own. To adequately perform the foregoing and monitor for fraud in their minor children's names, parents/guardians will need to expend personal time (approximately 30 minutes per month).

512. All of these steps run until the minor reaches the age of majority, after which the minor-turned-adult manages their own freezes, reports, and ongoing monitoring duties for the rest of their lives because synthetic-identity misuse cultivated in childhood often does not surface until the person first applies for credit as an adult.

513. Credit monitoring does not detect a sextortionist messaging a 13-year-old, a phishing email from a "professor," the takeover of a student's school account, or the publication of a private message about a hospitalization. Protecting against these harms requires parents to monitor their children's communications, and requires students, parents, and teachers to scrutinize every school-related message, verify contacts through independent channels, change school

credentials, and, for many, seek counseling and other support. These costs in time, money, and emotional distress are present and continuing. They fall on Plaintiffs and the Class, not on Instructure, and they will persist for as long as the data remains in criminal hands, which, on Instructure's own admission, cannot be ruled out.

## CLASS ACTION ALLEGATIONS

514. Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23 on behalf of a class (the "Class") and state subclasses ("Subclasses") defined as:

> **Nationwide Class:** All United States residents whose Sensitive Information was accessed and exfiltrated in the Data Breach, including all who are sent a notice of the Data Breach.
>
> **Alabama State Subclass:** All Alabama state residents whose Sensitive Information was accessed and exfiltrated in the Data Breach, including all who are sent a notice of the Data Breach.
>
> **California State Subclass:** All California state residents whose Sensitive Information was accessed and exfiltrated in the Data Breach, including all who are sent a notice of the Data Breach.
>
> **Florida State Subclass:** All Florida state residents whose Sensitive Information was accessed and exfiltrated in the Data Breach, including all who are sent a notice of the Data Breach.
>
> **Georgia State Subclass:** All Georgia state residents whose Sensitive Information was accessed and exfiltrated in the Data Breach, including all who are sent a notice of the Data Breach.
>
> **Illinois State Subclass:** All Illinois state residents whose Sensitive Information was accessed and exfiltrated in the Data Breach, including all who are sent a notice of the Data Breach.
>
> **Indiana State Subclass:** All Indiana state residents whose Sensitive Information was accessed and exfiltrated in the Data Breach, including all who are sent a notice of the Data Breach.
>
> **Kansas State Subclass:** All Kansas state residents whose Sensitive Information was accessed and exfiltrated in the Data Breach, including all who are sent a notice of the Data Breach.

**Massachusetts State Subclass:** All Massachusetts state residents whose Sensitive Information was accessed and exfiltrated in the Data Breach, including all who are sent a notice of the Data Breach.

**Michigan State Subclass:** All Michigan state residents whose Sensitive Information was accessed and exfiltrated in the Data Breach, including all who are sent a notice of the Data Breach.

**Minnesota State Subclass:** All Minnesota state residents whose Sensitive Information was accessed and exfiltrated in the Data Breach, including all who are sent a notice of the Data Breach.

**New York State Subclass:** All New York state residents whose Sensitive Information was accessed and exfiltrated in the Data Breach, including all who are sent a notice of the Data Breach.

**Ohio State Subclass:** All Ohio state residents whose Sensitive Information was accessed and exfiltrated in the Data Breach, including all who are sent a notice of the Data Breach.

**Oklahoma State Subclass:** All Oklahoma state residents whose Sensitive Information was accessed and exfiltrated in the Data Breach, including all who are sent a notice of the Data Breach.

**Oregon State Subclass:** All Oregon state residents whose Sensitive Information was accessed and exfiltrated in the Data Breach, including all who are sent a notice of the Data Breach.

**Pennsylvania State Subclass:** All Pennsylvania state residents whose Sensitive Information was accessed and exfiltrated in the Data Breach, including all who are sent a notice of the Data Breach.

**Tennessee State Subclass:** All Tennessee state residents whose Sensitive Information was accessed and exfiltrated in the Data Breach, including all who are sent a notice of the Data Breach.

**Texas State Subclass:** All Texas state residents whose Sensitive Information was accessed and exfiltrated in the Data Breach, including all who are sent a notice of the Data Breach.

**Utah State Subclass:** All Utah state residents whose Sensitive Information was accessed and exfiltrated in the Data Breach, including all who are sent a notice of the Data Breach.

> **Virginia State Subclass:** All Virginia state residents whose Sensitive Information was accessed and exfiltrated in the Data Breach, including all who are sent a notice of the Data Breach.

515. Excluded from the Class are Defendants' officers, directors, and employees; any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families, and members of their staff. Also excluded from the Class are teachers whose claims arise solely from their use of the Free-for-Teacher program and who are members of the class(es) being litigated in the Track Three proceedings established by the Court's case management order (ECF No. 174).

516. Class certification of Plaintiffs' claims is appropriate because Plaintiffs can prove the elements of the claims on a class-wide basis utilizing the same evidence as would be used to prove those elements in separate actions alleging the same claims.

517. ***Numerosity.*** The Class Members are so numerous that joinder of all Class Members would be impracticable. The Class consists of approximately 275 million individuals. Also, the Class comprises an easily ascertainable set of customers who were impacted by the Data Breach. The exact number and identity of Class Members can be confirmed through discovery, which includes Defendants' records.

518. ***Commonality.*** Common questions of fact and law exist as to all Class Members and predominate over questions affecting only individual Class Members. These common questions of law or fact include, among other things:

- whether Defendants' cybersecurity systems and/or protocols before and during the Data Breach complied with relevant data security laws, regulations, and industry standards;

- whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;
- whether Defendants owed a duty to Class Members to safeguard their Sensitive Information;
- whether Defendants breached its duty to Class Members to safeguard their Sensitive Information;
- whether Defendants knew or should have known that its data security systems and monitoring processes were deficient;
- whether Defendants took reasonable measures to determine the extent of the Data Breach after it was discovered;
- whether Defendants' conduct was negligent; and
- whether Plaintiffs and Class Members are entitled to damages, injunctive relief, or other equitable relief, and the extent of such damages and relief.

519. ***Predominance.*** Defendants engaged in a common course of conduct toward Plaintiffs and Class Members, in that all of Plaintiffs' and Class Members' Sensitive Information was stored on the same network system and was unlawfully and inadequately protected in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

520. ***Typicality.*** Plaintiffs' claims are typical of the claims of the other members of the Class because, *inter alia*, all Class Members were similarly injured as a result of Defendants' uniform misconduct described herein and were accordingly subject to the same alleged Data Breach.

521. ***Adequacy of Representation.*** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class they seek to represent, they

retained counsel competent and experienced in complex class action litigation, and they will prosecute this action earnestly. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

522. ***Superiority – Federal Rule of Civil Procedure 23(b)(3).*** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendants, making it impracticable for Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

523. Class certification is also appropriate under Rules 23(b)(1) and/or (b)(2) because:

- The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications establishing conflicting standards of conduct for Defendants;
- The prosecution of separate actions by individual Class Members would create a risk of adjudication that would be dispositive of the interests of other Class Members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests; and
- Defendants have acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief regarding the members of the Class as a whole.

