Jessica A. Wilkes (admitted *pro hac vice*)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Tel: (405) 235-1560
jaw@federmanlaw.com

*Liaison Counsel for the Educator Track (Track 3)*

Nicholas Andrew Hall (admitted *pro hac vice*)
**Hall Attorneys, P.C.**
P.O. Box 1370
Edna, Texas 77957
Telephone: (713) 428-8967
nhall@hallattorneys.com

*Lead Counsel for the Educator Track (Track 3)*

**THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

**IN RE: INSTRUCTURE DATA BREACH LITIGATION**

*This Document Relates to Track 3*

**CONSOLIDATED CLASS ACTION COMPLAINT**
**TRACK 3 (EDUCATOR TRACK)**

**PROPOSED CLASS ACTION**

**JURY TRIAL DEMANDED**

Case No. 2:26-cv-00374-RJS-CMR

District Judge Robert J. Shelby

Chief Magistrate Judge Cecilia M. Romero

**TABLE OF CONTENTS**

I. NATURE OF THE ACTION ..... 1

II. PARTIES ..... 3

III. JURISDICTION AND VENUE ..... 5

IV. FACTUAL ALLEGATIONS ..... 6

A. User-Owned Content and the Commercial Benefits of FFT ..... 6

B. The Data Breach and Canvas Outage ..... 15

C. Canvas Free-for-Teacher Was Taken Offline and Then Discontinued ..... 18

D. The July Export Failures, Extension, and Different Recovery Outcomes ..... 21

E. Dr. Vallera's Free-for-Teacher Educator Injuries ..... 22

F. Dr. McKown's Continuing Inability to Recover Her Materials ..... 25

G. Recovery Decisions Were Linked to the Replacement Product ..... 26

H. Lack of Assent and the Disputed Published Terms ..... 29

I. KKR Ownership and Relevant Corporate Decisions ..... 31

V. EDUCATOR TRACK 3 DAMAGES AND INJURY ..... 33

VI. CLASS ALLEGATIONS ..... 33

VII. CLAIMS FOR RELIEF ..... 37

COUNT I - NEGLIGENCE AND GROSS NEGLIGENCE ..... 37

COUNT II - BREACH OF IMPLIED-IN-FACT CONTRACT ..... 40

COUNT III - BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ..... 42

COUNT IV – BAILMENT ..... 43

COUNT V - CONVERSION ..... 45

COUNT VI - TRESPASS TO CHATTELS ........ 47

COUNT VII - UNJUST ENRICHMENT AND RESTITUTION ........ 47

COUNT VIII – DECLARATORY AND INJUNCTIVE RELIEF ........ 49

VIII. PRAYER FOR RELIEF ........ 50

IX. JURY DEMAND ........ 51

Plaintiffs Dr. Farah L. Vallera ("Dr. Vallera") and Dr. Lisa McKown ("Dr. McKown") (collectively, "Plaintiffs"), individually and on behalf of the Educator Track Classes defined below, bring this Educator Track 3 Consolidated Class Action Complaint against Defendant Instructure, Inc. ("Instructure" or "Defendant"), pursuant to the September 30, 2026 Order permitting each track to file its own consolidated complaint (ECF No. 179).[1] Plaintiffs allege the following based on personal knowledge as to their respective acts, ownership, and experiences and, as to matters within Instructure's knowledge, on information and belief after reasonable investigation by counsel.

## I. NATURE OF THE ACTION

1. Instructure invited educators to create and store their own courses in Canvas Free-for-Teacher ("FFT"), obtained the commercial benefits of their participation, and controlled the systems through which they could retrieve their work. After security intrusions (the "Data Breach") precipitated a shutdown in May 2026, Instructure permanently discontinued FFT and limited recovery to brief export periods. Its notice and recovery decisions left Plaintiffs and the Class Members without their personally owned course materials ("Materials") and forced them to devote substantial time to reconstruction and recovery.

2. The property consists of identifiable course webpages, uploaded files, assessments, quiz banks, module arrangements, and corresponding account-linked electronic copies that

[1] The Educator Track brings claims and alleges injuries which are separate and distinct from the student-privacy claims and institutional contract claims in that the Educator Track claims arise out of a direct relationship between the teacher/educator and Instructure and seek recompense for FFT account holders whose right to their work product stored on FFT has been hindered, interfered with, or thwarted due to Instructure's conduct.

Plaintiffs personally created and owned. These reusable instructional assets embodied years of educational work and remained under Instructure's access controls after ordinary service ended.

3. Instructure offered export periods on May 28–29, July 28–30 as extended, and September 30–October 6, 2026. Neither Plaintiff received individualized notice of the May opportunity. Dr. Vallera demanded return and eventually recovered her Materials during the July period after repeated download failures. Dr. McKown received no notice from Instructure of the latest export period, including no email, could not export any files during it, and remains without her materials as of October 8, 2026.

4. Both Plaintiffs owned their affected courses and related intellectual property personally. The materials for which they seek relief did not belong to their employers, and their claims are for their own property and losses. Plaintiffs retained ownership when they placed those materials in FFT; authorizing the technical operations necessary to host their courses did not transfer title to Instructure.

5. This Educator Track concerns direct FFT account holders' loss of use, necessary reconstruction and recovery work, and related personal losses arising from the deprivation of their own course materials. The claims and requested relief are distinct from student-privacy claims and institutional contract claims.

6. Dr. Vallera seeks compensation for the deprivation and necessary recovery work completed before and during her successful July export. Dr. McKown seeks compensation for her own accrued losses and a secure, effective means to recover her still-unreturned courses and drafts.

Neither Plaintiff assented to Instructure's written or electronic terms. Their implied-in-fact contract claim arises from the separate undertaking manifested by the parties' reciprocal conduct.

7. Instructure controlled notice channels, recovery dates, authentication, and export tools. Its Senior Director of Community expressly linked decisions about existing FFT content to development of the replacement product. As detailed below, Plaintiffs allege on information and belief that Instructure coordinated further recovery with the new "Canvas Lite" launch in part to preserve educator relationships and promote continued adoption of Canvas products. Instructure had already demonstrated that controlled export access was possible; its continued control over access kept educators who still lacked their materials dependent on its recovery decisions.

8. Plaintiffs seek relief for actual deprivation of their materials and the resulting loss of use and necessary corrective work. Dr. McKown also seeks preservation and return of recoverable content. The requested return obligation is limited to existing materials and does not require indefinite continuation of FFT.

## II. PARTIES

9. Plaintiff Dr. Farah L. Vallera is a citizen and resident of Pennsylvania and resides in Lehigh County, Pennsylvania. She is a faculty member, instructional designer, curriculum writer, and educational researcher. Dr. Vallera personally owns the instructional materials and related intellectual property at issue and maintained them in her direct FFT account.

10. On information and belief, Dr. Vallera created her direct FFT account on or around 2018. She used that account to build, maintain, and deliver more than 50 courses. Her July 28 support email identified that volume of content. Dr. Vallera did not sign, accept, or otherwise

assent to any written or electronic terms or express agreement with Instructure or Canvas, including any purported later revision. The account-creation date is approximate. Her account, course, and export records identify the affected materials and her recovery activity.

11. When FFT was taken offline, Dr. Vallera's account contained active course content. Instructure had not told her that her account violated any usage restriction, exceeded storage limits, or had been deleted for inactivity. She did not abandon her materials, and her eventual download establishes that they remained available for recovery.

12. Plaintiff Dr. Lisa McKown is a citizen and resident of Indiana and resides in Marion County, Indiana. On information and belief, she created her direct FFT account on or around 2018. She did not sign, accept, or otherwise assent to any written or electronic terms or express agreement with Instructure or any of its subsidiaries, including any purported later revision. She used that account for her educational work, including instruction concerning infection detection in medical devices and certification courses for sterile processing.

13. Dr. McKown's account held materials for 12 active programs, courses awaiting publication, and additional draft courses. Dr. McKown personally owns those materials and their related intellectual property; they do not belong to her employer. She received no export notices from Instructure and has not recovered her materials. She seeks relief for the loss of use of her materials and her reconstruction and recovery efforts.

14. Defendant Instructure, Inc. is a Delaware corporation with its principal place of business in Salt Lake City, Utah. It owns, operates, markets, maintains, and controls Canvas and

FFT and directed FFT services to educators nationwide, including Dr. Vallera in Pennsylvania and Dr. McKown in Indiana.[2]

## III. JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the proposed Classes contain more than 100 members, at least one Class member is a citizen of a State different from Defendant, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Instructure publicly reported that FFT had supported approximately 76,000 teachers and 2.1 million courses worldwide. On information and belief, thousands of United States account holders stored educator-owned content in FFT, and the aggregate loss-of-use, recovery, rebuild, migration, substitute-platform, and professional-interruption damages associated with even a fraction of those courses exceed the jurisdictional threshold.[3]

16. This Court may grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and the Court's equitable authority. Those remedial statutes do not supply subject-matter

[2] Instructure Holdings, Inc., Annual Report (Form 10-K) for 2023, Note 1, at F-8 (filed Feb. 21, 2024), https://www.sec.gov/Archives/edgar/data/1841804/000095017024017904/inst-20231231.htm (identifying Instructure, Inc. as incorporated in Delaware and the business as headquartered in Salt Lake City); Instructure Holdings, Inc., Form 8-K/A, Explanatory Note (Apr. 12, 2024), https://www.sec.gov/Archives/edgar/data/1841804/000095017024044032/inst-20240201.htm (identifying Instructure, Inc. as a Delaware corporation and wholly owned subsidiary).

