Charles H. Thronson (USB 3260)
**PARSONS BEHLE & LATIMER**
201 S. Main, Suite 1800
Salt Lake City, Utah 84111
(801) 532-1234
cthronson@parsonsbehle.com

*Liaison Counsel for the Proposed Educational Institution Class and Counsel for Plaintiffs*

Jason L. Lichtman (USB 18770)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013
(212) 355-9500
jlichtman@lchb.com

*Member of Educational Institution Class Executive Committee and Counsel for Plaintiffs*

*Additional Counsel for the Proposed Educational Institution Class and Counsel for Plaintiffs listed on signature page*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH**

**CONEJO VALLEY UNIFIED SCHOOL DISTRICT; CONNEAUT SCHOOL DISTRICT; HAWKEYE COMMUNITY COLLEGE; HAWTHORNE SCHOOL DISTRICT; MOORE PUBLIC SCHOOLS; NEW HOPE-SOLEBURY SCHOOL DISTRICT; ROSEVILLE JOINT UNION HIGH SCHOOL DISTRICT,** *individually and on behalf of all others similarly situated,*

**Plaintiffs,**

**v.**

**INSTRUCTURE HOLDINGS, INC.; INSTRUCTURE, INC.; KKR & CO. INC.,**

**Defendants.**

*In re Instructure Data Breach Litigation*

**CONSOLIDATED CLASS ACTION COMPLAINT — TRACK 2**

**JURY DEMANDED**

Case No. 2:26-cv-00374

# Table of Contents

Page

INTRODUCTION ..... 1

JURISDICTION AND VENUE ..... 6

PARTIES ..... 8

FACTUAL BACKGROUND ..... 12

A. INSTRUCTURE COLLECTED AND ENABLED ACCESS TO THE EDUCATIONAL INSTITUTIONS' PROTECTED DATA ..... 12

B. INSTRUCTURE FAILED TO PROTECT THE EDUCATIONAL INSTITUTIONS' PROTECTED DATA ..... 21

1. Instructure Had a Duty to Follow Regulatory Guidance and Industry-Standard Cybersecurity Practices ..... 34

i. Instructure must comply with FTC guidance regarding safeguarding the Educational Institutions' Data ..... 34

ii. Instructure was contractually obligated to meet or exceed industry standards regarding its network security ..... 36

2. Instructure Failed to Protect the Educational Institutions' Data Against Exfiltration in Readable, Usable Form ..... 56

3. Instructure Failed to Implement Basic Security Controls to Protect the Educational Institutions' Data and Detect the Breach ..... 57

C. THE DATA BREACH WAS FORESEEABLE AND PREVENTABLE ..... 58

D. INSTRUCTURE PAID A FUTILE RANSOM IN AN ATTEMPT TO CONTAIN THE DATA, WHICH REMAINS SUBJECT TO ONGOING MISUSE BY HACKERS ..... 61

E. PLAINTIFFS AND CLASS MEMBERS HAVE BEEN HARMED ..... 65

CLASS ALLEGATIONS ..... 67

NATIONWIDE CLASS ..... 68

STATEWIDE SUBCLASSES ..... 69

CAUSES OF ACTION ..... 76

COUNT 1 BREACH OF EXPRESS CONTRACT ..... 76

COUNT 2 NEGLIGENCE ..... 82

COUNT 2A GROSS NEGLIGENCE ..... 91

COUNT 3 BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ..... 93

COUNT 4 UNJUST ENRICHMENT ..... 95

COUNT 5 DECLARATORY AND INJUNCTIVE RELIEF ..... 96

Table of Contents
(continued)

Page

PRAYER FOR RELIEF ..................................................................................................... 99
DEMAND FOR JURY TRIAL ......................................................................................... 100

Plaintiffs, Conejo Valley Unified School District, Conneaut School District, Hawkeye Community College, Hawthorne School District, Moore Public Schools, New Hope-Solebury School District, and Roseville Joint Union High School District (collectively, "Plaintiffs"), individually and on behalf of the Nationwide Class and Statewide Subclasses ("Classes," as defined below) and members of the Classes (collectively, including Plaintiffs, "Class Members" or "Educational Institutions"), allege the following against Defendants Instructure Holdings, Inc. and Instructure, Inc. (collectively, "Instructure") and KKR & Co. Inc. ("KKR" and, together with Instructure, "Defendants") based upon personal knowledge, the investigation of counsel, and information and belief as to all other matters:

**INTRODUCTION**

1. On May 6, 2026, Instructure told thousands of American schools that the criminal intrusion into its learning management system ("LMS") known as Canvas ("Canvas") had been "resolved." The next day, the same criminals accessed its systems through the same vulnerability Instructure had never fixed. This time, they locked the platform, forcing Instructure to shut Canvas down nationwide in the middle of final exams. Instructure's own Chief Executive Officer, Steve Daly ("Mr. Daly"), later conceded that the second intrusion came "by exploiting an issue related to [its] Free-For-Teacher accounts," and that this was "the same issue that led to the unauthorized access the prior week."

2. Instructure sold thousands of Educational Institutions a learning management system it marketed as the "#1 LMS in the world," with "100% uptime," "validated security," and security "built into the fabric of our cloud platform." It contractually promised to maintain "appropriate technical and organizational measures" protecting student and educator data, and to use commercially reasonable efforts to keep Canvas available 99.9% of the time. It delivered none of that. A criminal extortion group known as ShinyHunters (the same group that had breached

Instructure seven months earlier) exfiltrated 3.65 terabytes of unencrypted data beginning on or about April 25, 2026, and regained unauthorized access to Canvas on May 7, 2026 (together, "Data Breach" or "Breach"), including highly sensitive and personally identifiable information ("PII" or "Private Information") consisting of at least students' full names, student identification numbers, email addresses, and billions of private messages exchanged among students, teachers, and faculty (collectively, "Data" or "Protected Data"). Instructure did not detect the intrusion for roughly four days. Then it declared victory. Then it was breached again.

3. None of this took Instructure by surprise. Mr. Daly has since conceded that Educational Institutions "made clear that Canvas is critical infrastructure, and when something disrupts that (especially at the end of the semester), the ripple effects are enormous." He then added: "Honestly, we knew this at some level." In other words, Instructure knew Canvas was critical to American schools. It knew that ShinyHunters was targeting it, having been breached by the same group seven months earlier. It knew, as of April 29, 2026, exactly which vulnerability had been exploited. It told its customers the problem was solved anyway.

4. The Data Breach was both foreseeable and preventable. The Breach and its consequences would not have occurred absent Instructure's failure to implement rudimentary data-security measures and to respond appropriately to known threats and vulnerabilities. Remarkably, Instructure had publicly acknowledged a separate cybersecurity incident, reportedly involving the same threat actor, just seven months earlier. Despite knowing that sophisticated cybercriminals had previously targeted it, and despite the heightened sensitivity of the student educational records and PII entrusted to it, Instructure failed to implement the basic, expected, and promised safeguards necessary to prevent another compromise of its systems. The Data Breach was therefore the

foreseeable consequence of Instructure's longstanding failures to adequately secure its systems and the Private Information maintained therein.

5. Despite Instructure's repeated public representations regarding its purportedly sophisticated monitoring and incident-response capabilities, and despite its concrete awareness of the specific threat actor, Instructure failed to detect the initial intrusion for several days after the unauthorized access began. During that period, ShinyHunters accessed and exfiltrated vast troves of sensitive student and educational Data, while Instructure provided little to no meaningful public information regarding the scope or severity of the incident because of its delayed detection. After days of uncertainty and disruption, Instructure publicly represented that the incident had been "resolved," only for ShinyHunters to regain unauthorized access to Canvas the very next day. The second intrusion forced Instructure to place Canvas into "maintenance mode," causing widespread shutdowns and outages for schools and universities across the country during one of the most critical academic periods of the year. As a result, numerous schools were reportedly forced to postpone or cancel examinations, assignments, and other academic functions. At the same time, students, educators, and administrators suddenly lost access to coursework, exams, grading systems, communications, and other essential educational services hosted on Canvas.

6. Educational institutions throughout the nation rely on Canvas as an essential educational platform through which coursework, assignments, grades, attendance information, and private day-to-day communications are transmitted and maintained. For many Educational Institutions, Canvas is deeply integrated into ordinary educational operations and necessarily required schools, students, teachers, and staff to entrust Instructure with substantial quantities of sensitive Private Information. Instructure expressly and impliedly promised Plaintiffs and Class Members that it would implement and maintain reasonable, industry-standard data-security

safeguards to protect the Private Information stored within Canvas. Those representations were material to Plaintiffs' and Class Members' decisions to contract with Instructure, use Canvas, and permit Instructure to collect, process, store, and maintain highly sensitive information and communications through its platform.

7. To Plaintiffs' and Class Members' dismay, Instructure failed to honor these commitments. Instructure consistently failed to implement and maintain reasonable, industry-standard data security measures commensurate with the volume, sensitivity, and legal significance of the information entrusted to it. Accordingly, Plaintiffs and Class Members overpaid—for each contract and subsequent renewal with Instructure—for data security features that were inadequately implemented or altogether absent.

8. As a result of Instructure's repeated failures to implement and maintain reasonable, industry-standard data security measures, ShinyHunters was able to access Instructure's systems, exfiltrate massive quantities of Private Information, and publish a ransom demand threatening to release data from nearly 9,000 educational institutions and, as ShinyHunters claimed, approximately 275 million individuals unless Instructure paid the ransom.

9. The consequences are particularly severe, as the compromised information included billions of private personal messages among students, teachers, and staff, full names, student identification numbers, usernames, email addresses, and other presently unknown PII. These consequences are magnified given that the full scope of the Data Breach and Private Information released is yet to be revealed. Namely, the *billions* of unencrypted private messages stolen from Canvas could contain virtually any category of Private Information shared through the platform, including but not limited to sensitive messages containing information related to medical circumstances, accessibility accommodations, sexual assault allegations, personal and family

circumstances, learning disabilities, resumes, job opportunities, and disciplinary information. Moreover, the second unauthorized access and resulting outage demonstrates that the harm extends beyond data exfiltration alone, as it materially disrupted educational operations nationwide at a time when end-of-semester activities were in full swing, with final exams being administered, semester-long projects due, and grades being finalized.

10. Although Instructure reportedly paid a ransom in exchange for ShinyHunters' purported agreement to delete the stolen Data, that effort was inherently futile and did nothing to remedy the harms already inflicted upon Plaintiffs, Class Members, students, educators, and families nationwide. By then, the Data Breach had already resulted in the unauthorized exfiltration of unprecedented volumes of Private Information, widespread disruption to educational operations, and the shutdown of critical educational services during final examinations and end-of-semester activities. Nor did that effort eliminate the future harms that remain. As federal law enforcement agencies have repeatedly warned, paying cybercriminal ransom demands provides no assurance that stolen data will actually be deleted, returned, or not further disseminated. To the contrary, cybercriminals frequently retain, sell, trade, and/or leak stolen data notwithstanding assurances to the contrary. Moreover, when a ransom is demanded and an organization pays, the organization typically becomes a heightened target for future extortion attempts.

11. Indeed, schools and universities across the country have continued to warn students, faculty, and families to remain vigilant against phishing attempts, social engineering schemes, fraudulent activity, credential attacks, and other misuse of compromised information stemming from the Data Breach. Moreover, Instructure's premature assurances that the incident had purportedly been "resolved," which were quickly belied by ShinyHunters' renewed unauthorized access, together with Instructure's failure to provide complete and consistent information

regarding the scope of the Data Breach, further undermines any confidence that Plaintiffs and Class Members can reasonably place in Instructure's representations regarding the security of the stolen Data or the ultimate extent of the Breach. Accordingly, Plaintiffs, Class Members, and all Canvas users remain subject to ongoing and substantial risks arising from the Data Breach.

12. Through this action, Plaintiffs and Class Members seek to recover all damages available at law and equity arising from Defendants' misconduct, including economic damages, as well as injunctive and declaratory relief compelling Instructure to upgrade, enhance, and improve its cybersecurity and incident-response practices, and to maintain such improvements. The economic relief sought includes all damages naturally flowing from Instructure's repeated breaches of contracts and negligence, including, *inter alia*, recurring overpayment and benefit-of-the-bargain damages under each separate contract and renewal, damages arising from operational disruption and loss of access to Canvas, and compensation for the time, labor, and resources Educational Institutions were required to divert in responding to the Data Breach, restoring educational continuity, communicating with affected students and families, and mitigating the ongoing harms caused by the Breach.

## JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds $5,000,000, there are more than 100 proposed Class Members, and minimal diversity exists in that Defendants are citizens of States different from that of at least one Class Member. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

14. This Court has personal jurisdiction over Instructure because it regularly conducts business in Utah and its headquarters is located in Utah.

15. This Court also has personal jurisdiction over KKR. As discussed below, KKR purposefully directed its activities toward Utah and availed itself of the benefits and protections of Utah law, based on its acquisition-related contacts with Utah and operational control over a Utah company. Specifically, on July 25, 2024, Instructure announced it was set to be acquired by KKR, a deal that was ultimately finalized on November 13, 2024. Further, Plaintiffs' claims arise out of KKR's activities in Utah.

16. This Court's exercise of jurisdiction over KKR is reasonable and comports with fair play and substantial justice. First, KKR's entry into Utah was extensive: it negotiated a multibillion-dollar acquisition of a Utah-headquartered company following two years of due diligence, thereby making Instructure a controlled subsidiary within a KKR-led investor group upon completion of the transaction. Second, KKR will not be burdened by defending itself in this forum because it is a sophisticated investment firm managing approximately $757.9 billion in assets with ample access to counsel admitted in this District. Third, litigating in Utah will not conflict with the sovereignty of New York, where KKR is headquartered, or Delaware, KKR's state of incorporation. Fourth, Utah's interest in this litigation is substantial: Instructure is headquartered here, Utah residents' Data was compromised, and Utah Class Members will seek relief under Utah law. Fifth, Utah is important to Plaintiffs' interests because Instructure is headquartered here and relevant documents and witnesses are necessarily located here. Finally, although New York or Delaware might serve as alternative forums, the existence of an alternative forum does not render Utah unreasonable where all other factors support jurisdiction. In addition, the tortious conduct by Defendants that gave rise to Plaintiffs' and Class Members' injuries and claims occurred in and emanated from Utah.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Instructure's principal place of business is in Utah, KKR purposefully availed itself of the benefits and protections of Utah law, and a substantial portion of the events giving rise to the claims took place in this District, including corporate decisions concerning Defendants' data security policies and practices as well as the contractual relationships with its customers.

## PARTIES

18. Instructure Holdings, Inc. is a Delaware corporation headquartered at 6330 South 3000 East, Suite 700, Salt Lake City, Utah 84121. On November 13, 2024, Instructure was acquired, in a take-private transaction, by investment funds managed by KKR, together with Dragoneer Investment Group, and became a privately held portfolio company controlled by KKR as the lead sponsor; Instructure was delisted from the New York Stock Exchange upon completion of the transaction. Instructure is the developer, owner, and operator of the Canvas learning management system, one of the most widely used educational technology ("EdTech") platforms in the United States. By Instructure's own account, Canvas serves more than 30 million active users and approximately 9,000 educational institutions, encompassing approximately 40% of U.S. K-12 school districts and 50% of higher education institutions in North America; this active-user figure reflects the minimum verified scope of the population whose data Instructure collected and stored, independent of the larger figures claimed by ShinyHunters.

19. Upon publicly available information and belief, Instructure, Inc. was the predecessor to Instructure Holdings, Inc., and, prior to March 2020, developed, owned, and operated Canvas. To the extent Instructure, Inc. is a distinct legal entity from Defendant Instructure Holdings, Inc., references and allegations to "Instructure" include both entities, as applicable.

20. KKR is a Delaware corporation headquartered at 30 Hudson Yards, New York, New York 10001. KKR is one of the world's leading private-asset alternative investment firms.

Since 1976, it has expanded into numerous asset classes, including private equity, credit, cybersecurity, infrastructure, energy, and real estate. It has more than 40 offices across four continents, more than 5,000 employees, and approximately $757.9 billion in assets under management. KKR, through its agents and/or alter egos, consummated the acquisition of Instructure in November 2024. KKR dictates Instructure's strategic directives and uses Instructure's operations, including the Canvas learning management system, to further its private-investment purposes.

21. Upon information and belief, KKR exercises actual control over Instructure. KKR made its investment through its North America Fund XIII and, as the lead sponsor of the take-private transaction, controls the composition of Instructure's board of directors and directs Instructure's strategic direction, growth strategy, and capital allocation, as KKR has publicly stated. KKR also possesses specialized cybersecurity investment expertise relevant to its oversight of Instructure's data-security governance. The precise post-closing ownership percentages, board composition, and governance terms are not publicly available, are within Defendants' knowledge, and are subject to discovery.

22. Plaintiff Conejo Valley Unified School District ("Plaintiff," for purposes of this paragraph) is a school district located in California. Plaintiff serves approximately 15,500 students across its 26 schools offering instruction from kindergarten through 12th grade. Plaintiff contracted with Instructure to utilize Canvas. As a result of Instructure's failure to implement adequate cybersecurity, Plaintiff overpaid each time it entered into a contract with Instructure, did not receive the benefit of its bargain, has lost time and money responding to the Data Breach and resulting outage, and anticipates spending additional time and money on an ongoing basis to mitigate and address the harms caused by the Breach.

23. Plaintiff Conneaut School District ("Plaintiff," for purposes of this paragraph) is a school district located in Pennsylvania. Plaintiff serves approximately 1,700 students across its four schools offering instruction from kindergarten through 12th grade. Plaintiff contracted with Instructure to utilize Canvas. As a result of Instructure's failure to implement adequate cybersecurity, Plaintiff overpaid each time it entered into a contract with Instructure, did not receive the benefit of its bargain, has lost time and money responding to the Data Breach and resulting outage, and anticipates spending additional time and money on an ongoing basis to mitigate and address the harms caused by the Breach.

