Devin S. Anderson (18287)
Michael S. Lehr (16496)
KIRKLAND & ELLIS LLP
95 South State Street
Salt Lake City, Utah 84111
Telephone: (801) 877-8134
Facsimile: (801) 877-8101
devin.anderson@kirkland.com
mike.lehr@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
martin.roth@kirkland.com

Cristina M. Squiers (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, Texas 75205
Telephone: (214) 972-1770
Facsimile: (214) 972-1771
cristina.squiers@kirkland.com

*Attorneys for Defendants Instructure, Inc. and Instructure Holdings, Inc.*

---

**UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH**

| | |
|---|---|
| **IN RE: INSTRUCTURE DATA BREACH LITIGATION**<br><br>*This document relates to Track 1* | Case No. 2:26-cv-00374-RJS-CMR<br><br>**INSTRUCTURE'S MOTION TO DISMISS PLAINTIFFS' TRACK 1 CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>District Judge Robert J. Shelby<br><br>Chief Magistrate Judge Cecilia M. Romero |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ... 1

BACKGROUND ... 2

A. Instructure and Canvas ... 2

B. The Cyberattack and Instructure's Response ... 2

C. This Litigation ... 4

LEGAL STANDARDS ... 5

ARGUMENT ... 6

I. Plaintiffs Lack Article III Standing ... 6

A. Facial Challenge: Plaintiffs Fail to Establish Standing ... 6

B. Factual Challenge: Plaintiffs Cannot Establish Standing. ... 20

II. Choice of Law ... 23

III. Plaintiffs' Negligence and Negligence Per Se Claims Fail (Counts I, II) ... 24

A. Plaintiffs Fail to State a Negligence Claim (Count I). ... 24

B. Plaintiffs Fail to State a Negligence Per Se Claim (Count II). ... 26

C. The Economic Loss Rule Bars Both Negligence Claims. ... 28

IV. Plaintiffs' Fiduciary Duty Claim Fails (Count III) ... 29

V. Plaintiffs' California Constitutional Privacy Claim Fails (Count X) ... 30

VI. Plaintiffs' Breach of Implied Contract Claim Fails (Count IV) ... 31

VII. Plaintiffs' Unjust Enrichment Claim Fails (Count V) ... 32

VIII. Plaintiffs' State Statutory Claims Fail (Counts VI–IX, XI–XIV) ... 33

A. Utah Consumer Sales Practices Act (Count VI). ... 33

B. California Unfair Competition Law (Count VII). ... 34

C. California Consumers Legal Remedies Act (Count VIII). ... 36

D. California Consumer Privacy Act (Count IX). ........................................ 36

E. Michigan Consumer Protection Act (Count XI). ...................................... 38

F. Minnesota Consumer Fraud Act (Count XII). .......................................... 39

G. Minnesota Uniform Deceptive Trade Practices Act (Count XIII). ........... 39

H. New York General Business Law § 349 (Count XIV). ............................ 40

CONCLUSION ........................................................................................................ 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Accellion, Inc. Data Breach Litig.*,
713 F. Supp. 3d 623 (N.D. Cal. 2024) ....................30, 37

*Aclys Int'l v. Equifax*,438 F. App'x 689 (10th Cir. 2011) ....................28, 29

*In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*,
2021 WL 5937742 (D.N.J. Dec. 16, 2021) ....................38

*Am. Nat'l Fire Ins. Co. v. Farmers Ins. Exch.*,
927 P.2d 186 (Utah 1996) ....................23

*In re Ambry Genetics Data Breach Litig.*,
567 F. Supp. 3d 1130 (C.D. Cal. 2021) ....................29

*Anderson v. Hannaford Bros. Co.*,
659 F.3d 151 (1st Cir. 2011) ....................29

*Andreason v. Felsted*,
2006 UT App 188, 137 P.3d 1 ....................33

*In re Arthur J. Gallagher Data Breach Litig.*,
631 F. Supp. 3d 573 (N.D. Ill. 2022) ....................31, 32

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................6

*Attias v. CareFirst, Inc.*,
344 F.R.D. 38 (D.D.C. 2023) ....................12

*Attias v. CareFirst, Inc.*,
365 F. Supp. 3d 1 (D.D.C. 2019) ....................25, 26

*Bass v. Facebook, Inc.*,
394 F. Supp. 3d 1024 (N.D. Cal. 2019) ....................34

*Bear v. LifeMap Assur. Co.*,
2021 UT App 129, 503 P.3d 507 ....................31

*Beck v. McDonald*,
848 F.3d 262 (4th Cir. 2017) ....................8, 19, 20

*Bellwether Cmty. Credit Union v. Chipotle Mexican Grill, Inc.*,
353 F. Supp. 3d 1070 (D. Colo. 2018) ....................28

*Bhatia v. 3M Co.*,
323 F. Supp. 3d 1082 (D. Minn. 2018).....39

*In re Blackbaud, Inc., Customer Data Breach Litig.*,
567 F. Supp. 3d 667 (D.S.C. 2021).....27

*Blood v. Labette Cnty. Med. Ctr.*,2022 WL 11745549 (D. Kan. Oct. 20, 2022).....9, 10

*BMF Advance, LLC v. Litiscape, LLC*,
637 F. Supp. 3d 1272 (D. Utah 2022).....28, 29

*Bower v. Stein Eriksen Lodge Owners Ass'n*,
201 F. Supp. 2d 1134 (D. Utah 2002).....29

*Bracy v. Americold Logistics LLC*,2025 WL 552676 (N.D. Ga. Feb. 19, 2025).....27

*Bronson v. Swensen*,
500 F.3d 1099 (10th Cir. 2007).....6

*Brooks v. Peoples Bank*,
732 F. Supp. 3d 765 (S.D. Ohio 2024).....27, 29, 32

*C.C. v. Med-Data Inc.*,
2022 WL 970862 (D. Kan. Mar. 31, 2022).....10, 13

*In re Cap. One Consumer Data Sec. Breach Litig.*,
488 F. Supp. 3d 374 (E.D. Va. 2020).....27

*Carlton v. Brown*,
323 P.3d 571 (Utah 2014).....25

*Carr v. Okla. Student Loan Auth.*,
699 F. Supp. 3d 1241 (W.D. Okla. 2023).....17, 24

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983).....19

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)..... *passim*

*Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*,887 F.3d 803 (7th Cir. 2018).....28

*Colosimo v. Gateway Cmty. Church*,
2018 UT 26, 424 P.3d 866.....26, 27

*Cope v. Utah Valley State Coll.*,
2014 UT 53, 342 P.3d 243.....24, 26

*Cotte v. CVI SGP Acquisition Tr.*,
2022 WL 464307 (D. Utah Feb. 15, 2022) ....................33

*Daniel v. Nat'l Park Serv.*,
891 F.3d 762 (9th Cir. 2018) ....................9

*Desert Miriah, Inc. v. B & L Auto, Inc.*,
2000 UT 83, 12 P.3d 580 ....................32

*Doe v. Conceptions Reprod. Assocs., Inc.*,
2026 WL 1145600 (D. Colo. Apr. 28, 2026) ....................25, 26, 27

*Dugas v. Starwood Hotels & Resorts Worldwide, Inc.*,
2016 WL 6523428 (S.D. Cal. Nov. 3, 2016) ....................34

*Durgan v. U-Haul Int'l Inc.*,
2023 WL 12140653 (D. Ariz. July 28, 2023) ....................32

*E-Shops Corp. v. U.S. Bank Nat'l Ass'n*,
678 F.3d 659 (8th Cir. 2012) ....................39, 40

*Elias v. Hewlett-Packard Co.*,
903 F. Supp. 2d 843 (N.D. Cal. 2012) ....................36

*Estrada v. TaskUs, Inc.*,
2026 WL 2169907 (S.D.N.Y. July 28, 2026) ....................37

*F.S. v. Captify Health, Inc.*,
2024 WL 1282437 (D. Kan. Mar. 26, 2024) ....................18

*Fan v. Home Depot U.S.A., Inc.*,
2022 WL 16964099 (E.D. Cal. Nov. 15, 2022) ....................34

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ....................6, 7

*First Sec. Bank of Utah N.A. v. Banberry Dev. Corp.*,
786 P.2d 1326 (Utah 1990) ....................29

*Gardiner v. Walmart Inc.*,
2021 WL 2520103 (N.D. Cal. Mar. 5, 2021) ....................38

*Golden v. Sound Inpatient Physicians Med. Grp., Inc.*,
93 F. Supp. 3d 1171 (E.D. Cal. 2015) ....................35

*Goshen v. Mut. Life Ins. Co. of N.Y.*,
98 N.Y.2d 314 (2002) ....................40

*Griffey v. Magellan Health Inc.*,
562 F. Supp. 3d 34 (D. Ariz. 2021) ....................25

*Hadley v. Kellogg Sales Co.*,
243 F. Supp. 3d 1074 (N.D. Cal. 2017) ....................35

*HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*,
208 F. Supp. 3d 1193 (D. Utah 2016)....................28, 29

*Heideman v. Washington City*,
2007 UT App 11, 155 P.3d 900 ....................31

*Henderson v. Reventics, LLC*,
2024 WL 5241386 (D. Colo. Sept. 30, 2024).................... *passim*

*Hendricks v. DSW Shoe Warehouse, Inc.*,
444 F. Supp. 2d 775 (W.D. Mich. 2006) ....................39

*Hermansen v. Tasulis*,
2002 UT 52, 48 P.3d 235 ....................28

*Hernandez-Silva v. Instructure, Inc.*,
2025 WL 2233210 (C.D. Cal. Aug. 4, 2025)....................34

*Hill v. Nat'l Collegiate Athletic Ass'n*,
7 Cal. 4th 1 (1994) ....................30

*Holmes v. Am. States Ins. Co.*,
2000 UT App 85, 1 P.3d 552 ....................33

*Holmes v. Elephant Ins. Co.*,
156 F.4th 413 (4th Cir. 2025), *cert. dismissed*, 146 S. Ct. 2549 (2026)....................9

*Holt v. United States*,
46 F.3d 1000 (10th Cir. 1995) ....................2, 6, 20

*In re iPhone Application Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012) ....................30

*J.M. v. Illuminate Educ., Inc.*,
19 Cal. 5th 705 (2026) ....................35

*Jacobsen v. Deseret Book Co.*,
287 F.3d 936 (10th Cir. 2002) ....................2

*Jenkins v. Assoc. Wholesale Grocers, Inc.*,
2025 WL 708574 (D. Kan. Mar. 5, 2025) .................... *passim*

*Jimenez v. OE Fed. Credit Union*,
2025 WL 2402137 (N.D. Cal. Aug. 19, 2025) ....................37

*Karter v. Epiq Sys., Inc.*,
2021 WL 4353274 (C.D. Cal. July 16, 2021)....................37

*Keown v. Int'l Ass'n of Sheet Metal Air Rail Transp. Workers*,
2024 WL 4239936 (D.D.C. Sept. 19, 2024) ....................27

*Kim v. McDonald's USA, LLC*,
2022 WL 4482826 (N.D. Ill. Sept. 27, 2022) ....................12

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
313 U.S. 487 (1941)....................23

*Legg v. Leaders Life Ins. Co.*,
574 F. Supp. 3d 985 (W.D. Okla. 2021) .................... *passim*

*Los Alamos Study Grp. v. U.S. Dep't of Energy*,
692 F.3d 1057 (10th Cir. 2012) ....................6

*Low v. LinkedIn Corp.*,
900 F. Supp. 2d 1010 (N.D. Cal. 2012) ....................30

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................7, 19, 20

*Malinowski v. Int'l Bus. Machs. Corp.*,
2025 WL 965812 (S.D.N.Y. Mar. 31, 2025) ....................8

*Martinez v. Best Buy Co.*,
2012 UT App 186, 283 P.3d 521 ....................33

*Maser v. CommonSpirit Health*,
2024 WL 2863579 (D. Colo. Apr. 16, 2024)....................12, 13

*Masterson v. IMA Fin. Grp., Inc.*,
2023 WL 8647157 (D. Kan. Dec. 14, 2023)....................14, 18

*McCombs v. Delta Grp. Elecs., Inc.*,
676 F. Supp. 3d 1064 (D.N.M. 2023) ....................9

*McMorris v. Carlos Lopez & Assocs., LLC*,995 F.3d 295 (2d Cir. 2021)....................10, 11, 12, 21

*In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*,
603 F. Supp. 3d 1183 (S.D. Fla. 2022) ....................23, 27, 29