524. Class certification under Federal Rule of Civil Procedure 23(c)(4) is also appropriate because this Court can designate specific claims or issues for class-wide treatment and may designate multiple subclasses.

525. Defendants acted on grounds that apply generally to the Class as a whole, making injunctive and/or declaratory relief appropriate on a class-wide basis under Federal Rule of Civil Procedure 23(b)(2).

526. No unusual difficulties are likely to be encountered in the management of this action as a class action.

527. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

## CAUSES OF ACTION

### COUNT I
### <u>NEGLIGENCE</u>
### (On behalf of Plaintiffs and the Nationwide Class or, Alternatively, the State Subclasses)

528. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

529. Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in safeguarding and protecting the Sensitive Information belonging to Plaintiffs and Class Members that was in Defendants' possession, custody, or control. By accepting possession and/or control over Plaintiffs' and Class Members' Sensitive Information, Defendants accepted the duty to safeguard it and keep it from being compromised, lost, stolen, accessed, and misused by unauthorized persons, to prevent foreseeable harm, and to provide data security consistent with industry standards.

530. Defendants knew the risks of collecting and storing Plaintiffs' and Class Members' Sensitive Information and the importance of maintaining secure systems and processes to ensure it would remain secure and safe. Defendants knew of the many data breaches in recent years that targeted businesses that collect sensitive personal information.

531. Given the nature of Defendants' business, the sensitivity and value of the personal information they maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring.

532. Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Sensitive Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect personal information entrusted to them—including Plaintiffs' and Class Members' Sensitive Information.

533. It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Sensitive Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Class Members' Sensitive Information to unauthorized individuals.

534. But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiffs and Class Members, their Sensitive Information would not have been compromised.

535. As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care, and their negligence that directly and proximately caused the Data Breach, Plaintiffs and Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure, publication, and theft of their Sensitive Information; (iii) breach of the confidentiality of their Sensitive Information; (iv) deprivation of the value of their Sensitive Information, for which there is a well-established national and international market; (v) the continued risk to their Sensitive Information which remains in Defendants' possession; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft that they face and will continue to face; and (vii) nominal damages. In addition, Class Members already have suffered actual fraud and identity theft, demonstrating how imminent the threat of such fraudulent activity and damages are to all Class Members.

**COUNT II**
**NEGLIGENCE PER SE**
**(On behalf of Plaintiffs and the Nationwide Class Or, Alternatively, the State Subclasses)**

536. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

537. Defendants' duties to use reasonable data security measures also arose under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect personal information. Various FTC publications and data security

breach orders further form the basis of Defendants' duties. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

538. Plaintiffs and Class Members are within the class of persons the FTC Act was intended to protect, as consumers whose personal information Defendants collected, maintained, and were obligated to safeguard.

539. The harm that occurred as a result of the Data Breach—the unauthorized access, exfiltration, and disclosure of Plaintiffs' and Class Members' Sensitive Information—is the type of harm the FTC Act was intended to guard against.

540. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and Class Members' Sensitive Information and by failing to comply with applicable industry standards. Defendants' violation of Section 5 of the FTC Act constitutes negligence per se.

541. COPPA, and its implementing rule, 16 C.F.R. Part 312, required Defendants, as operators of an online service with actual knowledge that it collects personal information from children under 13, to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of that information, including by keeping personal information only as long as necessary to fulfill the specific purpose for which the data was collected.

542. Defendants were further required, no later than April 22, 2026, to establish, implement, and maintain a written information security program with safeguards appropriate to the sensitivity of children's personal information.

543. Defendants' failure to maintain reasonable security procedures, to identify and remediate the vulnerability in its Free-for-Teacher accounts, and to fully contain the intrusion

before declaring it resolved violated COPPA and its implementing rule. Violations of the rule are treated as unfair or deceptive acts or practices under the FTC Act. Defendants breached the aforementioned duties when they failed to use security practices that would protect Plaintiffs' and Class Members' Sensitive Information, thus resulting in unauthorized third-party access to Plaintiffs' and Class Members' Sensitive Information.

544. Defendants further breached the aforementioned duties by failing to design, adopt, implement, control, manage, monitor, update, and audit their processes, controls, policies, procedures, and protocols to comply with the applicable laws and safeguard and protect Plaintiffs' and Class Members' Sensitive Information within their possession, custody, and control.

545. As a direct and proximate result of Defendants' negligence per se, Plaintiffs' and Class Members' Sensitive Information was disseminated and made available to unauthorized third parties, and Plaintiffs and Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure, publication, and theft of their Sensitive Information; (iii) breach of the confidentiality of their Sensitive Information; (iv) deprivation of the value of their Sensitive Information, for which there is a well-established national and international market; (v) the continued risk to their Sensitive Information which remains in Defendants' possession; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft that they face and will continue to face; and (vii) nominal damages. In addition, Class Members already have suffered actual fraud

and identity theft, demonstrating how imminent the threat of such fraudulent activity and damages are to all Class Members.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
**(On behalf of Plaintiffs and the Nationwide Class Or, Alternatively, the State Subclasses)**

546. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

547. Plaintiffs and Class Members provided Defendants with their Sensitive Information in confidence, believing that Defendants would protect their information. Plaintiffs and Class Members would not have provided Defendants with this information had they known it would not be adequately protected. Defendants' acceptance and storage of Plaintiffs' and Class Members' Sensitive Information created a fiduciary relationship between Defendants, on the one hand, and Plaintiffs and Class Members, on the other hand. In light of this relationship, Defendants must act primarily for the benefit of their users, which includes safeguarding and protecting Plaintiffs' and Class Members' Sensitive Information.

548. Defendants had a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of their relationship. Defendants breached that duty by failing to properly protect the integrity of their systems containing Plaintiffs' and Class Members' Sensitive Information and failing to safeguard Plaintiffs' and Class Members' Sensitive Information that they collected.

549. As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft

of their Sensitive Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Sensitive Information; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Sensitive Information which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Sensitive Information compromised as a result of the Data Breach; and (vii) nominal damages. In addition, Class Members already have suffered actual fraud and identity theft, demonstrating how imminent the threat of such fraudulent activity and damages are to all Class Members.

**COUNT IV**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiffs and the Nationwide Class Or, Alternatively, the State Subclasses)**

550. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

551. By using Canvas, Plaintiffs and Class Members entered into implied contracts with Defendants.

552. Pursuant to these implied contracts, Plaintiffs and Class Members provided Defendants with their Sensitive Information. In exchange, Defendants agreed, among other things, and Plaintiffs understood, that Defendants would: (1) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class Members' Sensitive Information; and (2) protect Plaintiffs' and Class Members' Sensitive Information in compliance with federal and state laws and regulations and industry standards.