[3] Ruth Thornton, Instructure, *Collaborate, Grow, and Learn with Canvas LMS Free-for-Teacher* (July 5, 2023), https://www.instructure.com/resources/blog/collaborate-grow-and-learn-canvas-lms-free-teacher (reporting worldwide program activity). The United States class estimate and aggregate amount in controversy are alleged on information and belief, not reported as company statistics.

jurisdiction by themselves; CAFA supplies jurisdiction over all claims asserted here, and the requested declaratory and injunctive relief arises from the same common nucleus of facts as the damages claims.

17. The Court has personal jurisdiction over Instructure because Instructure is headquartered in this District, conducts substantial business from Utah, and made, implemented, or controlled the FFT security, incident-response, notice, shutdown, content-retention, export, migration, and remediation decisions challenged here from or through its Utah operations. Plaintiffs' claims arise from or relate to Instructure's operation of FFT and the challenged conduct.

18. Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because Instructure resides here and a substantial part of the conduct and omissions giving rise to Plaintiffs' claims - including corporate security, notice, shutdown, retention, export, migration, and remediation decisions - occurred in or were directed from this District. Venue is also appropriate because related Instructure actions are consolidated in *In re Instructure Data Breach Litigation*, Case No. 2:26-cv-00374-RJS-CMR.

## IV. FACTUAL ALLEGATIONS

### A. User-Owned Content and the Commercial Benefits of FFT

19. Instructure marketed and provided Canvas and FFT as learning-management systems through which educators could create accounts, organize courses, upload files, build assessments, communicate, and preserve reusable instructional content.

20. FFT was specifically marketed as resource for individual educators whose affiliated institutions did not yet subscribe to Canvas. Through marketing materials and the products' own

purpose and offerings, Instructure invited and encouraged individual educators, including Plaintiffs and the Track 3 Class Members to use FFT to create and store their course materials, assignments, files, and other education content.

21. The materials at issue are the named Plaintiffs' personally owned course materials and related files and the materials that Class members owned or had an immediate right to possess. Uploading those materials to FFT did not transfer ownership to Instructure.

22. Although the FFT platform itself was marketed as "free" for the individual educators, Instructure solicited sustained educator participation in and reliance on FFT for its own financial gain.

23. Instructure promised that it is "committed" to all educators that use Canvas platforms, including FFT. In a July 2023 company blog, Instructure's product manager expressly stated: "Standing with our commitment to educators no matter how and where they teach, Canvas Free-for-Teacher allows users to leverage the platform without automatic expiration, granting peace of mind of continued, ongoing access to the familiar platform to achieve those learning goals." Instructure further promised that its FFT platform would remain reasonably available stating "Instructure is committed to providing access to Canvas Free-for-Teacher," and "[w]hile other LMS providers have scaled back or eliminated their free platforms, Instructure understands the importance of continuing to offer this accessible opportunity to educators everywhere." The blog went on to state "[o]ur consistent back-to-school rushes indicate that hundreds of thousands of users need equitable access to an LMS on an ongoing basis. Through Canvas Free-for-Teacher, Instructure aims to provide that access in an unrivaled way, . . . ." The same publication promoted

FFT's scale in teachers, courses, students, and usage hours. Instructure thus publicly used educators' participation and course activity to demonstrate the program's value.[4]

24. Instructure's investor disclosures likewise identified commercial value in product adoption and user participation. Its 2023 annual report described surrounding existing free K–12 solutions with its platform and monetizing demand for its broader capabilities, cross-selling products to Canvas customers, and analyzing user data and collaborating with customers in product development. It connected increased adoption and feature usage with brand loyalty and customer lifetime value and identified its approximately two-million-member user community as a competitive factor. These disclosures concerned the broader business in which FFT operated.[5]

25. On its website, Instructure promoted a specific example of FFT use supporting institutional adoption. Instructure's Baliuag University case study describes faculty use of FFT before the university adopted Canvas in July 2017, followed by the university's use of FFT-experienced instructors to help colleagues adopt Canvas.[6] Instructure Global Limited, its UK affiliate, also advertised FFT accounts as a way to try Canvas in an institutional procurement listing

---

[4] Ruth Thornton, Instructure, *Collaborate, Grow, and Learn with Canvas LMS Free-for-Teacher* (July 5, 2023), https://www.instructure.com/resources/blog/collaborate-grow-and-learn-canvas-lms-free-teacher.

[5] Instructure Holdings, Inc., Annual Report (Form 10-K) for 2023, at 5, 10–12, 49 (filed Feb. 21, 2024), https://www.sec.gov/Archives/edgar/data/1841804/000095017024017904/inst-20231231.htm.

[6] Instructure, *How Adding an LMS Helped Baliuag University Usher in a Digital Transformation*, https://www.instructure.com/en-au/resources/case-studies/how-adding-lms-helped-university-usher-digital-transformation (last visited on Oct. 8, 2026).

that offered administrative trials through sales. Educator familiarity and product evaluation were concrete functions of the free offering within Instructure's business.[7]

26. Instructure also collected and used data from use of its Canvas products (including FFT) and solicited product ideas and feedback through its "Instructure Community" page. On its website, Instructure has a "Product Blog" which describes reviewing user submissions, organizing development priorities, and carrying community input into product development.[8]

27. In its Product Privacy Policy effective December 31, 2023, Instructure disclosed collection of account and submitted-content information, product-usage information, device information, and communications such as support requests and product feedback. It stated that it used this information to provide, analyze, and improve its products and could create and use de-identified or aggregate information for any purpose. These disclosures describe operational and product-development uses of user participation in addition to providing the immediate educational service.[9]

28. Instructure publicly reports that its broader Community has generated at least 780 product ideas in production and contains at least 65,000 resources.[10]

---

[7] GOV.UK Digital Marketplace, *Instructure Global Limited*, https://www.applytosupply.digitalmarketplace.service.gov.uk/g-cloud-14/services/173463782527186 (last visited Oct. 8, 2026).

[8] Instructure, INSTRUCTURE COMMUNITY, https://www.instructure.com/community; INSTRUCTURE COMMUNITY, THE PRODUCT BLOG, *Idea Conversations: The Path Forward*, https://community.instructure.com/en/discussion/547057/idea-conversations-the-path-forward/p1 (last visited Oct. 8, 2026) (describing a February 1, 2023 launch target for the ideas process).

[9] Instructure, *Instructure Product Privacy Policy | 2023* §§ 2–3 (effective Dec. 31, 2023), https://www.instructure.com/policies/privacy-retire.

[10] Instructure, *A Community Built by Educators for Educators*, https://www.instructure.com/community (last visited Oct. 8, 2026).

29. Plaintiffs uploaded their personally owned course materials, created and maintained FFT accounts, and used the platform to prepare and deliver educational content. That participation supplied account and usage information of the kinds Instructure's policy identified for operating and improving its products. Plaintiffs also supplied the recovery and support communications described below.

30. At Instructure's invitation, Plaintiffs supplied their personally owned instructional materials, and Track 3 Class Members supplied materials they owned or had an immediate right to possess, together with account information; they used FFT for educational work and permitted the technical hosting and processing necessary for that use. Instructure knowingly accepted that performance and operated account-specific storage, course-management, and export functions. Plaintiffs' participation supplied content and activity for Instructure's free educator offering while leaving ownership of their materials with them.[11]

31. As Instructure intended and per FFT's design, direct FFT users depended on Instructure's account controls, databases, and export tools to obtain complete Canvas-native copies of their courses.

32. For direct FFT users, reasonable security, preservation, exportability, and access to user-owned content were material functions of the service. Instructure invited educators to maintain reusable materials within its account-controlled environment and supplied tools for

[11] Instructure, *Acceptable Use | Policy* (eff. Jan. 11, 2018), https://www.instructure.com/policies/acceptable-use-2018 (recognizing user ownership and describing the limited permissions needed for hosting, display, sharing at users' direction, and backup). The policy is cited as Instructure's public description of service operations and ownership, not as terms assented to by Plaintiffs.

accessing and exporting them. Its public descriptions of access and security identify the functions it undertook and the risks it recognized.

33. Instructure knew educators would invest substantial time, energy, and labor in the course structures and materials created and stored on the FFT platform. Instructure further knew that these account users would suffer foreseeable property, professional, and economic harm if Instructure failed to safeguard those systems, denied users reasonable access to the information stored on the FFT platform, or created a recovery process that did not provide effective notice and a reasonable means of export.

34. Canvas associated course content with specific user accounts, course identifiers, files, database records, and exportable course packages. Instructure further stored individual identification information for each account holder, including email addresses. As such, upon information and belief, Instructure has reasonable means to identify the intellectual property stored on FFT that belongs to each account.

35. Instructure controlled FFT authentication, the database and application server, and export availability. On information and belief, it also maintained account-activity and export records that, together with notice-delivery information and support reports, provided means to identify accounts and courses requiring further recovery assistance. Generation of an export does not by itself establish successful delivery to its owner. Plaintiffs' communications separately gave Instructure actual notice of their own recovery problems.