24. Plaintiff Hawkeye Community College ("Plaintiff," for purposes of this paragraph) is a not-for-profit public community college located in Iowa. Plaintiff serves over 15,000 students through credit and continuing education coursework offering over 70 credit technical programs, transfer education, and college-credit classes for high-school students. Plaintiff contracted with Instructure to utilize Canvas. As a result of Instructure's failure to implement adequate cybersecurity, Plaintiff overpaid each time it entered into a contract with Instructure, did not receive the benefit of its bargain, has lost time and money responding to the Data Breach and resulting outage, and anticipates spending additional time and money on an ongoing basis to mitigate and address the harms caused by the Breach.

25. Plaintiff Hawthorne School District ("Plaintiff," for purposes of this paragraph) is a school district located in California. Plaintiff serves approximately 6,700 students across its 11 schools offering instruction from kindergarten through 12th grade. Plaintiff contracted with Instructure to utilize Canvas. As a result of Instructure's failure to implement adequate cybersecurity, Plaintiff overpaid each time it entered into a contract with Instructure, did not receive the benefit of its bargain, has lost time and money responding to the Data Breach and

resulting outage, and anticipates spending additional time and money on an ongoing basis to mitigate and address the harms caused by the Breach.

26. Plaintiff Moore Public Schools ("Plaintiff," for purposes of this paragraph) is a school district located in Oklahoma. Plaintiff serves approximately 22,700 students across its 35 schools offering instruction from pre-kindergarten through 12th grade. Plaintiff contracted with Instructure to utilize Canvas. As a result of Instructure's failure to implement adequate cybersecurity, Plaintiff overpaid each time it entered into a contract with Instructure, did not receive the benefit of its bargain, has lost time and money responding to the Data Breach and resulting outage, and anticipates spending additional time and money on an ongoing basis to mitigate and address the harms caused by the Breach.

27. Plaintiff New Hope-Solebury School District ("Plaintiff," for purposes of this paragraph) is a school district located in Pennsylvania. Plaintiff serves approximately 1,300 students across its four schools offering instruction from kindergarten through 12th grade. Plaintiff contracted with Instructure to utilize Canvas. As a result of Instructure's failure to implement adequate cybersecurity, Plaintiff overpaid each time it entered into a contract with Instructure, did not receive the benefit of its bargain, has lost time and money responding to the Data Breach and resulting outage, and anticipates spending additional time and money on an ongoing basis to mitigate and address the harms caused by the Breach.

28. Plaintiff Roseville Joint Union High School District ("Plaintiff," for purposes of this paragraph) is a school district located in California. Plaintiff serves approximately 13,000 students across its eight schools offering instruction from 9th through 12th grade, as well as adult education. Plaintiff contracted with Instructure to utilize Canvas. As a result of Instructure's failure to implement adequate cybersecurity, Plaintiff overpaid each time it entered into a contract with

Instructure, did not receive the benefit of its bargain, has lost time and money responding to the Data Breach and resulting outage, and anticipates spending additional time and money on an ongoing basis to mitigate and address the harms caused by the Breach.

## FACTUAL BACKGROUND

### A. INSTRUCTURE COLLECTED AND ENABLED ACCESS TO THE EDUCATIONAL INSTITUTIONS' PROTECTED DATA

29. Instructure is an EdTech company that owns and operates Canvas, an LMS that provides services to thousands of K-12 schools, colleges, universities, and school districts for managing coursework, assignments, messaging, grading systems, and other educational records used by tens of millions of students, parents, educators, and administrators. On November 13, 2024, Instructure was acquired by KKR in a transaction valued at $4.8 billion.

30. Instructure markets Canvas as the "#1 LMS in the world," representing that the platform provides "100% uptime" and is "always on," emphasizing reliability, accessibility, and uninterrupted access to educational records and communications.[1]

31. Instructure also publishes guidance to higher education institutions regarding how to evaluate and select an LMS. Instructure states, "[The LMS] of yesterday hosted course materials. The LMS of tomorrow adds *security*, *uptime*, native interactive video, clear data for faculty, template courses, and AI that faculty can trust and actually use."[2] Through these representations, Instructure emphasized that cybersecurity, reliability, and data protection were essential and integrated features of the Canvas platform.

---

[1] *Canvas by Instructure: World leading LMS for teaching & learning*, INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/canvas (last visited Oct. 7, 2026).

[2] *Your Higher Education Guide to Choosing a Learning Management System*, INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/resources/ebooks/your-guide-choosing-learning-management-system (last visited Oct. 7, 2026) (emphasis added).

32. Instructure further markets Canvas as having a "[m]odern, cloud-native foundation" which purportedly delivers superior "performance, security, and reliability for large, multi-campus deployments."[3] Instructure markets Canvas as superior to competing learning management systems with respect to reliability and security, describing Canvas as "cloud-native" with "validated security," compared to its competitors that are "self-hosted and Saas [sic]," "[d]epending on hosting and setup," and merely "[c]loud-hosted; enterprise grade."[4] Instructure additionally represents that, "[w]ith a sophisticated hierarchy of templates and SIS/LTI governance, Canvas keeps complex, multi-campus organizations aligned, avoiding manual governance or maintenance."[5] Through these representations, Instructure conveyed that Canvas centrally managed and governed integrations with Student Information Systems, user permissions, templates, and related educational data systems across institutions, thereby reducing the need for individual schools or departments to independently administer and oversee those controls manually.[6]

33. Instructure has acknowledged the importance of protecting the sensitive educational and personal information entrusted to it through Canvas. Indeed, Instructure states:

> "**If student data isn't protected, the LMS loses all credibility**. Strong security and clear role-based access help districts balance transparency with responsibility. With defined permissions, students, educators, administrators, and families each see the information that's relevant to them—and nothing more. This reduces risk, supports compliance, and builds trust across the learning community. Just as importantly, **security should never get in the way of teaching and learning**. A

[3] *Canvas: The LMS Built for What's Next*, INSTRUCTURE HOLDINGS, INC., https://web.archive.org/web/20260508033334/https://www.instructure.com/resources/ebooks/canvas-lms-built-whats-next (archived May 8, 2026) (last visited Oct. 8, 2026).

[4] *Id.*

[5] *Id.*

[6] *Id.*

well-designed LMS keeps data protected in the background while instruction and communication move forward."[7]

34. Instructure also published marketing materials emphasizing that educational institutions should prioritize security, scalability, and infrastructure reliability when selecting an LMS. Indeed, Instructure justifies its higher costs and pricing structure, warning that "a less costly LMS now can create more expensive, cumbersome problems later," and advises that "[f]orward-thinking institutions should seek sustainable, scalable architecture that provides a seamless, quality experience."[8] Instructure promotes Canvas as providing "a scalable, secure, open infrastructure" fostering a "technology-friendly, data-friendly culture."[9] Instructure even cites a "2019 Campus Computing CIO Survey" that emphasizes "IT data security" and "[l]everaging IT to support student success" as leading institutional technology priorities.[10]

35. Instructure additionally represented that Canvas maintained robust security infrastructure, oversight, monitoring, and operational safeguards designed to host and manage sensitive educational data at scale securely:[11]

[7] Eli Johnson, *11 Ways an LMS Supports Students, Educators, and Districts*, INSTRUCTURE HOLDINGS, INC. (Dec. 17, 2025), https://www.instructure.com/resources/blog/11-ways-lms-supports-students-educators-districts#10.-secure-for-every-user (emphasis added).

[8] *The Cheap LMS Isn't Cheap*, INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/en-au/resources/infographic/cheap-lms-isnt-cheap (last visited Oct. 8, 2026).

[9] *Id.*

[10] *Id.*

[11] *Id.*

## Technology

| Unforeseen costs that can add up: | « » | One clear-cut cost that covers it all: |
| --- | --- | --- |

**Unforeseen costs that can add up:**

- X Servers (more students online = more servers = more money)
- X Additional software
- X Hardware upkeep
- X Security
- X Bandwidth
- X Poor adoption that leads to sustainability concerns

**Not to Mention:**

- X Development costs
- X Customizations
- X Configurations
- X Consultant implementations

(Run your costs through the AWS TCO calculator and see where you land.)

**One clear-cut cost that covers it all:**

- ✓ A multi-tenant system
- ✓ Amazon Web Services, the most secure cloud-hosting service available
- ✓ Seamless hosting, security, backups, and updates
- ✓ Open APIs, resource guides, and unmatched IT support from day one

**Not to Mention:**

- ✓ Intuitive, clean user interface, easy navigation, & integrated video tools
- ✓ Scalability for tens of millions of users with no up-front hardware investment
- ✓ A student LMS app with an average 4.7 stars from 1.3 million ratings
- ✓ Simplicity and support for those new or accustomed to online teaching and learning







36. Instructure also made extensive public representations regarding Canvas's purported security architecture, monitoring capabilities, access controls, and compliance. Through its publicly available "Trust Center," Mr. Daly represented that Instructure was committed to "building products that are secure and private by design" and promised customers that Instructure would "build security and privacy into all our products and all areas of our business." Indeed,

Instructure's dedication to data security and privacy professedly "begins at the highest levels of [the] organization—starting with [Mr. Daly], and [the] board."[12]

37. Similarly, Matt Kaminer, Instructure's Chief People and Legal Officer, emphasized Instructure's "rigorous [focus on] data privacy and protection," and that it holds itself "to high standards of governance and compliance," and "will protect what's entrusted to us."[13] These representations conveyed to Educational Institutions, students, educators, and families that Instructure maintained comprehensive and effective safeguards designed to protect sensitive educational and personal information from unauthorized access, disclosure, and misuse.

38. Instructure represented that "[s]ecurity is built into the fabric of our cloud platform, infrastructure, and processes, so you can rest assured that your data is safeguarded."[14] Instructure further represented that it maintained a "robust enterprise information security program" operating on a continuous "PDCA (Plan-Do-Check-Act) cycle" and based upon "Information Security Standards."[15] Instructure additionally represented that it maintained comprehensive policies and controls governing "all endpoints" of its production and corporate networks, including a "Network Security Policy" and an "IT Acceptable Use Policy," both of which were supposedly evaluated against "SOC 2 and ISO 27001 standards."[16]

---

[12] *Instructure Trust Center: Overview,* INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/trust-center (last visited Oct. 8, 2026).

[13] *Instructure Trust Center: Legal,* INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/trust-center/legal (last visited Oct. 8, 2026).

[14] *Instructure Trust Center: Security,* INSTRUCTURE HOLDINGS, INC., https://web.archive.org/web/20260513125633/https://www.instructure.com/trust-center/security (archived May 13, 2026) (last visited Oct. 7, 2026).

[15] *Id.*

[16] *Id.*

39. Instructure also represented that its platform was hosted and managed through Amazon Web Services ("AWS") and conformed with AWS's "well-architected framework," incorporated "control plane hardening standards and benchmarks," and utilized "continuous workload monitoring." Instructure further represented that it leveraged numerous AWS security services and tools, including "AWS WAF, Shield, GuardDuty, Security Groups, KMS, and more," and maintained infrastructure using a secure "'Infrastructure as code' approach."[17]

40. Instructure additionally represented that "[a]ll data is encrypted in transit," "[a]ll data is stored at rest within encrypted volumes," and "[d]ata is replicated in real-time for your protection."[18]

41. Instructure represented that its platform is protected by a comprehensive access control framework:

> The Instructure Learning Platform is protected by a comprehensive access control framework. Access to the platform is secured by authentication, authorization, and 2FA (where applied). Access to the cloud infrastructure is protected by a comprehensive access control framework with multiple layers, including VPN, 2FA, SSH, and digital certificates. Access to our systems is granted based on [the] principle of least privilege and need to know and supported by regular user access reviews and auditing processes.[19]

These statements are particularly significant given that ShinyHunters allegedly exploited weaknesses in Instructure-controlled systems and accounts associated with the "Free-for-Teacher" environment, thereby gaining unauthorized and unfettered access to institutional Data and user information. The Data Breach thus demonstrated that Instructure failed to adequately segregate, restrict, monitor, and govern access across various platform environments, integrations, and

---

[17] *Id.*
[18] *Id.*
[19] *Id.*

privileged systems, despite publicly representing that comprehensive access-control frameworks, least-privilege restrictions, and layered authentication protections were in place.

42. Instructure also represented that, "[a]s a fully hosted SaaS solution," the Canvas platform is "actively monitored by Instructure's Operations and Security teams on behalf of all customers," and that Instructure "continually monitors system usage, performance, health, and security."[20] According to Instructure, its operations teams used "internal and external industry-standard monitoring and alerting systems as well as custom alerting systems to ensure maximum coverage," and that security alerts were routed to appropriate personnel through PagerDuty.[21] Instructure further represented that it maintained "robust and considerable network and security monitoring to protect our customers and detect potential threats before they have a chance to have any impact," including through the use of AWS GuardDuty and centralized logging systems for "further analysis and alert generation."[22]

43. Instructure additionally represented that it maintained extensive compliance, auditing, and risk-management programs, including "continuous monitoring," "regular audits and assessments," "external assessments and audits conducted by independent experts," and compliance certifications and frameworks including "SOC 2 Type II," "ISO 27001," "NIST 800-53," "TX-RAMP," "Cyber Essentials Plus," and PCI DSS-related assessments.[23] Instructure further represented that it maintained "stringent processes" to evaluate third-party risks and annually assess vendors with access to sensitive or personal data.[24] Through these statements,

---

[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Instructure Trust Center: Compliance,* INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/trust-center/compliance (last visited Oct. 7, 2026).
[24] *Id.*

Instructure represented that it maintained mature governance, auditing, and risk-management structures designed to identify vulnerabilities, assess risks, monitor compliance, and protect educational data against unauthorized access and compromise.

44. Despite Instructure's extensive representations regarding security, monitoring, access controls, encryption, compliance, and risk management, the Data Breach nevertheless occurred. Instructure failed to implement, maintain, and enforce the safeguards it publicly represented as fundamental to Canvas's operation. In particular, Instructure failed to adequately secure and segregate certain platform environments; failed to prevent unauthorized access through insufficiently controlled authentication and privileged-access pathways; and failed to detect and stop unauthorized access to, and exfiltration of, sensitive educational Data in a timely manner, notwithstanding its representations concerning continuous monitoring, layered defenses, and comprehensive security governance.

45. Notably, although Instructure represented that data was encrypted in transit and at rest, the nature of the Breach indicates that the stolen Data was obtained in a readable and usable form, demonstrating that it was not effectively protected against unauthorized access. Moreover, Instructure was well aware of prior security incidents and vulnerabilities affecting its platform and related environments, including issues associated with access pathways and legacy or auxiliary systems, yet failed to timely remediate or fully eliminate the underlying security gaps that were later exploited in the Data Breach.

46. The Educational Institutions entrusted Instructure with highly sensitive personal information that reveals extraordinarily granular details, including the innermost thoughts and insecurities of the Educational Institutions' students—the disclosure of which invades and infringes upon their basic privacy rights and norms, as well as the Educational Institutions' ability

to protect their students and faculty. In entering into the relevant contracts at issue, it was of utmost importance that Instructure do everything it was contractually obligated to do in order to protect this Data and maintain secure, reliable, and uninterrupted access to the Canvas platform.

**B. INSTRUCTURE FAILED TO PROTECT THE EDUCATIONAL INSTITUTIONS' PROTECTED DATA**

47. On April 25, 2026, the notorious data theft and extortion gang ShinyHunters gained unauthorized access to Instructure's Canvas platform and related systems, compromising highly sensitive educational and Private Information. According to ShinyHunters, whose figures Instructure has not publicly verified, the Data Breach affected approximately 275 million individuals across nearly 9,000 schools, and ShinyHunters separately represented that the stolen data contained approximately 231 million unique email addresses. Because the number of affected individuals and records far exceeds Instructure's reported base of more than 30 million active users, the compromised data necessarily includes historical and former-user records retained by Instructure, not merely current active users.

48. Despite Instructure's repeated public representations concerning its purportedly robust cybersecurity architecture, it failed to detect the unauthorized intrusion for approximately four days. Instructure did not identify the attack until April 29, 2026, at which point it stated it had revoked the unauthorized party's access, retained outside forensic experts, and commenced an internal investigation.[25]

49. Instructure did not publicly announce the Data Breach until May 1, 2026, only disclosing that it had "recently experienced a cybersecurity incident perpetrated by a criminal

[25] *Security Incident Update & FAQs*, INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/incident_update (last visited Oct. 8, 2026).

threat actor."[26] However, omitted from the announcement was the fact that the unauthorized actors had already obtained access to substantial quantities of Private Information.

50. On May 2, 2026, Instructure provided limited additional details regarding the incident, stating that it had revoked "privileged credentials and access tokens associated with affected systems," deployed security patches, rotated certain internal keys, and implemented "increased monitoring across all platforms."[27] Instructure further disclosed that the information involved in the incident included "certain identifying information of users at affected institutions, such as names, email addresses, and student ID numbers, as well as messages among users."[28] Instructure would later disclose that it believed the incident also included usernames, course names, and enrollment information.[29] The exfiltrated information is highly valuable to cybercriminals and can be readily weaponized for phishing attacks, impersonation schemes, credential attacks, identity theft, and further compromise of Educational Institutions and their users.

51. On May 3, 2026, Ransomware.live posted the following ransom note from ShinyHunters:

> Nearly 9,000 schools worldwide affected. 275 million individuals data ranging from students, teachers, and other staff containing PII. Several billions of private messages among students and teachers and students and other students involved, containing personal conversations and other PII. Your Salesforce instance was also breached and a lot more other data is involved. Pay or Leak. This is

---

[26] *Confirmed Security Incident*, INSTRUCTURE HOLDINGS, INC., https://status.instructure.com/incidents/9wm4knj2r64z (last visited Oct. 7, 2026).

[27] *Id*.

[28] *Id*.

[29] *Incident Fact Sheet*, INSTRUCTURE HOLDINGS, INC. (May 13, 2026), https://www.instructure.com/sites/default/files/pdf/InstructurebyCanvas-Incident-Fact-Sheet-051326.pdf.