*Mgaresh v. Va. Union Univ.*,
2025 WL 641432 (E.D. Va. Feb. 27, 2025)....................29

*Mitchell v. Wells Fargo Bank*,
355 F. Supp. 3d 1136 (D. Utah 2018)....................21, 26, 27

*In re MOVEit Customer Data Sec. Breach Litig.*,
2025 WL 2176590 (D. Mass. July 31, 2025)....................17, 36, 38, 40

*In re MOVEit Customer Data Sec. Breach Litig.*,
2025 WL 2179475 (D. Mass. July 31, 2025)....................37, 39

*Muscogee (Creek) Nation v. Okla. Tax Comm'n*,
611 F.3d 1222 (10th Cir. 2010) ....................5

*In re NCB Mgmt. Servs., Inc. Data Breach Litig.*,
748 F. Supp. 3d 262 (E.D. Pa. 2024) ....................37

*New Mexico ex rel. Balderas v. Google, LLC*,
489 F. Supp. 3d 1254 (D.N.M. 2020) ....................2

*Owen-Brooks v. DISH Network Corp.*,
2024 WL 4338133 (D. Colo. Aug. 23, 2024) ....................9

*In re Packaged Ice Antitrust Litig.*,
779 F. Supp. 2d 642 (E.D. Mich. 2011)....................39

*Paskenta Enters. Corp. v. Cottle*,
2018 WL 522322 (D. Utah Jan. 22, 2018)....................24

*Patterson v. Assoc. Wholesale Grocers, Inc.*,
2026 WL 395115 (D. Kan. Feb. 12, 2026) .................... *passim*

*Peterson v. Cellco P'ship*,
164 Cal. App. 4th 1583 (2008) ....................34

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985)....................24

*In re PowerSchool Holdings, Inc. & PowerSchool Grp., LLC Customer Sec. Breach Litig.*,
2026 WL 817637 (S.D. Cal. Mar. 19, 2026) ....................33

*Prestby v. A&A Servs., LLC*,
2026 WL 26128 (D. Neb. Jan. 5, 2026)....................30

*In re Progressive Leasing Breach Litig.*,
2025 WL 213744 (D. Utah Jan. 16, 2025)....................17, 19, 20

*Pruchnicki v. Envision Healthcare Corp.*,
439 F. Supp. 3d 1226 (D. Nev. 2020), *aff'd*, 845 F. App'x 613 (9th Cir. 2021)....................25, 32

*Reilly v. Ceridian Corp.*,
664 F.3d 38 (3d Cir. 2011)....19

*Retzolff v. Jacobs Ent., Inc.*,
2026 WL 2819774 (D. Colo. Sept. 21, 2026)....9, 32

*Rocky Mountain Helicopters, Inc. v. Bell Helicopter Textron, Inc.*,
24 F.3d 125 (10th Cir. 1994)....23

*Ruiz v. Gap, Inc.*,
380 F. App'x 689 (9th Cir. 2010)....30

*Ruiz v. McDonnell*,
299 F.3d 1173 (10th Cir. 2002)....5

*In re Samsung Data Sec. Breach Litig.*,
761 F. Supp. 3d 781 (D.N.J. 2025)....12

*Santos-Pagán v. Bayamón Med. Ctr.*,
178 F.4th 66 (1st Cir. 2026)....9

*In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*,
45 F. Supp. 3d 14 (D.D.C. 2014)....14

*Sec. Sys., Inc. v. Alder Holdings, LLC*,
421 F. Supp. 3d 1186 (D. Utah 2019)....32

*SELCO Cmty. Credit Union v. Noodles & Co.*,
267 F. Supp. 3d 1288 (D. Colo. 2017)....28

*Silverpop Sys., Inc. v. Leading Mkt. Techs., Inc.*,641 F. App'x 849 (11th Cir.
2016)....28

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020)....34

*Sovereign Bank v. BJ's Wholesale Club, Inc.*,533 F.3d 162 (3d Cir. 2008)....28

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)....7, 14, 18

*Stephens v. Availity, L.L.C.*,
2019 WL 13041330 (M.D. Fla. Oct. 1, 2019)....30

*Stern v. Acad. Mortg. Corp.*,
2025 WL 239036 (D. Utah Jan. 17, 2025)....7, 10, 26

*Stern v. Acad. Mortg. Corp.*,
2025 WL 2852171 (D. Utah Oct. 8, 2025)....23, 26, 32

*Stutman v. Chem. Bank*,
95 N.Y.2d 24 (2000) .....40

*In re SuperValu, Inc.*,
870 F.3d 763 (8th Cir. 2017) .....19

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014).....7, 25

*Tandy v. City of Wichita*,
380 F.3d 1277 (10th Cir. 2004) .....7

*In re Target Corp. Data Sec. Breach Litig.*,
66 F. Supp. 3d 1154 (D. Minn. 2014).....23, 28

*Terpin v. AT&T Mobility LLC*,118 F.4th 1102 (9th Cir. 2024) .....28

*Theys v. Dental Intel., Inc.*,
2026 WL 636743 (N.D. Ill. Mar. 6, 2026).....32

*In re TJX Cos. Retail Sec. Breach Litig.*,564 F.3d 489 (1st Cir. 2009) .....28

*Toretto v. Donnelley Fin. Sols., Inc.*,
583 F. Supp. 3d 570 (S.D.N.Y. 2022).....27

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)..... *passim*

*Tsao v. Captiva MVP Rest. Partners, LLC*,
986 F.3d 1332 (11th Cir. 2021) .....19

*In re U.S. Vision Data Breach Litig.*,
732 F. Supp. 3d 369 (D.N.J. 2024) .....30, 31, 32

*Watkins v. MGA Ent., Inc.*,
550 F. Supp. 3d 815 (N.D. Cal. 2021) .....36

*Webb v. Injured Workers Pharmacy, LLC*,
72 F.4th 365 (1st Cir. 2023).....20

*Weisenberger v. Ameritas Mut. Holding Co.*,
597 F. Supp. 3d 1351 (D. Neb. 2022).....30

*Welborn v. IRS*,
218 F. Supp. 3d 64 (D.D.C. 2016).....15

*Yankovich v. Applus Techs., Inc.*,
621 F. Supp. 3d 269 (D. Conn. 2022).....12

*Young v. Colo. Dep't of Corr.*,
94 F.4th 1242 (10th Cir. 2024) ....7

*In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*,
601 F. Supp. 3d 625 (C.D. Cal. 2022) ....36, 38, 39

**Statutes**

15 U.S.C. § 45....26, 27, 35

15 U.S.C. §§ 6501–6506....26

15 U.S.C. §§ 6801–6809....27

Cal. Bus. & Prof. Code § 17200....34

Cal. Bus. & Prof. Code § 22584....35

Cal. Civ. Code § 1770....36

Cal. Civ. Code §§ 1798.80–.84....35

Cal. Civ. Code § 1798.81.5....35, 37

Cal. Civ. Code § 1798.140....36

Cal. Civ. Code § 1798.150....36, 37

Mich. Comp. Laws § 445.902....38

Minn. Stat. § 325D.45....39

Minn. Stat. § 325F.69....39

N.Y. Gen. Bus. Law § 349....40

Utah Code § 13-11-3....33

Utah Code § 13-11-19....34

Utah Code § 13-44-102....21

**Rules**

Fed. R. Civ. P. 9....39

Fed. R. Civ. P. 12....2, 5, 6, 20

**Other Authorities**

16 C.F.R. pt. 312 .....35

Restatement (Second) of Conflict of Laws § 145 (1971) .....23

Restatement (Second) of Conflict of Laws § 188 (1971) .....23

Restatement (Second) of Conflict of Laws § 221 (1971) .....23

Restatement (Second) of Contracts § 353 (1981) .....32

Restatement (Second) of Torts § 286 (1965) .....26

Restatement (Second) of Torts § 288 (1965) .....26

Restatement (Second) of Torts § 652B (1977) .....17

Restatement (Second) of Torts § 652D (1977) .....16

## INTRODUCTION

In April 2026, an international criminal organization known as ShinyHunters used a novel AI technique to attack Instructure, the company behind the Canvas learning platform used by schools across the country. Instructure expelled the threat actor, called in expert responders, and told the public two days after detection. To ensure the return and deletion of data the threat actor had stolen to extort Instructure, Instructure also made the difficult decision to pay a ransom. Plaintiffs, who used Canvas only because their schools contracted with Instructure, filed this lawsuit that blames Instructure for ShinyHunters' crime.

Missing, however, are any allegations that these plaintiffs have experienced an actual, felt harm arising from the cyberattack on Instructure. Nor could plaintiffs make such allegations. Several plaintiffs had no data taken by the threat actor at all. As for the rest, most had only non-sensitive contact and education information of the sort that is widely shared. Only two had sensitive information, and there is no evidence that they face any risk of imminent harm from an attack designed to extort Instructure. Plaintiffs' lawsuit instead rests on the premise that the theft of information alone in a cyberattack on a defendant necessarily gives rise to a cognizable injury. That is not the law. Without a cognizable injury and a causal connection, plaintiffs lack standing as a facial and factual matter, and their claims must be dismissed. Plaintiffs' claims also fail for various other reasons specific to each claim.

Instructure takes the cyberattack seriously and has strengthened its already robust defenses since. But the law does not make one victim of a crime the guarantor against every speculative harm a criminal might someday cause to other victims. The Court should dismiss the complaint.

## BACKGROUND[1]

### A. Instructure and Canvas

Instructure is an education-technology company that offers the premier learning management system, Canvas, to K-12 schools, colleges, and universities. Class Action Compl., Track 1 ("Compl.") ¶ 308, Dkt. No. 180. Canvas allows these institutions to manage their educational records and meet their educational objectives. *Id.* Students and teachers use Canvas because their institutions license it and require its use. *Id.* ¶¶ 43, 313, 411. Customer data security is a central pillar of Instructure's mission to "empower[] educators and learners to thrive in an increasingly complex, technology-driven world." Ex. 2, *Instructure Strengthens Commitment to a Secure, Trusted Learning Experience with Renewal of ISO 27001, SOC 2 Type II, and PCI DSS 4.0.1 Certifications*, Instructure (Dec. 9, 2025) (cited in Compl. ¶¶ 15 n.8, 33 n.16).

### B. The Cyberattack and Instructure's Response

The cyberattack at issue was perpetrated by "ShinyHunters," Compl. ¶¶ 5, 392, known for large-scale cyberattacks on leading companies across many sectors, *see id.* ¶¶ 5, 392, 490; Ex. 3, *Incident Fact Sheet* 1, Instructure (May 13, 2026) (cited in Compl. ¶ 390 n.102). Indeed, ShinyHunters has reportedly breached even the Federal Bureau of Investigation. *See* Ex. 4, *FBI Statement on Compromise of fbijobs.gov Portal and Alleged Impact to FBI Employee PII*, FBI

[1] For purposes of Instructure's facial standing challenge and its Rule 12(b)(6) motion, this section draws on the complaint and documents it incorporates by reference, which the Court may consider because they are "central to the plaintiff[s'] claim and the parties do not dispute the documents' authenticity." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002). This section also cites a government website, of which the court may take judicial notice. *See New Mexico ex rel. Balderas v. Google, LLC*, 489 F. Supp. 3d 1254, 1257 (D.N.M. 2020). For online materials cited in the complaint, Instructure omits URLs and cites the complaint paragraph where each URL appears. Facts drawn from the Declaration of Zach Pendleton (Ex. 1) ("Pendleton Decl.") are offered solely in support of Instructure's factual standing challenge under Rule 12(b)(1), for which the Court may consider evidence outside the pleadings. *See Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995).

National Press Office (Sept. 23, 2026), https://www.fbi.gov/news/press-releases/fbi-statement-on-compromise-of-fbijobsgov-portal-and-alleged-impact-to-fbi-employee-pii [https://perma.cc/ZA6R-QR3E].

ShinyHunters attacked Instructure by using a novel AI technique and submitting a customer-support ticket—a request for technical help—containing hidden malicious code. *See* Compl. ¶ 386. When a customer-support agent opened the ticket to review and route the request (as is standard protocol for handling such tickets), the malicious code automatically employed cross-site scripting to obtain unauthorized access. *Id.* ¶¶ 12, 386.