553. As alleged in *supra* ¶ 66, Defendants made numerous representations to the public at large, including Plaintiffs and Class Members, that they had adequate systems and processes in place to keep user data in their possession, custody, or control safe from unauthorized access, and that they had adequate cybersecurity measures/practices. Thus, the protection of personal information was a material term of the implied contracts between Plaintiffs and Class Members, on the one hand, and Defendants, on the other hand. Had Plaintiffs and Class Members known that Defendants would not adequately protect their Sensitive Information, they would not have used Defendants' Canvas platform.

554. Plaintiffs and Class Members performed their obligations under the implied contract when they provided Defendants with their Sensitive Information and used Defendants' platform.

555. Defendants breached their obligations under their implied contracts with Plaintiffs and Class Members in failing to implement and maintain reasonable security measures to protect and secure their Sensitive Information and in failing to implement and maintain security protocols and procedures to protect Plaintiffs' and Class Members' Sensitive Information in a manner that complies with applicable laws, regulations, and industry standards.

556. Defendants' breach of their obligations under their implied contracts with Plaintiffs and Class Members directly resulted in the Data Breach and the injuries that Plaintiffs and Class Members have suffered from the Data Breach.

557. Plaintiffs and Class Members were damaged by Defendants' breach of implied contracts because: (i) they paid for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft—risks justifying expenditures for protective and

remedial services for which they are entitled to compensation; (iii) their Sensitive Information was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their Sensitive Information has been breached; (v) they were deprived of the value of their Sensitive Information, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) nominal damages.

**COUNT V**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiffs and the Nationwide Class Or, Alternatively, the State Subclasses)**

558. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

559. This claim is pleaded in the alternative to the breach of implied contract claim.

560. Plaintiffs and Class Members conferred a monetary benefit upon Defendants (1) by utilizing Defendants' Canvas systems which resulted in Defendants receiving monetary gain, and (2) when Defendants used their data to conduct research and analytics and improve their platform, which supports Defendants' business operations and allows Defendants to profit.

561. Defendants accepted and had knowledge of the benefits conferred upon them by Plaintiffs and Class Members.

562. As a result of Defendants' conduct, Plaintiffs and Class Members suffered actual damages. The damages, at a minimum, consist of the value of reasonable data privacy and security practices and procedures that Plaintiffs and Class Members should have received in exchange for the benefits that Defendants accepted from Plaintiffs and Class Members.

563. Defendants should not be permitted to retain the monetary value of the benefits that they collected from Plaintiffs and Class Members because Defendants failed to adequately implement the data privacy and security procedures that were mandated by federal, state, and local laws and industry standards.

564. Defendants should be compelled to provide to Plaintiffs and Class Members all unlawful proceeds received by Defendants as a result of Defendants' conduct and Data Breach alleged herein.

**COUNT VI**
**VIOLATION OF THE UTAH CONSUMER SALES PRACTICES ACT**
**Utah Code §§ 13-11-1, et seq. (UCSPA)**
**(On behalf of Plaintiffs and the Nationwide Class or, alternatively, the State Subclasses)**

565. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

566. The Utah Consumer Sales Practices Act declares it a deceptive act or practice for a supplier to indicate that a consumer transaction involves rights, remedies, or obligations that it does not have, Utah Code §§ 13-11-4(1), (2)(a), (2)(b), (2)(j). A consumer who suffers loss as a result of a violation of the Act may recover actual damages plus court costs. *Id.* § 13-11-19(2). "Supplier" is defined broadly, without any requirement of direct privity with the consumer. *Id.* § 13-11-3(5). A "consumer transaction" is defined broadly to include "other written … disposition of … services … both tangible and intangible … to … a person for … primarily personal, family, or household purposes," which includes Defendants' provision of services, including the Canvas platform, to Plaintiffs and Class members. Utah Code § 13-11-3(2)(a)(i). Plaintiffs and Class

members used Defendants' services, which meets the statutory definition of "consumer transaction."

567. Defendants collect, obtain, and record information belonging to Canvas users, including names, email addresses, phone numbers, student identification numbers, and other personal information, along with data on student performance and records of student communications. Defendants represented to Plaintiffs and Class members at all relevant times that it had adequate practices and policies to keep their information safe from unauthorized access, including but not limited to data breaches. *See supra* ¶ 66. On or about April 25, 2026, a criminal hacking and extortion group known as ShinyHunters exploited a vulnerability in Defendants' Free-For-Teacher account program—a feature that permitted educators to create Canvas accounts and submit support tickets without institutional verification—to gain unauthorized access to Defendants' Canvas environment where it stored Plaintiffs' and Class members' sensitive personal information. Defendants did not detect the intrusion until April 29, 2026, and, despite declaring the incident contained, suffered a second intrusion on May 7, 2026. Both of these intrusions occurred as a direct and proximate result of Defendants' failure to implement and maintain adequate cyber security practices and processes to keep Sensitive Information in their possession safe. As a result, Plaintiffs' and Class members' highly sensitive personal information was compromised in the Data Breach. Due to Defendants' failures and the vulnerability in its program, ShinyHunters was able to access Canvas login pages at approximately 330 institutions worldwide and threatened to publicly release the stolen data unless Defendants paid a ransom.

568. Defendants' conduct, as described above, constituted a deceptive and unconscionable act or practice in violation of Utah Code §§ 13-11-4 and 13-11-5, including

because Defendants failed to design, adopt, implement, control, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, and protocols to safeguard and protect the Sensitive Information entrusted to them, while representing to Plaintiffs and Class Members and their schools that they maintained reasonable data security, and while omitting the true, inadequate state of their data security practices.

569. Plaintiffs and the Utah Subclass relied on Defendants' representations that they maintained reasonable data security measures, and on Defendants' omission of the true, inadequate state of their data security practices, in entrusting Defendants with their Sensitive Information and in continuing to use the Canvas platform, and suffered loss as a result of Defendants' violations of the UCSPA. Had Defendants disclosed the inadequacy of their data security practices, Plaintiffs and the Utah Subclass would not have entrusted Defendants with their Sensitive Information, or would have taken additional steps to protect it.

570. As a direct and proximate result of Defendants' violation of the UCSPA, Plaintiffs and Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure, publication, and theft of their personal information; (iii) breach of the confidentiality of their personal information; (iv) deprivation of the value of their personal information, for which there is a well-established national and international market; (v) the continued risk to their personal information which remains in Defendants' possession; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft that they face and will continue to face.

571. Pursuant to Utah Code § 13-11-19(3), Plaintiffs and the Utah Subclass are entitled to a declaratory judgment that Defendants' conduct violated the UCSPA and an order enjoining Defendants from further such violations, independent of and regardless of whether classwide actual damages are available under § 13-11-19(4).

572. Plaintiffs and the Utah Subclass seek all monetary and non-monetary relief allowed by law, including actual damages to the extent permitted by Utah Code § 13-11-19(4), or, in the alternative, declaratory and injunctive relief pursuant to Utah Code § 13-11-19(3), reasonable attorneys' fees and costs to the extent permitted by Utah Code § 13-11-19(5), and any other relief that is just and proper.