36. Instructure knew or should have known that FFT account holders would rely on ordinary platform access. Instructure knew or should have known that FFT account holders would

reasonably expect direct notice of any incidents or issues related to their FFT accounts, including notices of recovery windows. Moreover, Instructure has reasonable means to provide FFT account holders with such direct notice through the use of the email addresses associated with each FFT account. Instructure knew or should have known that passive publication of a short export deadline could deprive users of a meaningful opportunity to recover years of work.

37. In its 2022 Security Overview, Instructure described content sanitization, restrictions on employee access, and periodic access reviews as components of its security program. It identified these measures as protections against malicious content and unauthorized access.[12] Instructure also reported that it had extensively tested its Global Identity Service on Instructure-hosted sites, expressly including Free for Teacher, as part of a project intended to improve security.[13] Instructure's subsequent account of the Data Breach identified an FFT support-ticket vulnerability through which an attacker obtained an authorization token and elevated Canvas access when a customer-service representative opened a malicious ticket.[14] These allegations concern Instructure's handling of untrusted content and the security of its company-operated support process and privileged access.

---

[12] Instructure, *Security Overview* (2022), pp 9, 13–14, 16, reproduced at: https://iser.mpc.edu/Standard-IIIC_Evidence_Folder/IIIC3-05_CanvasParticAgr.pdf (reproduced following an institutional participation agreement).

[13] Michael Lysaght, INSTRUCTURE COMMUNITY, *The Future of Instructure Technology with Global Identity Service*, https://community.instructure.com/en/discussion/649304/the-future-of-instructure-technology-with-global-identity-service (last visited Oct. 8, 2026).

[14] Instructure, *Security Incident Update & FAQs: For Customers*, https://www.instructure.com/incident-update/customers (last visited Oct. 8, 2026) (describing the FFT support-ticket vulnerability and resulting authorization-token access).

38. The same Security Overview represented that stored data and off-site recovery backups were encrypted with AES-GCM 256-bit encryption, that Canvas traffic was encrypted using TLS 1.2, and that databases and content were backed up daily.[15]

39. Those statements identify protections Instructure itself recognized as important to confidentiality, integrity, and recoverability. Plaintiffs allege failures in the implementation and enforcement of reasonable security and retrieval safeguards in the affected environment, as detailed below. The Security Overview describes Instructure's knowledge and security measures within its control; Plaintiffs do not allege that they accepted the institutional agreement accompanying that document.

40. In its 2023 annual report, Instructure described a cloud-hosted, multi-tenant platform, backup and disaster-recovery services, recovery procedures, and key-data-store backups in multiple physical locations. It also represented that it followed industry-standard information-security practices to protect its servers and customers' critical data. These company-wide descriptions identify security and recovery functions relevant to Instructure's custody of content. The configuration of those functions for FFT and the location and condition of Plaintiffs' stored materials are within Instructure's records.[16]

---

[15] Instructure, *Security Overview* (2022), pp. 8, 13-14, 16, reproduced at https://iser.mpc.edu/Standard-IIIC_Evidence_Folder/IIIC3-05_CanvasParticAgr.pdf; *see also* Instructure, *Platform Security*, https://www.instructure.com/platform-security-trust-center-instructure (last visited on Oct. 7, 2026).

[16] Instructure Holdings, Inc., *Annual Report (Form 10-K)* 4, 9 (Feb. 21, 2024), https://www.sec.gov/Archives/edgar/data/1841804/000095017024017904/inst-20231231.htm.

41. The risks of cross-site scripting were publicly documented well before the Data Breach. In September 2024, the Cybersecurity and Infrastructure Security Agency ("CISA") and the FBI urged software manufacturers to prevent that class of vulnerability through appropriate input validation, output encoding, code review, and adversarial testing, and to examine recurring vulnerabilities across their products. The guidance addressed precautions within the software manufacturer's control. Instructure's subsequent description of two XSS attack paths implicates the same recognized risk.[17]

42. Instructure also had direct experience with an earlier compromise. On September 21, 2025, it disclosed a social-engineering attack involving its Salesforce instance and stated that it had investigated with outside experts and notified federal law enforcement. Instructure described the affected information as largely business contact information and stated that no Instructure products or product data were accessed. Its later Canvas incident FAQ said that the two incidents appeared attributable to ShinyHunters while distinguishing the earlier Salesforce incident from the direct attacks on Canvas.[18]

43. The FBI had warned on September 12, 2025 that attacks against Salesforce customers targeted support employees and used compromised or attacker-authorized OAuth access

---

[17] Cybersecurity & Infrastructure Sec. Agency & Fed. Bureau of Investigation, *Secure by Design Alert: Eliminating Cross-Site Scripting Vulnerabilities* (Sept. 2024), 1–3 https://www.ic3.gov/CSA/2024/240917.pdf.

[18] Instructure Privacy Team, *Update on Security Incident* (Sept. 21, 2025), https://www.instructure.com/resources/blog/security-incident-update; Instructure, *Security Incident Update & FAQs: For Customers*, https://www.instructure.com/incident-update/customers (last visited Oct. 8, 2026) (responses concerning the connection between the Salesforce and Canvas incidents and the earlier, unrelated incident).

to extract data. It recommended least-privilege authorization, restrictions on access locations, monitoring of API use and browser sessions, and review of integration credentials and tokens. Those warnings and Instructure's own prior incident made misuse of support access a foreseeable risk before the FFT support-ticket exploit, even though the incidents involved different systems and entry methods.[19]

**B. The Data Breach and Canvas Outage**

44. On or about April 29, 2026, Instructure detected unauthorized activity in its Canvas environment. Instructure later claimed that it revoked the unauthorized access, began an investigation, and engaged outside forensic experts.

45. Instructure stated that the Data Breach involved data fields including usernames, email addresses, course names, enrollment information, and messages. The security incident precipitated the FFT shutdown, and the same threat actor obtained additional access through a second vulnerability days later.

46. Instructure states that the actor created an FFT account and submitted malicious code through a support ticket. When a customer-service representative opened the ticket, the code exploited a cross-site scripting vulnerability, enabling the actor to obtain an authorization token and elevated access within Canvas. The attack thus exploited a privileged support pathway controlled by Instructure.

[19] Fed. Bureau of Investigation, FLASH-20250912-001, *Cyber Criminal Groups UNC6040 and UNC6395 Compromising Salesforce Instances for Data Theft and Extortion* (Sept. 12, 2025), pp. 2, 4–5, available at: https://www.ic3.gov/CSA/2025/250912.pdf.

47. On or about May 7, 2026, the same threat actor gained additional access through a second, unpatched cross-site scripting vulnerability in Canvas discussions. Instructure states that the actor used the OAuth authorization process to obtain a token and bypass the earlier fix. The actor changed customer-facing pages, and Instructure took Canvas offline into maintenance mode.[20]

48. The unauthorized ’intrusions and failure to contain the related attack paths precipitated Instructure’s decision to take Canvas offline and disable FFT. Those security-related actions interrupted Plaintiffs’ access to their materials. Instructure thereafter made separate decisions to discontinue FFT permanently and control recovery through the limited export periods alleged below.[21]

49. On information and belief, those attack paths reflect failures to isolate untrusted user content from privileged support sessions, constrain authorization tokens to legitimate functions and accounts, and identify and remediate related vulnerabilities after the first intrusion. The basis for this inference is Instructure’s description of malicious user content producing elevated application access and a second unpatched route bypassing the initial fix. Those failures compromised the mechanisms governing access and precipitated the shutdown that deprived Plaintiffs of their materials.

---

[20] Instructure, *Security Incident Update and FAQs: for Customers*, https://www.instructure.com/incident-update/customers (last visited Oct. 8, 2026) (responses describing the FFT support-ticket vulnerability and the May 7 discussion vulnerability).

[21] Instructure, *Incident Fact Sheet* (May 13, 2026), p. 1, available at: https://www.instructure.com/sites/default/files/pdf/InstructurebyCanvas-Incident-Fact-Sheet-051326.pdf.

50. On information and belief, Instructure also failed to apply reasonable restrictions and monitoring to the exercise of support privileges, including anomalous access across accounts and bulk export activity. Its FAQ identifies unusual support-account activity from April 25 through April 30 and briefly on May 7, including rapid access to multiple courses or accounts, as potential indicators of the threat actor. Those indicators, the described token exploits, and the pre-Data Breach guidance support the pleaded control failures.[22]

51. Instructure acknowledged that its incident communications had fallen short, stating that it had prioritized fact-finding and gone quiet when users needed consistent updates. For direct FFT educators, that communication failure was compounded by the permanent shutdown of their account environment and their dependence on Instructure-controlled authentication and export tools to recover existing content.[23]

52. In deciding to shut down the FFT platform, Instructure has acted unreasonably and in clear disregard to Plaintiffs' rights by, failing to timely and adequately inform FFT account holders – including Plaintiffs and the Track 3 Class Members – of the permanent shut down and the limited access and export windows, and failing to provide meaningful and adequate access to export their intellectual property stored on the FFT platform.

---

[22] Instructure, *Security Incident Update & FAQs: For Customers*, https://www.instructure.com/incident-update/customers (last visited Oct. 8, 2026) (response concerning log entries and audit-trail indicators); Fed. Bureau of Investigation, FLASH-20250912-001, *Cyber Criminal Groups UNC6040 and UNC6395 Compromising Salesforce Instances for Data Theft and Extortion* (Sept. 12, 2025), pp. 4–5, available at: https://www.ic3.gov/CSA/2025/250912.pdf.