> a final warning to reach out by 6 May 2026 before we leak along with several annoying (digital) problems that'll come your way. Make the right decision, don't be the next headline. | Size: 3.65TB+ (uncompressed) | Updated: 3 May 2026 | Warning: FINAL WARNING PAY OR LEAK[30]

52. Instructure did not *begin* notifying impacted organizations until May 5, 2026—more than a week after the initial intrusion and several days after first discovering the unauthorized access and exfiltration of their Data.[31] Even then, Instructure advised that if an institution had not yet been contacted, it had "not found evidence that your data was involved," while simultaneously reiterating that the investigation remained ongoing. Thus, it is highly likely that a large number of affected Educational Institutions remain uninformed as to whether their Data was compromised and, if so, to what extent.

53. That same day, *TechCrunch* published a report revealing that ShinyHunters had shared a sample of the stolen Data with the publication, containing messages, names, email addresses, and phone numbers from two schools in the United States.[32] *TechCrunch* also reported that ShinyHunters had provided it with a list of 8,800 schools affected by the Breach. TechCrunch further reported that, according to ShinyHunters, the stolen data contained approximately 231 million unique email addresses—a deduplicated figure that journalists partially corroborated by cross-referencing a sample of those addresses against the breach-notification database Have I Been

---

[30] *Instructure Holdings, Inc. (Canvas LMS, instructure.com)*, Ransomware.live, https://www.ransomware.live/id/SW5zdHJ1Y3R1cmUgSG9sZGluZ3MsIEluYy4gKENhbnZhIExNUywgaW5zdHJ1Y3R1cmUuY29tKUBzaGlueWh1bnRlcnM (last visited Oct. 8, 2026).

[31] *Security Incident Update & FAQs*, *supra* note 25.

[32] Lorenzo Franceschi-Bicchierai, *Hackers steal students' data during breach at education tech giant Instructure*, TechCrunch (May 5, 2026) https://techcrunch.com/2026/05/05/hackers-steal-students-data-during-breach-at-education-tech-giant-instructure/ (last visited Oct. 8, 2026).

Pwned, and one that is more conservative than, and does not independently verify, ShinyHunters' separate claim of approximately 275 million affected individuals.

54. Also on May 5, 2026, ShinyHunters publicly asserted that Instructure "had not even bothered speaking to us" regarding the stolen Data and threatened to leak information unless ransom demands were met.[33] The gang provided a list of approximately 1,400 impacted schools and districts, inviting them to negotiate directly with the attackers to prevent public dissemination of the stolen information, thereby amplifying the fear, uncertainty, and disruption already caused by the Data Breach.[34]

55. On May 6, 2026, Instructure publicly represented that it was continuing to investigate the Data Breach. Mere minutes later, however, Instructure announced that the Data Breach was "resolved" because it was apparently not seeing "any ongoing unauthorized activity," while simultaneously issuing precautionary security recommendations for customers.[35]

---

[33] A.J. Vicens, *Schools reach out to Canvas hackers as breach hits US classrooms, source says*, REUTERS (May 8, 2026) https://www.reuters.com/legal/litigation/schools-reach-out-hackers-canvas-breach-hits-us-classrooms-source-says-2026-05-08/ (last visited Oct. 8, 2026).

[34] *Id*.

[35] *Confirmed Security Incident*, *supra* note 26.

## Confirmed Security Incident

Incident Report for Instructure

**Resolved**

UPDATE - Canvas is fully operational, and we are not seeing any ongoing unauthorized activity.
As a precaution, we recommend customers follow security best practices, including enforcing MFA on privileged accounts, reviewing admin access, and rotating API tokens or keys where applicable.
This will be our final update via this status page for this incident. We will continue to provide updates as appropriate through other channels and are now communicating directly with impacted customers to provide organization-specific information and support.
Posted 5 days ago. May 06, 2026 - 15:15 MDT

**Update**

We are continuing to investigate this issue.
Posted 5 days ago. May 06, 2026 - 15:13 MDT

56. These contradictory statements conveyed a false impression that the threat had been contained and that Instructure had restored the integrity and security of its systems. Instructure's purported remediation efforts proved ineffective. Indeed, on May 7, 2026—the very next day after Instructure claimed the incident had been resolved—ShinyHunters again gained unauthorized access to Instructure's platform, proving Instructure's resolution efforts to be futile.

57. ShinyHunters posted the following message on the Canvas platform, acerbically pointing out the flaws in Instructure's post-breach discourse by announcing the second breach, and again inviting schools to negotiate directly with the gang given Instructure's indifference:




58. Instructure subsequently acknowledged that the threat actor had successfully compromised its systems for a second time, disclosing that on May 7, 2026, it had identified "additional unauthorized activity tied to the same incident."[36] According to Instructure, the unauthorized actor "made changes to the pages that appeared when some students and teachers were logged in through Canvas."[37] Indeed, when logging into Canvas to access critical course

---

[36] *Security Incident Update & FAQs*, INSTRUCTURE HOLDINGS, INC., https://web.archive.org/web/20260511040713/https://www.instructure.com/incident_update (archived May 11, 2026) (last visited Oct. 8, 2026).

[37] *Security Incident Update & FAQs*, *supra* note 25.

materials, users were invariably met with the message from ShinyHunters as shown above. Instructure further admitted that it was forced to place Canvas into "maintenance mode" in order to contain the activity, investigate the incident, and apply additional safeguards.[38] In practical effect, however, placing Canvas into "maintenance mode" constituted a widespread shutdown and unavailability of the Canvas platform for students, educators, and institutions across the country that depended on Canvas during a critical academic period, thereby depriving Plaintiffs and Class Members of the continuous and reliable platform access for which they contracted and paid substantial sums.

59. The consequences of the shutdown were immediate and severe. Educational Institutions and users were unable to access coursework, assignment portals, examinations, communications, study materials, grading systems, and other core instructional functions hosted through Canvas. For example, public reporting reflects that students from Harvard University, the University of Pennsylvania, Duke University, the University of California, Los Angeles, and the University of Nebraska were reportedly blocked from using Canvas and each instead saw the message posted by ShinyHunters.[39] The incident therefore did not merely create severe cybersecurity concerns; it caused a nationwide operational paralysis across Educational Institutions that relied upon Canvas as an essential component of their educational infrastructure and disrupted the precise services and operational continuity Instructure had represented it would provide.

---

[38] *Id*.

[39] Kurt Knutsson, *School app Canvas breach hits during finals*, FOX NEWS (May 11, 2026) https://www.foxnews.com/tech/school-app-canvas-breach-hits-during-finals (last visited Oct. 8, 2026).

60. The timing of the Data Breach and resulting outage at the end of the scholastic year substantially exacerbated the harm caused by Instructure's security and incident-response failures because the platform-wide disruption occurred during final examinations, final projects, assignment deadlines, grading periods, and end-of-semester academic activities at schools and universities nationwide. Indeed, "[s]tudents across the country [were] preparing for finals or already taking them" when Canvas became inaccessible.[40] Students and educators were suddenly unable to submit assignments, retrieve course information, review course materials, or access exams during the most academically consequential period of the semester. School administrators, faculty, and IT personnel were forced to divert substantial time and resources toward emergency response efforts, alternative testing and grading procedures, and restoring educational continuity.

61. The disruption was so significant that a number of schools were forced to postpone or cancel exams and assignments, including the University of Illinois, Penn State University, and Baylor University.[41] The disruption thus underscored the degree to which schools and universities had become dependent on Instructure's platform and its security and uptime assurances for essential instructional continuity, academic administration, grading, and communications.

62. Instructure's CEO publicly acknowledged the magnitude of the Data Breach and Instructure's deficient response, stating: "[o]ver the past few days, many of you dealt with real disruption. Stress on your teams. Missed moments in the classroom. Questions you couldn't get answered. You deserved more consistent communication from us, and we didn't deliver it. I'm

---

[40] *Id*.

[41] Rachel Treisman, *Canvas is back online, but questions – and final exam disruptions – linger*, NPR (May 8, 2026) https://www.npr.org/2026/05/08/nx-s1-5815956/canvas-data-breach-school-finals (last visited Oct. 8, 2026).

sorry for that."[42] Mr. Daly further acknowledged Instructure's decision to "get the facts right before speaking publicly," stating that Instructure "focused on fact-finding and went quiet when you needed consistent updates."[43] These statements explicitly acknowledge the inadequacy of Instructure's communications and incident-response practices during a period of acute operational and educational disruption.

63. Mr. Daly further acknowledged that Instructure "identified a vulnerability regarding support tickets in our Free for Teacher environment that was exploited," and that Instructure had "temporarily disabled Free for Teacher while [it] complete[d] a full security review."[44] Instructure further confirmed that the unauthorized actor carried out the activity "by exploiting an issue related to [its] Free-For-Teacher accounts," which Instructure acknowledged was "the same issue that led to the unauthorized access the prior week."[45] Instructure thereafter shut down the Free-for-Teacher environment while it attempted to remediate the issue and implement additional safeguards,[46] and ultimately shut down Free-for-Teacher accounts permanently, advising that this purportedly rendered Canvas fully operational and declining to recommend "broad new customer-side remediation."[47]

64. However, Instructure's statement that shutting down the Free-for-Teacher accounts gave it "the confidence to restore access to Canvas, which is now fully back online and available for use" appeared to be yet another display of carelessness.[48] Indeed, a number of schools were

---

[42] *Security Incident Update & FAQs*, *supra* note 25.
[43] *Id.*
[44] *Id.*
[45] *Security Incident Update & FAQs*, *supra* note 36.
[46] *Security Incident Update & FAQs*, *supra* note 25.
[47] *Id.*
[48] Treisman, *supra* note 41.

still unable to access Canvas the next day, including Penn State University, the University of California campuses, and Montgomery County Public Schools in Maryland.[49] In light of Instructure's repeated premature statements, it is impossible to put any stock in its statements regarding the extent of the information compromised, the overall extent of the Data Breach, and the sufficiency of Instructure's remedial measures until the full details come to light.

65. The circumstances surrounding the Data Breach further demonstrate material deficiencies in Instructure's publicly represented security architecture, incident-response procedures, and access controls. Specifically, Instructure admitted that the unauthorized activity was tied to vulnerabilities associated with the "Free-for-Teacher" environment and related support-ticket functionality, notwithstanding its repeated representations that Canvas employed layered authentication protections, least-privilege access restrictions, continuous monitoring, reliable operational safeguards, and comprehensive governance over platform environments and integrations. The foregoing also demonstrates that Instructure failed to timely remediate known or knowable vulnerabilities even after detecting the initial intrusion *and* publicly assuring customers that the incident had been "resolved." The fact that the same threat actor was able to regain unauthorized access through the same underlying vulnerability within days of Instructure's purported remediation efforts evidences serious deficiencies in its cybersecurity safeguards, monitoring practices, incident-response protocols, and access-control procedures.

66. The United States government has likewise placed Instructure's security measures, incident-response practices, and public representations under significant scrutiny. In a letter addressed to Mr. Daly from the U.S. House of Representatives Committee on Homeland Security (the "House Committee"), the House Committee described the Data Breach and resulting

---

[49] *Id.*

disruptions as "a matter of national concern," and further observed that "the gap between Instructure's public characterization of this event and the scale suggested by the attacker's own claims warrants a full and transparent accounting."[50] As the House Committee aptly noted:

> The recurrence of an intrusion within days of an initial breach disclosure, and Instructure's apparent failure to fully remediate the underlying vulnerabilities during that window, **raise serious questions about the company's incident response capabilities and its obligations to the institutions** and individuals whose data it holds.[51]

67. The U.S. Senate Committee on Health, Education, Labor, and Pensions (the "Senate Committee") has similarly called into question Instructure's data security capabilities and incident-response practices following the Data Breach, demanding answers from Mr. Daly concerning, *inter alia*, Instructure's cybersecurity protocols, its adherence to industry best practices, the timing and adequacy of its breach disclosures, and the scope of the compromised information.[52] The Senate Committee pointedly observed that Instructure's public disclosures left material questions unanswered, noting that "[a]dditional transparency is needed regarding what information hostile actors accessed, what measures Instructure had implemented prior to the incident to protect sensitive information, and what steps the company intends to take going forward to address vulnerabilities and improve its security infrastructure."[53] Instructure's continued

---

[50] Letter from Hon. Andrew R. Garbarino, Chairman, *H. Comm. on Homeland Sec., to Steve Daly, CEO, Instructure Holdings,* Inc. (May 11, 2026), https://homeland.house.gov/wp-content/uploads/2026/05/2026.05.11-Homeland-to-Instructure-Holdings-Inc.pdf.

[51] *Id*. (emphasis added).

[52] Letter from Sens. Bill Cassidy, M.D., and Tommy Tuberville, *S. Comm. on Health, Educ., Labor & Pensions, to Steve Daly, CEO, Instructure Holdings*, Inc. (May 12, 2026), https://www.help.senate.gov/imo/media/doc/letter_to_instructure_on_data_breach.pdf.

[53] *Id*.

opacity amplifies the already-severe harms arising from the Data Breach, further undermining confidence in the company's abilities.

68. Mr. Daly himself has acknowledged that Instructure's incident response was lacking, stating "[w]e want to acknowledge that our initial response during the incident added to what was already a challenging situation, and for that, we are truly sorry."[54] And yet, Instructure's incident-response and notification practices continue to worsen—on June 23, 2026, Instructure stated that "early next week" it would deliver customer- and organization-specific notifications and data findings; but on June 29, 2026, Instructure extended this window to the week of July 13, 2026; and on July 14, 2026, Instructure stated it was halting data notification delivery because the platform it selected to make such deliveries "may have been subject to a security threat."[55] To be sure, Instructure said that its customers could "[r]est assured, [their] data remains secure."[56] However, the cascade of calamities and broken promises necessarily requires Plaintiffs, Class Members, and all Canvas users to remain skeptical.

69. In response to mounting concerns regarding customer trust, Instructure acknowledged that the Canvas Data Breach was "the second data breach in less than a year," referencing a prior "Salesforce-related incident" that Instructure has characterized as a "distinct event[] involving different systems and circumstances" from the 2026 Canvas Data Breach.[57] Instructure was therefore aware of prior security incidents, attack pathways, and risks involving its systems and hosted educational data prior to the Data Breach described herein, yet nevertheless

[54] *Security Incident Update & FAQs*, *supra* note 25.
[55] *Id*.
[56] *Id*.
[57] *Security Incident Update & FAQs*, *supra* note 36.

failed to adequately remediate vulnerabilities, strengthen access restrictions, or otherwise prevent subsequent unauthorized access to sensitive educational and personal information.

70. The Data Breach exposed Plaintiffs and Class Members to an ongoing and increased risk of fraud, phishing attacks, social engineering schemes, identity theft, unauthorized account access, and misuse of confidential educational communications and records. The compromised information, including, at least, full names, email addresses, student ID numbers, and billions of private messages among students and educators, is precisely the type of information cybercriminals exploit to target students, families, faculty, and administrators.

71. On top of the categories of information that Instructure has confirmed were compromised, the host of additional sensitive information it collects from users remains subject to the same risks. For example, Instructure also collects and processes phone numbers, IP addresses and other device information, usernames and passwords, profile information, video images and voice recordings, submitted coursework, and in some instances, dates of birth and payment card information.[58] Moreover, Instructure collects, *at minimum*, parent/guardian email addresses, full names, ID numbers, student survey responses, attendance data, grade level, curriculum programs, school enrollment, teacher names, gender information, and user metadata and use of "cookies." Instructure also contemplates collection of: student and parent/guardian addresses and phone numbers; dates of birth; places of birth; student bus pick up and/or drop off location; student bus assignment; medical alerts/health data; student disability information; and living situations. Plaintiffs and Class Members cannot reasonably rely on Instructure's assurances that such data was not similarly exposed or remains secure following the Data Breach. Moreover, the breadth

[58] *Instructure: Product Privacy Notice*, INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/policies/product-privacy-policy (last visited Oct. 8, 2026).

and concentration of this information make Instructure an especially valuable target for threat actors and demonstrate that, absent meaningful injunctive relief and improved security controls, Plaintiffs and Class Members remain at substantial risk of future compromise, misuse of their information, and future cybersecurity incidents arising from the same deficient practices revealed by the Data Breach.

### 1. Instructure Had a Duty to Follow Regulatory Guidance and Industry-Standard Cybersecurity Practices

72. The Breach and exfiltration were a direct result of Instructure's failure to comply with state and federal laws and regulations, as well as basic industry standards governing the protection of Data.

#### i. Instructure must comply with FTC guidance regarding safeguarding the Educational Institutions' Data

73. Instructure failed to comply with Federal Trade Commission ("FTC") guidance on protecting PII and complying with industry-standard cybersecurity practices. Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as the FTC has interpreted it, the failure of companies like Instructure to use reasonable measures to protect PII. Several publications by the FTC outline the importance of implementing reasonable security systems to protect data. To that end, the FTC recommends the following practices:

a. Limit access to customer information to only those employees who have a business reason to see it;

b. Keep customer information encrypted to provide better protection in case of theft;

c. Maintain up-to-date and appropriate programs and controls to prevent unauthorized access to customer information;

d. Use appropriate oversight and/or audit procedures to detect the improper disclosure or theft of customer information;

e. Monitor both in- and out-bound transfers of information for indications of compromise, such as large volumes of data being transmitted unexpectedly; and

f. Monitor activity logs for signs of unauthorized access to customer information.[59]

74. The FTC has also issued numerous guides for businesses highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[60]

75. In 2016, the FTC issued a publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for businesses.[61] The guidelines note that businesses should protect the personal customer information they keep; properly delete PII that is no longer needed; encrypt information stored on computer networks; understand their networks' vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating that someone is attempting to hack the system or accessing from an unknown location; watch for

---

[59] Fed. Trade Comm'n, *Financial Institutions and Customer Information: Complying with the Safeguards Rule* (Apr. 2006), https://www.consumer.sc.gov/sites/consumer/files/Documents/Identity%20Theft/ftc_safeguards_rule.pdf.