On April 29, 2026, Instructure detected the intrusion, promptly revoked the attacker's access, brought in outside forensic experts, commenced an internal investigation, and worked with law enforcement. Ex. 3, *Incident Fact Sheet*, *supra*, at 1; Ex. 5, Lawrence Abrams, *Instructure Confirms Data Breach, ShinyHunters Claims Attack*, BleepingComputer (May 3, 2026) (cited in Compl. ¶ 392 n.104); Compl. ¶ 388. On May 1, Instructure disclosed the breach to the public. Compl. ¶ 389.

The information involved in the cyberattack was limited to basic account and course information—names, email addresses, user identifiers, login and time-zone data, course, enrollment, group, and section information—and messages Canvas users had exchanged through Canvas's in-platform messaging, such as messages between students and instructors. Pendleton Decl. ¶¶ 5, 9; Compl. ¶ 4. A sample of the stolen data ShinyHunters shared with reporters "did not contain passwords or the other types of data that Instructure said was unaffected by the breach." Ex. 6, Lorenzo Franceschi-Bicchierai, *Hackers Steal Students' Data During Breach at Education Tech Giant Instructure*, TechCrunch (May 5, 2026) (cited in Compl. ¶ 394 n.106).

On May 7, ShinyHunters attacked again and made changes to the pages that appeared when some students and teachers were logged into Canvas. Compl. ¶¶ 9, 386. Instructure detected and disabled this second attack approximately *10 minutes* after it began. Ex. 3, *Incident Fact Sheet*, *supra*, at 1. No additional data was accessed or exfiltrated during this event. *Id.* Instructure temporarily placed Canvas in maintenance mode while it responded, and basic service was restored that night. *See* Ex. 7, *Instructure Security Incident*, Troy Univ. Info. Tech. (May 8, 2026 update) (cited in Compl. ¶ 487 n.128); *see also* Compl. ¶¶ 175, 270, 414–15.

On May 11, Instructure paid a ransom to ShinyHunters and the stolen data was returned. Instructure received confirmation that any remaining copies had been destroyed, and the attacker gave assurance that no Instructure customer would be extorted. Compl. ¶ 488 & nn.131–32.

**C. This Litigation**

Plaintiffs' counsel did not wait to learn what had happened and who, if anyone, had actually been impacted by the cyberattack. The first lawsuit was filed just six days after Instructure detected the intrusion and four days after it disclosed the attack. *See* Dkt. 20 at 2. The various actions have now been consolidated and are brought on behalf of three groups: (1) individual Canvas users (Track 1), (2) school districts and educational institutions (Track 2), and (3) teachers and educators who used Canvas Free-for-Teacher accounts (Track 3). Dkts. 180, 185, 184.

Track 1 plaintiffs filed the operative complaint on behalf of 27 named plaintiffs, asserting 14 causes of action: five common-law claims and nine statutory and constitutional claims under the laws of Utah, California, Michigan, Minnesota, and New York. Compl. ¶¶ 528–645. Each rests on the same generic theory that Instructure failed to implement adequate security measures to prevent the cyberattack. *Id.* ¶¶ 1–2. The complaint says little about the individual plaintiffs. Fifteen do not allege their information has been misused in any way. *Id.* ¶¶ 78–86 (Clark), 97–104 (Darnell), 105–12 (Delagarza), 113–20 (Gabrich), 157–63 (Mockert), 164–70 (Parker), 198–205

(Bowler), 230–35 (P.E.), 236–43 (N.M.), 244–52 (E.H.), 253–58 (A.N.), 259–66 (G.S.), 267–75 (J.U.), 276–80 (K.I.), 281–85 (M.I.). Four allege unauthorized logins, charges, or credit alerts on existing financial accounts. *Id.* ¶¶ 93–94 (Coelho), 144 (Large), 155 (Miceli), 213 (Brock). No plaintiff explains how the account and course information involved in the cyberattack enabled unauthorized financial activity. The remaining allegations generically reference increased spam calls, texts, and emails and a handful of scam and extortion messages. *Id.* ¶¶ 75, 92, 125, 134, 143, 145–47, 177, 186, 195, 212, 220, 227. The complaint identifies no named plaintiff whose information appeared in the sample of data ShinyHunters shared with reporters or in a dark-web posting. *Id.* ¶¶ 291, 394.

In connection with this motion, Instructure determined that eight named plaintiffs had no data involved in the cyberattack; only two had messages containing potentially reportable personal information; and the remaining 17 had only account and course information involved, along with, for some, messages that contained no potentially reportable personal information. Pendleton Decl. ¶¶ 8, 10–13. Nor has any plaintiff's data been posted on the dark web. *Id.* ¶ 15.

## LEGAL STANDARDS[2]

Rule 12(b)(1) authorizes dismissal for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). A Rule 12(b)(1) motion may take the form of "(1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based." *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002). On a facial challenge, the Court accepts "well-pleaded factual allegations as true," but need not accept "unsupported conclusory allegations." *Muscogee (Creek) Nation v. Okla. Tax*

[2] Unless otherwise noted, all emphasis is added and all internal quotation marks, alterations, footnotes, and citations are omitted.

*Comm'n*, 611 F.3d 1222, 1227 (10th Cir. 2010). On a factual challenge, the Court "may not presume the truthfulness of the complaint's factual allegations," and instead "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995). The Court "may weigh the evidence and make factual findings," *Los Alamos Study Grp. v. U.S. Dep't of Energy*, 692 F.3d 1057, 1063 (10th Cir. 2012), without converting the motion into one for summary judgment, *Holt*, 46 F.3d at 1002–03.

Rule 12(b)(6) authorizes dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Facts "merely consistent with" liability fall short of "the line between possibility and plausibility of entitlement to relief." *Id.*

## ARGUMENT

### I. Plaintiffs Lack Article III Standing

No plaintiff has standing to maintain this lawsuit. To establish Article III standing, a plaintiff must show that (1) she "has suffered or likely will suffer an injury in fact," (2) "the injury likely was caused or will be caused by the defendant," and (3) "the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). "Each plaintiff must have standing to seek each form of relief in each claim." *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007). Plaintiffs satisfy none of these requirements, both on the face of the complaint and on the actual facts.

#### A. Facial Challenge: Plaintiffs Fail to Establish Standing.

Even taking the complaint's well-pleaded allegations as true, plaintiffs fail to allege facts showing an injury in fact, let alone one that was caused by the cyberattack and would be

redressable by a favorable decision. Injury in fact requires "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). A concrete injury is "real" rather than "abstract"; a particularized injury "must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339–40 (2016). How a plaintiff satisfies the injury-in-fact requirement depends on the relief sought. *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004). For damages, a mere risk of future harm, standing alone, does not suffice absent a separate concrete harm. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 436–37 (2021). By contrast, injunctive or declaratory relief requires a "continuing injury" or a "real and immediate threat" of future injury. *Young v. Colo. Dep't of Corr.*, 94 F.4th 1242, 1255 (10th Cir. 2024). Threatened harm must be "certainly impending," or there must be a "substantial risk" it will occur. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Beyond injury, plaintiffs attempting to establish causation cannot "rely on speculation about the unfettered choices made by independent actors not before the courts," meaning the "links in the chain of causation" must not be "too speculative or too attenuated." *All. for Hippocratic Med.*, 602 U.S. at 383; *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). Redressability requires that it be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561.

Two important principles emerge from courts' application of standing doctrine to cases arising out of a cyberattack. First, courts in this Circuit "have reached something of a consensus—injury in fact requires actual misuse of the PII. Merely experiencing a breach won't suffice." *Jenkins v. Assoc. Wholesale Grocers, Inc.*, 2025 WL 708574, at *4 (D. Kan. Mar. 5, 2025); *Stern v. Acad. Mortg. Corp.*, 2025 WL 239036, at *3 (D. Utah Jan. 17, 2025) ("[D]istrict courts throughout the Tenth Circuit have predicted that the Court of Appeals will require actual misuse

of stolen data to find that plaintiffs have standing."). This is true even if the data for some plaintiffs is potentially sensitive. *Jenkins*, 2025 WL 708574, at *9–11; *Patterson v. Assoc. Wholesale Grocers, Inc.*, 2026 WL 395115, at *6–7 (D. Kan. Feb. 12, 2026). In other words, "mere theft …, without more, cannot confer Article III standing." *Beck v. McDonald*, 848 F.3d 262, 275 (4th Cir. 2017). An injury arises only if someone misuses the data in a way that brings an injury home to the named plaintiff. Second, misuse that is not causally connected to the cyberattack does not count. *See Jenkins*, 2025 WL 708574, at *10. In cyberattack cases, "without more than mere correlation, a causal relationship cannot be established." *Malinowski v. Int'l Bus. Machs. Corp.*, 2025 WL 965812, at *4 (S.D.N.Y. Mar. 31, 2025).

Before reaching any specific theory of harm, plaintiffs face a threshold problem: they do not plausibly allege that *anyone* has used the data involved in the cyberattack *against them*—to defraud them, steal their identities, or otherwise target them individually. Fifteen plaintiffs allege no misuse at all, and the remaining twelve allege financial activity or spam they do not plausibly tie to Canvas data. All plaintiffs therefore fail to explain how the data "connects to the injury alleged." *Jenkins*, 2025 WL 708574, at *7. Their remaining theories—risk of future harm, mitigation costs, emotional distress, and lost privacy—fail too; none supports prospective relief.

***Financial account activity, alerts, and spam.*** The few plaintiffs who allege misuse or other post-attack activity do not plausibly connect that activity to Canvas data. Their allegations fall into two groups: (1) unauthorized financial-account activity or alerts (Coelho, Large, Miceli, and Brock), Compl. ¶¶ 93–94, 144, 155, 213, and (2) increased spam calls, texts, emails, or other scam and extortion messages (Bless, Coelho, Hall, Jacobs, Large, Reyes, Theobald, Nelson, Brock, and the parent of A.D. and E.D.), *id.* ¶¶ 75, 92, 125, 134, 143, 145–47, 177, 186, 195, 212, 220, 227. Neither set of allegations has a sufficient causal connection to the cyberattack.

With respect to the first group, the allegedly unauthorized financial activity involves account information the cyberattack did not include. *Id.* ¶¶ 93–94, 144, 155, 213. None of these plaintiffs alleges Canvas held her bank account numbers, card numbers, passwords, or other account credentials. *See id.* ¶¶ 89–90, 139–40, 152, 208–09. Nor does any of them explain how a name, student ID, grades, or class schedule could be used to log into a bank account or make unauthorized charges. Without a plausible link between the stolen data and access to the affected account, unauthorized account activity is not fairly traceable to a cyberattack. *See, e.g., Santos-Pagán v. Bayamón Med. Ctr.*, 178 F.4th 66, 73 (1st Cir. 2026); *Daniel v. Nat'l Park Serv.*, 891 F.3d 762, 767 (9th Cir. 2018); *Henderson v. Reventics, LLC*, 2024 WL 5241386, at *7 (D. Colo. Sept. 30, 2024).

With respect to the second group, plaintiffs similarly provide no connection between the alleged spam and the Canvas data at issue. Most allege only an unspecified "increase" in spam, without saying when it began or what it contained. *E.g.*, Compl. ¶¶ 92, 125, 177, 195, 212. Even assuming the spam began only after the cyberattack, "spam calls, texts, and e-mails have become very common in this digitized world," so their timing alone does not link them to that attack. *McCombs v. Delta Grp. Elecs., Inc.*, 676 F. Supp. 3d 1064, 1074 (D.N.M. 2023); *see, e.g.*, *Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 420 n.3 (4th Cir. 2025), *cert. dismissed*, 146 S. Ct. 2549 (2026); *Santos-Pagán*, 178 F.4th at 72–73; *Retzolff v. Jacobs Ent., Inc.*, 2026 WL 2819774, at *5 (D. Colo. Sept. 21, 2026); *Henderson*, 2024 WL 5241386, at *6; *Blood v. Labette Cnty. Med. Ctr.*, 2022 WL 11745549, at *6 (D. Kan. Oct. 20, 2022). Absent allegations that the defendant was somehow "unique in possessing" the plaintiff's information, attributing spam calls to the cyberattack "is too conclusory," because "it is equally conceivable that the spammers obtained [p]laintiffs' phone numbers and email addresses independently from other sources." *Owen-Brooks*

*v. DISH Network Corp.*, 2024 WL 4338133, at *10 (D. Colo. Aug. 23, 2024). Regardless, courts consider spam an "annoyance" or "frustrat[ion]" that does not amount to a concrete injury. *See, e.g.*, *Blood*, 2022 WL 11745549, at *6; *Jenkins*, 2025 WL 708574, at *6. After all, unwanted messages from unknown senders are an everyday incident of modern life for anyone with a phone number or email address.