**COUNT VII**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200, et seq. (UCL)**
**(On behalf of Plaintiffs Jacobs and Large and the California Subclass)**

573. Plaintiffs Jacobs and Large reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

574. California's UCL prohibits any person from committing an act of "unfair competition," including "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Unfair competition" is interpreted broadly to include acts that violate other laws, and may include acts even if not specifically proscribed by some other law.

575. Defendants violated the UCL's "unlawful" prong by, among other things, violating the California Customer Records Act, Cal. Civ. Code §§ 1798.80-.84, Section 5 of the FTC Act, 15 U.S.C. § 45, California's Student Online Personal Information Protection Act (SOPIPA), Cal. Bus. & Prof. Code § 22584(a), and COPPA, 16 C.F.R. Part 312, each as alleged herein.

576. Defendants collect, obtain, and record information belonging to Canvas users, including names, email addresses, phone numbers, student identification numbers, and other personal information, along with data on student performance and records of student communications. On or about April 25, 2026, a criminal hacking and extortion group known as ShinyHunters exploited a vulnerability in Defendants' Free-For-Teacher account program—a feature that permitted educators to create Canvas accounts and submit support tickets without institutional verification—to gain unauthorized access to Defendants' Canvas environment where it stored Plaintiffs' and Class members' sensitive personal information. Defendants did not detect the intrusion until April 29, 2026, and, despite declaring the incident contained, suffered a second intrusion on May 7, 2026. Both of these intrusions occurred as a direct and proximate result of Defendants' failure to implement and maintain adequate cyber security practices and processes to keep Sensitive Information in their possession safe. As a result, Plaintiffs' and Class members' highly sensitive personal information was compromised in the Data Breach. Due to Defendants' failures and the vulnerability in its program, ShinyHunters was able to access Canvas login pages at approximately 330 institutions worldwide and threatened to publicly release the stolen data unless Defendants paid a ransom.

577. Defendants' use of inadequate data security to protect the Personal Information of California Plaintiffs and the California Subclass was also independently unfair within the meaning of the UCL because the harm it caused to consumers was not outweighed by any countervailing benefit to consumers or competition, and was not an injury Plaintiffs and the California Subclass could reasonably have avoided.

578. As a result of Defendants' unlawful and unfair business practices, California Plaintiffs' and the California Subclass's Personal Information was subjected to unauthorized access and exfiltration, theft, or disclosure through Defendants' computer network.

579. As a direct and proximate result of Defendants' misconduct, California Plaintiffs and the California Subclass were injured and lost money or property, including the loss of their legally protected interest in the confidentiality and privacy of their Personal Information, out-of-pocket mitigation costs, outage-related expenses and lost wages during finals and other academic periods where usage was necessary, and/or the benefit-of-the-bargain (for students/parents who paid tuition and/or other fees/expenses for academics).

580. Plaintiffs and Class Members also remain at heightened risk of future injury because their Personal Information resides with Defendants and, further, because Defendants continue to gather new Personal Information on Plaintiffs and Class Members. Without the use of adequate data security, Plaintiffs and Class Members remain at a heightened and substantial risk that their Personal Information will be subject to another data breach. Plaintiffs and Class members lack an adequate remedy at law, as money damages, alone, are retrospective and cannot address Defendants' ongoing failure to implement adequate data security, which continues to expose Plaintiffs and Class members to future harm. An injunction requiring Defendants to implement industry-standard security practices is a prospective remedy that is categorically unavailable at law, and would afford Plaintiffs and Class members necessary relief given Defendants' continued retention of Plaintiffs' and Class members' PII in an insecure environment, which creates a real, immediate, and substantial risk of future breach that only injunctive relief can address.

581. California Plaintiffs and the California Subclass seek all monetary and non-monetary relief allowed by law, including restitution, disgorgement, and injunctive relief under Cal. Bus. & Prof. Code § 17203, and any other relief available by law and to which the Court deems proper.

**COUNT VIII**
**VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
**Cal. Civ. Code §§ 1750, et seq. (CLRA)**
**(On behalf of Plaintiffs Jacobs and Large and the California Subclass)**

582. Plaintiffs Jacobs and Large reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

583. The CLRA, Cal. Civ. Code §§ 1750, et seq., is a comprehensive statutory scheme that is to be "liberally construed" to protect consumers against unfair and deceptive business practices by businesses providing goods or services to consumers. Cal. Civ. Code § 1760.

584. Defendants are each within the definition of "person" set forth in Cal. Civ. Code § 1761(c). Plaintiffs and the California Subclass are "consumers" as defined in Cal. Civ. Code § 1761(d) because they sought or acquired, by purchase or lease, Defendants' Canvas platform and services for personal, family, or household purposes. Defendants have provided "services" as defined in Cal. Civ. Code § 1761(b), and Plaintiffs and the California Subclass have engaged in "transactions" with Defendants as defined in Cal. Civ. Code § 1761(e).

585. Defendants collect, obtain, and record information belonging to Canvas users, including names, email addresses, phone numbers, student identification numbers, and other personal information, along with data on student performance and records of student communications. On or about April 25, 2026, a criminal hacking and extortion group known as

ShinyHunters exploited a vulnerability in Defendants' Free-For-Teacher account program—a feature that permitted educators to create Canvas accounts and submit support tickets without institutional verification—to gain unauthorized access to Defendants' Canvas environment where it stored Plaintiffs' and Class members' sensitive personal information. Defendants did not detect the intrusion until April 29, 2026, and, despite declaring the incident contained, suffered a second intrusion on May 7, 2026. Both of these intrusions occurred as a direct and proximate result of Defendants' failure to implement and maintain adequate cyber security practices and processes to keep Sensitive Information in their possession safe. As a result, Plaintiffs' and Class members' highly sensitive personal information was compromised in the Data Breach. Due to Defendants' failures and the vulnerability in its program, ShinyHunters was able to access Canvas login pages at approximately 330 institutions worldwide and threatened to publicly release the stolen data unless Defendants paid a ransom.

586. Cal. Civ. Code § 1770(a) declares unlawful certain "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction... that results in the sale or lease of goods or services to any consumer," including: (5) "[r]epresenting that goods or services have... characteristics,... uses, [or] benefits... that they do not have," and (7) "[r]epresenting that goods or services are of a particular standard, quality, or grade... if they are of another." Defendants' acts and practices in connection with the sale of the Canvas platform and services violated Cal. Civ. Code § 1770(a)(5) and (7). Omissions are independently actionable under Cal. Civ. Code § 1770(a)(5) and (7), and Defendants are also liable under the CLRA for their omissions.