[23] Instructure, *Security Incident Update & FAQs: For Customers*, https://www.instructure.com/incident-update/customers (last visited Oct. 8, 2026) (response concerning delayed and inconsistent incident communications).

53. On information and belief, the same centralized security, incident-response, and executive teams controlled the first response, the May 7 shutdown, the decision to permanently discontinue FFT, the selection of notice channels, the duration of each recovery window, and the availability of support and individualized exports.

54. Instructure's encryption representations did not secure the application privileges through which stored information could be accessed in readable form. On information and belief, Instructure failed to enforce reasonable safeguards against unauthorized acquisition and use of those privileges. The admitted support-token and OAuth attack paths identify an access-control failure even if storage and transmission were encrypted.

**C. Canvas Free-for-Teacher Was Taken Offline and Then Discontinued**

55. Instructure has stated that the unauthorized actor carried out activity using one of its Canvas Free-for-Teacher accounts and that, as a result, Canvas Free-for-Teacher was taken offline. Instructure then permanently discontinued the Free-for-Teacher program.

56. After Free-for-Teacher was taken offline, Instructure temporarily restored access in a limited capacity from 12:00 a.m. Eastern Time on May 28, 2026 through 11:59 p.m. Eastern Time on May 29, 2026 so educators could download course content and close out the school year. This window lasted only approximately 48 hours.

57. Neither Plaintiff received individualized notice of the May recovery window. In the public discussion of that window, Instructure's Senior Director of Community, Renee Carney, explained that the company had considered messaging every FFT user but declined to do so

because of bounce and spam concerns. Rather, Instructure relied on ineffective publications on its website to notify FFT users and allowed these FFT users only approximately 48 hours to act.[24]

58. Plaintiffs' account email addresses provided channels for timely, actionable recovery notice. Had Instructure provided effective individualized notice or a reasonably longer supported recovery opportunity, Plaintiffs would have been able to take reasonable steps to timely retrieve their intellectual property.

59. Dr. Vallera's repeated monitoring, direct requests for assistance, and eventual export efforts demonstrate her efforts to recover the materials rather than abandon them.

60. After Dr. Vallera demanded return of her courses, Instructure support told her on June 4, 2026: "There is not another planned window to retrieve content from Free for Teacher at this time." Support acknowledged "how much work and care goes into your courses and content" but instructed her to monitor a blog. Instructure did not identify whether her courses remained in a database, backup, snapshot, object store, or archive; did not provide an individualized export; and did not give a concrete retrieval date.

61. In July 2026, Instructure announced another FFT access window (which it described as ***final***) from 12:00 a.m. Eastern Time on July 28 through 11:59 p.m. Eastern Time on July 29, 2026. Instructure stated that users could log in, view courses, and export materials; in-

---

[24] Instructure, INSTRUCTURE COMMUNITY, *Free-for-Teacher Platform Restoration*, https://community.instructure.com/en/discussion/666181/free-for-teacher-platform-restoration (last visited Oct. 8, 2026) (Renee Carney responses concerning messaging FFT users); *see also* Instructure, INSTRUCTURE COMMUNITY, *A Temporary Change to Community Access for Free for Teacher Users* (June 4, 2026), https://community.instructure.com/en/discussion/comment/1259429 (Carney response to MelissaSamaro).

platform support functionality would remain off; and the FFT database and application server would remain segregated behind a dedicated firewall.[25]

62. In the discussion accompanying the July announcement, an Instructure representative described the email audience as instructors active in FFT within the prior year. Another representative explained that the company had developed a validated email list.[26]

63. Dr. McKown alleges that she did not receive an export notice from Instructure, while Dr. Vallera participated in the July window.

64. The post-window conduct is distinct from the initial emergency suspension. Plaintiffs challenge the delay in providing a workable recovery process, the adequacy of notice, and the technical failures encountered when export access was restored.

65. Dr. Vallera's eventual recovery does not resolve Dr. McKown's separate, continuing inability to reclaim her materials.

66. On information and belief, recoverable copies of Dr. McKown's stored course materials remain within Instructure's control. Her account contained active courses and drafts before the shutdown, and Instructure repeatedly reopened the legacy environment, most recently through October 6, inviting remaining FFT users to export existing content.

---

[25] Instructure, INSTRUCTURE COMMUNITY, *An Additional Free-for-Teacher Access Window* (July 2026), https://community.instructure.com/en/discussion/666586/an-additional-free-for-teacher-access-window.

[26] *Id*. (comments by Kristin Lundstrum and Renee Carney concerning the July email audience and validated mailing list).

**D. The July Export Failures, Extension, and Different Recovery Outcomes**

67. When the July export window opened, Dr. Vallera attempted to use it. On July 28, 2026, she emailed Brittany Weston at Instructure support alerting Instructure that she had tried two courses several times each and that neither of the emailed export links nor the in-course links allowed her to retrieve the content. She reported more than 50 courses, explained that she had followed the instructions and watched the export videos, and asked for help before time expired. The screenshot included in her email displayed "Page Not Found."

68. Instructure's Community discussion recorded reports of heavy-load messages, failed downloads, and exports reported as complete whose links returned errors. Those reports are consistent with Dr. Vallera's documented experience. [27]

69. In a separate, subsequent announcement titled "Free-For-Teacher Open Window Extension," Instructure acknowledged that many users experienced errors during the opening hours, despite its internal validation of access. Instructure extended the window by 12 hours, setting the revised closing time at July 30, 2026, at 11:59 a.m. Eastern Time. The extension increased the originally announced recovery period from approximately 48 to approximately 60 hours.[28]

[27] Instructure, INSTRUCTURE COMMUNITY, *An Additional Free-for-Teacher Access Window*, https://community.instructure.com/en/discussion/666586/an-additional-free-for-teacher-access-window/p1 (last visited Oct. 8, 2026) (user error reports, employee responses by Kristin Lundstrum and Renee Carney, and subsequent participant reports of successful downloads).

[28] Instructure, INSTRUCTURE COMMUNITY, *Free-For-Teacher Open Window Extension*, https://community.instructure.com/en/discussion/666708/free-for-teacher-open-window-extension (last visited Oct. 2, 2026).

70. Dr. Vallera ultimately downloaded her materials during the July recovery period. She seeks relief for the preceding loss of use, necessary reconstruction and recovery work, and additional efforts caused by failed downloads.

71. Dr. McKown received no export notices from Instructure and did not recover her materials during the May or July period. She likewise received no notice from Instructure, including no email, of the September 30 through October 6, 2026 window and could not export any files during that window. As of October 8, 2026, her courses and drafts remain unrecovered.

72. Restoring limited access during these short export windows does not establish that each account holder received notice or actually recovered the relevant content. Instructure's notices, authentication records, course inventories, export-generation logs, and download records can distinguish a generated export link from a successful retrieval and identify the duration of each user's deprivation.

**E. Dr. Vallera's Free-for-Teacher Educator Injuries**

73. Dr. Vallera personally created and arranged the affected instructional materials and owns them and the related intellectual property. They are her own property, not her employer's. She needed them for her own educational work while they were inaccessible.

74. Dr. Vallera used FFT to build, store, and deliver more than 50 courses and associated curriculum assets. The affected property included course shells, module sequences, assessments, quiz banks, files, links, HTML layouts, feedback, and account-linked metadata. Her claim concerns the loss of use and recovery burden before and during their eventual download.

75. Dr. Vallera received no direct email about the Data Breach or the May recovery period. She did not see the passive announcement in time to act. The absence of individualized notice, combined with the exceptionally short deadline, deprived her of a meaningful opportunity to export years of work.

76. Dr. Vallera did not abandon her courses or consent to losing access to them. She consistently sought recovery and ultimately obtained her materials during the July export period.

77. Dr. Vallera expressly requested assistance recovering her courses. After 'Instructure's June 4 statement that no further window was then planned, she asked whether someone could download her courses for her and requested escalation. Instructure's support team offered to connect her with its sales team in response to those recovery requests. On June 23, she followed up that she had still not heard from the sales team despite calls and a message. These communications document her recovery efforts and the intervening delay.

78. Instructure announced a further recovery date in July, after Dr. Vallera's June requests for return and escalation. During the intervening period, Dr. Vallera remained deprived of the ability to use, update, deliver, migrate, or verify her courses.

79. After Instructure support failed to return her courses, Dr. Vallera contacted Instructure sales in an effort to preserve her ability to deliver courses and trainings. An Instructure representative discussed a paid Canvas offering of approximately $5,000 per year for up to 200 students, plus an implementation fee later estimated at approximately $10,000. The sales discussion did not produce access to her existing FFT content.

80. The proposed paid service was not a substitute for return of existing property. Instructure did not promise that purchasing it would restore Dr. Vallera's courses, and no paid migration was completed.

81. When Dr. Vallera asked whether the implementation fee would include migration of her FFT courses, the Instructure representative responded: "I'm not certain the courses can be migrated." The proposed paid service therefore did not assure restoration of the assets Instructure already hosted and controlled.

82. Dr. Vallera personally spent more than 20 hours recreating course materials and dealing with the lack of access to her property. Those efforts included reconstructing or preserving instructional content, locating recovery information, contacting support and sales, and attempting recovery. During the July window, she also followed Instructure's instructions, repeatedly retried failed download links, and reported the failures before obtaining her materials. Her July 28 email and screenshot document particular failed attempts; the more-than-20-hour allegation concerns her total recovery and reconstruction effort.