[60] Fed. Trade Comm'n, *Start With Security* (June 2015), http://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[61] Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (Oct. 2016), http://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

76. The FTC recommends, among other things, that businesses restrict employee access to sensitive customer information; require that strong passwords be used by employees with access to sensitive customer information; apply security measures that have proven successful in the particular industry; and verify that third parties with access to sensitive information use reasonable security measures.

77. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures that businesses must take to meet their data security obligations.

**ii. Instructure was contractually obligated to meet or exceed industry standards regarding its network security**

78. Instructure failed to comply with industry standards relating to data security, operational resiliency, monitoring, and incident response, including standards and practices that Instructure expressly represented it followed through its public-facing policies, "Trust Center" materials, and security statements, along with those expressly identified in Instructure's contracts.

79. Instructure's contractual data security obligations are explicitly set forth in the Instructure Global Data Processing Addendum ("DPA")[62] and Master Terms and Conditions.[63] The DPA and Master Terms and Conditions both constitute contracts of adhesion because

[62] Instructure's DPA was last updated on October 1, 2024. Prior to that, the DPA was updated on December 21, 2022.

[63] Instructure's Master Terms and Conditions have versions containing effective dates of April 17, 2026; January 16, 2024; and November 16, 2023.

Plaintiffs and Class Members had no opportunity to negotiate those terms and instead were required to accept them on a take-it-or-leave-it basis if they wished to utilize Canvas, one of the most widely used learning management and EdTech platforms in the United States and one that is integral to educational activities nationwide. Nonetheless, the DPA and Master Terms and Conditions set forth baseline obligations that Instructure was required to satisfy with respect to data security.

80. The DPA forms part of every contractual agreement between Instructure and its customers, necessarily including each contract and renewal with Plaintiffs and Class Members. The DPA is automatically added as an addendum to all contractual agreements, including any "Instructure Services Order Form, Instructure Standard Terms and Conditions, or other written or electronic agreement in effect." Similarly, the Master Terms and Conditions apply to every "Order Form" which broadly encompasses "any order for the provision of products or services" by Instructure. Accordingly, the DPA and Master Terms and Conditions are incorporated into every contractual agreement for the Canvas LMS between Instructure and Class Members, as well as each renewal of the Canvas subscription and related services.

81. Pursuant to the DPA, Instructure explicitly agreed to comply with all applicable data protection laws. Instructure agreed to process Plaintiffs' and Class Members' Data in order to "detect, prevent, or investigate security incidents, fraud, and other abuse or misuse," "comply with Instructure's legal or regulatory obligations," and as otherwise permitted under applicable data protection laws and in accordance with the DPA, Order Forms, Master Terms and Conditions, the Instructure Product Privacy Notice, and any other agreement with Plaintiffs and Class Members.

82. The DPA requires Instructure to "maintain appropriate technical and organizational measures for the protection of security … confidentiality, and integrity of Customer Personal Data

and Account Data as set forth in the Instructure security documentation." This included Instructure's requirement to maintain appropriate measures for "protection against unauthorized or unlawful Processing and against accidental or unlawful destruction, loss or alteration or damage, unauthorized disclosure of, or access to, Customer Personal Data or Account Data." The DPA also sets forth that Instructure is required to delete its customers' data upon termination of a contractual relationship and, in the event of a data security incident, to provide notice to Class Members without undue delay.

83. The Master Terms and Conditions expressly require Instructure to comply with all applicable laws and regulations "pertaining to personally identifiable information from records that are subject to applicable privacy laws." Moreover, Instructure's Master Terms and Conditions represent that it would implement reasonable administrative, technical, and physical safeguards in an effort to secure its facilities and systems from unauthorized access and to secure the confidentiality, integrity, availability, and accessibility of protected data and related educational services. Instructure also agreed to use commercially reasonable efforts to maintain an annual uptime percentage of at least 99.9% through these agreements and to use confidential information solely for the purposes of fulfilling its agreed upon obligations.

84. Instructure and Plaintiff Conejo Valley Unified School District entered into a contractual relationship for the Canvas LMS subscription and related services on July 9, 2020, with a term subsequently extended through June 30, 2026, including through a Purchase Agreement executed by the parties (together with addenda, terms, order forms, renewals, prior agreements, policies, and other agreements incorporated by reference, "Conejo Valley Agreements"). Through the Conejo Valley Agreements, Instructure expressly represented that the Canvas LMS and all related services are fully compliant with all applicable requirements,

including all state and federal laws. Through the Conejo Valley Agreements, Instructure also expressly agreed to comply with all federal, state, and local laws, rules, regulations, and ordinances applicable to Instructure, and its business, services, personnel, equipment, and products, including the Canvas LMS. Instructure further agreed to use confidential information it received solely for the purposes of fulfilling its obligations under the Conejo Valley Agreements.

85. The Conejo Valley Agreements expressly incorporate the applicable order form for such subscription and services, which in turn expressly incorporates Instructure's DPA. The Conejo Valley Agreements also expressly incorporate the California Student Data Privacy Agreement ("CSDPA"), which was executed by Instructure. The Education Technology JPA ("Ed Tech JPA") is a Joint Powers Authority formed by California school districts, offices of education, and community college districts to aggregate purchasing power and expertise. The Ed Tech JPA selected Instructure for an award under a Request for Proposal for Learning Management Solution Platform and thereafter entered into a Master Agreement to establish terms of the purchase by its members, including Conejo Valley Unified School District, which was also incorporated by reference to the Conejo Valley Agreements.

86. Instructure and Plaintiff Conneaut School District entered into a contractual relationship for the Canvas LMS subscription and related services, including through a Master Subscription Service Agreement executed by the parties (together with addenda, terms, order forms, renewals, prior agreements, policies, and other agreements incorporated by reference, "Conneaut Agreements"). Plaintiff Conneaut School District and Instructure maintained a contractual relationship for the Canvas LMS since at least as early as 2016.

87. Through the Conneaut Agreements, Instructure expressly represented and warranted that it would comply with all applicable laws and regulations and would implement

reasonable administrative, technical, and physical safeguards to protect its systems from unauthorized access to confidential information and data. Moreover, through the Conneaut Agreements, Instructure expressly warranted that commercially reasonable efforts would be made to maintain the online availability of its services for a minimum availability percentage of 99.9% in a trailing 365-day period. Instructure also agreed that it would protect confidential information using the same degree of care it uses to protect its own confidential information, and in no event less than reasonable care, through the Conneaut Agreements.

88. Instructure and Plaintiff Hawkeye Community College entered into a contractual relationship for the Canvas LMS subscription and related services beginning in 2015 and extending through at least January 31, 2030, including through a Services Order Form executed by the parties in December 2024 (together with addenda, terms, order forms, renewals, prior agreements, policies, and other agreements incorporated by reference, "Hawkeye Agreements"). The Hawkeye Agreements expressly incorporate by reference Instructure's DPA and Instructure's Master Terms and Conditions.

89. Instructure and Plaintiff Hawthorne School District entered into a contractual relationship for the Canvas LMS subscription and related services, including through a Service Order Form executed by the parties in 2020 (together with addenda, terms, order forms, renewals, prior agreements, policies, and other agreements incorporated by reference, "Hawthorne Agreements"). The Hawthorne Agreements expressly incorporate Instructure's Master Terms and Conditions.

90. Instructure and Plaintiff Moore Public Schools entered into a contractual relationship for the Canvas LMS subscription and related services beginning on February 12, 2018, and extending through June 30, 2027, including through a Services Order Form executed by the

parties on June 10, 2025 (together with addenda, terms, order forms, renewals, prior agreements, policies, and other agreements incorporated by reference, "Moore Agreements"). The Moore Agreements expressly incorporate Instructure's DPA and Master Terms and Conditions.

91. Instructure and Plaintiff New Hope-Solebury School District entered into a contractual relationship for the Canvas LMS subscription and related services beginning in 2017 and extending through at least June 30, 2026, including through a Service Order Form executed by the parties on January 23, 2025 (together with addenda, terms, order forms, renewals, prior agreements, policies, and other agreements incorporated by reference, "New Hope Agreements"). The New Hope Agreements expressly incorporate by reference Instructure's DPA and Instructure's Master Terms and Conditions.

92. Instructure and Plaintiff Roseville Joint Union High School District entered into a contractual relationship for the Canvas LMS subscription and related services beginning in 2021 through a Services Order Form executed by the parties (together with addenda, terms, order forms, renewals, prior agreements, policies, and other agreements incorporated by reference, "Roseville Agreements"). The Roseville Agreements expressly incorporate by reference Instructure's Master Terms and Conditions.

93. Instructure made extensive promises to Plaintiffs and Class Members in its representations within its Trust Center materials, Master Terms and Conditions, DPA, Product Privacy Notice, Network Security Policy, IT Acceptable Use Policy, Master Subscription Service Agreement, Order Forms, Conejo Valley Agreements, Conneaut Agreements, Hawkeye Agreements, Hawthorne Agreements, Moore Agreements, New Hope Agreements, Roseville Agreements, and additional contractual agreements with Plaintiffs and Class Members (collectively, "Contracts"). These materials were incorporated into and formed part of Instructure's

contractual relationships with Plaintiffs and Class Members, including through express incorporation by reference among the governing agreements. Among other things, Instructure's Product Privacy Notice incorporated representations contained within its Trust Center materials, which in turn were incorporated into the DPA, Order Forms, Master Terms and Conditions, and related agreements governing Instructure's handling, storage, processing, and protection of Plaintiffs' and Class Members' Data. Moreover, the DPA requires Instructure to protect the security, confidentiality, and integrity of the Data "as set forth in the Instructure security documentation," which includes the extensive representations within the Trust Center.

94. Instructure represented that it maintained a "robust enterprise information security program" evaluated against "SOC 2 and ISO 27001 standards," that it aligned with "NIST 800-53," and that security was "built into the fabric" of its cloud platform, infrastructure, and processes. Instructure further represented that it utilized continuous monitoring, layered access controls, least-privilege principles, encryption in transit and at rest, regular audits and assessments, and comprehensive governance frameworks designed to protect educational data from unauthorized access, misuse, disclosure, alteration, destruction, and disruption.

95. Instructure further represented that Canvas was a secure, reliable, and continuously available learning management system that provided "100% uptime," was "always on," and maintained a "modern, cloud-native foundation" designed to deliver superior "performance, security, and reliability" for educational institutions. Instructure emphasized that security, uptime, resiliency, governance, and operational continuity were core and integrated features of the Canvas platform.

96. The Contracts required that Instructure implement, *inter alia*, the following:

a. **Passwords, Authentication, and Access Controls**. Instructure was required to protect access to the Canvas platform and underlying infrastructure through authentication, authorization, VPN protections, SSH controls, digital certificates, two-factor authentication, and role-based access restrictions grounded in least-privilege and need-to-know principles. Instructure was further required to maintain policies, procedures, and practices limiting access to customer data, conduct regular access reviews and audits, and implement technical and organizational safeguards designed to prevent unauthorized access, disclosure, alteration, and misuse of customer data. Despite these obligations, Instructure failed to adequately restrict, segment, monitor, and govern privileged access pathways and failed to prevent unauthorized access to sensitive educational data and systems.

b. **Security Monitoring and Threat Detection.** Instructure represented that it would "continually monitor[] system usage, performance, health, and security," maintain "robust and considerable network and security monitoring," utilize "industry-standard monitoring and alerting systems," and route alerts to appropriate personnel through PagerDuty and related systems. Instructure was further required to use AWS GuardDuty, centralized logging, continuous monitoring, layered defenses, and commercially reasonable measures to identify, investigate, contain, mitigate, and remediate threats and security incidents affecting customer Data, as represented. Instructure was additionally obligated to investigate

security incidents, cooperate with customers in responding to breaches, and take commercially reasonable steps to minimize resulting harm. Despite these obligations, threat actors maintained unauthorized access to Instructure-controlled systems for days without detection while exfiltrating sensitive educational Data and disrupting educational operations nationwide.

c. **Encryption and Data Protection.** Instructure was required to "adhere to any applicable law relating to data security" and "comply with all applicable federal, state, and local laws, rules, and regulations pertaining to [s]tudent Data privacy and security." Instructure was further required to encrypt all Data in transit and store all Data at rest within encrypted volumes. Instructure was further required to safeguard Data through layered security controls, cloud-native infrastructure protections, confidentiality safeguards, and organizational measures designed to prevent unauthorized or unlawful access, disclosure, destruction, loss, or alteration of customer Data. Instructure additionally represented that it maintained policies and practices designed to ensure data integrity, confidentiality, and secure handling of customer information consistent with regulatory obligations and recognized privacy principles. Nevertheless, the Data Breach demonstrated that unauthorized actors were able to obtain sensitive educational records and Private Information in a readable and usable form, evidencing that Instructure failed to adequately encrypt and secure such Data against unauthorized access, disclosure, and exfiltration.

d. **System Availability, Reliability, and Operational Continuity.** Instructure represented that Canvas provided "100% uptime," was "always on," and maintained scalable, resilient, and highly available infrastructure designed to ensure uninterrupted access to educational records, coursework, assignments, grading systems, messaging systems, and related educational services. Instructure further represented that it maintained governance and operational controls intended to preserve the reliability and continuity of educational services. Instructure nevertheless failed to maintain reliable and uninterrupted access to Canvas during a critical period of final examinations and end-of-semester activities, resulting in widespread outages, shutdowns, disruptions, postponements, and cancellations affecting schools, educators, and students nationwide.

e. **Network Security and Infrastructure Hardening.** Instructure represented that its platform was hosted within AWS and incorporated "well-architected framework" principles, "control plane hardening standards and benchmarks," secure infrastructure-as-code methodologies, firewalls, security groups, workload monitoring, and layered cloud-security protections. Instructure was obligated to maintain appropriate technical, administrative, and organizational measures designed to secure customer Data and prevent unauthorized access to its systems and services. Instructure failed to adequately secure and harden its environments, systems, integrations, and access pathways, thereby permitting

unauthorized access and compromise of sensitive educational systems and Data.

f. **Risk Assessments, Auditing, and Compliance Oversight.** Instructure represented that it maintained continuous monitoring, regular audits and assessments, independent external assessments, annual penetration testing, and compliance with recognized cybersecurity frameworks and standards including SOC 2 Type II, ISO 27001, NIST, NIST SP 800-53, TX-RAMP, SCF, CSC, CIS Top 20, CMMC, and related governance frameworks. Instructure further represented that it maintained stringent processes to assess risks and vulnerabilities associated with third parties, subprocessors, integrations, and sensitive data access, and that it would cooperate with customer audit and data protection assessment obligations under applicable privacy laws. Had Instructure implemented and enforced reasonable risk-assessment, auditing, penetration testing, and remediation procedures consistent with its representations and industry standards, it would have identified and remediated the vulnerabilities and deficiencies exploited during the Data Breach.

g. **Role-Based Permissions and Segregation of Systems.** Instructure expressly acknowledged that educational institutions depended upon strong role-based access and permissions systems to ensure that users "see the information that's relevant to them—and nothing more." Instructure further represented that Canvas centrally governed and managed integrations, permissions, templates, and educational data systems across institutions,

while maintaining safeguards designed to limit unauthorized lateral access and preserve Data confidentiality. Despite these representations, Instructure failed to adequately segregate systems, restrict lateral access, isolate sensitive data environments, and prevent unauthorized actors from accessing institutional and user Data through interconnected systems and environments.

h. **Security Breach Management and Customer Communications.** Instructure represented that it maintained mature governance, operational oversight, and security response capabilities designed to identify, contain, mitigate, investigate, remediate, and notify customers of security incidents affecting customer Data and educational services without undue delay, with such notice to include pertinent information surrounding the details of a breach, including types of information involved, relevant dates, and law enforcement involvement. Instructure nevertheless failed to timely detect the intrusion, failed to provide prompt and complete information to schools and users regarding the scope and nature of the compromise, and prematurely represented that the incident had been resolved before additional unauthorized access and widespread operational disruptions continued to occur.

i. **Data Retention, Deletion, and Privacy Compliance.** Instructure represented that it maintained data retention and deletion policies consistent with applicable data protection laws and that customer data would be securely returned or deleted upon request or termination of services.

Instructure further represented that it adhered to recognized international privacy and data protection frameworks and maintained policies designed to ensure transparency, accountability, integrity, security, and confidentiality in its handling of customer data. Upon termination of an agreement, Instructure was required to dispose of all customer data. Despite these representations, Instructure failed to implement and maintain reasonable safeguards sufficient to protect the confidentiality and integrity of the sensitive educational and personal Data entrusted to it. Moreover, the monumental amount of Data and Canvas users implicated in the Data Breach evidences that Instructure failed to properly dispose of Educational Institutions' Protected Data.

97. As set forth herein, regardless of whether applicable industry standards, including but not limited to NIST standards, ISO 27001, 27017, 27018, SOC 2, CISA, TX-RAMP, SCF, CSC, CIS Top 20, CMMC, and Cyber Essentials Plus, or Instructure's own represented security commitments are applied, Instructure's failure to implement and enforce reasonable safeguards—including failures related to access controls, network segmentation, data encryption, continuous monitoring, threat detection, incident response, privileged-access governance, resiliency planning, and operational continuity—directly contributed to the Data Breach and resulting disruptions. Moreover, these repeated failures caused Plaintiffs and Class Members to consistently overpay for the product and services throughout the duration of the contractual relationships.

98. Under the NIST cybersecurity framework, Instructure was further obligated to have the following reasonable administrative, technical, operational and physical safeguards and practices in place:

a. Data-in-transit (motion) is encrypted;

b. Data destruction is performed according to contract and agreements;

c. A plan for vulnerability management is developed and implemented;

d. Log/audit records are ascertained, implemented, documented, and reviewed according to policy;

e. Credentials and identities are issued, verified, managed, audited, and revoked, as applicable, for authorized devices, processes, and users; and

f. Remote access is managed by Instructure and also conforms to the ISO/IEC 27001:2022 standard.