***Risk of future harm.*** Plaintiffs also allege that the cyberattack exposed them to a "present and continuing risk of phishing, impersonation, fraud, and identity theft," Compl. ¶ 40; *see id.* ¶¶ 53, 296, and that students, many of them minors, now face the risk of sextortion and grooming, *see id.* ¶¶ 51, 483, 492–96. These speculative risks cannot support plaintiffs' claims for either retrospective or prospective relief.

First, a feared future harm is not a present injury that can support damages. For a plaintiff seeking "damages, the mere risk of future harm, standing alone, cannot qualify as a concrete harm—at least unless the exposure to the risk of future harm itself causes a *separate* concrete harm." *TransUnion*, 594 U.S. at 436. District courts in this Circuit have repeatedly applied this rule to reject damages claims premised on the risk of future fraud or identity theft after a cyberattack. *See, e.g.*, *Legg v. Leaders Life Ins. Co.*, 574 F. Supp. 3d 985, 993 (W.D. Okla. 2021); *Jenkins*, 2025 WL 708574, at *9; *Blood*, 2022 WL 11745549, at *8; *C.C. v. Med-Data Inc.*, 2022 WL 970862, at *7 (D. Kan. Mar. 31, 2022).

Second, plaintiffs' alleged risks of harm are insufficient for prospective relief. "District courts throughout the Tenth Circuit have adopted the three-factor test from *McMorris v. Carlos Lopez & Associates, LLC*, [995 F.3d 295, 301–02 (2d Cir. 2021)] to determine whether an injury is sufficiently imminent in the data breach context." *Stern*, 2025 WL 239036, at *3; *see, e.g.*, *Jenkins*, 2025 WL 708574, at *9–11; *Patterson*, 2026 WL 395115, at *6–7. That balancing test

asks "whether any portion of the dataset has already been misused, even if the plaintiffs themselves have not yet experienced identity theft or fraud"; "whether the type of data that has been exposed is sensitive such that there is a high risk of identity theft or fraud"; and "whether the plaintiffs' data has been exposed as the result of a targeted attempt to obtain that data." *McMorris*, 995 F.3d at 303. Plaintiffs cannot satisfy that test.

As to misuse, plaintiffs do not plausibly allege that any portion of the dataset has been misused against them. *See supra* Part I.A.1.

The data is also not sufficiently sensitive to make a risk of future harm plausible. As plaintiffs acknowledge, the data involved names, email addresses, course names, enrollment information, and messages, which is not the type of sensitive information that creates a high risk of identity theft or fraud. *See* Compl. ¶ 390; Ex. 3, *Incident Fact Sheet*, *supra*, at 1. Names, school email addresses, and course enrollments are routinely shared with classmates and instructors, in many cases are also public or shared on social media, and none of them can be used to open an account, access funds, or impersonate someone to a financial institution. The messages are no different. They are communications Canvas users exchanged with one another through Canvas's in-platform messaging feature—such as messages between students and their instructors about their courses—not a channel for conducting financial transactions or transmitting account credentials. Pendleton Decl. ¶ 5. Plaintiffs speculate that Canvas messages may contain financial information, *see* Compl. ¶ 45, but no named plaintiff alleges that he or she conveyed his or her Social Security number or financial-account information in Canvas messages.[3] And unlike "the dissemination of high-risk information such as Social Security numbers and dates of birth,"

[3] In fact, the data taken in the cyberattack did not include Social Security numbers or financial-account information for any named plaintiff. Pendleton Decl. ¶ 14.

disclosure of "basic publicly available information" does not pose the same risk. *McMorris*, 995 F.3d at 302; *see also Attias v. CareFirst, Inc.*, 344 F.R.D. 38, 54 (D.D.C. 2023); *Yankovich v. Applus Techs., Inc.*, 621 F. Supp. 3d 269, 275–77 (D. Conn. 2022); *In re Samsung Data Sec. Breach Litig.*, 761 F. Supp. 3d 781, 788, 794, 796 (D.N.J. 2025); *Kim v. McDonald's USA, LLC*, 2022 WL 4482826, at *5 (N.D. Ill. Sept. 27, 2022).

The nature of the cyberattack also weighs against the risk of future harm. By plaintiffs' own account, the attacker sought to cripple Canvas and extort Instructure—locking the platform, forcing it offline, and posting ransom notices—not to harvest students' information for fraud. *See* Compl. ¶¶ 413–14, 426, 491. And even if the attack were treated as targeted, a targeted theft of names and course enrollments gives a fraudster nothing to work with. Courts applying *McMorris* have found no substantial risk where the attack was targeted but there was no misuse and the data was not highly sensitive. *See Patterson*, 2026 WL 395115, at *6–7; *Maser v. CommonSpirit Health*, 2024 WL 2863579, at *7–8 (D. Colo. Apr. 16, 2024); *Yankovich*, 621 F. Supp. 3d at 276–77. The *McMorris* factors confirm that plaintiffs face no substantial risk of imminent harm.

The same factors defeat plaintiffs' allegations about the risks of sextortion and grooming. *See* Compl. ¶¶ 51, 483, 492–96. These are serious allegations that Instructure does not take lightly. But they are not seriously made here. No plaintiff alleges that she or her child has been solicited, groomed, or subjected to sextortion. No plaintiff alleges conveying in a Canvas message any information that would enable such a scheme. Nothing in the complaint ties any such harm to this cyberattack. And the theory rests on a chain of inferences, each of which is individually speculative and which collectively are utterly implausible: an unidentified offender will obtain the stolen names, contact details, enrollment information, and messages; single out a named plaintiff or her child among millions of users; initiate contact; and turn that information into a successful scheme.

*See id.* ¶¶ 58–63, 483, 494–95. Imagining a worst-case scenario does not make this risk imminent; it is just another "speculative chain of possibilities." *Clapper*, 568 U.S. at 414; *see also Maser*, 2024 WL 2863579, at *7–8 (rejecting argument that stolen data could be used to "pretend to be someone they are not" and deceive the plaintiff into disclosing more sensitive information).

Likewise, plaintiffs cannot substitute generalized research, law-enforcement advisories, and school warnings about data breaches, phishing, and online exploitation, *see* Compl. ¶¶ 483–90, for the plaintiff-specific showing of misuse and data sensitivity that Article III requires. Standing "is not dispensed in gross"; each plaintiff must show an injury to himself or herself. *TransUnion*, 594 U.S. at 431. Reports about what some criminals do with stolen data in general say nothing about whether these criminals did, or will, do anything with these plaintiffs' data—particularly where the data at issue bears no resemblance to the data those reports describe as being misused. *See Legg*, 574 F. Supp. 3d at 993 (concluding that such materials "do nothing to clarify the risks to the plaintiffs in this case"); *Jenkins*, 2025 WL 708574, at *11 (similar); *Henderson*, 2024 WL 5241386, at *8 (holding that allegations reciting "the general risks of identity theft, how personal information can be sold on illicit internet sites, and what 'a dishonest person' may do" with stolen data "do not allege any actual, specific risks to Plaintiffs"); *C.C.*, 2022 WL 970862, at *7 (similar). Plaintiffs' alleged risk of future fraud, identity theft, sextortion, or other misuse is not a concrete injury that can support damages, and it is too speculative to support prospective relief.

***Mitigation.*** Every named plaintiff except K.I. and M.I. alleges spending time mitigating the risks of future harm. Theobald also alleges spending $349.99 on LifeLock, and N.M.'s parent alleges purchasing credit monitoring and incurring ongoing out-of-pocket costs. Compl. ¶¶ 188, 241–42; *see id.* ¶¶ 299(e), 477(d)–(f), (h). Those expenditures cannot support damages absent a sufficiently imminent underlying risk. Plaintiffs "cannot manufacture standing merely by inflicting

harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. Because the alleged risk of future misuse is neither certainly impending nor substantial, *see supra* Part I.A.2, the time and money plaintiffs have already spent guarding against that risk cannot create an injury. *See Jenkins*, 2025 WL 708574, at *11 (holding 240 hours of mitigation insufficient). "[W]hile it may have been reasonable to take some steps to mitigate the risks associated with [a] data breach, those actions cannot create a concrete injury where there is no imminent threat of harm." *Legg*, 574 F. Supp. 3d at 994. And because credit monitoring guards against misuse of Social Security and financial information the cyberattack did not involve, purchasing it reflects a general precaution in an era of frequent data breaches, not a cost fairly traceable to this incident. *See Clapper*, 568 U.S. at 416; *In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 26 (D.D.C. 2014).

***Emotional distress.*** Every named plaintiff except Darnell, Miceli, P.E., and A.N. alleges having experienced "stress, anxiety, and concern" over lost privacy and potential misuse of their information, largely in identical boilerplate allegations. *E.g.*, Compl. ¶¶ 77, 86. Emotional distress tied only to a speculative risk of future misuse is insufficient to establish an injury in fact. *See Jenkins*, 2025 WL 708574, at *11; *Henderson*, 2024 WL 5241386, at *7; *Masterson v. IMA Fin. Grp., Inc.*, 2023 WL 8647157, at *7 (D. Kan. Dec. 14, 2023).

***Diminished value of information.*** All plaintiffs allege that their information "has an inherent market value" that "has been damaged and diminished by its compromise and unauthorized release." Compl. ¶ 508; *see id.* ¶¶ 293–94, 477(i). That theory is nonsense. An injury in fact must "affect the plaintiff in a personal and individual way," *Spokeo*, 578 U.S. at 339, so the question is not whether personal data has value to someone in the abstract, but whether *these plaintiffs lost* something of value they once had. They did not. No named plaintiff alleges any

individualized facts about the value of his or her information, and no plaintiff alleges having tried to sell it, much less having received less for it because of the cyberattack. Nor do plaintiffs allege they lost possession of anything. Unlike a stolen car, stolen data remains in its owner's hands: plaintiffs can still use their names, email addresses, and enrollment information exactly as before, and nothing about the cyberattack prevents them from sharing, licensing, or selling that information to anyone they choose. And the "market value" plaintiffs invoke is the value of personal data in bulk to data brokers and advertisers, Compl. ¶ 508; *see id.* ¶¶ 293–94—not a price any individual student could command for his own name and course schedule, and not a market any plaintiff alleges he would ever enter. And plaintiffs' own theory of the case confirms they want their information kept private, not sold. *See, e.g.*, Compl. ¶ 480.

Unsurprisingly, "[c]ourts have routinely rejected the proposition that an individual's personal identifying information has an independent monetary value" that a cyberattack somehow diminishes. *Welborn v. IRS*, 218 F. Supp. 3d 64, 78 (D.D.C. 2016); *see also Legg*, 574 F. Supp. 3d at 994–95 ("Assuming personal identifying information has a monetary value, Plaintiff fails to allege that he attempted to sell his personal information and was forced to accept a decreased price."); *Henderson*, 2024 WL 5241386, at *6 (rejecting diminished-value theory where plaintiffs' "allegations do not … show how they suffered a concrete injury through any loss in value—such as through an inability to sell their personal information or a lower price offered in such a sale").

***Benefit of the bargain.*** All plaintiffs collectively allege that they "paid for data security protection they did not receive," Compl. ¶ 557(i), and seek the difference in value between the protection expected and received, *id.* ¶ 299(d); *see id.* ¶¶ 477(j), 579. A lost benefit of the bargain is a classic economic injury: a plaintiff who pays for something and receives less than she paid for has lost money, and that loss is concrete. But that theory does not work for plaintiffs because they

do not allege that *they* were the ones who paid Instructure for anything. Plaintiffs used Canvas because their schools made them. *See* Compl. ¶¶ 43, 312–13, 411. And no plaintiff alleges that any portion of tuition or fees he or she paid to a school was allocated to Canvas, let alone to Canvas's data security, or that he or she would have paid less for school had the protection been different (which, even if true, would be a matter for plaintiffs to take up with their schools, not Instructure). Without a payment, there is no "bargain" whose benefit plaintiffs could have lost. *See, e.g.*, *Legg*, 574 F. Supp. 3d at 994–95 (no standing where plaintiff had not "indicated that he paid any sort of premium in exchange for data security or that the data breach diminished the value of the insurance products he received in return"); *Henderson*, 2024 WL 5241386, at *6 (similar).

***Loss of privacy.*** All plaintiffs collectively assert a privacy injury from the theft of their data. Compl. ¶ 292. An intangible harm like loss of privacy is concrete only if it bears "a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424–25. Although the harm need not be "an exact duplicate," the inquiry is "not an open-ended invitation for federal courts to loosen Article III." *Id.* at 424–25. The possible analogues are "disclosure of private information" and "intrusion upon seclusion." *Id.* at 425. Plaintiffs' alleged harm resembles neither.