587. Defendants' unlawful acts included the following: (a) Defendants omitted and concealed the fact that they did not employ reasonable safeguards to protect Plaintiffs' and the California Subclass's Personal Information. Defendants could and should have made a proper disclosure when Plaintiffs and the California Subclass, or their schools and institutions on their behalf, created Canvas accounts or subscribed to Defendants' services, or by any other means reasonably calculated to inform them of the inadequate data security. Defendants knew or should have known that their data security practices were deficient, including because Defendants were aware that the education-technology sector is a frequent target of sophisticated cyberattacks. (b) Defendants also made implied or implicit representations that their data security practices were sufficient to protect Plaintiffs' and the California Subclass's Personal Information. Defendants required Plaintiffs and the California Subclass, or their schools and institutions, to provide that Personal Information in order to use the Canvas platform. In doing so, Defendants made implied or implicit representations that their data security practices were sufficient to protect that Personal Information. By virtue of accepting Plaintiffs' and the California Subclass's Personal Information, Defendants implicitly represented that their data security processes were sufficient to safeguard it. Those representations were false and misleading.

588. Defendants' misrepresentations and omissions were material because they were likely to and did deceive reasonable consumers about the adequacy of Defendants' data security and their ability to protect the confidentiality of consumers' Personal Information.

589. Had Defendants disclosed to Plaintiffs and the California Subclass that Defendants' data systems were not reasonably secure, Defendants would have been unable to continue operating the Canvas platform in like fashion and would have been forced to adopt reasonable data

security measures. Instead, Defendants received, maintained, and compiled Plaintiffs' and the California Subclass's Personal Information as part of the Canvas services Defendants provided, without advising Plaintiffs and the California Subclass that Defendants' data security practices were insufficient to protect that Personal Information.

590. Plaintiffs and the California Subclass transacted with Defendants in California by, among other things, creating Canvas accounts, enrolling in or using courses administered through Canvas, or having their schools or institutions subscribe to the Canvas platform on their behalf, and were deceived in California when they did so without being informed of Defendants' deficient data security practices.

591. Cal. Civ. Code § 1780(a) provides that "[a]ny consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 may bring an action against that person to recover or obtain" actual damages (no less than $1,000 in a class action), an order enjoining the unlawful methods, acts, or practices, restitution of property, punitive damages, and any other relief the court deems proper.

592. As a direct and proximate result of Defendants' violation of Cal. Civ. Code § 1770(a)(5) and (7), Plaintiffs and Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure, publication, and theft of their personal information; (iii) breach of the confidentiality of their personal information; (iv) deprivation of the value of their personal information, for which there is a well-established national and international market; (v) the continued risk to their personal information which remains in

Defendants' possession; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft that they face and will continue to face.

593. Defendants' violations of the CLRA were not the result of a "bona fide error" for purposes of Cal. Civ. Code § 1784. Instead, Defendants acted with knowledge, recklessness, gross negligence, negligence, and/or other actionable misconduct.

594. Plaintiffs and the California Subclass are entitled to, and seek, injunctive relief enjoining Defendants' unlawful methods, acts, and practices, together with restitution of property, and such other relief as the Court deems proper under Cal. Civ. Code § 1780(a)(2), (3), and (5). Plaintiffs and the California Subclass do not seek an award of actual or punitive damages under Cal. Civ. Code § 1780(a)(1) or (a)(4) in this pleading; such relief, together with an award of attorneys' fees and costs as the prevailing party under Cal. Civ. Code § 1780(e), will be sought by amendment following compliance with the pre-suit notice procedure of Cal. Civ. Code § 1782(a).

**COUNT IX**
**VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT OF 2018**
**Cal. Civ. Code §§ 1798.100–.199.100 (CCPA)**
**(On behalf of Plaintiffs Jacobs and Large and the California Subclass)**

595. Plaintiffs Jacobs and Large reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

596. California Plaintiffs and California Subclass Members are "consumer[s]" as defined by Cal. Civ. Code § 1798.140(i) because they are natural persons who are California residents.

597. Defendants are each a "business" as defined by Cal. Civ. Code § 1798.140(d) because each is a corporation organized or operated for the profit or financial benefit of its owners, does business in California, determines the purposes and means of processing consumers' personal information, and satisfies the statute's applicable revenue or data-volume thresholds.

598. The Personal Information taken in the Data Breach is personal information as defined by Cal. Civ. Code § 1798.81.5(d)(1)(A), because it includes California Plaintiffs' and California Subclass Members' unencrypted names and other identifying information.

599. Defendants collect, obtain, and record information belonging to Canvas users, including names, email addresses, phone numbers, student identification numbers, and other personal information, along with data on student performance and records of student communications. California Plaintiffs allege that their compromised communications on the Canvas platform included information related to their medical history, medical treatment, and/or diagnosis by a health care professionals, which falls within the statutory definition of "medical information." § 1798.81.5(d)(1)(A)(iv), (d)(2). On or about April 25, 2026, a criminal hacking and extortion group known as ShinyHunters exploited a vulnerability in Defendants' Free-For-Teacher account program—a feature that permitted educators to create Canvas accounts and submit support tickets without institutional verification—to gain unauthorized access to Defendants' Canvas environment where it stored Plaintiffs' and Class members' sensitive personal information. Defendants did not detect the intrusion until April 29, 2026, and, despite declaring the incident contained, suffered a second intrusion on May 7, 2026. Both of these intrusions occurred as a direct and proximate result of Defendants' failure to implement and maintain adequate cyber security practices and processes to keep Sensitive Information in their possession safe. As a result,

Plaintiffs' and Class members' highly sensitive personal information was compromised in the Data Breach. Due to Defendants' failures and the vulnerability in its program, ShinyHunters was able to access Canvas login pages at approximately 330 institutions worldwide and threatened to publicly release the stolen data unless Defendants paid a ransom.

600. Defendants violated Cal. Civ. Code § 1798.150(a) by failing to prevent California Plaintiffs' and California Subclass Members' nonencrypted and nonredacted Personal Information from unauthorized access and exfiltration, theft, or disclosure as a result of Defendants' failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information.

601. As a direct and proximate result of Defendants' violation of the CCPA, California Plaintiffs and California Subclass Members were injured and lost money or property, including the loss of their legally protected interest in the confidentiality and privacy of their Personal Information.

602. California Plaintiffs and California Subclass Members have suffered actual pecuniary damages and seek to recover statutory damages of not less than one hundred dollars ($100) and not greater than seven hundred and fifty dollars ($750) per Plaintiff and Class Member per incident, or actual damages, whichever is greater, together with injunctive and declaratory relief, under Cal. Civ. Code § 1798.150.

603. To date, Plaintiffs have complied with the requirements of California Civil Code Section 1798.150(b), which provides that "[n]o [prefiling] notice shall be required prior to an individual consumer initiating an action solely for actual pecuniary damages." On October 8, 2026, Plaintiffs provided Defendants with written notice identifying their violations of Cal. Civil Code

§ 1798.150(a) and demanding the Data Breach be cured, pursuant to Cal. Civil Code § 1798.150(b). Another class member sent pre-suit notice in May 2026. If within 30 days of receiving Plaintiffs' notices, Defendants neither cure the noticed violations nor provide Plaintiffs with an express written statement that the violations have been cured and that no further violations shall occur, Plaintiffs will have satisfied the requirements of California Civil Code Section 1798.150(b). In that event, Plaintiffs seek (1) injunctive relief in the form of an order requiring Defendants to employ adequate security practices consistent with law and industry standards to protect the California Class Members' Personal Information; and (2) statutory damages or actual damages, whichever is greater, pursuant to Cal. Civil Code § 1798.150(a)(1)(A) & (B).