83. Dr. Vallera seeks the reasonable value of the loss of use of her materials and necessary personal reconstruction and recovery work caused by Instructure's conduct.

84. Dr. Vallera's necessary recovery and reconstruction work displaced time she otherwise would have used to develop new course materials and pursue other activities. She seeks compensation for necessary corrective work and loss of use, subject to the measure available for each substantive claim.

### F. Dr. McKown's Continuing Inability to Recover Her Materials

85. On information and belief, Dr. McKown created her FFT account on or around 2018. Her personally owned materials relate to 12 active programs, courses she was preparing to publish, and additional courses in draft. She owns the related intellectual property; the materials do not belong to her employer. Course and file records identify the materials associated with her account.

86. Dr. McKown previously informed Instructure that she could not access her course materials. An Instructure sales representative told her that email notice had been provided concerning a 48-hour export opportunity, but she had received no such notice and remained unable to reclaim her materials. Despite knowing that her access problem remained unresolved, Instructure did not follow up with her to provide recovery assistance or notify her of the September 30 through October 6, 2026 export period. Dr. McKown received no notice of that window from Instructure, including no email, and was unable to export any files. As of October 8, 2026, she has not otherwise recovered her course materials.

87. Dr. McKown personally spent more than 20 hours recreating instructional materials and dealing with the lack of access to her property. She needed existing course and draft materials for publication and teaching, could not retrieve them, and had to reconstruct content rather than continue her planned instructional work. She seeks the reasonable value of necessary personal recovery and reconstruction efforts and loss of use caused by the challenged conduct. Her materials remain unrecovered.

88. Dr. McKown presently seeks a secure means to identify and recover the course materials that she personally owns. She expressly requests preservation, account-level confirmation of retained content, and return or export through a workable process that protects any third-party information. Her continuing injury concerns materials she has not reclaimed, rather than the ordinary loss of access to a discontinued free service.

**G. Recovery Decisions Were Linked to the Replacement Product**

89. In the FFT restoration discussion, Renee Carney stated that Instructure was deciding both what its next free product would look like and what would happen to courses and content in the closed FFT environment. When a user clarified that educators were asking whether their data still existed, Carney responded that "the decisions are intertwined and not easily isolated." This expressly linked the disposition of existing materials to replacement-product planning.[29]

90. After the July export period, another user reported missed notices, unsuccessful efforts to obtain assistance, and the need to rebuild courses. Carney responded that Instructure could not then provide FFT content and was preparing communications about the replacement solution together with further clarity for educators who had missed the prior windows. That exchange gave Instructure additional notice that its recovery process had left educators without their materials.[30]

---

[29] Instructure, INSTRUCTURE COMMUNITY, *Free-for-Teacher Platform Restoration*, https://community.instructure.com/en/discussion/666181 (last visited Oct. 8, 2026) (Renee Carney responses to EricWalters and tom_collins).

[30] Instructure, INSTRUCTURE COMMUNITY, *Free-For-Teacher Open Window Extension*, https://community.instructure.com/en/discussion/666708/free-for-teacher-open-window-

91. In a September 11, 2026 company blog, Instructure described Canvas Lite as the continuation of FFT's free educator offering and as a way for instructors to experience Canvas before seeking broader institutional adoption. It invited educators who outgrew the free limits or needed additional features to discuss a full Canvas license. The blog also identified learners' future familiarity with Canvas as a benefit. Instructure thus expressly described commercial adoption opportunities and enduring product familiarity as benefits of the free educator channel.[31]

92. Instructure's September 9, 2026 Canvas Lite announcement tied the September 30–October 6 FFT export period to the new product's launch. It encouraged users to move existing courses into Canvas Lite, explained that transfer would not occur automatically, and warned that legacy access would end after the window. Canvas Lite was offered at no cost with capacity limits, while the announcement invited users needing more capacity or features to discuss a full institutional license. Dr. McKown received no notice from Instructure, including no email, of this export period and could not export any files during it.[32]

---

extension (last visited Oct. 8, 2026) (Renee Carney response to CarolineJudd).

[31] Instructure, *Say Hello to Canvas Lite*, (Sept. 11, 2026), https://www.instructure.com/resources/blog/say-hello-canvas-lite ("This feels a lot like Free for Teacher, and that's on purpose" and "Where Canvas Lite fits alongside Canvas").

[32] Zach Pendleton, INSTRUCTURE COMMUNITY, *Built for Individual Educators, Built with Security in Mind: Introducing Canvas Lite* (Sept. 9, 2026), https://community.instructure.com/en/discussion/667092/built-for-individual-educators-built-with-security-in-mind-introducing-canvas-lite ("One week to bring over your existing course content" and "What's different from Free-for-Teacher,"); Instructure, *Instructure Announces Canvas Lite, a New Free Course Tool Built for Educators* (Sept. 9, 2026), https://www.instructure.com/press-release/instructure-announces-canvas-lite-new-free-course-tool-built-educators.

93. On information and belief, Instructure deliberately deferred and coordinated further recovery for educators still without their materials with Canvas Lite's launch to preserve their participation in Canvas and promote adoption of its replacement offering. Instructure retained control of the materials and the timing of access while preparing the successor product, then presented the final, time-limited return opportunity together with instructions to move courses into Canvas Lite and invitations to discuss institutional licenses.

94. Carney's statements linked decisions about existing FFT content to planning for the replacement offering. Instructure's later' Canvas Lite announcements described adoption objectives 'and options 'for broader institutional use. Taken together with the timing of the remaining export window and the recovery communications described above, those statements support Plaintiffs' allegation, on information and belief, that product-transition objectives influenced the timing and administration of recovery.[33]

95. Instructure provided May and July export opportunities before Canvas Lite launched, and Dr. Vallera recovered her materials in July. The subsequent product transition nevertheless left Dr. McKown and other remaining users dependent on Instructure's timing and communications to retrieve their work. Plaintiffs challenge the unreasonable delay and knowing frustration of return for those still deprived of content, while recognizing the need for legitimate security precautions.

[33] The information-and-belief inference is drawn from the Carney exchanges in Free-for-Teacher Platform Restoration and Free-For-Teacher Open Window Extension, the September 9 Canvas Lite announcement, and the September 11 company blog cited above, together with Dr. Vallera's recovery and sales communications alleged in this Complaint.

**H. Lack of Assent and the Disputed Published Terms**

96. Neither Dr. Vallera nor Dr. McKown agreed to any written or online terms, acceptable-use policy, or express contract with Instructure or Canvas, either when opening her account or through any purported later revision. Neither assented to a liability limitation, jury waiver, class-action waiver, or forfeiture of her materials. Instructure's publication of its January 11, 2018 Acceptable Use Policy ('2018 AUP') or later FFT terms does not establish assent by either Plaintiff.[34]

97. The 2018 AUP reserves discretion to terminate service or remove content without notice, disclaims warranties and liability for loss of use or failure to store content, imposes a $50 liability ceiling on users who paid nothing, and includes jury and class-action waivers. Plaintiffs deny agreeing to those restrictions.

98. If Instructure contends that its termination, content-removal, storage, and liability provisions give it unrestricted discretion to accept user materials yet provide no meaningful safeguarding, access, notice, or return, Plaintiffs allege that the supposed undertaking on that construction is illusory. Instructure cannot invoke a purported bargain that binds educators while reserving the power to eliminate every material obligation on its own side after accepting their performance. Plaintiffs challenge that asserted power over existing property and accrued

[34] Instructure, *Acceptable Use Policy* (eff. Jan. 11, 2018), https://www.instructure.com/policies/acceptable-use-2018; Instructure, *Canvas Lite Terms and Conditions* (eff. Sept. 30, 2026), https://www.instructure.com/policies/canvas-lite-terms-conditions. The former FFT terms URL now redirects to the latter page; the current page does not establish the text or assent history of Plaintiffs' original FFT accounts.

obligations, including any claimed retroactive power to change the bargain, rather than a prospective decision to stop offering a free service.

99. Plaintiffs separately challenge the unilaterally drafted limitations and waivers for lack of assent and, as applied, unconscionability and conflict with public policy. Instructure accepted years of educator-created work and controlled the only complete retrieval route. On the construction it may assert, the combined exclusions, nominal cap, and collective-redress waiver would leave educators bearing the loss while insulating Instructure from meaningful accountability for its own knowing deprivation or reckless custodial conduct. Plaintiffs contest any exemption for gross negligence or intentional misconduct to the extent prohibited by public policy, and the scope and severability of each challenged provision.

100. The 2018 AUP also promises notice when revisions meaningfully reduce users' rights. Neither Plaintiff assented to revised terms. Mere publication of a later webpage, continued use without adequate notice of the proposed change, or an effort to recover already-owned materials does not establish either Plaintiff's assent to the disputed revision. Any defense based on a revision requires the actual text and contemporaneous evidence of the notice and assent asserted for the particular account. Plaintiffs challenge any claimed unilateral power to extinguish accrued claims or existing property rights without notice and assent.

101. As of October 7, 2026, the former FFT terms URL redirects to Canvas Lite Terms and Conditions effective September 30, 2026. That later publication does not establish the terms presented when Plaintiffs opened their FFT accounts or create retroactive consent. Neither Plaintiff agreed to substitute those later written terms for her existing rights in FFT materials. Any asserted

restriction must be evaluated against the actual version and evidence of formation, notice, and assent applicable to the account.