99. Relevant here, NIST standards require that organizations encrypt data both at rest and while in motion, "implement[] role-based access control and configuring it so that each user can access only the pieces of data necessary for the user's role" and "ensure that users who must access records containing PII only have access to the minimum amount of PII, along with only those privileges (*e.g.,* read, write, execute) that are necessary to perform their job duties."[64]

100. Like the NIST standard, the ISO 27001 standard focuses on establishing, implementing, maintaining, and continually improving an information security management system. Adopting ISO 27001 standards mitigates risk of unauthorized access and data breaches.[65] ISO standards recommend that companies undertake a risk assessment to determine if encryption

---

[64] Nat'l Inst. of Standards & Tech., *Guide to Protecting the Confidentiality of Personally Identifiable Information (PII): Recommendations of the National Institute of Standards and Technology* (Apr. 2010), https://nvlpubs.nist.gov/nistpubs/legacy/sp/nistspecialpublication800-122.pdf.

[65] Int'l Org. for Standardization, *ISO/IEC 27001:2022 Information Security, Cybersecurity and Privacy Protection — Information Security Management Systems — Requirements* (2022), https://www.iso.org/standard/27001.

must be used to protect the confidentiality of sensitive information and ensure that the data is accessible to those who need it when it is required.[66] ISO standards further address limiting access to sensitive data to only essential employees, implementing measures to ensure that access to data is allowed only after a verified authentication process, and implementing a system to alert the organization to unauthorized access to data.[67]

101. Similarly, the SOC 2 standard is another widely recognized standard in the United States. SOC 2 compliance ensures that data is managed in a way that protects privacy and security, requiring regular audits and controls over data access.[68] SOC 2 compliance examines whether organizations encrypt data in motion, restrict "access to information assets, including hardware, data (including during processing and in transmission), software, administrative authorities, mobile devices, output, and offline system components," and "identify and authenticate individuals who can access sensitive data and infrastructure, and segment networks and data bases and limit points of access to sensitive network segments."[69]

102. CISA guidance also encourages organizations to prevent unauthorized access by:

a. Conduct regular vulnerability scanning to identify and address vulnerabilities, particularly on internet-facing devices;

---

[66] Int'l Org. for Standardization, *ISO 27002:2022 – Control 8.24 – Use of Cryptography*, https://www.isms.online/iso-27002/control-8-24-use-of-cryptography/ (last visited Oct. 8, 2026).

[67] Int'l Org. for Standardization, *ISO 27002:2022 – Control 8.3 – Information Access Restriction*, https://www.isms.online/iso-27002/control-8-3-information-access-restriction/ (last visited Oct. 8, 2026).

[68] *AICPA & CIMA, 2018 SOC 2 Description Criteria (With Revised Implementation Guidance – 2022)* (Oct. 1, 2023), https://www.aicpa-cima.com/resources/download/get-description-criteria-for-your-organizations-soc-2-r-report (last visited Oct. 8, 2026).

[69] AICPA, *2017 Trust Services Criteria for Security, Availability, Processing Integrity, Confidentiality, and Privacy* (updated Mar. 2020), https://assets.ctfassets.net/rb9cdnjh59cm/72xv4p67HVXKp6CjWmjkPk/1cdbfa19f6307e2720396b66a6194dc9/trust-services-criteria-updated-copyright.pdf.

b. Regularly patch and update software to latest available versions, prioritizing timely patching of internet-facing servers and software processing internet data;

c. Ensure devices are properly configured and that security features are enabled;

d. Employ best practices for use of Remote Desktop Protocol (RDP) as threat actors often gain initial access to a network through exposed and poorly secured remote services; and

e. Disable operating system network file sharing protocol known as Server Message Block ("SMB"), which is used by threat actors to travel through a network to spread malware or access sensitive data.[70]

CISA guidance further recommends that the principle of least privilege be applied to all systems so that users only have the access they need to perform their jobs.[71]

103. CISA guidance recommends comprehensive network monitoring, in addition to network segregation, to help contain the impact of an intrusion and prevent or limit lateral movement on the part of malicious actors.[72]

104. Lastly, various cybersecurity industry best practices also have been published, are readily available, and should be consulted as a go-to source for any entity instituting, developing, maintaining, or enhancing its cybersecurity standards. Additional cybersecurity best practices include, but are not limited to, installing appropriate malware detection software, monitoring and

[70] Multi-State Info. Sharing & Analysis Ctr., Cybersecurity & Infrastructure Sec. Agency, U.S. DEP'T OF HOMELAND SEC., *Ransomware Guide*, at 4 (Sept. 2020), https://www.cisa.gov/sites/default/files/publications/CISA_MS-ISAC_Ransomware%20Guide_S508C_.pdf.

[71] *Id.* at 6.

[72] *Id.*

limiting network ports, securing web browsers and e-mail systems, configuring network infrastructure (like firewalls, switches, and routers), safeguarding physical security systems, training staff on key cybersecurity aspects, monitoring for vulnerability alerts, and promptly detecting and addressing vulnerability alerts before exploitation by cybercriminals.

105. Not only should Instructure have had measures in place to prevent compromise in the first place, but it also should have properly siloed its systems. When data is properly siloed rather than maintained in a centralized database, an intruder is only able to access data to which any compromised credentials were allowed access rather than to the entire set of sensitive data. Had Instructure limited access to sensitive data sets to only essential employees, the hackers would have only been able to acquire a subset of data and not the entire data sets containing unencrypted Private Information and confidential communications at issue in the Data Breach.

106. In the event of a breach of customer data, Instructure was obligated to promptly notify Plaintiffs and Class Members, investigate and take reasonable steps to mitigate the breach, and facilitate compliance with applicable laws, including to:

a. Take steps to mitigate and remediate a data breach;

b. Notify Plaintiffs and Class Members without undue delay;

c. Provide Plaintiffs and Class Members with sufficient information to permit Plaintiffs and Class Members to make a determination as to any notification obligations under federal, state, or local laws and regulations; and

d. Cooperate with Plaintiffs and Class Members and take commercially reasonable steps to assist Plaintiffs and Class Members in an investigation of the Data Breach.

107. Upon learning of the Data Breach, Instructure substantially or entirely failed to perform these contractual obligations. Instead, Instructure:

a. Failed to timely detect and stop unauthorized access to its systems despite representing that it maintained continuous monitoring, layered defenses, centralized logging, and robust threat-detection capabilities;

b. Allowed threat actors to maintain access to systems and Data for a prolonged period while sensitive educational records and Private Information were exfiltrated;

c. Provided delayed, incomplete, inconsistent, and insufficient information to schools, educators, students, and families regarding the scope and consequences of the Data Breach;

d. Publicly represented that the incident had been resolved, only for additional unauthorized access, outages, disruptions, and operational shutdowns to continue thereafter;

e. Failed to prevent widespread disruptions to coursework, examinations, grading systems, assignments, communications, and other educational services during final examinations and end-of-semester activities;

f. Forced educational institutions nationwide to cancel, postpone, modify, or otherwise disrupt finals, coursework deadlines, grading periods, and related academic operations; and

g. Failed to adequately restore trust and operational stability, as schools and institutions continued issuing warnings and guidance to students, educators, and families regarding the ongoing risks and uncertainties arising from the Data Breach.

108. As a result of failing to meet its contractual, statutory, and common-law obligations, Plaintiffs and/or Class Members suffered actual, concrete, and ascertainable harms, including but not limited to, the following:

a. Paying inflated prices for services that were not actually provided;

b. Paying inflated prices for a product that was not delivered as promised;

c. Paying additional wages to staff members to address the Data Breach, such as overtime pay;

d. Increased workload on administrative staff for managing affected Data and addressing concerns from parents, students, and faculty;

e. Expenses for hiring cybersecurity experts to investigate the Breach;

f. Costs for cybersecurity experts to assess potential risks to students, teachers, parents, and staff;

g. Fees for cybersecurity experts to provide recommendations on securing the Educational Institutions' Data;

h. Legal expenses, including to understand regulatory compliance obligations;

i. Expenses to transition data from Instructure to a different, more secure platform;

j. Technical support costs associated with data transfer;

k. Expenses for implementing improved security measures;

l. Lost opportunity costs from redirecting school staff to mitigate the Data Breach's impact;

m. Costs for providing continued credit monitoring and identity theft services to affected students, parents, and faculty;

n. Ongoing monitoring costs due to delayed or hidden fraudulent activity;

o. Expenses for drafting and sending notification letters/emails to affected individuals;

p. Increased costs associated with disrupted instructional planning, including the need to redesign lesson plans, reallocate academic calendars, and adjust grading timelines due to Canvas outages and system instability during critical academic periods;

q. Costs incurred from delayed or interrupted access to student coursework, submissions, and grading data, including administrative time spent reconstructing records, reconciling missing or inaccessible assignments, and resolving disputes arising from incomplete or disrupted academic records;

r. Costs for setting up support hotlines or response teams for inquiries;

s. Costs associated with academic remediation efforts necessitated by the Data Breach, including make-up examinations, extended deadlines, alternative assessments, and additional instructional time required to address lost instructional continuity;

t. Costs associated with reputational harm and institutional response efforts, including expenditures to reassure students, parents, faculty, and the public regarding data security, system reliability, and continuity of educational services following the Data Breach;

u. Increased operational and infrastructure costs resulting from system downtime and degradation, including implementation of interim manual processes, duplicate systems, and other workarounds necessary to maintain instructional continuity and basic educational operations;

v. Administrative expenses for responding to concerns from students, teachers, parents, and faculty about the Data Breach; and

w. Other damages, costs, and losses directly and proximately caused by Instructure's failure to safeguard Private Information, maintain system integrity, and provide continuous, reliable access to the Canvas platform as represented.

109. The overpayment and benefit-of-the-bargain damages described herein are direct damages. They measure the difference between the price Plaintiffs and Class Members paid for Canvas and the value of what Instructure actually delivered, and they are calculable from Instructure's own pricing and billing records without reference to any downstream or collateral loss. They are not consequential, indirect, incidental, or special damages.

### 2. Instructure Failed to Protect the Educational Institutions' Data Against Exfiltration in Readable, Usable Form

110. Instructure has represented that sensitive educational data within the Canvas platform is encrypted at rest and protected through layered security controls during storage and transmission. Nevertheless, the circumstances of the Data Breach indicate that ShinyHunters was able to obtain and exfiltrate sensitive educational records and Private Information in a readable and usable form. This demonstrates that, notwithstanding Instructure's encryption representations and obligations, the Data was internet-accessible and in a decrypted state at the time of the unauthorized access and exfiltration.

111. Any organization that utilizes cloud storage or services should be focused on cloud security. There are specific standards and guidelines readily available to assist any organization in managing cloud security, including:

a. ISO 27017, which provides guidance for cloud security and applies the guidance of ISO 27002 to the cloud with seven additional controls; and

b. ISO 27018, which is closely related to ISO 27017, and defines privacy requirements in a cloud environment, particularly how the customer and cloud provider must protect PII.

112. Given that threat actors frequently attack cloud repositories, improved network security can help mitigate attacks. Had Instructure implemented sufficient network security protections, such as appropriate encryption of Data during processing, then the Data Breach could have been prevented.

113. Instructure was aware of its obligations to protect its customers' Data before the Data Breach, yet failed to take reasonable steps to protect it from unauthorized access. Instructure also was aware of the significant repercussions if it failed to do so because Instructure collected Data from millions of students, teachers, and Educational Institutions and it knew that this Data, if hacked, would result in injury, including to Plaintiffs and Class Members.

### 3. Instructure Failed to Implement Basic Security Controls to Protect the Educational Institutions' Data and Detect the Breach

114. Reports indicate that ShinyHunters was able to exploit vulnerabilities associated with "Free-for-Teacher" accounts and potentially compromised application programming interface ("API") keys or third-party integrations to obtain access to user data.

115. Through these access points, ShinyHunters was able to obtain 3.65 terabytes of Private Information associated with, according to ShinyHunters, approximately 275 million individuals across approximately 9,000 institutions. While the full technical details of the intrusion have not been publicly confirmed, available reporting indicates that account-level or integration-level weaknesses played a central role in enabling the unauthorized access.

116. The Data Breach reflects serious deficiencies in the security controls governing externally accessible accounts and connected integrations within the Canvas ecosystem. In

particular, the circumstances of the Breach suggest that protections surrounding authentication, token or key management, and third-party access pathways were not sufficient to prevent compromise once initial access was obtained.

117. Instructure has publicly emphasized the importance of strong authentication and security controls across its platform. However, the Breach indicates that these safeguards were not effectively implemented or enforced in a manner sufficient to prevent exploitation of compromised accounts or integration mechanisms even after Instructure had supposedly secured its network following its April 29, 2026 detection of the initial intrusion.

118. As a result, the Data Breach appears to have been facilitated by failures in basic cybersecurity controls, including secure authentication practices, proper management of access credentials and API tokens, and adequate restriction of data access through user and integration pathways.

119. Instructure could have, and should have, taken steps that would have mitigated the risks from the typical and fundamental hacking tactics that resulted in this Data Breach.

**C. THE DATA BREACH WAS FORESEEABLE AND PREVENTABLE**

120. EdTech providers and student data have become frequent and well-known targets of cybercriminals, particularly given the vast quantities of sensitive personal information, educational records, and institutional data they maintain. Threat actors routinely target learning management systems, student-information systems, and related educational platforms through credential compromise, social engineering, and exploitation of weak access controls.

121. Instructure was not merely aware of these risks; it had actual, concrete notice of them. Incredibly, the Data Breach was not the first time Instructure had been the target of a cybersecurity attack, nor was it the first time Instructure had been targeted by ShinyHunters, which had targeted Instructure just months earlier during a series of cyberattacks associated with

Salesforce. Despite this prior notice that it was a target of ShinyHunters, Instructure failed to implement appropriate remedial measures to prevent subsequent compromise. As a result, approximately seven months after the distinct September 2025 Salesforce incident, ShinyHunters carried out the 2026 Canvas Data Breach described herein—a single incident comprising the initial April 2026 intrusion and the subsequent May 7, 2026 recurrence through the same unremediated vulnerability.

122. In September 2025, Instructure was the subject of a social engineering attack where ShinyHunters gained unauthorized access to Instructure's Salesforce business systems.[73] Instructure has publicly characterized that prior Salesforce-related incident and the 2026 Canvas security incident as "distinct events involving different systems and circumstances"—the September 2025 incident having involved Instructure's Salesforce business systems and largely public business-contact information, and the 2026 Data Breach having involved the Canvas production platform, the Free-for-Teacher environment, and the sensitive student and educator Private Information stored therein. That the two events are distinct does not diminish the notice the earlier breach provided; to the contrary, it confirms that Instructure was warned that the same threat actor, known for targeting educational institutions and platforms and extracting the personal data they maintain, was targeting it and that its security was inadequate, yet failed to remediate before the Canvas Data Breach. That attack also provided ShinyHunters with familiarity regarding Instructure's security infrastructure and organizational vulnerabilities, allowing the threat actor to

---

[73] Sean Nikkel, *Technical Advisory: ShinyHunters Breach of Instructure Canvas LMS*, BITDEFENDER (May 8, 2026), https://www.bitdefender.com/en-us/blog/businessinsights/technical-advisory-shinyhunters-breach-instructure-canvas-lms (last visited Oct. 8, 2026).

employ such familiarity to again target the Canvas platform just seven months later.[74] Had Instructure implemented appropriate organization-wide remedial measures and industry-standard security controls, the Data Breach would have been prevented. Instead, Instructure's exposure pattern does not encompass a single weakness within its security infrastructure, but rather signals "a series of underdefended adjacencies where trust boundaries between systems were weaker than the sensitivity of data they protected."[75]

123. Instructure therefore had concrete, actual notice of a known threat to its systems, platforms, and integrated environments *by the same threat actor.* Yet, Instructure failed to undertake known, adequate remedial efforts within a reasonable time. Instructure's repeated insouciance to known security risks ultimately enabled the Data Breach.

124. Instructure publicly acknowledged the prior incident on September 21, 2025, ironically stating that "transparency is a priority" while vaguely asserting that it had "implemented additional security measures to help prevent similar incidents in the future."[76] Clearly, whatever measures Instructure claims to have implemented were insufficient.

125. In the Senate Committee's May 12, 2026 letter to Mr. Daly, after referencing the September 2025 incident and emphasizing that the Data Breach was "not the first time Instructure has experienced a cybersecurity incident," the Senate Committee demanded answers and accountability regarding its response, asking "[w]hat remedial steps did Instructure take to improve its security protocols after that incident?"[77]

---

[74] *ACTIVE THREAT NOTICE: Instructure Canvas Breach*, RED PIRANHA, https://redpiranha.net/news/shinyhunters-canvas-breach (last visited Oct. 8, 2026).
[75] Nikkel, *supra* note 73.
[76] *Update on Security Incident*, INSTRUCTURE HOLDINGS, INC., https://www.instructure.com/resources/blog/security-incident-update (last visited Oct. 8, 2026).
[77] Letter from Sens. Cassidy and Tuberville, *supra* note 52.

126. Given Instructure's concrete notice of ShinyHunters' intentions to target its platforms, Instructure was, or undoubtedly should have been, well aware of ShinyHunters' capabilities considering the threat actor's widely publicized history of targeting EdTech vendors, institutions, and other companies maintaining large repositories of sensitive data. Indeed, ShinyHunters is reportedly the same threat actor responsible for prior attacks on PowerSchool and Infinite Campus, additional educational platform vendors, as well as recent attacks on universities themselves, including the University of Pennsylvania, Harvard University, and Princeton University. Moreover, ShinyHunters was likewise responsible for dozens of other massive cybersecurity attacks at industry leading companies, including those impacting Ticketmaster, AT&T Wireless, and Microsoft, to name a few. As such, Instructure's familiarity with the threat actor was not illusory. Instructure thus should have taken steps to prevent the Data Breach far beyond the rudimentary measures it previously employed, but failed to do so.