First, the disclosure analogue fails twice over. Instructure disclosed nothing; criminals stole data from Instructure. Moreover, no named plaintiff alleges facts showing their information was made public. The tort requires "publicity"—communication "to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Restatement (Second) of Torts § 652D cmt. a (1977). Plaintiffs speculate only that their information "has already been published—or will be published imminently—by cybercriminals on the Dark Web," Compl. ¶ 291, but they do not identify any named plaintiff

whose information was posted on the dark web, much less by Instructure. *See In re Progressive Leasing Breach Litig.*, 2025 WL 213744, at *10–13 (D. Utah Jan. 16, 2025). Indeed, where stolen data merely "sits in a [cybercriminal's] database" and is not published or used to commit fraud, there is no concrete harm; otherwise, every breach victim "would arguably have standing to sue even if . . . the data is returned after a ransom payment," as happened here. *Id.* at *11 n.151.

Second, the intrusion analogue fails because the alleged intruders were cybercriminals, not Instructure. The tort reaches one who "intentionally intrudes" on another's private affairs. Restatement (Second) of Torts § 652B (1977). Although standing does not require proof of every element of the common-law tort, courts have rejected the intrusion analogue where the plaintiff alleged negligent security rather than an intentional intrusion attributable to the defendant. *See Jenkins*, 2025 WL 708574, at *12–13; *Patterson*, 2026 WL 395115, at *9; *Carr v. Okla. Student Loan Auth.*, 699 F. Supp. 3d 1241, 1252 (W.D. Okla. 2023); *In re MOVEit Customer Data Sec. Breach Litig.*, 2025 WL 2176590, at *15 (D. Mass. July 31, 2025).

***Notice delay.*** All plaintiffs collectively allege that Instructure "deprived Plaintiffs of the earliest opportunity to guard themselves against the Data Breach's effects by failing to promptly notify them," Compl. ¶ 295, and that their injuries were "worsened" by untimely notice, *id.* ¶ 297. But a delay in notice is not itself an injury; it matters only if something happened during the delay that earlier notice would have prevented. To make out that theory, a plaintiff must identify (1) a harm that occurred in the window before notice, and (2) a step she would have taken, had she known sooner, that would have avoided or limited it—for example, freezing an account before a fraudulent charge posted. Plaintiffs allege neither. No named plaintiff alleges when he or she learned of the cyberattack, what he or she would have done differently with earlier notice, or any fraud or other harm that occurred between Instructure's detection of the intrusion and its

announcement. Nor is there any window of consequence to speak of. Instructure announced the attack two days after detecting it, *see supra* Background Part B, and plaintiffs' counsel filed the first lawsuit four days after that, *see supra* Background Part C. Courts in this Circuit reject delayed-notice standing in that circumstance. *See, e.g.*, *F.S. v. Captify Health, Inc.*, 2024 WL 1282437, at *4 (D. Kan. Mar. 26, 2024); *Masterson*, 2023 WL 8647157, at *6.

***Outage-related harms.*** Bless, Clark, Darnell, Delagarza, Gabrich, Jacobs, Large, Mockert, Reyes, Theobald, Bowler, Brock, A.D., E.D., E.H., and G.S. allege temporary Canvas outages caused late assignments and lost access to course materials during finals. Compl. ¶¶ 74, 83, 102, 109, 117, 133, 142, 161, 176, 185, 202, 211, 219, 226, 249, 263. These allegations do not establish standing. None of these plaintiffs alleges any lasting consequence: no plaintiff alleges a lower grade, a failed or incomplete course, lost academic credit, a delayed graduation, a lost scholarship, or any other concrete effect on his or her education. Large, who alleges prior assignments were never recovered and had to be redone, identifies no resulting effect on her grades, credit, or tuition. *Id.* ¶ 142. And the complaint's collective allegation of outage-related travel and housing expenses and lost wages does not identify which named plaintiff, if any, incurred those losses or in what amount, *id.* ¶ 433(d), and so cannot supply the "particularized" injury each plaintiff must show, *Spokeo*, 578 U.S. at 339. What remains is a brief interruption: Instructure restored basic service the same night, *see supra* Background Part B, and plaintiffs' own allegations place restoration by the next day for many schools, Compl. ¶¶ 175, 270. A short loss of access to an online service, followed by rescheduled work, is a temporary inconvenience of the kind every student experiences when a server goes down, a campus closes for weather, or an exam is postponed. It is not the sort of "real" harm that Article III requires, because nothing was lost: the coursework remained, the deadlines moved, and the semester ended as it would have. *See Spokeo*, 578 U.S. at 339–41.

Causation fails too, and on plaintiffs' own account. Plaintiffs allege that the outages were caused "first by Defendants taking Canvas offline and then by institutions disconnecting." Compl. ¶ 416; *see id.* ¶¶ 386, 414, 425. Neither cause is the conduct plaintiffs challenge. The first was Instructure's protective response to a criminal attack—placing Canvas in maintenance mode to shut the attacker out and confirm access was closed. *See* Ex. 3, *Incident Fact Sheet*, *supra*, at 1. Plaintiffs cannot fault Instructure both for failing to stop the attacker and for shutting the attacker out. The second was the independent choice of plaintiffs' schools to disconnect from Canvas, and harm that results from "the independent action of some third party not before the court" is not fairly traceable to the defendant. *Lujan*, 504 U.S. at 560. And because the outage has ended with no alleged recurrence, it cannot support prospective relief. *See infra* Part I.A.10.

***Injunctive and declaratory relief.*** Plaintiffs lack standing for the injunctive and declaratory relief they seek. To begin, the only forward-looking harm they identify—future misuse of the stolen data—is not "sufficiently imminent and substantial," *TransUnion*, 594 U.S. at 435, for the reasons already given, *see supra* Part I.A.2; *see also Reilly v. Ceridian Corp.*, 664 F.3d 38, 42, 45 (3d Cir. 2011); *Beck*, 848 F.3d at 274–75; *In re SuperValu, Inc.*, 870 F.3d 763, 769–72 (8th Cir. 2017); *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1344 (11th Cir. 2021). Regardless, an injunction against Instructure would accomplish nothing. Any future misuse of data already taken would be committed by third-party criminals. *See Progressive Leasing*, 2025 WL 213744, at *14; *Jenkins*, 2025 WL 708574, at *14. Every other alleged harm is a completed, past event, and "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).

Nor can plaintiffs rest prospective relief on the risk of a future breach. Courts consistently hold that a future-breach theory resting on the fact that the defendant suffered a cyberattack in the

past is too speculative to supply standing. *See Beck*, 848 F.3d at 277 (finding no sufficiently "immediate" danger of future injury even where "the named plaintiffs have been victimized by at least two admitted VA data breaches"); *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 378 (1st Cir. 2023); *Jenkins*, 2025 WL 708574, at *14–15; *Patterson*, 2026 WL 395115, at *9; *Progressive Leasing*, 2025 WL 213744, at *14. That is because another breach would require a new, independent criminal attack, and whether one will occur, and succeed, is pure conjecture. *See Clapper*, 568 U.S. at 414.

**B. Factual Challenge: Plaintiffs Cannot Establish Standing.**

Even if the complaint's allegations were facially sufficient, plaintiffs will not be able to establish standing as a factual matter in this case. Because Instructure also brings a factual attack under Rule 12(b)(1), the Court "may not presume the truthfulness of the complaint's factual allegations" and may consider declarations to resolve disputed facts bearing on standing without converting this motion into one for summary judgment. *Holt*, 46 F.3d at 1003. Two sets of facts defeat plaintiffs' claimed injuries and causation: (1) the data, if any, that was involved in the cyberattack for each named plaintiff; and (2) the absence of any plaintiff's data from the cyberattack on the dark web.

***Data involved.*** First, eight of the 27 named plaintiffs—Dana Reyes, Brandi Nelson, A.D., E.D., P.E., N.M., E.H., and A.N.—had no data involved in the cyberattack at all. Pendleton Decl. ¶¶ 8, 10. Instructure reviewed the data involved in the cyberattack and found none of these eight plaintiffs' data. *Id.* ¶¶ 7–8, 10. Every data-related harm these plaintiffs allege—the risk of future misuse, the time and money spent guarding against it, their anxiety, and any spam or suspicious activity—is downstream of a theft that did not include their information. A plaintiff whose information was not taken has suffered no injury from its theft, and any harm she attributes to that theft cannot be fairly traced to the cyberattack. *See Lujan*, 504 U.S. at 560; *Jenkins*, 2025 WL

708574, at *7; *Mitchell v. Wells Fargo Bank*, 355 F. Supp. 3d 1136, 1144–48 (D. Utah 2018) (dismissing for lack of standing "Bystander Plaintiffs" who alleged no unauthorized account opened in their names).

Second, 17 of the remaining 19 named plaintiffs had only account and course information involved—such as names, email addresses, login names, user identifiers, and course, section, and enrollment information—and, for some, messages that contained no potentially reportable personal information. Pendleton Decl. ¶¶ 8–9, 11–12. In other words, none of the information involved for these plaintiffs meets the statutory definition of "personal information" that triggers breach-notification obligations. *See, e.g.*, Utah Code § 13-44-102. That is the relevant benchmark because it reflects a considered legislative judgment about which data may potentially give rise to a risk of identity theft and fraud. Utah, like other states, requires notice only when a person's name is compromised together with a data element that can be used to commit fraud—such as a Social Security number, a driver's license number, or a financial-account number with its access code. *Id.* Information outside that definition does not trigger notice because legislatures have concluded its theft does not expose the individual to a meaningful risk of financial harm. Data the law does not even require a company to report cannot plausibly create the "certainly impending" or "substantial" risk of harm Article III demands. *See Clapper*, 568 U.S. at 414 & n.5. And that legislative judgment matches common sense. Names, school email addresses, and course enrollments are routinely shared, often posted on publicly accessible websites and social media, and none of them can be used to open an account, access funds, or impersonate someone to a financial institution. *See* Ex. 3, *Incident Fact Sheet*, *supra*, at 1; *McMorris*, 995 F.3d at 303; *Jenkins*, 2025 WL 708574, at *9–11. These 17 plaintiffs do not have a valid injury.

Third, only two named plaintiffs—Julianne Theobald and Carmen Brock—had messages potentially taken by the threat actor that contained potentially reportable personal information. Pendleton Decl. ¶¶ 8, 13. [redacted] But sensitivity alone does not translate into an actual, felt harm. And here, there is no indication that this information will be exposed or used in a way to embarrass, discriminate against, or target the person it describes. Neither plaintiff alleges anything of the kind has happened or is about to. Neither alleges anyone has seen, used, or even referenced the information. Instructure's dark-web monitoring has found no posting of any data involved in the cyberattack, *id.* ¶ 15, and the stolen data was returned and its destruction confirmed, *see supra* Background Part B; Pendleton Decl. ¶ 6. Theobald and Brock do not have a valid injury.

***No exposure.*** No data involved in the cyberattack—whether named plaintiffs' or anyone else's—has been posted on the dark web. Instructure has monitored, or caused to be monitored on its behalf, the dark web and has found no posting of any such data, including any data belonging to any named plaintiff. Pendleton Decl. ¶ 15. Nor is Instructure aware of any instance in which that data has been used to commit fraud or identity theft against any named plaintiff or any other person. *Id.* ¶ 16. That evidence confirms plaintiffs' vague assertion that their information "has already been published—or will be published imminently," Compl. ¶ 291, is speculation, and forecloses any claim of a certainly impending or substantial risk of misuse. *See Clapper*, 568 U.S. at 414; *Legg*, 574 F. Supp. 3d at 993.

Because no named plaintiff suffered a concrete injury fairly traceable to the cyberattack, the Court should dismiss the complaint for lack of standing.

## II. Choice of Law

The complaint is silent on choice of law. A federal court sitting in diversity applies the forum state's choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). For tort claims, Utah applies the Restatement (Second) of Conflict of Laws' "most significant relationship" test, which considers "(1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered." *Rocky Mountain Helicopters, Inc. v. Bell Helicopter Textron, Inc.*, 24 F.3d 125, 128 (10th Cir. 1994); *see* Restatement (Second) of Conflict of Laws § 145 (1971). Utah applies the same Restatement framework to contract and quasi-contract claims. *See Am. Nat'l Fire Ins. Co. v. Farmers Ins. Exch.*, 927 P.2d 186, 188 (Utah 1996); Restatement (Second) of Conflict of Laws §§ 188, 221.