**COUNT X**
**VIOLATION OF THE CALIFORNIA CONSTITUTION'S RIGHT TO PRIVACY**
**Cal. Const., Art. I, § 1**
**(On behalf of Plaintiffs Jacobs and Large and the California Subclass)**

604. Plaintiffs Jacobs and Large reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

605. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const., Art. I, § 1.

606. The right to privacy guaranteed by Article I, Section 1 of the California Constitution creates a private right of action for damages against private parties, including Defendants.

607. Defendants collect, obtain, and record information belonging to Canvas users, including names, email addresses, phone numbers, student identification numbers, and other

personal information, along with data on student performance and records of student communications. On or about April 25, 2026, a criminal hacking and extortion group known as ShinyHunters exploited a vulnerability in Defendants' Free-For-Teacher account program—a feature that permitted educators to create Canvas accounts and submit support tickets without institutional verification—to gain unauthorized access to Defendants' Canvas environment where it stored Plaintiffs' and Class members' sensitive personal information. Defendants did not detect the intrusion until April 29, 2026, and, despite declaring the incident contained, suffered a second intrusion on May 7, 2026. Both of these intrusions occurred as a direct and proximate result of Defendants' failure to implement and maintain adequate cyber security practices and processes to keep Sensitive Information in their possession safe. As a result, Plaintiffs' and Class members' highly sensitive personal information was compromised in the Data Breach. Due to Defendants' failures and the vulnerability in its program, ShinyHunters was able to access Canvas login pages at approximately 330 institutions worldwide and threatened to publicly release the stolen data unless Defendants paid a ransom.

608. Plaintiffs and the California Subclass had a legally protected privacy interest in their Personal Information, including their names, email addresses, phone numbers, student identification numbers, private Canvas messages, and student and academic records, which Defendants collected and maintained as part of the Canvas platform.

609. Plaintiffs and the California Subclass had a reasonable expectation of privacy in that: (i) the Data Breach occurred as a result of Defendants' lax and inadequate security practices with respect to securely collecting, storing, and using their Personal Information, as well as preventing its unauthorized disclosure; (ii) Plaintiffs and the California Subclass did not consent

or otherwise authorize Defendants to disclose their Personal Information to the parties responsible for the Data Breach; and (iii) Plaintiffs and the California Subclass could not reasonably expect Defendants would commit acts in violation of laws protecting their privacy.

610. Defendants' conduct in failing to implement reasonable data security measures, resulting in the unauthorized acquisition, exfiltration, and threatened public release of Plaintiffs' and the California Subclass's sensitive Personal Information—including the contents of private messages of students, many of whom are minors—by a criminal hacking and extortion group, constitutes a serious invasion of privacy so egregious as to constitute a breach of social norms.

611. As a direct and proximate result of Defendants' invasion of their constitutional privacy rights, Plaintiffs and the California Subclass suffered actual and concrete injury, and are entitled to appropriate relief, including damages to compensate them for the harm to their privacy interests, loss of valuable rights and protections, heightened stress, fear, anxiety, and risk of future invasions of privacy, and the mental and emotional distress and harm to human dignity interests caused by Defendants' invasion of their privacy.

612. Plaintiffs and the California Subclass seek appropriate relief for that injury, including, but not limited to, damages that will reasonably compensate them for the harm to their privacy interests, as well as disgorgement of profits made by Defendants as a result of their invasion of Plaintiffs' and the California Subclass's privacy.

**COUNT XI**
**<u>VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT</u>**
**Mich. Comp. Laws Ann. § 445.901, et seq.**
**(On behalf of Plaintiff Gerid Bowler and the Michigan Subclass)**

613. Plaintiff Gerid Bowler realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

614. Defendants are each a "person" as defined by Mich. Comp. Laws Ann. § 445.902(1)(d). Defendants offered or sold goods or services in Michigan and engaged in "trade or commerce" directly or indirectly affecting the people of Michigan, as defined by Mich. Comp. Laws Ann. § 445.902(1)(g). Defendants provided their services to Plaintiffs and Class members, and thus meet the statutory definition of "trade or commerce" by "providing goods, property, or service primarily for personal, family, or household purposes." MCL 445.902(1)(g).

615. Defendants engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of Mich. Comp. Laws Ann. § 445.903(1), including: (a) representing that their Canvas platform and services have characteristics, uses, and benefits that they did not have, in violation of Mich. Comp. Laws Ann. § 445.903(1)(c); (b) representing that their Canvas platform and services are of a particular standard or quality when they are of another, in violation of Mich. Comp. Laws Ann. § 445.903(1)(e); (c) making representations of fact material to the transaction such that a person reasonably believed the represented or suggested state of affairs to be other than it actually was, in violation of Mich. Comp. Laws Ann. § 445.903(1)(bb); and (d) failing to reveal facts material to the transaction in light of representations of fact made in a positive manner, in violation of Mich. Comp. Laws Ann. § 445.903(1)(cc).

616. Defendants collect, obtain, and record information belonging to Canvas users, including names, email addresses, phone numbers, student identification numbers, and other personal information, along with data on student performance and records of student communications. On or about April 25, 2026, a criminal hacking and extortion group known as ShinyHunters exploited a vulnerability in Defendants' Free-For-Teacher account program—a feature that permitted educators to create Canvas accounts and submit support tickets without

institutional verification—to gain unauthorized access to Defendants' Canvas environment where it stored Plaintiffs' and Class members' sensitive personal information. Defendants did not detect the intrusion until April 29, 2026, and, despite declaring the incident contained, suffered a second intrusion on May 7, 2026. Both of these intrusions occurred as a direct and proximate result of Defendants' failure to implement and maintain adequate cyber security practices and processes to keep Sensitive Information in their possession safe. As a result, Plaintiffs' and Class members' highly sensitive personal information was compromised in the Data Breach. Due to Defendants' failures and the vulnerability in its program, ShinyHunters was able to access Canvas login pages at approximately 330 institutions worldwide and threatened to publicly release the stolen data unless Defendants paid a ransom.

617. Defendants' unfair, unconscionable, and deceptive practices include: (a) failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and the Michigan Subclass's Sensitive Information, which was a direct and proximate cause of the Data Breach; (b) failing to identify and remediate foreseeable security and privacy risks, which was a direct and proximate cause of the Data Breach; (c) failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and the Michigan Subclass's Sensitive Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach; (d) misrepresenting that their Canvas platform would protect the privacy and confidentiality of Plaintiffs' and the Michigan Subclass's Sensitive Information, including by implementing and maintaining reasonable security measures; (e) misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of that Sensitive Information; (f) failing to timely and adequately notify

Plaintiffs and the Michigan Subclass of the Data Breach; (g) omitting, suppressing, and concealing the material fact that their Canvas platform did not reasonably or adequately secure Plaintiffs' and the Michigan Subclass's Sensitive Information; and (h) omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of that Sensitive Information.