102. Under Federal Rule of Civil Procedure 8(d), Plaintiffs plead implied-in-fact contract, implied covenant, tort, property, and restitution theories in the alternative. They do not concede that any written or online agreement was formed or that any disputed restriction is enforceable. If Instructure establishes an enforceable express agreement governing the same subject, Plaintiffs alternatively assert the covenant implied in that agreement and their separate formation, scope, and enforceability challenges.

## I. KKR Ownership and Relevant Corporate Decisions

103. On November 13, 2024, investment funds managed by KKR and Dragoneer completed the acquisition of Instructure Holdings, Inc. in a transaction valued at approximately $4.8 billion. Instructure's SEC filing identifies its new parent as an affiliate of KKR-managed funds. The joint closing release announced plans for product innovation and expansion and a goal of reaching $1 billion in revenue by 2028. KKR partner Webster Chua described an intention to work closely with Instructure's management to grow the business. KKR, its managed funds, and Dragoneer are nonparties, not defendants in this Complaint.[35]

[35] Instructure Holdings, Inc., Form 8-K, Introductory Note and Items 2.01, 5.01–5.02 (Nov. 13, 2024), https://www.sec.gov/Archives/edgar/data/1841804/000119312524257230/d878225d8k.htm; *id.*, Ex. 99.1, KKR and Dragoneer Complete Acquisition of Instructure, https://www.sec.gov/Archives/edgar/data/1841804/000119312524257230/d878225dex991.htm (joint Instructure/KKR release).

104. The use of a free educator offering to encourage Canvas adoption preceded KKR's investment. On information and belief, Instructure pursued the 2026 Canvas Lite transition as part of its growth strategy under that ownership, and KKR representatives received information about and communicated with management concerning product investment and business strategy. That inference rests on the announced ownership and management relationship and the identified growth objectives. Contemporaneous plans, budgets, board materials, and management communications concerning FFT, security, recovery resources, and Canvas Lite are relevant to Instructure's knowledge and reasons for its decisions, including whether commercial objectives influenced the timing of content return. Plaintiffs seek targeted discovery of those records from Instructure and relevant nonparty KKR entities.

105. KKR's 2024 Sustainability Report describes Project Shield as a program to improve portfolio-company cybersecurity and reports engagement with at least 165 portfolio companies. It describes expanded cybersecurity reviews, initiatives addressing secure-code development for product-driven businesses, and meetings for portfolio-company cybersecurity leaders. Whether Instructure participated, what risks were identified, and what recommendations or resource decisions were communicated are subjects for targeted discovery concerning Instructure's knowledge and response.[36]

[36] KKR, *2024 Sustainability Report*, pp. 21–22, available at: https://www.kkr.com/content/dam/kkr/sustainability/pdf/2024-sustainability-report.pdf (last visited Oct. 8, 2026).

## V. EDUCATOR TRACK 3 DAMAGES AND INJURY

106. Plaintiffs and Class members seek direct, nonduplicative relief for deprivation and loss of use of their own instructional materials, the reasonable value of necessary reconstruction and recovery work, and related expenditures actually borne by them. Each named Plaintiff personally spent more than 20 hours recreating materials and addressing lost access, as alleged separately above. Those efforts were incurred to restore practical use of specific property needed for their educational work.

107. Dr. Vallera lost use of her courses until she recovered them during the July period and incurred additional recovery efforts because her download links failed. Dr. McKown has incurred reconstruction time and remains deprived of her materials.

108. Dr. Vallera missed the May window without individualized notice but later attempted the July process and encountered technical failures.

109. Dr. McKown received no export notices from Instructure, including no email about the most recent period, and could not export any files during it. She has not recovered her materials. Instructure's failure to follow up after learning of her access problem prolonged her inability to reclaim and use her materials.

## VI. CLASS ALLEGATIONS

110. Plaintiffs bring this separate Educator Track under Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), subject to amendment based on account status, historical terms and assent records, ownership, notice and export logs, support requests, retention records, and the results of all announced recovery periods.

111. Plaintiffs propose the following Nationwide FFT Class, or such modified class(es) as the Court deems appropriate:

> **Nationwide FFT Class**: All natural persons in the United States who maintained a Canvas Free-for-Teacher account and Materials stored on the FFT platform when FFT was taken offline in May 2026.

112. Dr. McKown seeks to represent the following Content-Return Subclass, or such modified class(es) as the Court deems appropriate.

> **Content-Return Subclass**: All members of the Nationwide FFT Class who have not obtained a complete and usable export or other return of their Materials stored on the FFT platform.

113. The Nationwide FFT Class and Content-Return Subclass as collectively referred to herein as the "Class."

114. Excluded from the Class are Defendant and its affiliates; judicial officers assigned to this action and their immediate families; persons asserting only student or parent claims; and persons who validly request exclusion from a Rule 23(b)(3) class. A member who later recovered content is not excluded solely because of that recovery, but may recover only for a substantiated compensable injury and may not recover twice for the same loss.

115. ***Numerosity.*** As reflected in the company publication cited in the jurisdictional allegations, FFT had supported approximately 76,000 teachers and 2.1 million courses worldwide. The number of United States users who missed the May window, did not complete export, or remained deprived through June is within Instructure's account, email, authentication, export, support-ticket, and retention records and is sufficiently numerous that joinder is impracticable.

116. ***Ascertainability and Administrative Feasibility.*** Class membership and relevant recovery status can be evaluated through direct-account status, ownership evidence, account and course identifiers, email-send and delivery records, login logs, export-generation and download logs, support requests, and documentation of actual recovery and unreimbursed losses. A record that an export was generated is not necessarily a record that it was successfully downloaded.

117. ***Commonality.*** Common questions include which terms and sign-up interfaces applied; whether Instructure retained Class members' content after shutdown; whether the content was technically retrievable; whether individualized notice was feasible; whether the May, July, and subsequent recovery protocols were reasonable; whether Instructure provided effective notice and recovery assistance to account holders whose access problems were already known to it; whether the security and recovery conduct breached an implied-in-fact contract or the implied covenant, or constituted breach of bailment duties, conversion, trespass to chattels, negligence, or unjust enrichment; whether limitations and waivers were assented to and enforceable; and whether uniform preservation, disclosure, export, and fallback relief is appropriate.

118. Common proof includes Instructure's centralized security and incident-response records, FFT architecture, input-sanitization and support-access controls, token and encryption configurations, historical terms and interfaces, relevant KKR-management communications, account and course databases, retention policies, email and web-notice decisions, authentication and export logs, support scripts, the July export-error reports and engineering response, the extension decision, and subsequent recovery protocols.

119. ***Typicality.*** Both Plaintiffs maintained direct FFT accounts, lost access to their materials, and challenge common notice and recovery practices. Dr. Vallera's claims include a documented demand, repeated July download failures, eventual recovery, and accrued loss-of-use and recovery damages. Dr. McKown's claims include lack of notice from Instructure of the export periods, including no email notice of the most recent period and no files exported during it, reconstruction efforts, and continuing nonrecovery despite Instructure's knowledge of her access problem. Dr. McKown represents the Content-Return Subclass'.

120. ***Adequacy.*** Plaintiffs will fairly and adequately protect the interests of the proposed Class and the Subclass they represent. Plaintiffs have retained counsel experienced in class, privacy, data-breach, consumer-protection, and complex litigation.

121. ***Predominance.*** The central liability issues arise from common FFT architecture, centralized shutdown and notice decisions, common recovery policies, identifiable term versions and notice or assent practices, and centrally maintained account and export records. Alternatively, Plaintiffs seek certification under Rule 23(c)(4) of appropriate common issues concerning Instructure's centralized security, notice, and recovery practices.

122. Damages will account for actual recovery dates, duration of deprivation, necessary personal reconstruction and recovery tasks, failed export attempts, and substantiated expenditures. Each Plaintiff's more-than-20-hour account must be evaluated separately; no uniform rate or number of hours is assumed for absent Class members.

123. ***Superiority.*** A class action is superior to individual actions because the cost of litigating ownership, content-status, notice, and export issues individually would exceed many

educators' recoveries, while the same centralized conduct and records would otherwise be relitigated repeatedly.

124. ***Rule 23(b)(2).*** Instructure has acted or refused to act on grounds generally applicable to the Content-Return Subclass. Dr. McKown seeks a common preservation, account-status, individualized-notice, and supported-return protocol for that Subclass, with appropriate account-level implementation.

## VII. CLAIMS FOR RELIEF

### COUNT I - NEGLIGENCE AND GROSS NEGLIGENCE
### (By Plaintiffs on Behalf of the Nationwide FFT Class and Subclasses)

125. Plaintiffs incorporate all preceding factual allegations applicable to this Count as though fully set forth herein.

126. Instructure owed reasonable-care duties arising from its affirmative acceptance, custody, and handling of identifiable property belonging to Plaintiffs and Class members. It accepted their authored webpages and electronic materials into account-linked storage, controlled the systems for retrieval, disabled ordinary access, and administered the subsequent return process. The duties concern reasonable handling of existing property and protection against unjustified interference with its owner's possession.

127. Those custodial duties required reasonable care in safeguarding entrusted content and administering the notice and retrieval mechanisms for its return.