### D. INSTRUCTURE PAID A FUTILE RANSOM IN AN ATTEMPT TO CONTAIN THE DATA, WHICH REMAINS SUBJECT TO ONGOING MISUSE BY HACKERS

127. Following the Data Breach, Instructure reported that it had engaged in communications with ShinyHunters and reached an agreement described as involving the purported deletion of stolen Data, along with general assurances that no Instructure customers would be extorted as a result of the Breach.[78]

128. Instructure neither disclosed the specific terms of such arrangement, nor whether law enforcement agencies were involved in its communications with ShinyHunters.[79]

---

[78] *Security Incident Update & FAQs*, *supra* note 25.
[79] Qasim Nauman, *Maker of Canvas Learning Platform Strikes Deal for Hackers to Return Data*, THE NEW YORK TIMES (May 12, 2026),

129. Despite Instructure's assurances, the potential for future harm remains. Indeed, Instructure itself has acknowledged that "there is never complete certainty when dealing with cybercriminals"[80] and has advised its users to remain "cautious of unexpected emails or messages referencing this incident, avoid clicking suspicious links, and report anything unusual" while recommending that customers continue to monitor their Canvas environments, integrations, and administrative activity.[81]

130. Federal law enforcement guidance, including from the FBI, similarly warns that "[p]aying a ransom doesn't guarantee you or your organization will get any data back" and that "[t]he FBI does not support paying a ransom in response to a ransomware attack" in light of these ever-lingering risks and the fact that such extortion payments "encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity." [82]

131. Palo Alto Networks' Unit 42, a well-regarded cybersecurity research firm, warns that, "even if you pay the ransom, ***there's no guarantee that the cybercriminal will follow through*** on their end of the bargain. Even if your files are restored to their original state, it's possible that the perpetrator will maintain a copy of the stolen data and could potentially sell it on the dark web or use it against you in future attacks."[83]

---

https://www.nytimes.com/2026/05/12/us/canvas-instructure-hackers-deal.html (last visited Oct. 8, 2026).

[80] *Id*.

[81] *Security Incident Update & FAQs*, *supra* note 25.

[82] Fed. *Bureau of Investigation*, *Ransomware*, https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/ransomware (last visited Oct. 8, 2026).

[83] Jeremy Brown, *Breaking Down Ransomware Attacks*, PALO ALTO NETWORKS (May 21, 2021), at https://unit42.paloaltonetworks.com/breaking-down-ransomware-attacks/ (last visited Oct. 8, 2026) (emphasis in original).

132. The Center for Internet Security warns that once the data is exfiltrated from a network, its confidential nature is destroyed and it should be "assume[d] it will be traded to other threat actors, sold, or held for a second/future extortion attempt."[84] And even where companies pay for the return of data, attackers often leak or sell the data regardless, because there is no way to verify that copies of the data are destroyed.[85]

133. These advisories underscore that, notwithstanding any reported arrangement with threat actors, the security and integrity of the exfiltrated Data cannot be assured and that the risks of phishing, credential stuffing, identity theft, impersonation, fraudulent schemes, targeted harassment, doxing, social engineering campaigns, and other misuse remain ongoing for Plaintiffs and Class Members.

134. While, in the infancy of the Data Breach's aftermath, there has been no confirmation that the stolen Data has been sold on the Dark Web, such absence is far from indicative of safety. Stolen data takes time to be published, as data holds its highest value before it is sold because its utility and exclusivity are intact. In underground markets, undisclosed PII and Private Information has the greatest potential for profit only when the buyer can be confident they are the sole possessor. Once data is sold—or worse, sold multiple times—it quickly loses value, as competitors race to exploit the same credentials. This degradation in value stems from both diminishing exclusivity and increasing detection risks.

135. Selling data on the Dark Web or elsewhere creates traceability and risk. The act of transferring stolen information introduces exposure to law enforcement or countermeasures (*e.g.*,

---

[84] Ctr. for Internet Sec., Ransomware*: The Data Exfiltration and Double Extortion Trends,* https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends (last visited Oct. 8, 2026).
[85] *Id*.

honeypots or fake buyers). For experienced actors in the "upper tier" of the underground economy, it is more profitable and less risky to exploit the data directly rather than sell it. Hence, raw data's worth lies not just in its market price, but in the potential value it holds before being diluted by risk, competition, or exposure.

136. Additionally, the underground economy operates under extreme uncertainty and dishonesty, often likened to a "market for lemons." Buyers have no way of verifying the quality or exclusivity of data before purchase. It is therefore likely that data leaked onto the Dark Web has already been exploited for its most valuable content. Moreover, once a company succumbs to a cybercriminal's ransom demand, it is often placed on a "sucker list" and is thereafter treated as a profitable target within the cybercriminal underworld.

137. ShinyHunters is a well-known collective of cybercriminals that has been credited with several large-scale breaches going back to 2020. ShinyHunters initially began by exfiltrating and attempting to sell stolen data but has since transitioned to using stolen data for extortion attempts and then, sometimes several years after the fact, publishing the data to anyone with internet access.

138. Accordingly, Plaintiffs and Class Members remain subject to continuing and substantial risks of harm arising from the Data Breach. These risks are not speculative but are inherent in the nature of the compromised Data and the known practices of threat actors involved in its exfiltration and potential dissemination. As a result, Plaintiffs and Class Members have suffered and will continue to suffer injury, including the need for ongoing monitoring, mitigation efforts, and responses to actual or attempted misuse of their Data. These ongoing risks also underscore the need for practical injunctive relief to protect Educational Institutions' sensitive information.

### E. PLAINTIFFS AND CLASS MEMBERS HAVE BEEN HARMED

139. Instructure provides subscription-based and support services for which Plaintiffs and Class Members considerably overpaid. Each time Plaintiffs and Class Members entered into a contract or renewal with Instructure, they received a product without the contractually obligated data security features and practices.

140. Instructure's failure to keep Plaintiffs' and Class Members' Data secure has had severe and continuing consequences. It has forced the affected Educational Institutions to devote substantial time and resources to understanding the Data Breach and its impact on students and teachers, communicating known threats and risks to affected individuals, implementing temporary instructional and testing alternatives, exploring alternative means of storing and processing their Data, and ensuring that sensitive information is protected against future misuse and unauthorized access.

141. Plaintiffs and Class Members also suffered substantial operational disruption as a result of the second unauthorized access and resulting Canvas outage, which occurred during final examinations, final projects, grading periods, and end-of-semester academic activities. Educators and administrators were unable to access coursework, examinations, grading tools, communications, and other essential educational functions, and numerous institutions were forced to postpone or cancel assignments and examinations altogether. Plaintiffs and Class Members also suffered reputational harm in addition to incurring costs associated with the Data Breach. They have suffered serious injury and face a present and imminent substantial risk of future injury, including extortion attempts and/or the consequences of misuse of their Data.

142. As a direct and proximate result of Instructure's known deficient data security practices, as well as its concealment of the same, Plaintiffs and Class Members have suffered and will continue to suffer injury.

143. Instructure was required to safeguard Plaintiffs' and Class Members' Data, maintain reasonable cybersecurity and incident-response measures, and provide reliable, uninterrupted access to Canvas, all pursuant to the Contracts, applicable laws and regulations, industry standards, Instructure's representations, and principles of equity. It did not do so. Because data privacy and security are integral and necessary components of the software product Instructure offered to Plaintiffs and Class Members, Plaintiffs and Class Members received a product that lacked benefits they were promised, reasonably expected, and were otherwise entitled to receive under their Contracts. As a result, Plaintiffs and Class Members suffered economic losses, including the difference in value between the product and services as promised and the insecure, disrupted, and deficient product and services actually received.

144. The difference in value between the product and services Instructure provided (lacking adequate data security, operational continuity, incident-response measures, and reliable platform access), and the product and services Plaintiffs and Class Members should have received (with adequate data security, incident response, uptime, and operational safeguards) is objective and quantifiable. There is a difference between the market valuation of the product and services that should have been provided and the product as actually received, and all Class Members have therefore suffered the same loss commensurate or proportional to the price paid by them or on their behalf for Canvas and related services.

145. Data security, operational continuity, reliability, incident response, and uptime are obviously material to Plaintiffs and Class Members, and they have been damaged whether or not an individual Class Member's data was actually subject to the Data Breach by overpaying for security, reliability, continuity, and support features that were inadequately implemented or altogether absent. Plaintiffs and Class Members were damaged at the time of each contract and

renewal, when they paid for security, reliability, continuity, and support features that Instructure did not deliver. The Data Breach did not create that injury; it revealed it. Class Members whose Data was exfiltrated in the Data Breach suffered additional and distinct injury, as alleged herein.

146. Even apart from the overpayment for Instructure's services, the stolen Data is one of the most valuable commodities on the Dark Web. Moreover, there are time lags between when data is stolen, when it is used, and when the discovery occurs that it has been used. In some cases, data is leaked years after the initial exfiltration, demonstrating the ongoing risk that the Data at issue here will be misused.

147. Plaintiffs and Class Members will need to remain vigilant against unauthorized use of the stolen Data for years to come and must continue to devote school resources to monitoring the Data Breach and communicating with affected individuals.

148. Accordingly, Plaintiffs and Class Members seek full disgorgement of Defendants' ill-gotten gains. The subscription and renewal fees Plaintiffs and Class Members paid, as described herein, reflect the dollar amounts that Defendants benefited from on an annual basis, in part due to their cost-cutting and unlawful conduct. Plaintiffs and Class Members allege that their payments to Instructure were excessive in light of Instructure's failure to deliver the functional data security and contractual support services promised under the Contracts. Plaintiffs and Class Members also seek compensatory damages for the measurable value of their Data, the cost of future protective measures, time spent remedying exposure, injunctive or equitable relief, and any other damages, economic or non-economic, arising from Defendants' unlawful conduct.

## CLASS ALLEGATIONS

149. Plaintiffs bring this class action individually on behalf of themselves and on behalf of all similarly situated Educational Institutions, including state departments of education, school districts, universities, colleges, charter schools, and public and private schools in a nationwide

class and, in the alternative, statewide subclasses, pursuant to Federal Rule of Civil Procedure 23. As described below, this action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23(a), 23(b)(2), and 23(b)(3) (as well as the requirements for certification of one or more issue classes under Rule 23(c)(4)). Accordingly, Plaintiffs seek certification of the following Classes:

**NATIONWIDE CLASS**

150. Pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3), as applicable, Plaintiffs seek certification of the following nationwide class:

> All school districts, colleges, universities, charter schools, and other educational institutions in the United States that contracted with Instructure to provide the Canvas learning management system and related products and services.
>
> The Nationwide Class asserts claims for Breach of Express Contract (Count 1) and Breach of the Implied Covenant of Good Faith and Fair Dealing (Count 3) against Instructure, and claims for Negligence (Count 2), Gross Negligence (Count 2A), Unjust Enrichment (Count 4), and Declaratory and Injunctive Relief (Count 5) against Instructure and KKR.

151. To the extent the Court determines that the law of each Class Member's state governs any claim, the Statewide Subclasses assert these same claims under the laws of their respective states.

152. Utah law governs the claims of the Nationwide Class. The Instructure Master Terms and Conditions and the Instructure Global Data Processing Addendum—which Instructure drafted, incorporated into every Order Form and every renewal, and required every Class Member to accept on a non-negotiable basis—designate the law of the State of Utah as the law governing the parties' agreements. Instructure selected that law for its own benefit and may not now be heard to disclaim it.

153. Utah independently has a significant aggregation of contacts with the claims of every Class Member. Instructure is headquartered in Salt Lake City, Utah, and Canvas is

developed, operated, maintained, and administered from Utah. The uniform contract documents governing every Class Member's relationship with Instructure were drafted, issued, and maintained by Instructure in Utah. The corporate decisions that give rise to every claim in this action, including decisions concerning Instructure's data-security budget, architecture, access controls, monitoring, vulnerability remediation, and incident-response and notification practices, were made in Utah. The public representations on which every Class Member relied (Instructure's Trust Center materials, Product Privacy Notice, and security and uptime representations) were authored, approved, and published from Utah. Every Class Member's claim therefore arises from a uniform set of Utah-issued contract terms and a uniform course of Utah-based conduct, and the application of Utah law to those claims is neither arbitrary nor unfair.

154. Because each Class Member's claims arise from the same uniform contract documents and the same centralized conduct, the elements of those claims do not materially vary by Class Member's state. In the alternative, and to the extent the Court determines that the law of each Class Member's state governs any claim, Plaintiffs seek certification of the Statewide Subclasses, and in the further alternative seek certification under Rule 23(c)(4) of the common issues identified above, including whether Instructure's security measures were reasonable, whether Instructure failed to remediate the Free-for-Teacher vulnerability after detecting its exploitation, and whether Instructure's post-detection representations were accurate.

## STATEWIDE SUBCLASSES

155. In the alternative, Plaintiffs repeat and reallege the Nationwide Class definition and claims on behalf of themselves and subclasses ("Statewide Subclasses" and with the Nationwide Class, the "Classes") consisting of Educational Institutions in California, Pennsylvania, Iowa, Oklahoma, and additional states to be named, under the laws of each respective state.

156. Excluded from the Classes are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Classes are any judicial officers presiding over this matter, members of their immediate family, and members of their judicial staff having a financial or other beneficial interest in the outcome of this litigation.

157. **Numerosity. Fed. R. Civ. P. 23(a)(1).** The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, thousands of Educational Institutions have been affected. All Educational Institutions that contracted with Instructure to provide Canvas overpaid for Canvas, and ShinyHunters has published a list, which Instructure has not verified, of thousands of Educational Institutions whose Data it claims to have exfiltrated. The exact identities of affected Educational Institutions are otherwise available from Defendants' records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods. Instructure's own reported figures—more than 30 million active users and approximately 9,000 institutions—independently establish that joinder of all Class Members is impracticable, without reliance on any unverified figure claimed by ShinyHunters.

158. **Commonality and Predominance. Fed. R. Civ. P. 23(a)(2), 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members. These common questions, among others, include:

a. Whether and to what extent Defendants had a duty to protect the confidentiality of the Data for Instructure's customers and former customers;

b. Whether Instructure failed to take reasonable and prudent security measures to ensure its Canvas platform and related systems were protected;

c. Whether Defendants enabled unauthorized access to institutional Data through inadequate controls governing Free-for-Teacher accounts, third-party integrations, and/or API tokens in violation of Instructure's Contracts;

d. Whether Defendants failed to adequately segregate environments and user roles within Canvas such that access pathways intended for limited or non-production use were capable of exposing institutional Data;

e. Whether Instructure failed to use reasonably available information to monitor its systems and prevent the Data Breach from happening;

f. Whether Instructure required its contractors and subcontractors to implement sufficient security measures, including the same security measures that it required for its direct employees;

g. Whether Instructure implemented multi-factor authentication ("MFA") protection, least-privilege access controls, and adequate authentication safeguards for its administrators, contractors, and technical staff;

h. Whether Defendants knew or should have known that Canvas, its Free-for-Teacher environment, or related integration pathways were vulnerable to compromise;

i. Whether Defendants were negligent in failing to implement reasonable and adequate security procedures and practices at Instructure;

j. Whether Instructure failed to timely detect, contain, or disclose unauthorized access to Plaintiffs' and Class Members' Data;

k. Whether Instructure's incident response and communications were reasonable in light of applicable legal, regulatory, and industry standards, including federal cybersecurity guidance;

l. Whether Instructure's security measures were reasonable in light of applicable legal and regulatory requirements and industry standards, including the FTC Act;

m. Whether the Data Breach and related outages caused operational disruption during critical academic periods, including final examinations, grading periods, and end-of-semester activities, and whether Defendants' response adequately mitigated such harm;

n. Whether Instructure had any contractual obligations to provide for the security of its customers' Data;

o. Whether Instructure has complied with any contractual obligations to protect its customers' Data;

p. Whether KKR, as controlling parent and owner, exercised oversight or control over Instructure's cybersecurity governance, risk management, or incident response practices;

q. Whether Instructure failed to notify Plaintiffs and Class Members as soon as practicable and without delay after the Data Breach was discovered;

r. Whether Plaintiffs and Class Members overpaid for Instructure's services;

s. Whether Defendants' security measures for Canvas conformed to the NIST and ISO frameworks and federal cybersecurity guidance that Instructure represented it followed;

t. Whether Defendants' conduct resulted in or was the proximate cause of Plaintiffs' and Class Members' injuries;

u. Whether Plaintiffs and Class Members suffered damages or other losses because of Defendants' failure to protect their Data;

v. Whether Defendants should retain the money paid by Plaintiffs and Class Members to protect their Data; and

w. Whether Plaintiffs and Class Members are entitled to declaratory and injunctive relief.

159. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of other Class Members' claims because Plaintiffs and Class Members were subjected to the same allegedly unlawful conduct and harmed in the same way. Plaintiffs' damages and injuries are akin to those of other Class Members, and Plaintiffs seek relief consistent with the relief of the Class.

160. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are adequate representatives of the Classes because Plaintiffs are impacted members of the Classes and are committed to pursuing this matter against Defendants to obtain relief for the Classes. Plaintiffs have no conflicts of interest with the Classes. Plaintiffs' counsel are competent and experienced in litigating class actions, including extensive experience in data breach and data privacy litigation. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Classes' interests.

161. **Predominance and Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Common issues in this litigation also predominate over individual

issues because the issues discussed in the foregoing paragraph concerning commonality are more important to the resolution of this litigation than any individual issues. The purpose of the class-action mechanism is to permit litigation against wrongdoers even when the damages suffered by an individual plaintiff may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and Class Members may be relatively small in comparison to the burden and expense required to litigate their claims individually against Defendants, and thus individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. It would create the potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class-action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court. Damages are susceptible to common proof. Plaintiffs' principal damages theory is the difference between the market value of the Canvas services as promised — with the represented security, monitoring, incident-response, and uptime protections — and the value of the services actually delivered, measured as a proportion of the fees each Class Member paid. That differential is capable of calculation on a classwide basis from Instructure's own pricing and billing records and does not vary by Class Member's state.

162. **Risk of Prosecuting Separate Actions.** This case is appropriate for certification because prosecuting separate actions by individual proposed Class Members creates the risk of inconsistent adjudications and incompatible standards of conduct for Defendants.