That test could point to a different state's law for each plaintiff. The named plaintiffs reside in 19 states, while Instructure is headquartered in Utah and incorporated in Delaware. *See* Compl. ¶¶ 69–285, 300. Those states' laws differ on some questions this motion presents. For example, whether the economic loss rule bars data-breach negligence claims "is a complicated question of law, with significant difference across states." *Stern v. Acad. Mortg. Corp.*, 2025 WL 2852171, at *7 (D. Utah Oct. 8, 2025); *see In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154, 1171–76 (D. Minn. 2014). And "[t]he data breach context raises unique problems in choice-of-law analysis" because data stored on distributed cloud systems makes the place of the breach and the place of injury difficult to pin down. *In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*, 603 F. Supp. 3d 1183, 1199 (S.D. Fla. 2022).

The Court need not resolve those questions now. Courts in this Circuit recognize that "choice of law analysis is a fact intensive process which th[e] Court is ill-equipped to engage in at this early stage of litigation," *Carr*, 699 F. Supp. 3d at 1246–47, and, at the pleading stage, courts apply forum law where the parties have not undertaken a choice-of-law analysis, *see Paskenta Enters. Corp. v. Cottle*, 2018 WL 522322, at *2 (D. Utah Jan. 22, 2018) (applying "Utah's substantive law for the purposes of this motion" where neither party conducted a choice-of-law analysis). Instructure therefore addresses plaintiffs' common-law claims under Utah law for purposes of this motion.

Two qualifications follow. First, where plaintiffs bring claims under a particular state's statute or constitution—California, Michigan, Minnesota, or New York—Instructure analyzes those claims under that state's law. *See infra* Parts V, VIII. Second, where a common-law rule varies meaningfully from state to state, Instructure shows the claim fails under the other states' law as well, so that the outcome does not depend on which state's law ultimately governs. Instructure does so without conceding that Utah law governs any plaintiff's claims or could constitutionally be applied classwide, *see Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821–22 (1985), and reserves the right to contest the governing law at a later stage.

## III. Plaintiffs' Negligence and Negligence Per Se Claims Fail (Counts I, II)

### A. Plaintiffs Fail to State a Negligence Claim (Count I).

To establish negligence under Utah law, a plaintiff must prove that the defendant's breach of a duty caused "the plaintiff to suffer legally compensable damages." *Cope v. Utah Valley State Coll.*, 2014 UT 53, ¶ 11, 342 P.3d 243. Here, plaintiffs allege no "legally compensable damages." *Id.* Their claimed injuries—identity-theft and future-breach risks, lost confidentiality and data value, mitigation time and expense, and nominal damages, Compl. ¶ 535—fail to establish even Article III injury for the reasons explained in Part I.A. But even if the Court were to find some of

these harms sufficient for standing, they would still fail as a matter of state substantive law, because "the standard for alleging actual damages is generally higher than that for plausibly alleging an injury-in-fact." *Attias v. CareFirst, Inc.*, 365 F. Supp. 3d 1, 9, 13 (D.D.C. 2019). The two inquiries ask different questions. For example, Article III asks whether a plaintiff has a sufficient stake in the dispute, and a "substantial risk" of future harm can suffice. *Susan B. Anthony List*, 573 U.S. at 158. Tort law asks whether the plaintiff has already suffered a loss the law will compensate, and a risk—however substantial—is not a loss.

Applying that rule, each of plaintiffs' theories fails on its own terms. ***Future risk***: "a mere risk of future harm, without more, is not the type of damage that is recoverable through a negligence claim." *Doe v. Conceptions Reprod. Assocs., Inc.*, 2026 WL 1145600, at *4 (D. Colo. Apr. 28, 2026); *accord Griffey v. Magellan Health Inc.*, 562 F. Supp. 3d 34, 45–46 (D. Ariz. 2021). ***Lost time***: time spent monitoring accounts, untethered to lost wages or out-of-pocket expense, "is too speculative and attenuated from actual pecuniary or physical damages to sustain a negligence claim." *Conceptions*, 2026 WL 1145600, at *5. ***Mitigation***: even out-of-pocket monitoring costs are recoverable only if they were "both reasonable and necessary" responses to an actual harm, *Griffey*, 562 F. Supp. 3d at 45–46, and plaintiffs plead no actual harm to which those costs responded. ***Diminished value***: a plaintiff "must establish both the existence of a market for her personal information and an impairment of her ability to participate in that market," *Pruchnicki v. Envision Healthcare Corp.*, 439 F. Supp. 3d 1226, 1234 (D. Nev. 2020), *aff'd*, 845 F. App'x 613 (9th Cir. 2021), and plaintiffs allege neither. ***Lost confidentiality***: the alleged loss rests on theft by criminals, not any disclosure by Instructure, and a privacy interest is not the kind of economic or physical loss negligence compensates. ***Emotional distress***: Utah does not permit recovery for negligently caused distress unless it "result[ed] in illness or bodily harm," *Carlton v. Brown*, 323

P.3d 571, 585 (Utah 2014); *see Mitchell*, 355 F. Supp. 3d at 1167–68, and no plaintiff alleges either. And ***nominal damages*** cannot substitute for the actual loss that the damages element of negligence requires. *See Cope*, 2014 UT 53, ¶ 11.

Courts routinely dismiss negligence claims on these theories even where plaintiffs have standing. *See Attias*, 365 F. Supp. 3d at 9, 13; *Conceptions*, 2026 WL 1145600, at *4–5. This Court's decision in *Stern* is not to the contrary. There, a negligence claim was able to proceed because plaintiffs' data was published on the dark web and a plaintiff suffered a fraudulent loan—actual misuse making mitigation efforts responses to "present harms, not future harms." *Stern*, 2025 WL 2852171, at *6. Plaintiffs here allege nothing comparable. *See supra* Parts I.A.1, I.B.

**B. Plaintiffs Fail to State a Negligence Per Se Claim (Count II).**

Plaintiffs additionally fail to state a negligence per se claim because the federal statutes they invoke cannot supply a tort standard of care, nor do plaintiffs fall within those statutes' protected classes. Utah will impose a tort duty based on a statute only when the plaintiff shows "(1) the existence of the statute or ordinance, (2) that the statute or ordinance was intended to protect the class of persons which includes the party, (3) that the protection is directed toward the type of harm which has in fact occurred as a result of the violation, and (4) that the violation of the ordinance or statute was the proximate cause of the injury complained of." *Colosimo v. Gateway Cmty. Church*, 2018 UT 26, ¶ 45, 424 P.3d 866; *see* Restatement (Second) of Torts §§ 286, 288 (1965). Plaintiffs invoke two federal statutes: Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45; and the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. §§ 6501–6506. Compl. ¶¶ 537–43.

First, neither the FTC Act nor COPPA can supply the standard of care. A court will borrow a statute to establish a duty of care only if it decides the statute defines "the standard of conduct of a reasonable person." *Mitchell*, 355 F. Supp. 3d at 1157. Courts applying Utah law have declined

to treat federal data-handling statutes that way. In *Mitchell*, the court refused to base a negligence per se claim on the Gramm-Leach-Bliley Act ("GLBA")—a federal statute that, like those here, regulates how businesses handle consumers' personal information. *Id.* It gave two reasons. First, no Utah court had ever derived a tort duty from a federal statute that, like the GLBA, gives private parties no right to sue. Second, Utah has applied negligence per se to statutes guarding against physical dangers—so-called "dangerous instrumentalities"—and the GLBA, which governs the handling of information, is not that kind of statute. *Id.* at 1158. Section 5 of the FTC Act and COPPA fail both counts, too: Congress gave private parties no right to sue under either, and neither regulates physical dangers. Allowing a negligence per se claim here would accomplish through state tort law what Congress chose not to allow—private lawsuits to enforce these federal statutes—and would therefore extend Utah's doctrine beyond anything its courts have recognized.[4]

Second, even if these statutes supplied a tort standard, plaintiffs must plead membership in the protected class. *Colosimo*, 2018 UT 26, ¶ 45. Most do not. COPPA protects only information collected "from children under 13." Compl. ¶ 541. None of the 17 named plaintiffs suing in their own names alleges any information was collected before age 13. *See In re Blackbaud, Inc., Customer Data Breach Litig.*, 567 F. Supp. 3d 667, 685–86 (D.S.C. 2021). Nor can any plaintiff base a negligence per se claim on Section 5 of the FTC Act. That statute's "paramount aim . . . is

---

4 Courts applying the laws of other states implicated by the complaint have reached the same conclusion as to Section 5 of the FTC Act, holding that a statute Congress left to FTC enforcement—and that sets only a general prohibition on "unfair" practices rather than a specific standard of conduct—cannot supply a negligence per se predicate. *See, e.g.*, *Brooks v. Peoples Bank*, 732 F. Supp. 3d 765, 779–80 (S.D. Ohio 2024); *Mednax*, 603 F. Supp. 3d at 1225; *Toretto v. Donnelley Fin. Sols., Inc.*, 583 F. Supp. 3d 570, 606 (S.D.N.Y. 2022); *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 408 (E.D. Va. 2020); *Conceptions*, 2026 WL 1145600, at *8; *Bracy v. Americold Logistics LLC*, 2025 WL 552676, at *5 (N.D. Ga. Feb. 19, 2025) (Georgia); *Keown v. Int'l Ass'n of Sheet Metal Air Rail Transp. Workers*, 2024 WL 4239936, at *8 (D.D.C. Sept. 19, 2024). That consensus confirms that Utah courts would not be outliers in declining to recognize such a claim.

the protection of the public from the evils likely to result from the destruction of competition," and courts in this Circuit reject Section 5–based claims by those who are neither consumers nor competitors harmed by unfair trade practices. *Bellwether Cmty. Credit Union v. Chipotle Mexican Grill, Inc.*, 353 F. Supp. 3d 1070, 1085–86 (D. Colo. 2018); *SELCO Cmty. Credit Union v. Noodles & Co.*, 267 F. Supp. 3d 1288, 1297 n.4 (D. Colo. 2017). Plaintiffs used Canvas through their schools as students—not as Instructure's customers or competitors.

**C. The Economic Loss Rule Bars Both Negligence Claims.**

The economic loss rule "bars recovery of economic losses in negligence actions unless the plaintiff can show physical damage to other property or bodily injury." *BMF Advance, LLC v. Litiscape, LLC*, 637 F. Supp. 3d 1272, 1286 (D. Utah 2022). Here, plaintiffs allege neither physical injury nor property damage. "Damage to computer data is not the sort of risk of physical harm to . . . property that would prevent the application of the economic loss doctrine." *Bellwether*, 353 F. Supp. 3d at 1084–85; *see SELCO*, 267 F. Supp. 3d at 1294–97. Courts applying the laws of other states implicated by the complaint routinely reach the same result in cyberattack cases. *See, e.g.*, *Terpin v. AT&T Mobility LLC*, 118 F.4th 1102, 1114–16 (9th Cir. 2024) (California); *Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*, 887 F.3d 803, 818 (7th Cir. 2018) (Illinois and Missouri); *In re TJX Cos. Retail Sec. Breach Litig.*, 564 F.3d 489, 498 (1st Cir. 2009) (Massachusetts); *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 175–78 (3d Cir. 2008) (Pennsylvania); *Silverpop Sys., Inc. v. Leading Mkt. Techs., Inc.*, 641 F. App'x 849, 852–54 (11th Cir. 2016) (Georgia); *Target*, 66 F. Supp. 3d at 1171–76 (Alaska, California, Illinois, and Iowa).

Nor can plaintiffs escape the rule through its narrow independent-duty exception, which applies only where Utah tort law already recognizes a duty "independent of any contractual obligations." *Hermansen v. Tasulis*, 2002 UT 52, ¶ 17, 48 P.3d 235, 240; *see Aclys Int'l v. Equifax*, 438 F. App'x 689, 692 (10th Cir. 2011); *HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 208

F. Supp. 3d 1193, 1199 (D. Utah 2016). Plaintiffs identify no Utah authority recognizing a tort duty to safeguard their data, and the Tenth Circuit has declined to create a comparable duty for a company handling consumer information. *Aclys*, 438 F. App'x at 692–93. Nor does the general duty of reasonable care suffice, because Utah does not extend it to purely economic harm. *BMF*, 637 F. Supp. 3d at 1286 (holding "[a]n actor has no general duty to avoid the unintentional infliction of economic loss on another").