618. Defendants intended to mislead Plaintiffs and the Michigan Subclass and to induce them to rely on their misrepresentations and omissions. Defendants acted intentionally, knowingly, and maliciously to violate the Michigan Consumer Protection Act, and recklessly disregarded Plaintiffs' and the Michigan Subclass's rights.

619. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive practices, Plaintiffs and the Michigan Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Sensitive Information.

620. Plaintiffs and the Michigan Subclass seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $250, together with their reasonable attorney fees pursuant to Mich. Comp. Laws Ann. § 445.911(2), injunctive relief, and any other relief that is just and proper.

**COUNT XII**
**VIOLATION OF THE MINNESOTA CONSUMER FRAUD ACT**
**Minn. Stat. §§ 325F.68, et seq. and Minn. Stat. §§ 8.31, et seq.**
**(On behalf of Plaintiff Mockert and the Minnesota Subclass)**

621. Plaintiff Mockert realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

622. Defendants, Plaintiffs, and the Minnesota Subclass are each a "person" as defined by Minn. Stat. § 325F.68(3). Defendants' Canvas platform and services are "merchandise" as defined by Minn. Stat. § 325F.68(2), and Defendants engaged in "sales" of that merchandise as defined by Minn. Stat. § 325F.68(4).

623. Defendants collect, obtain, and record information belonging to Canvas users, including names, email addresses, phone numbers, student identification numbers, and other personal information, along with data on student performance and records of student communications. On or about April 25, 2026, a criminal hacking and extortion group known as ShinyHunters exploited a vulnerability in Defendants' Free-For-Teacher account program—a feature that permitted educators to create Canvas accounts and submit support tickets without institutional verification—to gain unauthorized access to Defendants' Canvas environment where it stored Plaintiffs' and Class members' sensitive personal information. Defendants did not detect the intrusion until April 29, 2026, and, despite declaring the incident contained, suffered a second intrusion on May 7, 2026. Both of these intrusions occurred as a direct and proximate result of Defendants' failure to implement and maintain adequate cyber security practices and processes to keep Sensitive Information in their possession safe. As a result, Plaintiffs' and Class members' highly sensitive personal information was compromised in the Data Breach. Due to Defendants' failures and the vulnerability in its program, ShinyHunters was able to access Canvas login pages

at approximately 330 institutions worldwide and threatened to publicly release the stolen data unless Defendants paid a ransom.

624. Defendants engaged in fraud, false pretense, false promise, misrepresentation, misleading statements, and deceptive practices in connection with the sale of merchandise, in violation of Minn. Stat. § 325F.69(1), including: (a) failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and the Minnesota Subclass's Sensitive Information, which was a direct and proximate cause of the Data Breach; (b) failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents in the education-technology sector, which was a direct and proximate cause of the Data Breach; (c) failing to comply with common law and statutory duties pertaining to the security and privacy of that Sensitive Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach; (d) misrepresenting that they would protect the privacy and confidentiality of that Sensitive Information, including by implementing and maintaining reasonable security measures; (e) misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of that Sensitive Information; (f) omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure that Sensitive Information; and (g) omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of that Sensitive Information.

625. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and their ability to protect the confidentiality of Plaintiffs' and the Minnesota Subclass's Sensitive Information.

626. Defendants intended to mislead Plaintiffs and the Minnesota Subclass and induce them to rely on Defendants' misrepresentations and omissions. Defendants' fraudulent, misleading, and deceptive practices affected the public interest, including those affected by the Data Breach.

627. As a direct and proximate result of Defendants' violation of Minn. Stat. § 325F.69(1), Plaintiffs and Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, inter alia: (i) a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure, publication, and theft of their personal information; (iii) breach of the confidentiality of their personal information; (iv) deprivation of the value of their personal information, for which there is a well-established national and international market; (v) the continued risk to their personal information which remains in Defendants' possession; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft that they face and will continue to face.

628. Plaintiffs and the Minnesota Subclass seek all monetary and non-monetary relief allowed by law, including damages, injunctive or other equitable relief, and attorneys' fees, disbursements, and costs, pursuant to Minn. Stat. § 8.31, subd. 3a.

**COUNT XIII**
**VIOLATION OF THE MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**Minn. Stat. §§ 325D.43, et seq.**
**(On behalf of Plaintiff Mockert and the Minnesota Subclass)**

629. Plaintiff Mockert realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

630. By engaging in deceptive trade practices in the course of their business, directly or indirectly affecting the people of Minnesota, Defendants violated Minn. Stat. § 325D.44, including the following provisions: (a) representing that their Canvas platform and services had characteristics, uses, and benefits that they did not have, in violation of Minn. Stat. § 325D.44(1)(5); (b) representing that their Canvas platform and services were of a particular standard or quality when they were of another, in violation of Minn. Stat. § 325D.44(1)(7); (c) advertising their Canvas platform and services with intent not to provide them as advertised, in violation of Minn. Stat. § 325D.44(1)(9); and (d) engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding, in violation of Minn. Stat. § 325D.44(1)(13).

631. Defendants collect, obtain, and record information belonging to Canvas users, including names, email addresses, phone numbers, student identification numbers, and other personal information, along with data on student performance and records of student communications. On or about April 25, 2026, a criminal hacking and extortion group known as ShinyHunters exploited a vulnerability in Defendants' Free-For-Teacher account program—a feature that permitted educators to create Canvas accounts and submit support tickets without institutional verification—to gain unauthorized access to Defendants' Canvas environment where it stored Plaintiffs' and Class members' sensitive personal information. Defendants did not detect

the intrusion until April 29, 2026, and, despite declaring the incident contained, suffered a second intrusion on May 7, 2026. Both of these intrusions occurred as a direct and proximate result of Defendants' failure to implement and maintain adequate cyber security practices and processes to keep Sensitive Information in their possession safe. As a result, Plaintiffs' and Class members' highly sensitive personal information was compromised in the Data Breach. Due to Defendants' failures and the vulnerability in its program, ShinyHunters was able to access Canvas login pages at approximately 330 institutions worldwide and threatened to publicly release the stolen data unless Defendants paid a ransom. Defendants' deficient cybersecurity is "unfair or unconscionable" under § 325D.44(1)(13), and because Defendants still possess Plaintiffs' and Class members' Sensitive Information—and they have to continue using Defendants' services—there remains an ongoing threat that Plaintiffs' and Class members' Sensitive Information will be compromised in the future if Defendants do not fix their practices to adequately protect it.

632. Defendants' deceptive practices include: (a) failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and the Minnesota Subclass's Sensitive Information, which was a direct and proximate cause of the Data Breach; (b) failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents in the education-technology sector, which was a direct and proximate cause of the Data Breach; (c) failing to comply with common law and statutory duties pertaining to the security and privacy of that Sensitive Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach; (d) misrepresenting that they would protect the privacy and confidentiality of that Sensitive Information, including by implementing and

maintaining reasonable security measures; (e) misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of that Sensitive Information; (f) omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure that Sensitive Information; and (g) omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of that Sensitive Information.

633. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and their ability to protect the confidentiality of Plaintiffs' and the Minnesota Subclass's Sensitive Information. Defendants intended to mislead Plaintiffs and the Minnesota Subclass and induce them to rely on Defendants' misrepresentations and omissions.

634. Had Defendants disclosed to Plaintiffs and the Minnesota Subclass that their Canvas platform and data systems were not secure and, thus, vulnerable to attack, Defendants would have been forced to adopt reasonable data security measures and comply with the law. Instead, Defendants received, maintained, and compiled Plaintiffs' and the Minnesota Subclass's Sensitive Information as part of the Canvas services they provided without advising Plaintiffs and the Minnesota Subclass that Defendants' data security practices were insufficient to maintain the safety and confidentiality of that Sensitive Information. Accordingly, Plaintiffs and the Minnesota Subclass acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

635. Defendants acted intentionally, knowingly, and maliciously to violate the Minnesota Uniform Deceptive Trade Practices Act, and recklessly disregarded Plaintiffs' and the

Minnesota Subclass's rights. Defendants' knowledge of past data breaches in the education-technology sector put them on notice that their security and privacy protections were inadequate and/or susceptible to being targeted for a data breach.

636. As a direct and proximate result of Defendants' deceptive trade practices, Plaintiffs and the Minnesota Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including time and expenses related to monitoring their financial accounts for fraudulent activity, an increased, imminent risk of fraud and identity theft, and loss of value of their Sensitive Information.

637. Plaintiffs and the Minnesota Subclass seek all relief allowed by law under Minn. Stat. § 325D.45, including an order enjoining Defendants' deceptive trade practices and reasonable attorneys' fees and costs.

**COUNT XIV**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349**
**N.Y. Gen. Bus. Law § 349**
**(On behalf of Plaintiff J.U. and the New York Subclass)**

638. Plaintiff J.U. realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

639. New York General Business Law § 349(a) provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." New York courts interpret § 349 by looking to the definition of deceptive acts and practices under Section 5 of the FTC Act.

640. Defendants are each a "person, firm, corporation or association" within the meaning of N.Y. Gen. Bus. Law § 349(b), and, at all relevant times, were engaged in "business," "trade,"

or "commerce" within the meaning of § 349(a), including the responsibility for safeguarding New York Plaintiffs' and New York Subclass members' Sensitive Information.

641. Defendants collect, obtain, and record information belonging to Canvas users, including names, email addresses, phone numbers, student identification numbers, and other personal information, along with data on student performance and records of student communications. On or about April 25, 2026, a criminal hacking and extortion group known as ShinyHunters exploited a vulnerability in Defendants' Free-For-Teacher account program—a feature that permitted educators to create Canvas accounts and submit support tickets without institutional verification—to gain unauthorized access to Defendants' Canvas environment where it stored Plaintiffs' and Class members' sensitive personal information. Defendants did not detect the intrusion until April 29, 2026, and, despite declaring the incident contained, suffered a second intrusion on May 7, 2026. Both of these intrusions occurred as a direct and proximate result of Defendants' failure to implement and maintain adequate cyber security practices and processes to keep Sensitive Information in their possession safe. As a result, Plaintiffs' and Class members' highly sensitive personal information was compromised in the Data Breach. Due to Defendants' failures and the vulnerability in its program, ShinyHunters was able to access Canvas login pages at approximately 330 institutions worldwide and threatened to publicly release the stolen data unless Defendants paid a ransom.

642. Defendants engaged in deceptive acts or practices in the conduct of their business, in violation of N.Y. Gen. Bus. Law § 349, including by: (a) failing to implement and maintain reasonable security and privacy measures to protect New York Plaintiffs' and New York Subclass members' Sensitive Information, which was a direct and proximate cause of the Data Breach; (b)

failing to identify and remediate the foreseeable security risk posed by the Free-For-Teacher program's lack of institutional verification; and (c) failing to comply with duties imposed by Section 5 of the FTC Act, 15 U.S.C. § 45.

643. Defendants' deceptive conduct is material because it was likely to deceive reasonable consumers about the adequacy of Defendants' data security and their ability to protect the confidentiality of Sensitive Information. Defendants' deceptive and unlawful acts and practices affected the public interest and consumers at large, including the New York Subclass affected by the Data Breach.

644. As a direct and proximate result of Defendants' violation of N.Y. Gen. Bus. Law § 349, Plaintiffs and Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, inter alia: (i) a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure, publication, and theft of their personal information; (iii) breach of the confidentiality of their personal information; (iv) deprivation of the value of their personal information, for which there is a well-established national and international market; (v) the continued risk to their personal information which remains in Defendants' possession; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft that they face and will continue to face; and (vii) nominal damages.

645. New York Plaintiffs and the New York Subclass seek all monetary and non-monetary relief allowed by law, including any: actual damages, or fifty dollars, whichever is greater; treble damages up to one thousand dollars for Defendants' willful or knowing violation;

reasonable attorneys' fees; injunctive relief; and any other relief available by law and to which the Court deems proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request that this Court:

A. Certify this case as a class action pursuant to Federal Rule of Civil Procedure 23;

B. Order appropriate compensatory, injunctive, equitable, declaratory, punitive, and nominal relief to Plaintiffs and Class Members under applicable law;

C. Award Plaintiffs an appropriate Class representative service award for their prosecution of this matter on behalf of all Class Members;

D. Award Plaintiffs and the Class pre-judgment and post-judgment interest as prescribed by law;

E. Award reasonable attorneys' fees and costs as permitted by law; and

F. Enter other and further relief as the Court deems to be both just and fair.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury for any and all issues in this action so triable as of right.

Dated: October 8, 2026

Respectfully submitted,

/s/ Carissa A. Uresk
Jonathan O. Hafen
Carissa A. Uresk
**PARR BROWN GEE & LOVELESS**
101 South 200 East, Suite 700
Salt Lake City, UT 84111
Telephone: (801) 532-7840
jhafen@parrbrown.com

*Liaison Counsel for the Individual Users Track (Track 1)*

Tina Wolfson*
Jeff Westerman*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
twolfson@ahdootwolfson.com
jwesterman@ahdootwolfson.com

Melissa Clark**
**AHDOOT & WOLFSON, PC**
521 5th Avenue, 17th Floor
New York, NY 10175
Telephone: (917) 336-0171
Facsimile: (917) 336-0177
mclark@ahdootwolfson.com

E. Michelle Drake*
**BERGER MONTAGUE PC**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 594-5933
emdrake@bergermontague.com

Mark B. DeSanto*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
mdesanto@bergermontague.com

James J. Pizzirusso**
Mandy Boltax**
**HAUSFELD LLP**
1200 17th Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 540-7200
jpizzirusso@hausfeld.com
mboltax@hausfeld.com

*Co-Lead Counsel for the Individual Users Track (Track 1)*

***Admitted Pro Hac Vice***
*****Pro Hac Vice Forthcoming***