128. Instructure breached those duties by failing to reasonably isolate malicious user content from privileged support sessions; restrict the issuance, scope, and use of authorization and OAuth tokens; enforce least-privilege and appropriate account boundaries; monitor and act on

anomalous privileged access and bulk export activity; and identify and remediate related vulnerabilities after the first intrusion. Its failures also included inadequate individualized recovery notice and an export process that initially produced failed download links. Dr. Vallera eventually recovered her materials during the extended July window, but that recovery did not compensate her additional efforts. Instructure thereafter provided Dr. McKown no notice, including no email, of the September 30 through October 6 window despite knowing her access problem remained unresolved. She could not export any files during that window and still lacks an effective account-specific return process.

129. The security failures precipitated the shutdown and loss of access. Unauthorized use of support privileges and the resulting interruption of access were risks the pleaded controls were intended to address. Inadequate notice and recovery administration prolonged that deprivation and required additional corrective work. With timely individualized notice and a workable recovery process, Plaintiffs would have pursued earlier retrieval. Dr. Vallera's repeated requests and eventual recovery demonstrate that her content remained retrievable; failed July links required additional attempts and support contacts. Despite being told of Dr. McKown's access problem, Instructure did not notify her of the latest window or provide effective follow-up, leaving her to continue reconstruction without her original materials.

130. As a direct and proximate result, Plaintiffs suffered actual deprivation and loss of use of their personally owned materials and necessarily devoted substantial effort to recovery and reconstruction. They seek the reasonable recovery and restoration damages available for those injuries, together with related expenditures actually incurred by eligible Class members.

131. Instructure knew from the public recovery requests and Plaintiffs' communications that educators remained without valuable course materials. Its representatives acknowledged missed notices and requests for further access while the company continued to control the return process. It also received direct reports of July download failures. The combination of that knowledge and continuing control made prolonged deprivation and additional reconstruction work foreseeable.

132. Instructure's knowing disregard of the risk to existing user-owned materials constituted gross negligence. After receiving reports of nonreceipt and inability to recover, it maintained short, limited recovery opportunities and failed to provide effective notice and follow-up to Dr. McKown despite knowing of her unresolved access problem. Plaintiffs allege a marked departure from reasonable custodial care in the face of that known risk, supported by the decisions and communications described above.

133. Plaintiffs seek punitive or exemplary damages only on claims and facts satisfying the governing law. They contest any contractual limitation to the extent it was not agreed to, does not reach the particular conduct or relief, or cannot lawfully be applied. The factual basis for aggravated misconduct is pleaded above; Plaintiffs separately challenge the formation, scope, enforceability, and severability of each asserted limitation and the class waiver.

134. The information-and-belief security allegations rest on Instructure's own description of malicious support-ticket content obtaining privileged access and the second discussion vulnerability bypassing the initial fix. The precise configurations, token rules, internal warnings, and decision records are within Instructure's possession. The pre-Data Breach warnings

and Instructure's prior security experience further support foreseeability of compromise through privileged support access. Plaintiffs' allegations concern the unreasonable implementation and enforcement of safeguards against the identified attack paths.

**COUNT II - BREACH OF IMPLIED-IN-FACT CONTRACT**
**(On Behalf of the Nationwide FFT Class and Subclasses)**

135. Plaintiffs incorporate all preceding factual allegations applicable to this Count as though fully set forth herein.

136. Instructure and each Plaintiff formed an implied-in-fact agreement through their reciprocal conduct. Instructure invited account creation and course uploads, accepted each Plaintiff's materials and account information, associated them with her account, and provided continuing storage, course-management, access, and export functions. Each Plaintiff supplied and used her own materials in that arrangement. Their conduct manifested assent to hosting, reasonable safeguarding, access, and retrieval of those materials, independently of the written and online terms neither Plaintiff accepted.

137. Each Plaintiff furnished her personally owned course content, account information, use of the platform for educational activity, and limited permission to host and process her materials. Instructure requested, accepted, and used that performance to operate its free educator offering. It solicited that nonmonetary performance to support the product evaluation, educator adoption, and familiarity objectives documented above. Plaintiffs supplied their materials, permissions, and participation in exchange for the hosting, access, and retrieval functions Instructure provided. They performed their part of that exchange and did not abandon their property or transfer its ownership.

138. The undertaking required reasonable protection of the systems controlling Plaintiffs' content and a reasonable, secure opportunity to retrieve existing materials when ordinary access ended. Instructure manifested the retrieval component by maintaining account-specific copies under users' ownership and providing export tools; Plaintiffs supplied and maintained their materials for continued educational use and retrieval in that setting. The promised performance included usable access and export, with effective notice of a limited recovery opportunity when Instructure alone controlled the timing.

139. Instructure breached the implied-in-fact agreement through the deficient security practices alleged above and its failure to provide effective notice and a workable, timely means of returning existing materials. Dr. Vallera demanded recovery and encountered failed downloads before eventually obtaining her materials in July. Dr. McKown received no export notice from Instructure/Canvas, including no email about the September 30 through October 6 window, could not export any files during that window, and remains unable to reclaim her materials despite Instructure's prior knowledge of her access problem. The failure to provide the agreed retrieval benefit is also a breach independent of the alleged deficiencies in pre-Data Breach security: Instructure continued to control Plaintiffs' existing materials and the means of returning them after ordinary service ended.

140. Defendant's breach caused the loss of use and necessary recovery and reconstruction costs alleged for each Plaintiff. Dr. Vallera seeks accrued damages with credit for her recovery. Dr. McKown also seeks specific performance and preservation, account-status, and return relief for her unretrieved content.

**COUNT III - BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (On Behalf of the Nationwide FFT Class and Subclasses, in the Alternative)**

141. Plaintiffs incorporate all preceding factual allegations applicable to this Count as though fully set forth herein.

142. Plaintiffs incorporate the preceding factual allegations and the allegations concerning the parties' implied-in-fact agreement. That agreement carried an implied covenant that neither party would exercise discretion over performance to deprive the other of the benefits of their undertaking. Alternatively, if the Court finds an enforceable express agreement, Plaintiffs assert the covenant implied in that agreement without conceding assent to or enforceability of any challenged restriction. This is a contractual claim tied to the undertaking, not an independent duty of general fairness.

143. A basic benefit of the undertaking was meaningful access to and retrieval of Plaintiffs' own course materials. Instructure exclusively controlled recovery dates, notice channels, authentication, export tools, and individualized assistance. To the extent the agreement established that retrieval benefit without prescribing the timing, notice, or method of return upon discontinuation, Instructure retained discretion over those matters. This Count alternatively challenges Instructure's exercise of that discretion to frustrate the agreed retrieval benefit.

144. Instructure exercised its discretion over return in bad faith by selecting inadequate notice channels despite considering direct contact, continuing to withhold present recovery after requests, and failing to notify Dr. McKown of the latest window despite knowledge of her unresolved problem. On information and belief, it also deliberately deferred and coordinated

further recovery with its replacement-product rollout to preserve the commercial value of educator relationships and promote continued Canvas adoption. The employee statements, launch timing, sales referral, and commercial objectives alleged above support that inference. Those exercises of discretion intentionally frustrated the retrieval benefit for which Plaintiffs supplied their materials and participation.

145. Those breaches deprived Plaintiffs of the benefits of the undertaking and caused the completed loss of use and recovery costs alleged by Dr. Vallera and the continuing deprivation and reconstruction costs alleged by Dr. McKown. Plaintiffs seek the damages and, for Dr. McKown, preservation and content-return remedies supported by the underlying agreement. They separately contest any unassented, inapplicable, illusory, unconscionable, or otherwise unenforceable limitation, exclusion, or waiver.

**COUNT IV – BAILMENT**
**(By Plaintiffs on Behalf of the Nationwide FFT Class and Subclasses)**

146. Plaintiffs incorporate all preceding factual allegations applicable to this Count as though fully set forth herein.

147. Plaintiffs delivered personally owned and identifiable electronic materials, including authored course webpages, uploaded files, modules, assessments, quiz banks, and corresponding stored copies and arrangements, to Instructure for hosting, access, and retrieval through their direct accounts. They retained title to those materials and their related intellectual property. The deposited property is distinct from Instructure's source code, servers, and database as a whole.

148. The bailment benefited both sides. Plaintiffs obtained hosting and course-management functions; Instructure obtained the materials, operational permissions, and educational participation needed to run its free educator offering and develop the adoption and product-evaluation benefits described above. The absence of a subscription charge did not make Plaintiffs' participation valueless to Instructure or convert their property into Instructure's property.

149. Instructure knowingly accepted those materials, associated them with specific user and course identifiers, and stored them in systems under its control. Plaintiffs ordinarily accessed and retrieved them through Instructure's account and export mechanisms. Once FFT was disabled, Instructure controlled access to the stored records and files and the means of generating and delivering exports; Plaintiffs could not independently obtain complete copies from those systems.

150. Delivery and knowing acceptance for that limited purpose established a bailment and duties of reasonable care and return. Instructure's conduct manifested acceptance of custody, while its account-specific storage and export functions recognized the owners' continuing right to reclaim their materials. Plaintiffs' claim remains subject to legitimate security measures and any enforceable allocation of responsibility.

151. Dr. Vallera demanded return and eventually obtained her materials in July, establishing that her recoverable content remained in Instructure's custody during the earlier deprivation. Dr. McKown's materials remain unrecovered and, on information and belief for the reasons alleged above, recoverable copies remain under Instructure's control.