163. **Ascertainability.** The Classes are defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within each Class. The

Classes consist of Educational Institutions that contracted for Instructure services, and class membership can be determined using Instructure's records.

164. Plaintiffs and Class Members face an ongoing and prospective risk of future injury from Instructure's continuing data-security practices. Plaintiffs' and Class Members' Data remains in Instructure's custody, including the historical and former-user records Instructure retained and failed to delete. Instructure continues to operate Canvas as the platform of record for Plaintiffs and Class Members, and Plaintiffs intend to continue using Canvas or will be required to do so pending migration. Instructure has declined to recommend "broad new customer-side remediation," has not disclosed what measures it has implemented, and has twice represented that remediation was complete when it was not — including after the September 2025 incident, when it asserted that it had "implemented additional security measures to help prevent similar incidents in the future." Instructure's data-notification platform was itself reported to have "been subject to a security threat" as recently as July 2026. Absent injunctive relief requiring Instructure to implement and maintain security measures consistent with law and industry standards, and to verify that implementation, Plaintiffs and Class Members remain at substantial risk of a further compromise of the Data that Instructure continues to hold.

165. **Injunctive and Declaratory Relief.** Certification is appropriate under Rule 23(b)(2) for declaratory and injunctive relief only. Defendants, through their uniform conduct, acted or refused to act on grounds generally applicable to the Classes as a whole, and a single injunction requiring Instructure to implement and maintain reasonable data-security measures would provide relief to each Class Member. Plaintiffs seek no monetary relief on behalf of the Rule 23(b)(2) class; all monetary relief is sought on behalf of the Rule 23(b)(3) class.

166. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

## CAUSES OF ACTION

### COUNT 1
### BREACH OF EXPRESS CONTRACT
### (On behalf of the Nationwide Class and, in the alternative, the Statewide Subclasses, against Instructure)

167. Plaintiffs restate the factual allegations set forth in Paragraphs 1 through 166 above, as if set forth herein.

168. Plaintiffs bring this claim on behalf of the Nationwide Class under Utah law, or, in the alternative, on behalf of the Statewide Subclasses under the laws of their respective states.

169. Plaintiffs, Class Members, and Instructure are parties to the Contracts. Plaintiffs and Class Members fully performed their obligations under the Contracts.

170. The Contracts set forth the terms that govern customer data provided to Instructure. This customer data includes the Data of Plaintiffs' and Class Members' administration, employees, students, and/or teachers, all of which was compromised and stolen while in the care, custody, and control of Instructure. The Contracts also describe Instructure's duties and responsibilities for handling customer data, requiring Instructure to do so in accordance with applicable law and pursuant to the terms of the Contracts.

171. Instructure breached its Contracts by, among other things:

a. Failing to safeguard the confidential, private, and sensitive Data it obtained from Plaintiffs and the Class. The Contracts require Instructure to maintain the confidentiality, privacy, and security of the customer Data. Security and confidentiality were material terms of the Contracts, including as reflected in Instructure's own

representations regarding secure, cloud-native architecture, role-based, least privilege, and need-to-know access controls, and protected handling of student data. The Educational Institutions' decision to purchase and utilize Canvas was conditioned on Instructure's reciprocal promise to safeguard the Data. The Contracts further required Instructure to maintain appropriate technical and organizational measures to protect the confidentiality, integrity, and security of Plaintiffs' and Class Members' Data and Private Information, to regularly monitor compliance with such safeguards, and not to materially decrease the overall security of the Services during the term of the agreements. Instructure failed to comply with these obligations. The Data Breach has deprived Plaintiffs and Class Members of a benefit they reasonably expected to receive at the time the Contracts were made. Plaintiffs and Class Members were deprived of this benefit each time they entered into a contractual agreement and renewal with Instructure.

b. Failing to properly restrict and govern access to Data across Canvas environments, including insufficient segregation between institutional systems, auxiliary environments, and Free-for-Teacher or externally integrated systems, thereby permitting access pathways inconsistent with least-privilege principles and the intended scope of authorization under the Contracts. These failures permitted unauthorized processing of, disclosure of, access to, and exfiltration of the Data in contravention of Instructure's contractual obligations to prevent unauthorized or unlawful processing and access.

c. The Contracts impose limits on Instructure's access, collection, and processing of the Data, restricting Instructure to only those purposes provided for in the Contracts or consented to by Plaintiffs or Class Members. Access to the Data for any other purpose is limited by the Contracts to de-identified, anonymized, and/or encrypted data.

The access restrictions in the Contracts prohibited Instructure from processing and using the Data without consent, and formed an essential element of the Contracts. The Contracts specifically required Instructure to protect against unauthorized or unlawful processing, accidental or unlawful destruction, loss, alteration, damage, disclosure, or access to Plaintiffs' and Class Members' Data. The Data Breach was proximately caused by Instructure's deficient data protection practices and procedures resulting in the unauthorized access, collection, and processing of the Data. Accordingly, Instructure violated and materially breached the Contracts by allowing the unauthorized access, collection, and processing of the Data.

d. The Contracts further provide details regarding what Instructure must do to ensure its employees, agents, contractors, and subprocessors comply with the terms of the Contracts, including by maintaining the confidentiality, security, and privacy of customer data. Instructure was required, yet failed, to ensure compliance with its security measures and organizational safeguards, including those attributable to its employees, agents, vendors, contractors, and subprocessors, as it agreed to in the Contracts. These employees, agents, vendors, contractors, and subprocessors should have implemented basic procedures and safe data practices—such as MFA, data encryption, password rotation, and endpoint protection—for purposes of ensuring the privacy and security of Data under the terms of the Contracts. Instructure's failure to do so was unreasonable and inexcusable and directly caused the injuries complained of herein. Instructure's failure to ensure compliance by its agents, employees, contractors, and subprocessors, to whom Instructure provided access to customer data, also materially breached the Contracts.

e. Instructure further breached the Contracts by failing to implement and maintain reasonable access controls and security safeguards across its Canvas environment, including systems and account types that were broadly accessible to educators and users, such as Free-for-Teacher accounts, as well as systems connected through third-party integrations and APIs. These environments and access pathways materially expanded the attack surface for unauthorized access and were not sufficiently protected against foreseeable risks associated with credential compromise, token misuse, or unauthorized integration-based access. Instructure's failure to adequately secure these access pathways and to enforce consistent security controls across interconnected systems resulted in unauthorized access to and exfiltration of Plaintiffs' and Class Members' Data.

f. With respect to processing and use of Data in Instructure's possession, Instructure breached its Contracts. Instructure failed to perform its obligation under the Contracts concerning the processing and use of the Data, because it failed to implement reasonable security safeguards. Therefore, in failing to perform its obligations identified in the Contracts, Instructure materially breached the Contracts. The Contracts further required Instructure to cooperate with customer audit requests, provide information concerning its operational security practices and penetration testing, and provide reasonable assistance for data protection impact assessments and other privacy reviews required under applicable data protection laws. Had Instructure implemented and enforced reasonable auditing, assessment, and remediation procedures consistent with these obligations, it would have identified and remediated the vulnerabilities exploited during the Data Breach.

g. The Contracts required Instructure to encrypt Plaintiffs' and Class Members' Data both in transit and at rest, and to implement and maintain encryption and

other technical safeguards sufficient to ensure that such Data remained protected against unauthorized access, disclosure, and exfiltration even in the event of intrusion into Instructure's systems. Notwithstanding these obligations, the Data Breach demonstrates that unauthorized actors were able to access and obtain Plaintiffs' and Class Members' sensitive educational records and Private Information in a readable and usable form, reflecting a failure to properly encrypt, protect, or isolate data in transit and/or at rest, and a failure to implement effective encryption controls consistent with Instructure's contractual and security obligations.

h. In the event of a breach of customer data, Instructure also was obligated to promptly notify victims of the security incident. Upon learning of the Data Breach, Instructure substantially or entirely failed to perform these contractual obligations, including by failing to timely provide complete and accurate information regarding the scope of the breach, the categories of Data impacted, the systems affected, and the measures necessary for Plaintiffs and Class Members to mitigate ongoing harm.

i. Instructure was obligated, at a minimum, to abide by and maintain adequate data-security measures, consistent with industry standards, to protect customer data from unauthorized disclosure or acquisition by unauthorized persons. Instructure also failed to perform its data-security obligations in accordance with industry standards and regulatory guidance and failed to maintain an adequate data-security and privacy plan. Instructure's failure to perform its obligations under the Contracts, including its failure to abide by commercially reasonable, industry-standard security requirements, constituted a material breach of the Contracts.

j. In the event of a security breach, Instructure was required to investigate the incident, cooperate with Plaintiffs and Class Members in responding to the breach, and take commercially reasonable steps to mitigate the effects of the breach and minimize resulting harm. Instructure failed to take commercially reasonable mitigation measures sufficient to prevent continuing misuse, exposure, and dissemination of Plaintiffs' and Class Members' Data following the Data Breach.

172. Instructure breached the Contracts despite knowing that the Data holds substantial value and is at great risk of being targeted by hackers.

173. Instructure's breaches of the Contracts span beyond the Data Breach itself, which merely illuminated Instructure's repeated failures to adhere to its contractual data security obligations and applicable federal and state law. Instructure thus breached each separate contract and renewal with Plaintiffs and Class Members.

174. Plaintiffs and Class Members reasonably expected Instructure to perform its duties under the Contracts. Instructure made extensive representations with respect to its data security capabilities, which it failed to maintain. Plaintiffs and Class Members were also assured that Instructure could react in a timely and organized fashion to address the negative implications should a data breach occur. Plaintiffs and Class Members continued to perform their obligations and make payments under these reasonable beliefs.

175. As a direct and proximate result of Instructure's breaches of the Contracts identified herein, Plaintiffs and Class Members have suffered monetary and other damages each time they entered into a contractual agreement and renewal with Instructure. Those harms were foreseeable to Instructure because the Contracts expressly included the protections at issue, which were intended to protect against such harms. These losses were and remain unavoidable by Plaintiffs

and Class Members, and are the natural and probable consequence of Instructure's acts and omissions through which it materially breached the Contracts.

176. As a direct and proximate result of Instructure's breaches of the Contracts, Plaintiffs and Class Members were repeatedly deprived of the full benefit of data security protection that was promised under the Contracts.

177. Based upon Instructure's material breaches of the Contracts, Plaintiffs and Class Members seek to recover all available general damages, special damages, benefit-of-the-bargain damages, attorneys' fees and costs, and all other damages sufficient to compensate Plaintiffs and Class Members for their injuries as permitted by law.

**COUNT 2**
**NEGLIGENCE**
**(On behalf of the Nationwide Class and, in the alternative, the Statewide Subclasses, against Instructure and KKR)**

178. Plaintiffs restate the factual allegations set forth in Paragraphs 1 through 177 above, as if set forth herein.

179. Plaintiffs bring this claim on behalf of the Nationwide Class under Utah law, or in the alternative, on behalf of the Statewide Subclasses under the laws of their respective states as against Instructure and KKR.

180. Plaintiffs and Class Members were required to provide sensitive Data to use Canvas, and did so pursuant to Instructure's agreement to collect, encrypt, de-identify, and safely store their Data. Defendants had full knowledge of the sensitivity of the Data and the types of harm that Plaintiffs and Class Members could and would suffer if the Data were wrongfully disclosed.

181. Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Data in their possession from being compromised, lost, stolen, accessed, or misused by unauthorized persons.

Defendants also owed a duty to Plaintiffs and Class Members to refrain from unauthorized access to, viewing of, and/or use of unencrypted and identifiable Data. More specifically, that duty included, among other things:

a. Designing, maintaining, and testing Instructure's security systems to ensure that Plaintiffs' and Class Members' Data in their possession was properly secured and protected;

b. Implementing processes that would detect a breach of Instructure's security system in a timely manner;

c. Timely acting upon warnings and alerts, including those generated by Instructure's security systems regarding intrusion to its networks;

d. Maintaining security measures consistent with industry standards discussed herein; and

e. Deleting Data that Instructure no longer reasonably has a legitimate business purpose in retaining.

182. Defendants' duty of reasonable care in this case does not arise from, and does not duplicate, any contractual obligation. The Data entrusted to Instructure through Canvas belonged overwhelmingly to third parties who are not parties to any contract with Instructure: individual students, their parents and guardians, and individual teachers and staff. Instructure collected, stored, and retained the private messages, student identification numbers, medical alerts, disability information, and other sensitive personal information of these non-contracting individuals, including individuals who had long since left the Educational Institutions and whose records Instructure retained with no contractual basis for doing so. Instructure's obligation to exercise reasonable care in handling the personal information of persons with whom it had no contractual

relationship exists in law, arises from Instructure's own voluntary assumption of custody over that information, and is owed without regard to the terms of any agreement.

183. Instructure's duty here is also independent because it extends to conduct that no contract addresses or allocates. Having detected a live intrusion on April 29, 2026, and having revoked the intruder's access, Instructure undertook a course of conduct to investigate and remediate. Once it undertook that course of conduct, Instructure assumed a duty in tort to perform it with reasonable care — a duty breached when Instructure publicly represented that the incident had been "resolved" while leaving the exploited Free-for-Teacher vulnerability in place, thereby inducing Plaintiffs, Class Members, students, and educators to resume ordinary reliance on Canvas during final examinations.

184. Plaintiffs' negligence claim is also not an action for purely economic loss. The product Plaintiffs purchased was a learning management system and related services. The sensitive personal information compromised in the Data Breach — including the private messages, medical alerts, disability information, student identification numbers, and family circumstances of students, parents, teachers, and staff — was not a component of that product. It was separate property, belonging to separate persons, that Instructure took into its custody and was obligated to keep secure. The Data Breach caused damage to that other property, distinct from any deficiency in the Canvas product Plaintiffs bargained for, and distinct from any diminution in the value of that product. Instructure's post-detection misrepresentation that the incident had been "resolved" likewise caused injury that no contract term addresses, allocates, or remedies.

185. Defendants' duty to use reasonable care arose from several sources, including, but not limited to, the following:

a. Because of Instructure's role as one of the largest EdTech companies, Defendants were in a unique and superior position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach;

b. Defendants' duty to Plaintiffs and Class Members also arose pursuant to state law, including but not limited to: the Utah Protection of Personal Information Act, Utah Code Ann. § 13-44-101, *et seq.*; the Utah Student Data Protection Act, Utah Code Ann. § 53E-9-301, *et seq.*; the Utah Consumer Privacy Act, Utah Code Ann. § 13-61-101, *et seq.*; the Pennsylvania Breach of Personal Information Notification Act, 73 Pa. Stat. Ann. § 2303, *et seq.*; 73 Pa. Stat. Ann. § 2305a, *et seq.*; the Iowa Personal Information Security Breach Protection Act, Iowa Code Ann. § 715C.2, *et seq.*; Cal. Civ. Code § 1798.81.5; Cal. Civ. Code § 1798.82; and analogous data-security and breach-notification statutes in the States in which Class Members are located. These statutes, among others, further establish and reflect applicable standards of care governing the use and protection of data as well as data breach notifications, among other standards. Defendants' failures to adhere to these statutory obligations and baseline cybersecurity requirements constitute further evidence of their unreasonable and negligent conduct.

c. Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which the FTC has long construed and enforced to require entities holding sensitive personal information to employ reasonable data-security measures, together with the FTC's published data-security guidance and the body of consent orders entered in its data-security enforcement actions, establishes the standard of reasonable care applicable to entities in Instructure's position. Instructure's failure to employ the measures identified in that guidance (including limiting access to information on a business-need basis, encrypting

stored information, deploying intrusion detection sufficient to expose a breach as it occurs, monitoring for anomalous outbound transfers of large volumes of data, and maintaining a functioning breach response plan) is evidence of Instructure's failure to exercise reasonable care. Instructure was independently on notice of this standard because it publicly represented that it conformed to it;

d. The data-security and breach-notification statutes identified above, together with the NIST, ISO 27001, SOC 2, CISA, and related frameworks Instructure expressly represented that it followed, likewise establish the applicable standard of care, and Instructure's departures from them are evidence of its failure to exercise reasonable care;

e. In the alternative, and on behalf of each Statewide Subclass whose governing law so permits, Plaintiffs plead that Instructure's violation of Section 5 of the FTC Act and of the applicable state data-security statutes establishes the duty and breach elements of negligence. Section 5 creates an ascertainable standard of conduct as applied to custodians of sensitive personal information, and Plaintiffs — as Instructure's direct contracting customers whose data Instructure undertook to protect — are within the class of persons Section 5 was designed to protect and suffered the type of harm it was designed to prevent; and

f. Defendants also had a duty to safeguard the Data of Plaintiffs and Class Members and to promptly notify them of a breach pursuant to state statutes that require Instructure to reasonably safeguard sensitive Data.

186. Defendants also had common law duties to prevent foreseeable harm to Plaintiffs and Class Members. These duties existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices.

187. Instructure voluntarily solicited and accepted Plaintiffs' and/or Class Members' Data, even offering to host the Data with its business associates. Plaintiffs and Class Members relied upon Instructure to exercise its professional judgment to safeguard that Data from unauthorized access. Plaintiffs and Class Members relied on Instructure's misrepresentations as to information uniquely in the possession of Defendants. Defendants failed to correct such statements despite knowing of their falsity.

188. Defendants' duty to implement and maintain reasonable security measures also arose as a result of the special relationship that existed between Instructure, Plaintiffs, and Class Members. This special relationship arose because Plaintiffs and Class Members entrusted Instructure with their Data as part of the purchase of and subsequent use of services that Instructure offers as a major EdTech company. Defendants alone could have ensured that their security systems and data storage architecture were sufficient to prevent or minimize the Data Breach. The public interest will be furthered by imposing liability here as it will encourage similarly situated companies to implement reasonable and sufficient data security practices to ensure the protection of information entrusted to them. Public policy also recognizes that companies and agencies have legal and moral obligations to protect personal information with reasonable and appropriate safeguards.