## IV. Plaintiffs' Fiduciary Duty Claim Fails (Count III)

A fiduciary duty claim requires a fiduciary relationship, and Utah law does not make a software provider a fiduciary simply because it holds data. Plaintiffs allege no direct dealings with Instructure; they used Canvas only because their schools made them. *See* Compl. ¶¶ 43, 56, 312–13. Utah recognizes fiduciary relationships "specifically created by contract" and those "implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties." *First Sec. Bank of Utah N.A. v. Banberry Dev. Corp.*, 786 P.2d 1326, 1332 (Utah 1990). Plaintiffs identify no contract, statute, or license that made a remote party like Instructure their fiduciary. *See HealthBanc*, 208 F. Supp. 3d at 1199–1200. An implied relationship is demanding: It requires "dependency by one party on the other, and a voluntary assumption of a duty by the other party to advise, counsel and protect the weaker party;" "mere confidence in one party by another is not sufficient alone." *Bower v. Stein Eriksen Lodge Owners Ass'n*, 201 F. Supp. 2d 1134, 1144 (D. Utah 2002); *see Banberry*, 786 P.2d at 1333.

Courts across the country hold that receiving and storing personal information does not create a fiduciary relationship. *See, e.g.*, *Mednax*, 603 F. Supp. 3d at 1226; *Anderson v. Hannaford Bros. Co.*, 659 F.3d 151, 157–58 (1st Cir. 2011); *Brooks v. Peoples Bank*, 732 F. Supp. 3d 765, 781 (S.D. Ohio 2024); *In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1145–46 (C.D. Cal. 2021); *Mgaresh v. Va. Union Univ.*, 2025 WL 641432, at *5–6 (E.D. Va. Feb. 27, 2025).

At most, a data holder owes "a common law duty . . . to use due care, but not a special confidential relationship giving rise to a fiduciary duty." *Weisenberger v. Ameritas Mut. Holding Co.*, 597 F. Supp. 3d 1351, 1368 (D. Neb. 2022). Moreover, courts consistently reject fiduciary claims against technology vendors that serve an institution rather than the individuals whose data passes through their systems. *See, e.g.*, *In re U.S. Vision Data Breach Litig.*, 732 F. Supp. 3d 369, 376–77 (D.N.J. 2024); *Prestby v. A&A Servs., LLC*, 2026 WL 26128, at *28–29 (D. Neb. Jan. 5, 2026). In that setting, "there was no relationship between the parties," and the plaintiff "could not have depended on" the vendor. *Stephens v. Availity, L.L.C.*, 2019 WL 13041330, at *6 (M.D. Fla. Oct. 1, 2019).

## V. Plaintiffs' California Constitutional Privacy Claim Fails (Count X)

A constitutional privacy claim under California law is a "high bar" that requires "conduct by the defendant" that is "an egregious breach of the social norms underlying the privacy right." *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1024–25 (N.D. Cal. 2012); *see Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 37, 40 (1994). Even a company's own affirmative disclosure of users' browsing information to third parties did not clear that bar. *Low*, 900 F. Supp. 2d at 1025. If a company's deliberate sharing of user data is not egregious, an alleged failure to stop sophisticated cybercriminals cannot be. The California plaintiffs, Jacobs and Large, allege that criminals, not Instructure, took their information, Compl. ¶ 610, and they allege no conduct by Instructure beyond inadequate security. Allegedly inadequate security is not, as a matter of law, "an egregious breach of the social norms." *In re Accellion, Inc. Data Breach Litig.*, 713 F. Supp. 3d 623, 646–47 (N.D. Cal. 2024); *see Ruiz v. Gap, Inc.*, 380 F. App'x 689, 693 (9th Cir. 2010); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012) ("Even negligent conduct that leads to theft of highly personal information, including social security numbers, does not approach [the] standard of actionable conduct.").

**VI. Plaintiffs' Breach of Implied Contract Claim Fails (Count IV)**

A contract claim, express or implied, requires "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Bear v. LifeMap Assur. Co.*, 2021 UT App 129, ¶ 16, 503 P.3d 507.

First, plaintiffs fail to allege mutual assent. Plaintiffs' theory is that the act of "using Canvas" formed a contract. Compl. ¶¶ 551–53. But plaintiffs' own allegations foreclose that theory. They allege that they used Canvas because their schools licensed it and required them to use it, *id.* ¶¶ 43, 312–13, 411; that their schools adopted Canvas as "the mandatory, and frequently exclusive, means" of completing schoolwork, *id.* ¶ 55; that "Canvas is not optional," *id.* ¶ 411; and that they "had no choice," "did not select Canvas, and did not negotiate its terms," *id.* ¶ 56; *see id.* ¶ 57 (users "could not avoid [the] platform"). A party who, by its own account, had no choice but to use a product did not manifest an intent to bargain for anything by using it. Using a tool one's school mandates is not conduct "reasonably . . . interpretable as indicating an intention to make a bargain" with the tool's vendor, *Heideman v. Washington City*, 2007 UT App 11, ¶ 25, 155 P.3d 900, 908; it reflects only compliance with the school's choice. Courts dismiss implied contract claims against vendors in precisely that circumstance. *See U.S. Vision*, 732 F. Supp. 3d at 377–78; *In re Arthur J. Gallagher Data Breach Litig.*, 631 F. Supp. 3d 573, 591 (N.D. Ill. 2022).

Nor can plaintiffs manufacture a contract out of Instructure's public statements, privacy notices, and certifications. Plaintiffs plead these statements only as "representations to the public at large," and no named plaintiff alleges having read any of them before using Canvas, much less relied upon them. Compl. ¶¶ 66, 316–24, 553; *see id.* ¶¶ 69–285. That defeats assent.

Second, plaintiffs allege no consideration. It was their schools that paid for Canvas, so any cash bargain runs between Instructure and the schools. Compl. ¶¶ 43, 312–13. Plus, plaintiffs supplied their information because their schools required them to use Canvas, not in exchange for

any identifiable promise from Instructure. *See* Compl. ¶¶ 43, 411; *see Durgan v. U-Haul Int'l Inc.*, 2023 WL 12140653, at *6–7 (D. Ariz. July 28, 2023).

Third, even if plaintiffs had pleaded an implied contract, the harms they allege are not recoverable as contract damages. Contract damages compensate a party for the lost value of the promised performance; they do not reach speculative or non-pecuniary harms. Emotional distress is generally not recoverable for breach of contract. *See* Restatement (Second) of Contracts § 353 (1981). Risk of future misuse is not a present, measurable loss. And plaintiffs identify no measurable loss from lost time or any diminished value of their data. *See Pruchnicki*, 439 F. Supp. 3d at 1232–36; *Theys v. Dental Intel., Inc.*, 2026 WL 636743, at *10–11 (N.D. Ill. Mar. 6, 2026).

**VII. Plaintiffs' Unjust Enrichment Claim Fails (Count V)**

Unjust enrichment requires "a benefit conferred on one person by another." *Desert Miriah, Inc. v. B & L Auto, Inc.*, 2000 UT 83, ¶ 13, 12 P.3d 580. "[T]he conferral of a direct, rather than indirect, benefit" is required, and a claim fails where "any financial benefit … came from a third party," rather than from plaintiff. *Sec. Sys., Inc. v. Alder Holdings, LLC*, 421 F. Supp. 3d 1186, 1193–94 (D. Utah 2019). Here, whatever "monetary gain" is received when plaintiffs use Canvas comes from the schools that license it, not from plaintiffs, who allege no payment to Instructure. Compl. ¶¶ 43, 312–13, 411, 560; *see U.S. Vision*, 732 F. Supp. 3d at 378–79.

Nor did plaintiffs confer a benefit on Instructure simply by providing their information through Canvas. To the extent Instructure benefits from using platform data to improve Canvas, that value comes from Instructure's own work operating the service, not from plaintiffs. Courts routinely reject the theory that providing personal information confers a benefit absent facts showing the defendant sold or otherwise profited from it apart from providing the service. *See, e.g.*, *Stern*, 2025 WL 2852171, at *9; *Brooks*, 732 F. Supp. 3d at 782; *Arthur J. Gallagher*, 631 F. Supp. 3d at 592; *Retzolff*, 2026 WL 2819774, at *8. Count V should be dismissed.

## VIII. Plaintiffs' State Statutory Claims Fail (Counts VI–IX, XI–XIV)

### A. Utah Consumer Sales Practices Act (Count VI).

The UCSPA prohibits deceptive and unconscionable acts by a supplier in connection with a "consumer transaction." Utah Code §§ 13-11-3(2)(a), -4, -5. Plaintiffs allege Instructure represented it "maintained reasonable data security" while omitting "the true, inadequate state" of its practices. Compl. ¶¶ 568–69; *see id.* ¶ 66. That theory fails for numerous reasons.

First, there is no consumer transaction. A consumer transaction requires a transfer "to a person for primarily personal, family, or household purposes," Utah Code § 13-11-3(2)(a), and the only transfer alleged is Instructure's license of Canvas to schools for institutional use. Compl. ¶¶ 43, 312–13, 411; *see Holmes v. Am. States Ins. Co.*, 2000 UT App 85, ¶¶ 20–21, 1 P.3d 552; *In re PowerSchool Holdings, Inc. & PowerSchool Grp., LLC Customer Sec. Breach Litig.*, 2026 WL 817637, at *9–10 (S.D. Cal. Mar. 19, 2026) (dismissing UCSPA claim where education software was licensed to schools). Second, plaintiffs do not plead knowledge. A deceptive act requires "intentional or knowing behavior," *Martinez v. Best Buy Co.*, 2012 UT App 186, ¶ 4, 283 P.3d 521, and plaintiffs offer no facts showing Instructure knew its statements were false when made. Compl. ¶ 568; *see Cotte v. CVI SGP Acquisition Tr.*, 2022 WL 464307, at *9–10 (D. Utah Feb. 15, 2022) (dismissing UCSPA claim where plaintiffs gave "no factual basis for their conclusory allegation that Defendants acted knowingly or intentionally"). Third, plaintiffs allege no loss "causally connected to the violation." *Andreason v. Felsted*, 2006 UT App 188, ¶ 10, 137 P.3d 1. They provided their information to Canvas because of their schools' choice, not anything Instructure said to plaintiffs. Compl. ¶ 569.

Finally, plaintiffs cannot recover class damages under the UCSPA. The statute allows individual consumers to recover actual damages, but it permits class actual damages only where, before the transactions at issue, the challenged practice had already been declared unlawful by (i)

a Division rule, (ii) a reported final Utah court judgment, or (iii) a consent judgment binding the supplier. Utah Code § 13-11-19(2), (4)(a). Plaintiffs identify no such rule or judgment.

**B. California Unfair Competition Law (Count VII).**

The UCL prohibits "unlawful," "unfair," or "fraudulent" business practices, Cal. Bus. & Prof. Code § 17200, and plaintiffs invoke the unlawful and unfair prongs, Compl. ¶¶ 575, 577.

The UCL claim fails for three independent reasons. First, plaintiffs lack statutory standing. Any UCL plaintiff must show "a loss of money or property caused by unfair competition." *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1590 (2008). Neither California plaintiff, Jacobs or Large, alleges a deprivation of money or property. *See Hernandez-Silva v. Instructure, Inc.*, 2025 WL 2233210, at *5–6 (C.D. Cal. Aug. 4, 2025) (dismissing UCL claim against Instructure where plaintiffs alleged only loss of their data and diminution of its value, without facts showing they could or would sell it); *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1039–40 (N.D. Cal. 2019) (holding that risk of future harm and lost time are not lost money or property, and that data-value theory failed absent any alleged market for the information); *Dugas v. Starwood Hotels & Resorts Worldwide, Inc.*, 2016 WL 6523428, at *11 (S.D. Cal. Nov. 3, 2016) (holding the same as to anticipated monitoring costs and time spent responding to the breach, and holding that plaintiff failed to show personal information qualifies as property under the UCL).

Second, plaintiffs cannot obtain the equitable relief the UCL provides. *See* Compl. ¶¶ 580–81. Equitable restitution requires the absence of an adequate remedy at law. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020); *see Fan v. Home Depot U.S.A., Inc.*, 2022 WL 16964099, at *1–3 (E.D. Cal. Nov. 15, 2022). Where, as here, a UCL claim for equitable relief rests on the same factual allegations as other claims for damages, a plaintiff cannot establish that it lacks adequate legal remedies. *See Sonner*, 971 F.3d at 844; *Fan*, 2022 WL 16964099, at *3.