152. Instructure breached its alleged custodial duties by failing to exercise reasonable care in administering notice and recovery and failing to timely return materials entrusted for access and use. Dr. Vallera's claim includes delayed recovery after demand and additional export difficulties before successful download. Dr. McKown's claim concerns the failure to provide effective recovery notice or follow-up assistance despite knowing of her access problem, including the failure to notify her of the most recent export period, and her continuing inability to reclaim her materials.

153. Plaintiffs suffered loss of use and necessary recovery and reconstruction costs. Dr. McKown also seeks preservation and return of her still-unrecovered property.

**COUNT V - CONVERSION**
**(By Plaintiffs on Behalf of the Nationwide FFT Class and Subclasses)**

154. Plaintiffs incorporate all preceding factual allegations applicable to this Count as though fully set forth herein.

155. Plaintiffs' property consists of particular authored course webpages, files, and corresponding stored electronic copies, associated with their accounts and course identifiers. They could ordinarily view and edit those webpages, access their instructional assets, and retrieve exports through their accounts. Instructure exercised control over those particular stored copies and excluded her from using or retrieving them. This claim concerns that exclusion from identifiable property.

156. Plaintiffs personally owned the affected courses and related intellectual property and had the immediate right to reclaim them. The Class Members likewise owned or had an

immediate superior right to possess their identified materials. Instructure's hosting permission did not confer title or an unlimited right to withhold those materials from their owners.

157. Instructure initially held Plaintiffs' Materials with their permission with the requirement that Plaintiffs would maintain reasonable access to said Materials. However, after Instructure revoked Plaintiffs' and the Class Members' reasonable access to the FFT platform in May 2026, Instructure exceeded its right to possess the Materials. Instructure further denied Plaintiffs' and the Class Members' right to access their property.

158. On June 4, 2026, Dr. Vallera expressly requested return, including an individualized download and escalation after support stated that no further window was then planned. Instructure had already demonstrated a controlled export process in May, but continued to deny her a present means of retrieving her existing copies. Its knowing retention after demand and a reasonable opportunity for secure return deprived her of possession and use until the July recovery, without a lawful justification for the prolonged exclusion.

159. The July reopening and Dr. Vallera's successful download support the inference that Instructure retained control of her recoverable content during the preceding deprivation. Dr. Vallera seeks compensation for the alleged wrongful dominion before recovery, not an order returning property already recovered. Dr. Vallera seeks the remedies available for that completed interference.

160. Instructure wrongfully excluded Dr. Vallera from her own stored course webpages and files after demand for return.

161. In revoking Plaintiffs' and the Class Members' right to reasonably access their Materials, Instructure wrongfully denied them access to their property.

162. Plaintiffs seek the loss-of-use and reasonable recovery or reconstruction damages available under governing law for the period before and in obtaining return of their Materials.

**COUNT VI - TRESPASS TO CHATTELS**
**(By Plaintiffs on Behalf of the Nationwide FFT Class and Subclasses)**

163. Plaintiffs incorporate all preceding factual allegations applicable to this Count as though fully set forth herein.

164. Instructure intentionally and substantially interfered with Plaintiffs' and the Class Members' possessory use of identifiable electronic property by retaining exclusive access control of their Materials.

165. Plaintiffs and the Class Members did not consent to Instructure's exclusive control of their Materials.

166. The interference deprived Plaintiffs of the ability to view, use, update, deliver, verify, export, or migrate the affected courses for a substantial period and impaired the property's practical availability and professional value.

**COUNT VII - UNJUST ENRICHMENT AND RESTITUTION**
**(By Plaintiffs on Behalf of the Nationwide FFT Class and Subclasses, in the Alternative)**

167. Plaintiffs incorporate all preceding factual allegations applicable to this Count as though fully set forth herein.

168. This Count is pleaded in the alternative to Counts II and III.

169. Plaintiffs directly furnished Instructure with course content, account information, limited operational permissions, and educational use of FFT. Instructure knowingly requested and accepted that performance to populate and operate its free educator offering. Its promotional use of FFT activity, its adoption examples, and its own descriptions of the free channel's role in broader Canvas adoption show why that participation had commercial value to Instructure.

170. Instructure also used Dr. Vallera's specific request for recovery to initiate a sales referral and discussions of a paid Canvas offering, while her original course materials remained inaccessible on the FFT platform. Instructure also linked remaining users' recovery with the replacement-product (Canvas Lite) rollout and institutional-license promotion. On information and belief, routing recovery requests into sales discussions and replacement-product communications gave Instructure additional opportunities to market Canvas to educators seeking return of their existing materials.

171. Instructure's retained the benefit from Plaintiffs content and participation while frustrating the remaining return component and using control of recovery to further its own product transition. Plaintiffs supplied their materials for educational use with access and retrieval, not to give Instructure uncompensated control over their Materials after service ended.

172. Plaintiffs seek restitution of the benefit Instructure retained by maintaining exclusive access over their Materials.

173. Plaintiffs seek equitable relief to the extent available legal remedies do not adequately remedy Instructure's unjust retention of the identified benefit.

174. Plaintiffs request restitution, disgorgement of identifiable benefits unjustly retained from their contributions to the extent permitted, and other appropriate equitable relief.

**COUNT VIII – DECLARATORY AND INJUNCTIVE RELIEF**
**(By Dr. McKown on Behalf of the Content-Return Subclass Under Rule 23(b)(2))**

175. Dr. McKown incorporates the preceding allegations supporting her substantive claims and requests declaratory and injunctive remedies for herself and the Content-Return Subclass. The requested relief enforces the underlying ownership, custodial, and contractual rights alleged above.

176. An actual controversy exists concerning Dr. McKown's right to recover her personally owned FFT courses and drafts, the preservation and exportability of those materials, and Instructure's return obligations. As of October 7, 2026, she has received no return despite informing Instructure of her access problem and has obtained no files from the latest export period, of which Instructure gave her no notice, including no email.

177. Dr. McKown seeks a narrowly tailored order requiring preservation of recoverable FFT content associated with her account and the Content-Return Subclass; retention of relevant account, authentication, export, support, and deletion records; disclosure of whether the affected materials remain available; and a workable means to retrieve them. Relief may include a secure individualized export, appropriate ownership and identity verification, effective notice, and a reasonable fallback for failed authentication or downloads. No return order is sought for Dr. Vallera's recovered materials.

178. Dr. McKown needs her original course materials and unpublished drafts to continue her educational work. Her reconstruction efforts have not returned those originals, and money

alone cannot supply the existing copies that remain within Instructure's control. She seeks preservation and a secure return process for recoverable property, with safeguards appropriate to ownership, identity verification, and third-party information.

179. Instructure's repeated reopening of the legacy environment and delivery of exports demonstrate the practicability of a controlled recovery process. Dr. McKown requests relief tailored to the actual retention and technical condition of her materials and those of the Content-Return Subclass. A secure individualized export or equivalent supported process can address the continuing deprivation without requiring ongoing operation of FFT as a teaching service.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Educator Track Class and the Subclass they respectively seek to represent, respectfully request that the Court enter judgment in their favor and against Instructure as follows:

a. certifying the proposed Class and appropriate Subclass, appointing Dr. Vallera and Dr. McKown as representatives of the Nationwide FFT Class, appointing Dr. McKown as representative of the Content-Return Subclass, and appointing Plaintiffs' counsel as class counsel;

b. awarding each Plaintiff and eligible Class member the actual, compensatory, nominal, loss-of-use, recovery, reconstruction, migration, or other damages available under the applicable law, with any punitive or exemplary damages limited to claims and conduct supporting them; accounting for actual recovery dates and excluding duplicate recovery or permanent-loss value for property returned;

c. awarding nonduplicative restitution, disgorgement, and equitable monetary relief to the extent permitted;

d. declaring the parties' rights concerning ownership, possession, retention, export, return, and the scope and enforceability of the challenged Terms and waivers;

e. ordering, for Dr. McKown and the Content-Return Subclass, preservation, account-level disclosure, effective individualized notice, and a workable export or return process for recoverable content, including a reasonable fallback for failed authentication or downloads and appropriate safeguards against conditioning retrieval on a new paid-product purchase;

f. awarding Dr. McKown and the Content-Return Subclass specific performance, appropriate mandatory injunctive relief, an accounting, or other property-return relief supported by a substantive claim, limited to materials not already recovered and without requiring indefinite operation of FFT;

g. awarding pre-judgment and post-judgment interest;

h. awarding attorneys' fees, litigation expenses, and costs as permitted by law;

i. granting leave to amend as discovery reveals additional facts, entities, claims, subclasses, or remedies; and

j. awarding such other and further relief as the Court deems just and proper.

## IX. JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: October 8, 2026

Respectfully submitted,

By: *Jessica A. Wilkes*
Jessica A. Wilkes (admitted *pro hac vice*)

**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Tel: (405) 235-1560
jaw@federmanlaw.com

*Liaison Counsel for the Educator Track (Track)*

Nicholas Andrew Hall (admitted *pro hac vice*)
**Hall Attorneys, P.C.**
P.O. Box 1370
Edna, Texas 77957
Telephone: (713) 428-8967
nhall@hallattorneys.com

*Lead Counsel for the Educator Track (Track 3)*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 8, 2026, a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's CM/ECF system, which will automatically notify all counsel of record.

By: *Jessica A. Wilkes*
Jessica A. Wilkes (admitted *pro hac vice*)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Tel: (405) 235-1560
jaw@federmanlaw.com

*Liaison Counsel for the Educatory Track (Track 3)*