189. Defendants were required to provide timely, adequate, and appropriate notification of the Data Breach to Plaintiffs and Class Members. As discussed above, Plaintiffs and Class Members needed timely and effective notice so they could take appropriate measures to prevent, mitigate, or ameliorate the damage caused by Defendants' misconduct.

190. Defendants breached these duties owed to Plaintiffs and Class Members, as described above, and thus were negligent.

191. Defendants knew that their computing systems and data storage were vulnerable to unauthorized access and targeting by hackers for the purpose of stealing and misusing the confidential Data.

192. Plaintiffs and Class Members were foreseeable victims of Defendants' inadequate data security practices and failure to implement agreed-upon protections.

193. Defendants' duty extended to protecting Plaintiffs and Class Members from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actors' own conduct or misconduct exposes another to risk or defeats protections put in place to guard against such risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B (1965). Defendants' failure to take proper security measures to protect the sensitive Data for Plaintiffs and Class Members created conditions conducive to a foreseeable, intentional act; namely, the unauthorized access of Plaintiffs' and Class Members' Data.

194. Instructure's negligence is demonstrated by its own sequential conduct during the 2026 Data Breach. Instructure detected unauthorized activity in Canvas on April 29, 2026, and revoked the intruder's access; it thereafter publicly represented that the incident had been contained and "resolved"; yet it failed to remediate the same Free-for-Teacher vulnerability that the intruder had exploited; and, as a direct result, the same threat actor re-exploited that identical vulnerability on May 7, 2026. Instructure's failure to remediate a known, exploited vulnerability during the window between the two intrusions was unreasonable and breached its duty of care.

195. Instructure's duty and the foreseeability of the Data Breach are further established by prior, actor-specific notice. In September 2025, the same threat actor, ShinyHunters, breached Instructure's systems through a social-engineering attack on its Salesforce environment. Although Instructure has characterized that Salesforce-related incident and the 2026 Canvas Data Breach as

"distinct events involving different systems and circumstances"—the former involving Instructure's Salesforce business systems and largely public business-contact information, and the latter involving the Canvas production platform, the Free-for-Teacher environment, and sensitive student and educator Private Information—the September 2025 breach nonetheless placed Instructure on actual notice that ShinyHunters was targeting it for the Data it maintained and that its security and access controls were inadequate.

196. Instructure's negligence lies not in the mere occurrence of the September 2025 breach, but in its failure to act reasonably on the notice that breach provided. Despite actual knowledge that ShinyHunters was specifically targeting it, Instructure failed, over the ensuing seven months, to remediate identified weaknesses, harden its access pathways, and implement reasonable safeguards. That failure to act on notice was a substantial factor in causing the foreseeable and preventable 2026 Data Breach.

197. Because Instructure had specific, actual notice of the threat from both the September 2025 Salesforce breach and its own April 29, 2026 detection of the intrusion, the 2026 Data Breach—and the May 7, 2026 recurrence through the same unremediated vulnerability—were foreseeable consequences of Instructure's own inaction rather than independent, intervening causes. The criminal conduct of ShinyHunters does not sever the causal chain, because Instructure created and failed to remediate the conditions that made the foreseeable criminal exploitation possible.

198. KKR is liable for its own conduct. Upon acquiring control of Instructure on November 13, 2024, in a $4.8 billion take-private transaction following approximately two years of due diligence, KKR assumed control over the composition of Instructure's board of directors and over Instructure's strategic direction, growth strategy, and capital allocation, as KKR has itself

publicly stated. KKR holds itself out as possessing specialized cybersecurity expertise and invests in cybersecurity as a distinct asset class.

199. KKR thereby undertook to render services to Instructure — the governance, risk-management, and capital-allocation oversight of Instructure's data security — that KKR knew or should have recognized were necessary for the protection of third persons, namely the Educational Institutions and the millions of students, parents, and educators whose sensitive personal information Instructure held. KKR is subject to liability for its failure to exercise reasonable care in that undertaking because its failure increased the risk of harm to those persons, and because Instructure and the Educational Institutions relied upon KKR's undertaking of that oversight function. See Restatement (Second) of Torts § 324A (1965).

200. KKR performed that undertaking unreasonably. KKR controlled Instructure's security budget and board composition throughout the period from the September 2025 ShinyHunters intrusion through the 2026 Canvas Data Breach — the precise window in which Instructure failed to remediate the access pathways that ShinyHunters later exploited. KKR took no reasonable steps, during that window and with actual or constructive knowledge of that intrusion, to require remediation, to fund adequate security, or to install oversight sufficient to ensure it.

201. In the alternative, Instructure operates as the alter ego and agent of KKR. KKR controls Instructure's board, directs its strategic and capital decisions, and operates Instructure's business, including Canvas, to further KKR's own private-investment purposes, such that the acts and omissions of Instructure described herein are attributable to KKR. The precise terms of KKR's post-closing governance of Instructure, the identity of KKR-designated directors, KKR's role in approving Instructure's information-security budget, the reporting of the September 2025 intrusion

to KKR and to the Instructure board, and any directives KKR issued concerning remediation are not publicly available, are exclusively within Defendants' knowledge, and are the subject of discovery.

**COUNT 2A**
**GROSS NEGLIGENCE**
**(On behalf of the Nationwide Class and, in the alternative, the Statewide Subclasses, against Instructure and KKR)**

202. Plaintiffs restate the factual allegations set forth in Paragraphs 1 through 201 above, as if set forth herein. Plaintiffs plead this Count in the alternative to Count 2.

203. Instructure's conduct went beyond ordinary negligence and constituted a conscious and reckless disregard of a known risk to the Educational Institutions and to the students, parents, and educators whose Data it held. Instructure knew, as of September 2025, that ShinyHunters had breached its systems. It knew, as of April 29, 2026, that ShinyHunters had breached Canvas and that the intrusion had been accomplished through the support-ticket functionality of its Free-for-Teacher environment. It nonetheless left that vulnerability unremediated, publicly represented to thousands of schools that the incident had been "resolved," and thereby invited those schools, their students, and their faculty to resume full reliance on Canvas during final examinations. Within one day, the same threat actor re-entered through the same vulnerability.

204. Instructure's representations that it maintained continuous monitoring, layered defenses, least-privilege access controls, encryption in transit and at rest, and SOC 2, ISO 27001, and NIST 800-53 conformity were made while Instructure knew or recklessly disregarded that those safeguards were not in place or were not effective. Instructure made those representations to induce Educational Institutions to purchase and renew Canvas subscriptions and to entrust it with sensitive student and educator information.

205. To the extent any Contract purports to cap, limit, exclude, or waive Instructure's liability for the damages sought herein, such provision is unenforceable as applied to Instructure's gross negligence, recklessness, and willful misconduct, and is further unenforceable as unconscionable, having been imposed on Plaintiffs and Class Members on a non-negotiable, take-it-or-leave-it basis by the drafter of those terms, and having the effect of leaving Plaintiffs and Class Members without any meaningful remedy for the compromise of the sensitive personal information of millions of children.

206. KKR acquired control over Instructure prior to the September 2025 breach and thereby controlled Instructure's security budget and board composition throughout the period from the September 2025 ShinyHunters intrusion through the 2026 Canvas Data Breach — the precise window in which Instructure failed to remediate the access pathways that ShinyHunters later exploited. KKR's failure to take any reasonable steps to require remediation, fund adequate security, or install oversight sufficient to ensure it constitutes a conscious and reckless disregard of a known risk to Educational Institutions, and to the students, parents, and educators whose Data it held.

207. In the alternative, Instructure operates as the alter ego and agent of KKR. KKR controls Instructure's board, directs its strategic and capital decisions, and operates Instructure's business, including Canvas, to further KKR's own private-investment purposes, such that the conscious and reckless disregard of known risks by Instructure described herein are attributable to KKR. The precise terms of KKR's post-closing governance of Instructure, the identity of KKR-designated directors, KKR's role in approving Instructure's information-security budget, the reporting of the September 2025 intrusion to KKR and to the Instructure board, and any directives

KKR issued concerning remediation are not publicly available, are exclusively within Defendants' knowledge, and are the subject of discovery.

**COUNT 3**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(On behalf of the Nationwide Class and, in the alternative, the Statewide Subclasses, against Instructure)**

208. Plaintiffs restate the factual allegations set forth in Paragraphs 1 through 207 above, as if set forth herein.

209. Utah law implies in every contract a covenant of good faith and fair dealing, which prohibits either party from intentionally or purposefully acting to destroy, injure, or impair the other party's right to receive the benefits of the contract's express terms. The covenant further requires parties vested with discretion in performing contractual obligations to exercise that discretion reasonably, honestly, in good faith, and consistent with the agreed common purpose and justified expectations of the contracting parties.

210. The Contracts between Plaintiffs, Class Members, and Instructure expressly and/or by necessary implication allocated to Instructure the responsibility to provide a secure and reliable educational platform capable of safeguarding sensitive student, educator, and institutional Data and maintaining reasonable operational continuity for educational functions conducted through Canvas, including compliance with industry-standard security practices, prompt detection and containment of security incidents, and timely notice to impacted parties. Data security, confidentiality, platform reliability, and responsible handling of Data were central purposes of the Contracts and encompassed Plaintiffs' and Class Members' justified contractual expectations material to their decision to utilize Canvas and entrust Instructure with extensive sensitive information and educational communications.

211. Instructure held sole discretion over what to tell Plaintiffs and Class Members about the Data Breach, when to tell them, and how much to disclose. Instructure was required to exercise that discretion reasonably, honestly, and in good faith. Instead, Instructure represented on May 6, 2026, that the incident had been "resolved" minutes after representing that its investigation was continuing; advised Educational Institutions that had not been contacted that it had "not found evidence that your data was involved" while simultaneously acknowledging that the investigation remained ongoing, leaving an unknown number of institutions unable to determine whether their Data had been compromised; and then serially postponed customer-specific notifications from "early next week" in June 2026 to the week of July 13, 2026, before halting delivery altogether because the notification platform Instructure selected "may have been subject to a security threat." Instructure exercised its disclosure discretion to manage its own reputational exposure rather than to permit Plaintiffs and Class Members to discharge their own legal and institutional obligations to affected students, parents, and employees.

212. Instructure's conduct was contrary to the parties' justified expectations, subverted the Contracts' core purposes of providing secure and reliable educational platform services, and unfairly interfered with Plaintiffs' and Class Members' rights to receive the Contracts' benefits.

213. As a direct and proximate result of Instructure's breaches of the implied covenant of good faith and fair dealing, Plaintiffs and Class Members suffered damages, including but not limited to overpayment for services that did not provide the level of security, reliability, and protection reasonably expected under the Contracts, costs associated with responding to the Data Breach and service disruptions, loss of the benefit of the bargain, reputational damages, and other economic and non-economic injuries.

**<u>COUNT 4</u>**
**UNJUST ENRICHMENT**
**(On behalf of the Nationwide Class and, in the alternative, the Statewide Subclasses, against Instructure and KKR)**

214. Plaintiffs restate the factual allegations set forth in Paragraphs 1 through 213 above, as if set forth herein.

215. Plaintiffs bring this claim on behalf of the Nationwide Class under Utah law, or in the alternative, on behalf of the Statewide Subclasses under the laws of their respective states.

216. KKR is not a party to the Contracts, and Plaintiffs therefore assert this Count against KKR directly.

217. Defendants received monetary benefits from Plaintiffs and Class Members in the form of payments made under the Contracts for software services that were supposed to include adequate cybersecurity protections.

218. Defendants knowingly accepted and retained those payments while failing to provide the full scope of services promised—specifically, by underdelivering or omitting contractually required cybersecurity measures.

219. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendants elected to increase their own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to their own profit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize their own profits over the requisite security and the safety of their Private Information.

220. Defendants' retention of these funds was unjust, as it resulted from material misrepresentations, omissions, and systemic concealment of material facts regarding the actual quality and security of the services provided.

221. Defendants were aware that part of the money paid to them by Plaintiffs and Class Members was intended to be applied to data security. Rather than appropriately funding their data security obligations, Defendants directed that money to their own profits.

222. As against Instructure, Plaintiffs plead this Count in the alternative to Count 1, and specifically in the event that the Contracts are determined to be unenforceable in whole or in part, or that any provision of the Contracts purporting to limit, cap, or exclude damages is enforced so as to deprive Plaintiffs and Class Members of an adequate remedy at law.

223. Under principles of equity and good conscience, Defendants should not be permitted to retain the financial benefits wrongfully obtained through their deceptive and wrongful conduct.

224. As a direct and proximate result, Plaintiffs and Class Members have suffered economic harm and are entitled to restitution in an amount to be determined at trial.

## COUNT 5
## DECLARATORY AND INJUNCTIVE RELIEF
28 U.S.C. § 2201 et seq.
**(On behalf of the Nationwide Class and, in the alternative, the Statewide Subclasses, against Instructure and KKR)**

225. Plaintiffs restate the factual allegations set forth in Paragraphs 1 through 224 above, as if set forth herein.

226. Under the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. The Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the Contracts and the common law.

227. An actual controversy has arisen in the wake of the Data Breach regarding Instructure's present and prospective contractual duties, and Defendants' present and prospective common-law duties, to reasonably safeguard customer Data, and regarding Defendants' failure to maintain data-security measures that effectively protect Plaintiffs and Class Members from further breaches compromising their Data. Plaintiffs and the Class continue to suffer injury as a result of the compromise of their Data and remain at imminent risk of future compromises given the nature and quantity of the Data stored by Instructure and Defendants' repeated failure to maintain adequate data-security measures at Instructure, resulting in the Data Breach described herein. The scope of prospective relief is informed, at a minimum, by Instructure's own reported figures of more than 30 million active users and approximately 9,000 institutions, independent of the larger figures claimed by ShinyHunters.

228. Plaintiffs and Class Members face an ongoing and prospective risk of future injury from Instructure's continuing data-security practices. Plaintiffs' and Class Members' Data remains in Instructure's custody, including the historical and former-user records Instructure retained and failed to delete. Instructure continues to operate Canvas as the platform of record for Plaintiffs and Class Members, and Plaintiffs intend to continue using Canvas or will be required to do so pending migration. Instructure has declined to recommend "broad new customer-side remediation," has not disclosed what measures it has implemented, and has twice represented that remediation was complete when it was not. Absent injunctive relief requiring Instructure to implement and maintain security measures consistent with law and industry standards, and to verify that implementation, Plaintiffs and Class Members remain at substantial risk of a further compromise of the Data that Instructure continues to hold.

229. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owe a legal duty to secure Educational Institutions' Data at Instructure and to timely notify Educational Institutions of a data breach under the common law and their Contracts with the Educational Institutions;

b. Defendants continue to breach this legal duty by failing to employ reasonable measures to secure Educational Institutions' Data at Instructure; and

c. As a result of Defendants' ongoing breach of this legal duty, Plaintiffs and Class Members remain subject to continuing and imminent risk of, among other things, extortion demands and further proceedings arising from the compromise of their Data.

230. The Court also should issue corresponding prospective injunctive relief requiring Instructure to employ proper security protocols consistent with law and industry standards to protect Educational Institutions' Data.

231. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at Instructure. The risk of another such breach is real, immediate, and substantial. If another breach at Instructure occurs, Plaintiffs and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

232. The hardship to Plaintiffs and the Class if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Among other things, if another massive data breach occurs at Instructure, Plaintiffs and Class Members will likely be subjected to extortion demands, further proceedings, and other damage. On the other hand, the cost to Defendants of

complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants already have a pre-existing legal and contractual obligation to employ such measures.

233. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Instructure, thus eliminating the additional injuries that would result to Plaintiffs and Class Members.

**PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of all Class Members of the proposed Nationwide Class and/or Statewide Subclasses, respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendants as follows:

A. Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and appoint Plaintiffs' counsel as class counsel pursuant to Rule 23(g);

B. Award permanent injunctive relief to protect the highly sensitive information of Plaintiffs and Class Members;

C. Award Plaintiffs and Class Members compensatory, general, and nominal damages in an amount to be determined at trial;

D. Order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

E. Award statutory, treble, punitive, and/or exemplary damages to the extent permitted by law;

F. Grant Plaintiffs and the Classes the declaratory and injunctive relief sought in Count 5;

G. Award Plaintiffs the costs and disbursements of this action, together with reasonable attorneys' fees, costs, and expenses;

H. Award pre- and post-judgment interest at the maximum rate permitted by law; and

I. Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all claims so triable.

Dated: October 8, 2026

Respectfully submitted,

*/s/ Jason L. Lichtman*

Jason L. Lichtman (USB 18770)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013
Tel.: (212) 355-9500
jlichtman@lchb.com

*Member of Educational Institution Class Executive Committee and Counsel for Plaintiffs*

James E. Cecchi
**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel.: (973) 994-1700
Email: jcecchi@carellabyrne.com

*Lead Counsel for the Proposed Educational Institution Class and Counsel for Plaintiffs*

Charles H. Thronson (USB 3260)
**PARSONS BEHLE & LATIMER**
201 S. Main, Suite 1800
Salt Lake City, Utah 84111
Tel: (801) 532-1234
cthronson@parsonsbehle.com

*Liaison Counsel for the Proposed Educational Institution Class and Counsel for Plaintiffs*

Kristen Lake Cardoso
**KOPELOWITZ OSTROW, P.A.**
One W. Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Tel: (954) 525-4100
cardoso@kolawyers.com

Casondra Turner
**MILBERG PLLC**
260 Peachtree Street NW, Suite 2200
Atlanta, Georgia 30303
Tel.: (771) 772-3086
cturner@milberg.com

William Shinoff
**FRANTZ LAW GROUP, APLC**
402 W. Broadway
San Diego, California 92101
Tel: (855) 735-5945
Email: wshinoff@frantzlawgroup.com

Tyler S. Graden
**KESSLER TOPAZ MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, Pennsylvania 19087
Tel: (610) 667-7706
tgraden@ktmc.com

Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel.: (816) 714-7100
siegel@stuevesiegel.com

*Members of Educational Institution Class Executive Committee and Counsel for Plaintiffs*