Third, plaintiffs fail to plead either prong of the UCL. The unlawful prong borrows violations of other laws and fails when the predicate violations fail. *Golden v. Sound Inpatient Physicians Med. Grp., Inc.*, 93 F. Supp. 3d 1171, 1179 (E.D. Cal. 2015). Plaintiffs invoke the California Customer Records Act, Cal. Civ. Code §§ 1798.80-.84; Section 5 of the FTC Act, 15 U.S.C. § 45; California's Student Online Personal Information Protection Act ("SOPIPA"), Cal. Bus. & Prof. Code § 22584(a); and COPPA, 16 C.F.R. Part 312. Compl. ¶ 575. None supplies a predicate violation. SOPIPA covers only services "used primarily for K–12 school purposes," Cal. Bus. & Prof. Code § 22584(a), and both UCL plaintiffs attended college. Compl. ¶¶ 129, 138. COPPA likewise protects only information collected from children under 13, and neither college plaintiff alleges any such collection. The Customer Records Act protects "customers," Cal. Civ. Code § 1798.80(c), and individuals whose data reached a software vendor through an institution are not that vendor's customers. *J.M. v. Illuminate Educ., Inc.*, 19 Cal. 5th 705, 723–24 (2026) (holding that student whose school district purchased an education-technology vendor's services and supplied the student's information was not the vendor's "customer"). The Act also reaches only certain data, such as Social Security, financial-account, or medical information, Cal. Civ. Code § 1798.81.5(d)(1)(A), and plaintiffs do not identify any such information of Jacobs or Large that was actually taken. And Section 5 of the FTC Act cannot convert allegations of inadequate security into a UCL violation for the reasons explained in Part III.B.

The unfair prong fails for the same reasons. Plaintiffs allege that Instructure's "use of inadequate data security" was unfair, Compl. ¶ 577—the same conduct underlying their unlawful-prong theory. Where an unfair-prong theory overlaps entirely with the other prongs and fails for the same reasons, it falls with them. *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1104–05 (N.D. Cal. 2017). Count VII should be dismissed.

**C. California Consumers Legal Remedies Act (Count VIII).**

The CLRA covers "transactions" "intended to result or that results in the sale or lease of goods or services to any consumer," Cal. Civ. Code § 1770(a). Jacobs and Large allege no purchase from Instructure, Compl. ¶¶ 129, 138, 584, 590, and thus there is no "transaction" and no claim under the CLRA. *Watkins v. MGA Ent., Inc.*, 550 F. Supp. 3d 815, 835 (N.D. Cal. 2021).

Plaintiffs instead rely on Instructure's website statements that the company "protect[s] the information we receive by ensuring it's used only to support students, institutions, and education" and is "committed to protecting your privacy," Compl. ¶ 66, and on "implied or implicit representations" said to arise from accepting plaintiffs' information, *id.* ¶ 587. But for an affirmative-misrepresentation theory, plaintiffs must "allege that they actually read the challenged representations," *In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 601 F. Supp. 3d 625, 767 (C.D. Cal. 2022). Jacobs and Large make no such allegation. Compl. ¶¶ 129, 138, 584, 590; *see MOVEit*, 2025 WL 2176590, at *20–21 (dismissing CLRA claim against software vendor for lack of reliance where plaintiffs did not allege "any direct interaction" with it). Plus, the affirmative statements they cite are not actionable under the CLRA because they are "[g]eneralized, vague, and unspecified assertions" that "constitute mere puffery." *Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 854–55 (N.D. Cal. 2012).

**D. California Consumer Privacy Act (Count IX).**

Plaintiffs' CCPA claim fails for two reasons. First, Instructure is not a "business" that the CCPA allows consumers to sue. The CCPA distinguishes between two kinds of entities. A "business" is one that "determines the purposes and means of the processing of consumers' personal information." Cal. Civ. Code § 1798.140(d)(1). A "service provider" is one that "processes personal information on behalf of a business" "pursuant to a written contract." *Id.* § 1798.140(ag)(1). Only a business can be sued under the CCPA's private right of action. *Id.*

§ 1798.150(a)(1). Service providers are subject only to administrative enforcement by the state. *Id.* § 1798.155(a) (reaching "[a]ny business, service provider, contractor, or other person"); *see Karter v. Epiq Sys., Inc.*, 2021 WL 4353274, at *2 (C.D. Cal. July 16, 2021); *Jimenez v. OE Fed. Credit Union*, 2025 WL 2402137, at *7 (N.D. Cal. Aug. 19, 2025). Plaintiffs allege only in conclusory terms that Instructure is a business, Compl. ¶ 597, and courts routinely dismiss CCPA claims against vendors on such allegations. *See Estrada v. TaskUs, Inc.*, 2026 WL 2169907, at *13–14 (S.D.N.Y. July 28, 2026); *Accellion*, 713 F. Supp. 3d at 641–43; *In re NCB Mgmt. Servs., Inc. Data Breach Litig.*, 748 F. Supp. 3d 262, 288 (E.D. Pa. 2024); *In re MOVEit Customer Data Sec. Breach Litig.*, 2025 WL 2179475, at *26 (D. Mass. July 31, 2025). Indeed, plaintiffs' own allegations show that Instructure is a service provider, not a business. The schools decided to adopt Canvas and required students to use it, Compl. ¶¶ 43, 129, 138, making the schools the "business" and Instructure the service provider processing data on their behalf. Instructure's Privacy Notice Center, which plaintiffs cite, confirms that Instructure "generally process[es] user data at the direction of [its] customers." Ex. 8, *Welcome to the Instructure Privacy Notice Center*, Instructure (cited in Compl. ¶ 66 n.26). Plaintiffs plead no facts showing that Instructure decided why and how students' data would be processed.

Second, plaintiffs do not plausibly allege that covered information was involved. The CCPA's private right of action reaches only "nonencrypted and nonredacted personal information," defined in Cal. Civ. Code § 1798.81.5 as an individual's name *in combination with* specified data elements such as a Social Security number, financial-account number with its access code, or medical information. Cal. Civ. Code §§ 1798.150(a)(1), 1798.81.5(d)(1)(A). Names, email addresses, course names, and enrollment information do not qualify. An email address is covered only "in combination with a password or security question and answer that would permit

access to an online account," *id.* §§ 1798.150(a)(1), 1798.81.5(d)(1)(B), and plaintiffs do not allege any such credentials were involved. And plaintiffs' generalized allegation that compromised communications included medical history, treatment, or diagnosis information, Compl. ¶ 599; *see id.* ¶¶ 130, 139–40, does not allege Jacobs or Large ever included any such information in a Canvas message. *See Gardiner v. Walmart Inc.*, 2021 WL 2520103, at *3 (N.D. Cal. Mar. 5, 2021) (dismissing CCPA claim where the complaint did not allege facts showing that the plaintiff's covered personal information was disclosed, and declining to infer that it was).

**E. Michigan Consumer Protection Act (Count XI).**

The MCPA prohibits unfair, unconscionable, or deceptive practices in trade or commerce, and Bowler, the only Michigan resident, rests his claim on the same alleged security representations and omissions as the other statutory counts: Instructure's website statements that it "protect[s] the information we receive by ensuring it's used only to support students, institutions, and education" and is "committed to protecting your privacy," and its alleged failure to disclose inadequate security. *See* Compl. ¶¶ 66, 198–99.

But the MCPA covers goods or services provided "primarily for personal, family, or household purposes," Mich. Comp. Laws § 445.902(1)(g), and Instructure provided Canvas to Bowler's university for institutional use, not to Bowler for personal, family, or household purposes. *See MOVEit*, 2025 WL 2176590, at *29 (dismissing MCPA claim against software vendor whose product was "primarily for" commercial use, even if plaintiffs' own underlying transactions were personal). Further, a named MCPA plaintiff pursuing a misrepresentation theory "must still allege actual reliance" on the challenged statements. *ZF-TRW*, 601 F. Supp. 3d at 782. Bowler does not allege he saw either statement; he alleges only that his university required him to use Canvas. Compl. ¶¶ 198–99; *see In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, 2021 WL 5937742, at *32 (D.N.J. Dec. 16, 2021). He also pleads no knowing

falsehood with the particularity Rule 9(b) requires. *See In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 665–66 (E.D. Mich. 2011). Finally, even a properly pleaded violation would not entitle Bowler to damages without a cognizable loss. *See Hendricks v. DSW Shoe Warehouse, Inc.*, 444 F. Supp. 2d 775, 782–83 (W.D. Mich. 2006) (applying Mich. Comp. Laws § 445.911 and rejecting credit-monitoring costs incurred against a potential future loss). The loss Bowler alleges is the time and expense of monitoring for possible future identity theft; thus, Bowler fails to state a cognizable injury. *See* Compl. ¶¶ 203–05, 619; *supra* Part I.A.

**F. Minnesota Consumer Fraud Act (Count XII).**

The MCFA prohibits fraud, misrepresentation, and deceptive practices "with the intent that others rely thereon in connection with the sale of any merchandise." Minn. Stat. § 325F.69, subd. 1. Mockert, the only Minnesota resident, rests his claim on the same alleged security representations and omissions as the other statutory counts: Instructure's website statements. *See* Compl. ¶¶ 66, 157. A private plaintiff must plead "a causal relationship between the alleged injury and the wrongful conduct." *MOVEit*, 2025 WL 2179475, at *39; *see ZF-TRW*, 601 F. Supp. 3d at 783. Mockert does not allege he saw either statement or otherwise explain how the alleged deceptive conduct caused his loss. He likewise fails to plead "the who, what, when, where and how" of any affirmative misrepresentation, as Rule 9(b) requires. *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 665–66 (8th Cir. 2012). As to any alleged omissions, Mockert fails to allege any special circumstances that would create a legal or equitable duty to disclose the alleged deficiencies. *MOVEit*, 2025 WL 2179475, at *39 n.29.

**G. Minnesota Uniform Deceptive Trade Practices Act (Count XIII).**

The MUDTPA authorizes only injunctive relief, Minn. Stat. § 325D.45, subd. 1, and plaintiffs now aware of the alleged misrepresentations "cannot show that they are likely to be deceived by such representations in the future," *Bhatia v. 3M Co.*, 323 F. Supp. 3d 1082, 1097 (D.

Minn. 2018). The fraud-based theory also fails for the pleading reasons addressed above. *See E-Shops*, 678 F.3d at 665–66 (dismissing MUDTPA and MCFA claims where the complaint failed to plead with particularity how the alleged failure to notify or remedy the breach constituted false, deceptive, or misleading conduct).

### H. New York General Business Law § 349 (Count XIV).

A private deception claim under Section 349 requires conduct that is "misleading in a material way" and an injury caused by that conduct. *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000). J.U. invokes Instructure's general statements that it is "committed to protecting your privacy" and has "a dedicated privacy and security program," Compl. ¶ 66, as well as alleged inadequate security, the Free-for-Teacher verification risk, omissions, and FTC Act duties, *id.* ¶ 642. But he fails to plausibly connect a materially misleading omission to any alleged injury. The challenged transaction also must occur in New York; the plaintiff's residence alone does not resolve that inquiry. *See Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324–25 (2002). J.U.'s allegations fail to identify the New York nexus of the challenged transaction and instead impermissibly rely solely on his residence. *See* Compl. ¶¶ 267–69; *MOVEit*, 2025 WL 2176590, at *31. Thus, this claim fails too.

## CONCLUSION

Accordingly, Instructure respectfully requests that the Court dismiss the complaint.

Dated this 23rd day of November, 2026

Respectfully submitted,

*/s/ Devin S. Anderson*

Devin S. Anderson (18287)
Michael S. Lehr (16496)
KIRKLAND & ELLIS LLP
95 South State Street
Salt Lake City, Utah 84111
Telephone: (801) 877-8134
Facsimile: (801) 877-8101
devin.anderson@kirkland.com
mike.lehr@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
martin.roth@kirkland.com

Cristina M. Squiers (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, Texas 75205
Telephone: (214) 972-1770
Facsimile: (214) 972-1771
cristina.squiers@kirkland.com

*Attorneys for Defendants Instructure, Inc. and Instructure Holdings, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2026, I filed a true and correct copy of the foregoing Instructure's Motion to Dismiss Plaintiffs' Track 1 Consolidated Class Action Complaint via the Court's CM/ECF system, which automatically effectuated service on all parties of record in this matter.

*/s/ Devin S. Anderson*
Devin S. Anderson