Devin S. Anderson (18287)
Michael S. Lehr (16496)
KIRKLAND & ELLIS LLP
95 South State Street
Salt Lake City, Utah 84111
Telephone: (801) 877-8134
Facsimile: (801) 877-8101
devin.anderson@kirkland.com
mike.lehr@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
rothm@kirkland.com

Cristina M. Squiers (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, Texas 75205
Telephone: (214) 972-1770
cristina.squiers@kirkland.com

*Attorneys for Defendant Instructure, Inc.*

---

**UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH**

| | |
|---|---|
| **IN RE: INSTRUCTURE DATA BREACH LITIGATION**<br><br>*This document relates to Track 2* | Case No. 2:26-cv-00374-RJS-CMR<br><br>**INSTRUCTURE, INC.'S MOTION TO DISMISS TRACK 2 CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>District Judge Robert J. Shelby<br><br>Chief Magistrate Judge Cecilia M. Romero |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........ 1

BACKGROUND ........ 1

LEGAL STANDARDS ........ 5

ARGUMENT ........ 6

I. Plaintiffs Lack Article III Standing Because They Have Not Pled a Valid Injury. ........ 7

II. Plaintiffs Fail to State a Claim for Which Relief Can Be Granted. ........ 17

A. Choice of Law: Delaware Law Governs Plaintiffs' Breach of Contract Claims, and Various States' Laws Likely Govern Their Negligence Claims. ........ 17

B. Plaintiffs Fail to State a Claim for Breach of Express Contract (Count 1). ........ 18

C. Plaintiffs' Implied Covenant Claim (Count 3) Fails Because It Duplicates, and Would Impermissibly Override, the Parties' Express Agreement. ........ 23

D. Plaintiffs' Negligence and Gross Negligence Claims (Counts 2, 2A) Fail Because the Economic-Loss Doctrine Bars Them Under Any State's Law ........ 24

E. The Unjust Enrichment Claim (Count 4) Fails Because an Express Contract Governs the Parties' Relationship. ........ 27

F. Plaintiffs' Claim for Declaratory and Injunctive Relief (Count 5) Fails Because Plaintiffs Lack Standing and It Duplicates Their Damages Claims. ........ 29

CONCLUSION ........ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 21st Century Oncology Customer Data Sec. Breach Litig.*,
380 F. Supp. 3d 1243 (M.D. Fla. 2019)....................10

*Adams v. Credico, Inc.*,
2025 WL 1579693 (D.N.D. June 4, 2025)....................8

*Aragon v. United States*,
146 F.3d 819 (10th Cir. 1998)....................21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................6, 7, 8, 12

*Baker v. USD 229 Blue Valley*,
979 F.3d 866 (10th Cir. 2020)....................5

*New Mexico ex rel. Balderas v. Google, LLC*,
489 F. Supp. 3d 1254 (D.N.M. 2020)....................2

*Beck v. McDonald*,
848 F.3d 262 (4th Cir. 2017)....................16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................6, 7

*Bland v. Urology of Greater Atlanta, LLC*,
2024 WL 3313348 (N.D. Ga. Mar. 14, 2024)....................10

*Brooks v. Fiore*,
2001 WL 1218448 (D. Del. Oct. 11, 2001), *aff'd*, 53 F. App'x 662 (3d Cir. 2002)....................21

*Carlsen v. GameStop, Inc.*,
112 F. Supp. 3d 855 (D. Minn. 2015)....................10

*Chinitz v. Ally Bank*,
2020 WL 1692817 (D. Utah Apr. 7, 2020)....................25

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)....................14, 15, 16

*ClearOne, Inc. v. PathPartner Tech., Inc.*,
2019 WL 12043493 (D. Utah Sep. 30, 2019)....................17

*Clemens v. ExecuPharm Inc.*,
48 F.4th 146 (3d Cir. 2022) ..........13, 15

*In re Cmty. Health Sys., Inc.*,
2016 WL 4732630 (N.D. Ala. Sep. 12, 2016) ..........9

*Des Moines Flying Serv., Inc. v. Aerial Servs. Inc.*,
880 N.W.2d 212 (Iowa 2016) ..........26

*Diaz v. FCA US LLC*,
693 F. Supp. 3d 425 (D. Del. 2023)..........21

*Dittman v. UPMC*,
196 A.3d 1036 (Pa. 2018)..........26

*Dyer v. Nw. Airlines Corps.*,
334 F. Supp. 2d 1196 (D.N.D. 2004)..........20

*Earl v. NVR, Inc.*,
990 F.3d 310 (3d Cir. 2021)..........26

*Engl v. Nat. Grocers by Vitamin Cottage, Inc.*,
2016 WL 8578096 (D. Colo. June 20, 2016)..........10

*Feins v. Goldwater Bank NA*,
2022 WL 17552440 (D. Ariz. Dec. 9, 2022) ..........22

*Frank M. Booth, Inc. v. Reynolds Metals Co.*,
754 F. Supp. 1441 (E.D. Cal. 1991)..........26

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000)..........7

*Gables at Sterling Vill. Homeowners Ass'n, Inc. v. Castlewood-Sterling Vill. I, LLC*,
417 P.3d 95 (Utah 2018)..........25

*Gorkin v. Vinnell Corp.*,
2006 WL 517645 (D. Colo. Mar. 2, 2006) ..........20

*Harris v. Innovate Biopharmaceuticals, Inc.*,
2019 WL 5173782 (Del. Super. Ct. Oct. 15, 2019), *aff'd*, 228 A.3d 1063 (Del. 2020) ..........23, 24

*Hudson v. Boppy Co., LLC*,
2025 WL 1806182 (10th Cir. July 1, 2025)..........17

*Jacobsen Const. Co. v. Teton Builders*,
106 P.3d 719 (Utah 2005) .......... 18

*Jacobsen v. Deseret Book Co.*,
287 F.3d 936 (10th Cir. 2002) .......... 2

*Jones v. Mackey Price Thompson & Ostler*,
355 P.3d 1000 (Utah 2015) .......... 27

*Kansas Nat. Res. Coal. v. U.S. Dep't of Interior*,
971 F.3d 1222 (10th Cir. 2020) .......... 15

*Ketler v. PFPA, LLC*,
132 A.3d 746 (Del. 2016) .......... 29

*Khalik v. United Air Lines*,
671 F.3d 1188 (10th Cir. 2012) .......... 6

*Khan v. Children's Nat'l Health Sys.*,
188 F. Supp. 3d 524 (D. Md. 2016) .......... 9, 11

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
313 U.S. 487 (1941) .......... 18

*Kuhns v. Scottrade, Inc.*,
868 F.3d 711 (8th Cir. 2017) .......... 21

*Lawrence v. Kuenhold*,
271 F. App'x 763 (10th Cir. 2008) .......... 30

*Legal Tender Servs. PLLC v. Bank of Am. Fork*,
506 P.3d 1211 (Utah Ct. App. 2022) .......... 25

*Legg v. Leaders Life Ins. Co.*,
574 F. Supp. 3d 985 (W.D. Okla. 2021) .......... 9, 11

*Lewis v. Casey*,
518 U.S. 343 (1996) .......... 12

*McMorris v. Carlos Lopez & Assocs., LLC*,
995 F.3d 295 (2d Cir. 2021) .......... 13, 15

*Middlesex Mut. Assur. Co. v. Del. Elec. Signal Co.*,
2008 WL 4216145 (Del. Super. Ct. Sep. 11, 2008) .......... 28

*Muscogee (Creek) Nation v. Okla. Tax Comm'n*,
611 F.3d 1222 (10th Cir. 2010) .......... 6

*Nebraska Innkeepers, Inc. v. Pittsburgh-Des Moines Corp.*,
345 N.W.2d 124 (Iowa 1984) ....................26

*Negron v. Ascension Health*,
2025 WL 2710014 (E.D. Mo. Sep. 23, 2025)....................21

*New Mexico Trappers Ass'n v. Torrez*,
178 F.4th 561 (10th Cir. 2026) ....................7

*PeTA, People for the Ethical Treatment of Animals v. Rasmussen*,
298 F.3d 1198 (10th Cir. 2002) ....................30

*Preventive Energy Sols., LLC v. nCap Ventures 5 LLC*,
2017 WL 87028 (D. Utah Jan. 10, 2017)....................28

*In re Progressive Leasing Breach Litig.*,
2025 WL 213744 (D. Utah Jan. 16, 2025)....................13

*Reighard v. Yates*,
285 P.3d 1168 (Utah 2012)....................25

*Reilly v. Ceridian Corp.*,
664 F.3d 38 (3d Cir. 2011)....................16

*Remick v. Utah*,
2018 WL 1472484 (D. Utah Mar. 23, 2018) ....................9

*Remijas v. Neiman Marcus Grp., LLC*,
794 F.3d 688 (7th Cir. 2015) ....................11, 16

*Ridge at Red Hawk, LLC v. Schneider*,
493 F.3d 1174 (10th Cir. 2007) ....................6

*Ridgewood Manor II, Inc. v. Del. Manufactured Home Relocation Auth.*,
2014 WL 7453275 (Del. Ch. Dec. 31, 2014)....................27

*Robbins v. Oklahoma*,
519 F.3d 1242 (10th Cir. 2008) ....................9

*RTN Invs., LLC v. RETN, LLC*,
2011 WL 862268 (Del. Super. Ct. Feb. 10, 2011)....................20

*Sac & Fox Nation of Missouri v. Pierce*,
213 F.3d 566 (10th Cir. 2000) ....................14

*In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*,
45 F. Supp. 3d 14 (D.D.C. 2014)....................11

*Sheen v. Wells Fargo Bank, N.A.*,
505 P.3d 625 (Cal. 2022) ........................................................................................26

*Smith v. Lifevantage Corp.*,
2020 WL 6940735 (D. Utah Nov. 25, 2020) ..............................................................28

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)..................................................................................6, 8, 10, 17

*StreamCast Networks, Inc. v. IBIS LLC*,
2006 WL 5720345 (C.D. Cal. May 2, 2006) ..............................................................30

*Taylormade Eyecare & Optical v. Solutionreach, Inc.*,
2026 WL 884961 (D. Utah Mar. 31, 2026) ................................................................27

*Thorpe v. Washington City*,
243 P.3d 500 (Utah Ct. App. 2010) ..........................................................................27

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)..................................................................................................13

*U.S. Fid. & Guar. Co. v. U.S. Sports Specialty Ass'n*,
270 P.3d 464 (Utah 2012)..........................................................................................29

*United Golf, LLC v. Westlake Chem. Corp.*,
2006 WL 2807342 (N.D. Okla. Aug. 15, 2006) ........................................................27

*Vahid v. Presbyterian Healthcare Servs. Espanola Hosp.*,
2003 WL 27385077 (D.N.M. July 24, 2003)..............................................................21

*Waddoups v. Amalgamated Sugar Co.*,
54 P.3d 1054 (Utah 2002)..........................................................................................18

*Warth v. Seldin*,
422 U.S. 490 (1975)............................................................................................8, 14

*Webb v. Injured Workers Pharmacy, LLC*,
72 F.4th 365 (1st Cir. 2023)......................................................................................15

*Williams Cos., Inc. v. Energy Transfer Equity, L.P.*,
159 A.3d 264 (Del. 2017) ..........................................................................................19

*Winshall v. Viacom Int'l, Inc.*,
55 A.3d 629 (Del. Ch. 2011)......................................................................................18

*Xat.com Ltd. v. Hosting Servs., Inc.*,
2017 WL 449652 (D. Utah Feb. 2, 2017) ..................................................................28

*Yankovich v. Applus Techs., Inc.*,
621 F. Supp. 3d 269 (D. Conn. 2022)....13

*In re Zappos.com, Inc.*,
108 F. Supp. 3d 949 (D. Nev. 2015)....9

**Rules**

Fed. R. Civ. P. 12(b)(1)....5

Fed. R. Civ. P. 12(b)(6)....6, 7

**Other Authorities**

Restatement (Second) of Conflict of Laws § 136 cmt. h (1971)....18

Restatement (Second) of Conflict of Laws § 145(1) (1971)....18

## INTRODUCTION

Instructure is an education technology company that provides schools software and data-management services. Its web-based learning management system, Canvas, offers a wide range of services to schools, including assignment delivery and submission, grading, and communication between teachers, students, and parents. In April 2026, a sophisticated cybercriminal organization known as ShinyHunters launched a cyberattack against Instructure that leveraged highly advanced and novel AI techniques. Instructure promptly investigated and remediated these incidents, and it has communicated regular updates to customers and the public about its response.

This Court should dismiss plaintiffs' Track 2 complaint because these plaintiffs—seven school districts that contracted with Instructure to use Canvas—fail to plead any valid injury arising out of the cyberattack. This threshold defect deprives them of Article III standing and independently defeats all but one of their substantive claims. Plaintiffs' injury allegations are recycled verbatim for every named plaintiff, lack any plaintiff-specific facts, and are impermissibly conclusory. Each of plaintiffs' claims independently fails on the merits for additional reasons. The contract claims fail because the obligations plaintiffs try to enforce are not in the contracts. And the other claims fail because they would impermissibly override the contracts. This Court should therefore dismiss the complaint in its entirety.

## BACKGROUND

Instructure is an education technology company headquartered in Utah that offers a premier learning management system, Canvas, to K-12 schools, colleges, and universities. Dkt. 185, Consolidated Class Action Complaint, Track 2 (School District Track) ("Compl.") ¶¶ 18, 29. Canvas helps these institutions manage their educational records and meet their educational objectives. *Id.*

Instructure takes a "vigilant and proactive approach" to data security. Ex. 1, *Instructure Trust Center: Compliance*, INSTRUCTURE HOLDINGS, INC. (cited in Compl. ¶ 43 n.23).[1] As plaintiffs acknowledge, Instructure maintains numerous cybersecurity certifications and attestations. Compl. ¶ 43. Instructure also regularly conducts cybersecurity audits and assessments to validate adherence to these industry-standard frameworks. *Id.*

Despite these safeguards, Instructure (like many other organizations) was the victim of a sophisticated and novel cyberattack perpetrated by the "notorious data theft and extortion gang ShinyHunters." *Id.* ¶ 47. ShinyHunters has attacked other large entities, such as "universities and cloud database companies," Ex. 2, Lorenzo Franceschi-Bicchierai, *Hackers steal students' data during breach at education tech giant Instructure*, TechCrunch (May 5, 2026) (cited in Compl. ¶ 53 n.32), including "the University of Pennsylvania, Harvard University," "Princeton University," and "Ticketmaster, AT&T Wireless, and Microsoft." Compl. ¶ 126. Recently, ShinyHunters has breached even the Federal Bureau of Investigation ("FBI"). Ex. 3, *FBI Statement on Compromise of fbijobs.gov Portal and Alleged Impact to FBI Employee PII*, FBI National Press Office (Sep. 23, 2026), https://www.fbi.gov/news/press-releases/fbi-statement-on-compromise-of-fbijobsgov-portal-and-alleged-impact-to-fbi-employee-pii [https://perma.cc/ZA6R-QR3E] (last visited Nov. 23, 2026).

On April 29, 2026, Instructure detected an intrusion by a threat actor who gained unauthorized access to Canvas by creating an account in Canvas "Free-for-Teacher" and then

[1] The Court may consider "documents referred to in the complaint" when deciding a motion to dismiss because they are "central to the plaintiff[s'] claim and the parties do not dispute the documents' authenticity." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002). Likewise, the Court may take judicial notice of factual information found on the internet, including government websites. *New Mexico ex rel. Balderas v. Google, LLC*, 489 F. Supp. 3d 1254, 1257 (D.N.M. 2020).

submitting malicious code through a support ticket. Compl. ¶¶ 48, 63, 65. When a customer-service representative followed normal protocol and opened the ticket to review the request, the code employed cross-site scripting to obtain unauthorized access. *Id.* Upon detection, Instructure swiftly revoked the threat actor's access, launched an immediate and thorough investigation, and engaged outside forensic experts. *Id.* ¶ 183. Within 48 hours of detecting the attack and launching its response, Instructure disclosed the breach to the public. *Id.* ¶ 49. The next day, Instructure provided additional details to its customers about the incident and subsequent response, including that it had "revoked 'privileged credentials and access tokens associated with affected systems,' deployed security patches, rotated certain internal keys, and implemented 'increased monitoring across all platforms.'" *Id.* ¶ 50; Ex. 4, *Confirmed Security Incident*, INSTRUCTURE HOLDINGS, INC. (cited in Compl. ¶ 50 n.27).

During Instructure's incident response, the same threat actor regained unauthorized access on May 7 through a separate cross-site scripting path. Ex. 5, *Incident Fact Sheet*, INSTRUCTURE HOLDINGS, INC. (cited in Compl. ¶ 50 n.29). The heightened monitoring Instructure put into place after the initial intrusion worked: Instructure "detected and disabled the second attack approximately 10 minutes after it began." *Id.* Instructure found no evidence that any data was exfiltrated during this event. *Id.*

On May 11, 2026, Instructure paid a ransom in exchange for all stolen data, receiving digital confirmation that the threat actor had destroyed the stolen data, and obtaining assurance that no Instructure customers would be extorted. Compl. ¶¶ 127–28; Ex. 6, Qasim Nauman, *Maker of Canvas Learning Platform Strikes Deal for Hackers to Return Data*, N.Y. Times (May 12, 2026) (cited in Compl. ¶ 128 n.79).

Since the cyberattack, Instructure has taken additional steps to fortify its already robust cybersecurity program, including deploying additional security tools like CrowdStrike Falcon and Fastly's Signal Sciences web application firewall, and issuing regular updates to its customers about the security incident investigation and response. Ex. 7, *Security Incident Update & FAQs*, INSTRUCTURE HOLDINGS, INC. (cited in Compl. ¶ 48 n.25).

Plaintiffs in this consolidated action are seven educational institutions in California, Pennsylvania, Iowa, and Oklahoma that purport to sue on behalf of a nationwide class and alternative statewide subclasses of Instructure institutional customers. Compl. ¶¶ 149–55. Each plaintiff contracted with Instructure to use Canvas at its schools. *Id.* ¶¶ 22–28. According to plaintiffs, those relationships are governed by Instructure's Master Terms and Conditions ("MTC") and its Global Data Processing Addendum ("DPA"). *Id.* ¶¶ 79–80. The MTC applies to the provision of Instructure's products or services, and the DPA governs Instructure's data obligations across various jurisdictions and forms part of the agreement between Instructure and its customers.[2]

Under these agreements, Instructure agreed to: "maintain appropriate technical and organizational measures" for data protection, *id.* ¶ 82 (citing DPA § 7.1); implement "reasonable administrative, technical, and physical safeguards in an effort to secure" its systems, *id.* ¶ 83 (citing MTC § 5 (Jan. 16, 2024)); and use "commercially reasonable efforts" to maintain 99.9% annual uptime, *id.* ¶ 83 (citing MTC § 8). The agreements also contain provisions that "cap, limit, exclude, or waive" Instructure's liability. *Id.* ¶¶ 205, 222.[3]

---

[2] *See* https://www.instructure.com/policies/master-terms-conditions (MTC, Intro); https://www.instructure.com/policies/data-processing-addendum (DPA, Intro).

[3] The MTC provides that each party's cumulative maximum liability for a breach "arising out of or related to this agreement or the use or inability to use the service . . . shall not exceed the amount paid by customer under this agreement within the twelve . . . months immediately

Plaintiffs allege that the data the threat actor took as part of its ransom operation against Instructure included "private personal messages among students, teachers, and staff," which they speculate "could contain" sensitive information, as well as "full names, student identification numbers, usernames, [and] email addresses." *Id.* ¶ 9. Plaintiffs do not allege that sensitive information—such as Social Security numbers, financial-account information, or medical records—was taken, or that any information has been, or is being, misused against them. The complaint is unclear whether or to what extent plaintiffs claim that the information potentially accessed by the threat actor belongs to them rather than to their students.

Plaintiffs assert claims for breach of an express contract (Count 1), *id.* ¶¶ 167–77; negligence (Count 2), *id.* ¶¶ 178–201; gross negligence (Count 2A), *id.* ¶¶ 202–07; breach of the implied covenant of good faith and fair dealing (Count 3), *id.* ¶¶ 208–13; unjust enrichment (Count 4), *id.* ¶¶ 214–24; and declaratory and injunctive relief (Count 5), *id.* ¶¶ 225–33. All seven named plaintiffs plead their injuries with identical boilerplate language: Each alleges that it "overpaid each time it entered into a contract," "did not receive the benefit of its bargain," and "has lost time and money responding to the Data Breach." *Id.* ¶¶ 22–28. None identifies any of its own data that was actually taken or misused, or any specific financial or other harm it purportedly suffered.

## LEGAL STANDARDS

A motion to dismiss that asserts lack of standing is a challenge to the court's subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Instructure's challenge to standing here is facial: It "assumes the allegations in the complaint are true and argues they fail to establish jurisdiction." *Baker v.*

preceding the event giving rise to liability." MTC § 12. And that limitation-of-liability provision is incorporated into the DPA. *See* DPA § 15.

*USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020).[4] Plaintiffs bear "the burden of establishing" standing and, at the pleading stage, must "clearly . . . allege facts demonstrating" each element. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The Court accepts "well-pleaded factual allegations as true," but need not accept "unsupported conclusory allegations." *Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1227 (10th Cir. 2010).

A complaint is subject to dismissal under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Facts "merely consistent with" liability fall short of "the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Indeed, "the mere metaphysical possibility that *some* plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). In applying that standard, the Court must "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012).

## ARGUMENT

The complaint fails as a matter of law. *First*, plaintiffs have not pled a valid injury. Their injury allegations are quintessential boilerplate, copied verbatim for every named plaintiff, and far too conclusory to establish a particularized injury. Plaintiffs do not allege that any part of the price they paid was specifically allocated to data security; their response costs and anticipated

---

[4] Unless otherwise specified, all citations are cleaned up with emphasis added.

expenditures are self-inflicted; their generic allegations of operational disruption and reputational harm are divorced from any specific injury to any named plaintiff; and the speculative risk of future harm to students and other users is neither imminent nor plaintiffs' own. *Second*, each claim independently fails under Rule 12(b)(6). The breach of express contract claim (Count 1) fails because plaintiffs seek to hold Instructure liable for obligations not found in the contracts. The implied covenant claim (Count 3) duplicates, and would impermissibly override, the parties' express agreement. The negligence and gross negligence claims (Counts 2, 2A) are barred by the economic-loss doctrine under any potentially applicable state's law. The unjust enrichment claim (Count 4) fails because an express contract governs the parties' relationship. And the claim for declaratory and injunctive relief (Count 5) fails because it is duplicative and plaintiffs lack standing to seek injunctive relief. The complaint should be dismissed.

## I. Plaintiffs Lack Article III Standing Because They Have Not Pled a Valid Injury.

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). The Tenth Circuit "applie[s] the *Twombly* and *Iqbal* plausibility test to assess standing." *New Mexico Trappers Ass'n v. Torrez*, 178 F.4th 561, 568 n.2 (10th Cir. 2026). Plaintiffs are therefore required to allege more than "labels and conclusions" or mere speculation. *Twombly*, 550

U.S. at 555. Plaintiffs must "clearly . . . allege facts demonstrating" each element of standing. *Spokeo*, 578 U.S. at 338 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).[5]

Plaintiffs allege four categories of purported injury: (1) overpayment and benefit-of-the-bargain losses on their contracts; (2) resources spent understanding, communicating about, and mitigating the effects of the breach and Canvas outage, as well as anticipated future remediation expenditures; (3) operational disruptions and unspecified reputational harm; and (4) the risk of harm to students and other Canvas users. *See* Compl. ¶¶ 22–28, 139–48. Each fails.

At the threshold, plaintiffs' injury allegations all fail because they are neither concrete nor particularized. Each named plaintiff alleges, in identical words, only that, "[a]s a result of Instructure's failure to implement adequate cybersecurity," it "overpaid each time it entered into a contract with Instructure, did not receive the benefit of its bargain, has lost time and money responding to the Data Breach and resulting outage, and anticipates spending additional time and money on an ongoing basis to mitigate and address the harms caused by the Breach." *Id.* ¶¶ 22–28. In a section titled "Plaintiffs and Class Members Have Been Harmed," plaintiffs list purported generalized harms. *See id.* ¶¶ 139–48 (emphasis omitted).[6] But these are just "formulaic recitation[s]" copied and pasted across the complaint and thus are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679, 681. Without specifying the "amount of time and money" plaintiffs expended, the supposed injury is not concrete. *See Adams v. Credico, Inc.*, 2025 WL

---

[5] The same pleading deficiencies independently defeat nearly all of plaintiffs' state-law claims, all but one of which require actual injury or damages as an element. *See infra* Section II.

[6] This section recites the same harms as alleged elsewhere, including benefit-of-the-bargain damages, Compl. ¶ 139; mitigation damages, including "time and resources [devoted] to understanding the Data Breach," *id.* ¶ 140; "operational disruption" from the Canvas outage, *id.* ¶ 141; and the expenditure of resources "to monitoring the Data Breach" to prevent misuse of any stolen data, *id.* ¶ 147.

1579693, at *4 (D.N.D. June 4, 2025). And without alleging anything specific to each plaintiff, the purported injury is not particularized. *See Remick v. Utah*, 2018 WL 1472484, at *7–8 (D. Utah Mar. 23, 2018). Plaintiffs must "make clear exactly *who* is alleged to have done *what to whom*"; "collective allegations" are insufficient. *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008). Because collective, vague allegations are all plaintiffs have, all of their injury theories are insufficient to confer standing.

No category is sufficient on its own terms, either:

***Overpayment and Benefit of the Bargain.*** Plaintiffs' lead theory of injury is that, when they paid for Canvas, they contracted not merely for access to the Canvas platform but also for a discrete bundle of services that included data security, and that some unidentified portion of their Canvas subscription covered data-security services. *See, e.g.*, Compl. ¶ 143. Many courts have rejected this overpayment or benefit-of-the-bargain theory as a basis for standing where, as here, it rests on conclusory allegations. *See In re Cmty. Health Sys., Inc.*, 2016 WL 4732630, at *8 (N.D. Ala. Sep. 12, 2016) (collecting cases).

The overpayment or benefit-of-the-bargain theory does not work here because plaintiffs do not "allege facts showing how the price they paid for [the defendant's] goods incorporated some particular sum that was understood by both parties to be allocated towards the protection of customer data." *In re Zappos.com, Inc.*, 108 F. Supp. 3d 949, 962 n.5 (D. Nev. 2015); *see also Legg v. Leaders Life Ins. Co.*, 574 F. Supp. 3d 985, 995 (W.D. Okla. 2021). It likewise fails where, as here, the plaintiff does not "allege any facts showing that she overpaid for . . . services or that she would have sought those services from another provider had she been aware of the [defendant's] allegedly lax data security." *Khan v. Children's Nat'l Health Sys.*, 188 F. Supp. 3d 524, 533 (D. Md. 2016). This follows from the requirement that an injury be both concrete and

particularized—it "must affect the plaintiff in a personal and individual way," "must actually exist," and cannot merely be "abstract." *Spokeo*, 578 U.S. at 339–40. Without facts showing that these parties actually priced data security into the bargain, there is no way to measure—or even confirm the existence of—any difference between what plaintiffs paid and what they received; the claimed overpayment is simply a label, not a concrete economic loss. Thus, vaguely alleging "some difference between what [plaintiffs] paid and what [they] received . . . is not enough." *Carlsen v. GameStop, Inc.*, 112 F. Supp. 3d 855, 863 (D. Minn. 2015); *see also Bland v. Urology of Greater Atlanta, LLC*, 2024 WL 3313348, at *5–6 (N.D. Ga. Mar. 14, 2024).

For these reasons, in data-breach cases, "[c]ourts have generally found 'overpayment' theories insufficient to establish injury, even in situations involving highly sensitive" personal information. *Carlsen*, 112 F. Supp. 3d at 861. For example, in *In re 21st Century Oncology Customer Data Sec. Breach Litig.*, a putative nationwide class sued the healthcare-provider defendants after an unauthorized third party gained access to information belonging to 2.2 million current and former patients. 380 F. Supp. 3d 1243, 1246 (M.D. Fla. 2019). The plaintiffs alleged, among other things, that they overpaid for the defendants' services due to the inadequate protection of their data, and that they would not have done business with the defendants had they "disclosed their data security problems." *Id.* at 1250, 1257. The court rejected this overpayment theory of injury because there were "no factual allegations demonstrating that the Parties mutually agreed that any portion of the sums paid from Plaintiffs to Defendants would be allocated to data security." *Id.* at 1257. The court concluded that the plaintiffs' failure to "allege[] facts that show that the market value of" the defendants' services "was somehow less than what they paid" was fatal to their argument. *Id.* Many courts have reached the same conclusion. *See Engl v. Nat. Grocers by Vitamin Cottage, Inc.*, 2016 WL 8578096, at *9 (D. Colo. June 20, 2016) (rejecting benefit-of-the-

bargain theory of injury because plaintiffs failed to "allege facts showing that the price they paid . . . included an amount that both parties understood would be allocated toward protecting customer data"); *Legg*, 574 F. Supp. 3d at 994–95 (rejecting benefit-of-the-bargain theory where plaintiff did not "indicate[] that he paid any sort of premium in exchange for data security").

Here, plaintiffs do not specify what sensitive information is at issue or why students' sensitive information results in an injury to them. Plaintiffs also fail to allege facts that show the price they paid included a premium for data security, what that indeterminate premium cost, or that the parties understood some portion of their payment went to data security. Nor do they allege that they would have contracted with a different provider, identify who that provider might be, or state that they would have declined to do business with Instructure had they known of Instructure's allegedly deficient data-security practices. *See Khan*, 188 F. Supp. 3d at 533.

At bottom, plaintiffs' theory reduces to the claim "that some indeterminate part of their premiums went toward paying for security measures"—a claim courts consistently hold is "too flimsy to support standing." *In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 30 (D.D.C. 2014). The Court should follow suit and reject this "dubious" injury. *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 694 (7th Cir. 2015).

***Operational Disruption and Reputational Harm.*** Plaintiffs further allege that they "suffered substantial operational disruption as a result of the second unauthorized access and resulting Canvas outage," as well as unspecified "reputational harm in addition to incurring costs associated with the Data Breach." Compl. ¶ 141. These allegations are similarly just labels and conclusions, not specific or particularized facts.

Plaintiffs allege that the "disruption" caused by the data breach "was so significant that a number of schools were forced to postpone or cancel exams and assignments." *Id.* ¶ 61. But the

only schools they identify are three universities that are not plaintiffs here. *Id.* In fact, every time the complaint alleges harms with any specificity, they pertain to institutions other than the named plaintiffs. *Id.* ¶ 59 (Harvard University; University of Pennsylvania; Duke University; University of California, Los Angeles; and University of Nebraska), ¶ 61 (University of Illinois; Penn State University; and Baylor University), ¶ 65 (Penn State University; the University of California campuses; and Montgomery County Public Schools in Maryland). No named plaintiff alleges that it canceled an exam, lost instructional time, or suffered any other identifiable disruption to its own operations. And as for the reputational harm, plaintiffs do not identify a single student, parent, or partner who thinks less of them, or any lost enrollment, funding, or business. At bottom, the named plaintiffs themselves offer only assertions devoid of factual allegations—nothing more than "conclusory" and "formulaic recitation[s]" of injury that the Court must disregard. *Iqbal*, 556 U.S. at 678, 681. Because no named plaintiff alleges facts showing that it personally experienced operational disruption or reputational harm, these theories cannot sustain standing. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996).

***Mitigation.*** Plaintiffs next claim that they lost "time and money responding to the Data Breach and resulting outage." *See, e.g.*, Compl. ¶¶ 22–28. They assert that they had to "devote substantial time and resources to understanding the Data Breach and its impact on students and teachers, communicating known threats and risks to affected individuals, implementing temporary instructional and testing alternatives, exploring alternative means of storing and processing their Data, and ensuring that sensitive information is protected against future misuse and unauthorized access." *Id.* ¶ 140.

Yet no plaintiff individually identifies what specific actions it took or what amount it actually spent on any of these measures, let alone alleges a substantial risk of harm to its own

interests that made any measure necessary. Instead, plaintiffs merely recite things like the nationwide Canvas outage caused nonspecific disruptions at "numerous schools," *id.* ¶¶ 5, 9, 10, 58, 60, and that it was necessary to "devote substantial time and resources to . . . implementing temporary instructional and testing alternatives," *id.* ¶ 140. Alleged disruption at unnamed schools says nothing about whether (or how) any of these plaintiffs was itself harmed.

These mitigation allegations are plainly insufficient because "courts in this district have consistently declined to find standing absent any allegations of actual misuse." *In re Progressive Leasing Breach Litig.*, 2025 WL 213744, at *6 (D. Utah Jan. 16, 2025); *see also id.* at *6–9 (discussing post-*TransUnion* decisions). As many courts have explained, *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), compels that conclusion. *See Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 155 (3d Cir. 2022) ("*TransUnion* also made clear" that "something more is required" to support standing for a damages claim than "the allegation of a risk of future harm alone."). Thus, absent actual misuse, plaintiffs cannot manufacture standing by claiming an intent to spend money in the future to combat hypothetical future misuse. *Id.*

Here, plaintiffs concede that "there has been no confirmation that the stolen Data has been sold on the Dark Web." Compl. ¶ 134. Moreover, the data implicated—names; email addresses; user identifiers; login and time-zone data; course, enrollment, group, and section information; and messages—is not the type of information that creates a substantial risk of identity theft to plaintiffs (which are institutions anyway), such as Social Security or financial account numbers. *See McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 302 (2d Cir. 2021); *see also Yankovich v. Applus Techs., Inc.*, 621 F. Supp. 3d 269, 275–77 (D. Conn. 2022) (collecting district court cases). Thus, plaintiffs' suggestion that messages "*could* contain virtually any category of Private

Information," Compl. ¶ 9, is insufficient. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Alleged mitigation efforts, especially those based on speculation, are insufficient.

***Future Harms: Students.*** Plaintiffs allege that they "will need to remain vigilant against unauthorized use of the stolen Data for years to come and must continue to devote school resources to monitoring the Data Breach and communicating with affected individuals." Compl. ¶ 147. Instructure does not dispute that schools play a vital role in safeguarding the students' data entrusted to their care. But that role does not convert a speculative risk to students into a concrete and particularized injury to the institutions themselves. This supposed injury fails because any risk of future misuse is personal to the students, faculty, and staff whose information was involved—not to the plaintiff school districts—and, in all events, that risk is untethered from both the nature of this incident and the types of data at issue.

First, the risk plaintiffs invoke is not theirs. A plaintiff "generally must assert its own rights, rather than those belonging to third parties." *Sac & Fox Nation of Missouri v. Pierce*, 213 F.3d 566, 573 (10th Cir. 2000) (citing *Warth*, 422 U.S. at 499). However sincere plaintiffs' commitment to their students' welfare might be, any identity theft, fraud, or other misuse of student information would injure the students, not the institutions that serve them. Plaintiffs allege no basis for third-party or associational standing. Indeed, students with information allegedly involved in the incident have already separately asserted their own rights in this consolidated action as Track 1 plaintiffs. *See* Dkt. 180.

Second, the risk of misuse is not concrete or imminent given the nature of this incident. This was a ransom attack directed at Instructure, and it ended with Instructure paying a ransom in exchange for the stolen data, receiving digital confirmation that the threat actor had destroyed it, and obtaining assurance that no Instructure customers would be extorted as a result. Compl.

¶¶ 127–28. Plaintiffs concede that "there has been no confirmation that the stolen Data has been sold on the Dark Web," *id.* ¶ 134, and the information accessed—names, email addresses, student ID numbers, and messages, *id.* ¶ 50—is not the type of information that creates a substantial risk of identity theft. *See McMorris*, 995 F.3d at 302. There is no present risk, much less a future one.

Third, because the underlying risk is speculative, any monitoring or communication costs plaintiffs choose to incur in response are self-inflicted and insufficient to confer standing for the reasons discussed above. *See Clemens*, 48 F.4th at 155. Plaintiffs' allegations of future harm to students and other users do not establish a cognizable injury-in-fact under Article III.

***Future Harms: Institutions.*** Plaintiffs further claim that "[t]hey have suffered serious injury and face a present and imminent [] risk of future injury, including extortion attempts and/or the consequences of misuse of their Data." Compl. ¶ 141. But this purported harm is too speculative. "[F]or an injury to be imminent, it must be certainly impending." *Kansas Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1231 (10th Cir. 2020). "Allegations of possible future injury are not sufficient." *Clapper*, 568 U.S. at 409.

In determining whether the risk of future misuse of personally identifiable information following a data breach is imminent and substantial, circuit courts have adopted a multi-factor approach, weighing a non-exhaustive list of non-dispositive factors. *See, e.g.*, *McMorris*, 995 F.3d at 302. Those factors include whether (1) "any portion of the dataset has already been misused, even if the plaintiffs themselves have not yet experienced identity theft or fraud"; (2) "the type of data that has been exposed is sensitive such that there is a high risk of identity theft or fraud"; and (3) "the plaintiffs' data has been exposed as the result of a targeted attempt to obtain that data." *Id.* at 303. Other circuits look to similar considerations. *Id.* at 300–03 (collecting cases); *see also Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 375–76 (1st Cir. 2023). And courts have

consistently concluded that mitigation efforts following a data breach do not confer standing where the alleged harm is not imminent and thus any expenditures are self-imposed. *See Beck v. McDonald*, 848 F.3d 262, 277–78 (4th Cir. 2017); *Remijas*, 794 F.3d at 694; *Reilly v. Ceridian Corp.*, 664 F.3d 38, 46 (3d Cir. 2011).

Here, plaintiffs cannot show that the risk of future misuse is imminent and substantial, and their purported injuries are self-inflicted. Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves." *Clapper*, 568 U.S. at 416. Without such a rule, "an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear." *Id.* Such pocketbook injuries are thus only as concrete as the harms they are meant to avert. And as explained above, plaintiffs do not allege that any data has been misused or that the data is sensitive. At most, they speculate that private messages "*could* contain" sensitive information. Compl. ¶ 9. That omission is fatal both to their claimed response costs and to their anticipated future remediation expenditures.

***Injunctive Relief.*** For the same reasons, plaintiffs lack standing to seek injunctive relief. Plaintiffs allege that they "face an ongoing and prospective risk of future injury from Instructure's continuing data-security practices." *Id.* ¶¶ 164, 228. But the hypothetical possibility that Instructure will suffer another breach—and that plaintiffs' data will be compromised in it—is far too speculative to support standing for prospective relief. *See, e.g.*, *Beck*, 848 F.3d at 277 (no sufficiently "immediate" danger of future injury to support injunctive relief, even where "the named plaintiffs have been victimized by at least two [prior] data breaches").

The risk is especially remote here. The cyberattacks were perpetrated by a sophisticated cybercriminal organization using highly advanced and novel artificial-intelligence tools. *See* Compl. ¶¶ 126, 137. A recurrence of such a unique scenario is neither certainly impending nor the

subject of a substantial risk, particularly because Instructure has permanently shut down the point of access—the Free-for-Teacher environment. *Id.* ¶ 63. Plaintiffs have not adequately alleged a risk of future harm that is imminent or substantial, and thus they lack standing to pursue retrospective or prospective relief.

* * *

Plaintiffs allege only undifferentiated, generalized injuries not "affect[ing] [each] plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339. Absent allegations of personal injury, no named plaintiff "may seek relief on behalf of [itself] or any other member of the class." *Hudson v. Boppy Co., LLC*, 2025 WL 1806182, at *3 (10th Cir. July 1, 2025). Thus, the Court should dismiss plaintiffs' claims for lack of standing.

## II. Plaintiffs Fail to State a Claim for Which Relief Can Be Granted.

Plaintiffs' allegations also fail to state a claim on the merits. For this separate reason, the complaint should be dismissed in its entirety.

### A. Choice of Law: Delaware Law Governs Plaintiffs' Breach of Contract Claims, and Various States' Laws Likely Govern Their Negligence Claims.

***Contract claims.*** Delaware law governs plaintiffs' contract claims, and their suggestion that the contracts at issue require another state's law is wrong. *See, e.g.*, Compl. ¶¶ 152–54. The Master Terms and Conditions ("MTC") contains a choice-of-law provision that states that "this Agreement shall be interpreted, governed, and construed by the laws of the State of Delaware, without regard to principles of conflict of laws." MTC § 20.[7] And "[u]nder Utah law, the presence of a contractual choice of law provision is enforceable." *ClearOne, Inc. v. PathPartner Tech., Inc.*,

[7] Unless otherwise specified, the provisions cited herein refer to the most recent version of the MTC, which went into effect in April 2026 and does not differ in substance from the preceding version.

2019 WL 12043493, at *3 (D. Utah Sep. 30, 2019) (citing *Jacobsen Const. Co. v. Teton Builders*, 106 P.3d 719, 723 (Utah 2005)). Delaware law thus governs the interpretation and enforceability of the parties' agreement. Delaware law also applies to plaintiffs' implied-covenant claim because "[u]nder Delaware law, an implied covenant of good faith and fair dealing inheres in every contract." *Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 636 (Del. Ch. 2011).

***Tort claims.*** The Court must also determine which state's law governs plaintiffs' tort claims. A federal court sitting in diversity applies the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Utah applies the "most significant relationship" test from the Second Restatement of Conflict of Laws. *Waddoups v. Amalgamated Sugar Co.*, 54 P.3d 1054, 1059 (Utah 2002). Under this test, courts consider which state "'has the most significant relationship to the occurrence and the parties.'" *Id.* at 1060 (quoting Restatement (Second) of Conflict of Laws § 145(1) (1971)). For this inquiry, four factors are pertinent: (1) the place where the injury occurred; (2) the place where the underlying conduct occurred; (3) the parties' domicile, residence, nationality, place of incorporation, and place of business; and (4) the place where the parties' relationship, if any, is centered. *Id.*

Here, Utah—where Instructure is headquartered—and the named plaintiffs' home states—California, Pennsylvania, Iowa, and Oklahoma—each have a potential interest in applying their law. Plaintiffs have provided "insufficient information[] about the foreign law," and thus the Court will ordinarily "decide the case in accordance with its own local law." Restatement (Second) of Conflict of Laws § 136 cmt. h (1971). Nonetheless, plaintiffs' tort claims fail under the law of every potentially applicable state. *See infra* Section II.D.

### B. Plaintiffs Fail to State a Claim for Breach of Express Contract (Count 1).

Plaintiffs first allege that Instructure breached its express contracts. Compl. ¶¶ 167–77. Throughout the complaint, plaintiffs refer collectively to the "Contracts," which include

Instructure's "Trust Center materials, Master Terms and Conditions ["MTC"], DPA, Product Privacy Notice, Network Security Policy, IT Acceptable Use Policy, Master Subscription Service Agreement, Order Forms," certain plaintiff-specific agreements, and additional unspecified agreements with plaintiffs and class members. *Id.* ¶ 93. Plaintiffs claim Instructure breached these agreements by failing to "safeguard" their data, "implement and maintain reasonable access controls and security safeguards," "encrypt, protect, or isolate data," abide by "industry-standard security requirements," and "promptly notify" plaintiffs of the incident. *Id.* ¶ 171(a)–(j).

Plaintiffs' contract claims fail because they rest on obligations the contracts do not contain. Plaintiffs fail to identify any specific, enforceable promise, created by express contract language, that Instructure broke. Instead, plaintiffs point to aspirational marketing language, statements of policy, and general commitments to maintain appropriate technical and organizational measures. That is not nearly enough for a breach of express contract claim.

First, plaintiffs contend that Instructure promised "100% uptime" and an "always on" platform. *Id.* ¶¶ 2, 30, 95, 96(d). That is incorrect. The MTC, which, as plaintiffs concede, governs the parties' relationship, *id.* ¶¶ 79–80, provides only that Instructure "will use *commercially reasonable efforts*" to achieve 99.9% annual uptime. MTC § 8. By agreeing to use commercially reasonable efforts, Instructure promised to "take all reasonable steps" to fulfill its contractual duties. *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 272 (Del. 2017). That is a promise about effort, not outcome. In any event, Instructure delivered on that promise, and plaintiffs have no persuasive argument to the contrary. Although plaintiffs complain that Instructure temporarily took Canvas offline in response to the May 7 cyberattack, the complaint does not allege facts plausibly showing that Instructure's efforts fell short of the contractual standard. *See* Compl. ¶¶ 58–65.

Moreover, the MTC specifies the only remedy for an uptime shortfall: a service credit, capped at one-twelfth of the customer's annual fees, which is the customer's "sole and exclusive remedy" and is available only if the customer requests it in writing within 30 days. MTC § 8. The complaint does not allege that any plaintiff made such a request. Instructure also expressly disclaimed any warranty "that the service will be uninterrupted or error-free." *Id.* § 5. Thus, any damages for "operational disruption and loss of access to Canvas," Compl. ¶ 12, are limited to the service credit. Again, no plaintiff alleges it gave the required written notice.

Second, plaintiffs attempt to get around the MTC's clear language by transforming the Trust Center pages and policy statements into contractually binding obligations. Compl. ¶¶ 30–43, 93–96. But the parties agreed otherwise. The MTC "constitutes the entire agreement between the parties with respect to the subject matter thereof, and any prior representations, statements, and agreements relating thereto are superseded." MTC § 22. Instructure also disclaimed "all warranties, whether written, oral, express, implied, or statutory" except those expressly stated in Section 5. MTC § 5. Delaware law "consistently uphold[s] integration or merger clauses" like this one, rendering "evidence of prior or contemporaneous agreements that contradict the terms of an integrated and complete writing . . . inadmissible." *RTN Invs., LLC v. RETN, LLC*, 2011 WL 862268, at *13 (Del. Super. Ct. Feb. 10, 2011) (collecting cases). Under such a clause, the written agreement is the whole agreement, and a party cannot rely on outside statements to add obligations.

Thus, promotional language outside the four corners of the governing contract—such as "#1 LMS in the world" and "rest assured that your data is safeguarded"—cannot add terms to the express contract. Compl. ¶¶ 30, 38. Nor can online policy notices (e.g., Product Privacy Notice, Network Security Policy, IT Acceptable Use Policy). *See Dyer v. Nw. Airlines Corps.*, 334 F. Supp. 2d 1196, 1200 (D.N.D. 2004); *Gorkin v. Vinnell Corp.*, 2006 WL 517645, at *5 (D. Colo.

Mar. 2, 2006); *Vahid v. Presbyterian Healthcare Servs. Espanola Hosp.*, 2003 WL 27385077, at *2 (D.N.M. July 24, 2003) (collecting cases).

Regardless, the promotional language constitutes nonactionable puffery because it makes "generalized statements" without specific claims. *See Diaz v. FCA US LLC*, 693 F. Supp. 3d 425, 440 n.23 (D. Del. 2023). General statements "are not sufficient to create enforceable contractual obligations under Delaware law," and thus they do not give rise to contract claims. *Brooks v. Fiore*, 2001 WL 1218448, at *4 (D. Del. Oct. 11, 2001), *aff'd*, 53 F. App'x 662 (3d Cir. 2002).

Stripped of these extra-contractual statements, the complaint identifies no term of the MTC that Instructure breached. Extracontractual notices concerning privacy do not transform a payment for services into a payment for services *plus* data security. *Negron v. Ascension Health*, 2025 WL 2710014, at *11 (E.D. Mo. Sep. 23, 2025) (citing *Kuhns v. Scottrade, Inc.*, 868 F.3d 711, 718 (8th Cir. 2017)).

Third, plaintiffs' allegations fail to show that Instructure violated the Global Data Processing Addendum ("DPA"). Plaintiffs point to the DPA's promise that "Instructure shall comply with applicable Data Protection Laws," DPA § 3.1, and allege that because Instructure purportedly "failed to comply with Federal Trade Commission ('FTC') guidance on protecting" personally identifiable information, Instructure necessarily failed to comply with federal law. Compl. ¶¶ 73, 81. But it is a basic principle of administrative law that agency "guidance or advisory document[s]," as opposed to agency regulations, are not "entitled to the force and effect of law." *Aragon v. United States*, 146 F.3d 819, 824 (10th Cir. 1998). Thus, even if plaintiffs are correct that Instructure did not comply with FTC guidance, this is insufficient to state a claim for breach of the DPA. After all, even "a data security infrastructure in accordance with industry standards does not completely preclude the possibility of a data breach, and conversely a data breach does

not by itself demonstrate an inadequate data security infrastructure." *Feins v. Goldwater Bank NA*, 2022 WL 17552440, at *7 (D. Ariz. Dec. 9, 2022).

Plaintiffs' claim that Instructure violated the DPA by failing to maintain "appropriate technical and organizational measures" for data security likewise fails. Compl. ¶ 82. Although much of the complaint relies on the fact of the breach itself, *id.* ¶¶ 45, 110, 116, a criminal intrusion, standing alone, fails to plausibly show that Instructure's measures were not appropriate. After all, the cybercriminal organization behind the attack deployed sophisticated and novel tools to carry out this attack, and other sophisticated entities—including the FBI—have similarly fallen prey to the same organization. And although plaintiffs claim that Instructure breached its obligation to provide timely notice of the data breach, *see* DPA § 9, the allegations do not support their argument that Instructure unduly delayed, Compl. ¶ 82. According to plaintiffs, Instructure detected the intrusion on April 29, revoked access and engaged forensic experts that same day, announced the incident on May 1, disclosed the affected data categories on May 2, and began notifying institutions on May 5. *Id.* ¶¶ 48–52. Notice six days after a sophisticated cyberattack—after diligently seeking to understand the scope and nature of the attack—is not an undue delay. Without a contractual deadline or additional allegations that accurate notice could have been delivered earlier, this claim fails.

Finally, the parties already allocated the risks associated with non-performance caused by factors outside of Instructure's control in the MTC. The MTC provides that "Instructure will not be liable for failure or delay in its performance to the extent caused by circumstances beyond its reasonable control." MTC § 18. An attack by a sophisticated cybercriminal organization is definitionally a "circumstance[] beyond [Instructure's] reasonable control." Indeed, the complaint accurately describes ShinyHunters as a "notorious data theft and extortion gang" behind breaches

at Ticketmaster, AT&T, and Microsoft. Compl. ¶¶ 47, 126. At a minimum, that clause defeats any claim based on the temporary May 7 outage, which the complaint attributes to the criminal intrusion. *Id.* ¶¶ 56–58.

Thus, plaintiffs can point to no contractual promise that Instructure breached, and the contractual language that governs forecloses all of plaintiffs' breach-of-contract theories.

### C. Plaintiffs' Implied Covenant Claim (Count 3) Fails Because It Duplicates, and Would Impermissibly Override, the Parties' Express Agreement.

Plaintiffs repackage their contract claim as a breach of the implied covenant of good faith and fair dealing, alleging that Instructure failed "to provide a secure and reliable educational platform capable of safeguarding sensitive student, educator, and institutional Data" and to provide "compliance with industry-standard security practices, prompt detection and containment of security incidents, and timely notice to impacted parties." Compl. ¶ 210.

This claim fails for many reasons. First, the claim is impermissibly duplicative. An "implied covenant claim should not be considered separate from the breach of contract claim where, as here, a plaintiff alleges the same underlying facts in support of the breach of contract claim." *Harris v. Innovate Biopharmaceuticals, Inc.*, 2019 WL 5173782, at *8 (Del. Super. Ct. Oct. 15, 2019), *aff'd*, 228 A.3d 1063 (Del. 2020). Plaintiffs do not even try to plead around this rule: their implied covenant count invokes the "express[]" contract language on its face. Compl. ¶ 210.

Second, the claim rises or falls with the contract claim, because "a party cannot breach the covenant of good faith and fair dealing if there has been no breach of the underlying contract." *Harris*, 2019 WL 5173782, at *8 & n.7 (collecting cases). Because plaintiffs fail to plead a breach of contract for the reasons explained above, their implied covenant claim fails too.

Third, "the implied covenant cannot be used to override the express terms of an agreement." *Id.* The DPA's express notice terms govern its contractual duties, and thus the claim fails. Section 9 of the DPA provides that, in the event of a security breach, Instructure shall:

> (a) notify Customer of the Security Breach without undue delay after becoming aware of the Security Breach and such notification shall include at least the information required by the Data Protection Laws;
>
> (b) investigate the Security Breach and provide Customer with information about the Security Breach; and
>
> (c) take commercially reasonable steps to mitigate the effects and to minimize any damage resulting from the Security Breach, and to allow Customer to take reasonable and appropriate steps to do the same to the extent such steps are within Customer's control. Instructure shall cooperate with Customer and with any third parties designated by Customer to respond to the Security Breach.[8]

Section 9 thus covers the very notice, investigation, and mitigation duties that plaintiffs seek to impose through the implied covenant. If Instructure breached Section 9, the implied covenant claim is impermissibly duplicative of the breach-of-contract claim. If Instructure complied with Section 9, the claim fails because, under Delaware law, the "covenant cannot be used to override the express terms of an agreement." *Id.* Either way, Count 3 cannot survive.

### D. Plaintiffs' Negligence and Gross Negligence Claims (Counts 2, 2A) Fail Because the Economic-Loss Doctrine Bars Them Under Any State's Law.

Plaintiffs' negligence and gross negligence claims fail under any state's law under the economic-loss doctrine. Although plaintiffs do not provide sufficient information to determine which state's law applies, their tort claims fail under the law of every potentially relevant jurisdiction. Utah and each named plaintiff's home state recognize the economic-loss doctrine, which bars a plaintiff from recovering purely economic losses in tort absent bodily injury or

---

[8] https://www.instructure.com/policies/data-processing-addendum [https://perma.cc/6T26-VRZN] (last visited Nov. 23, 2026).

physical damage to other property. The doctrine preserves the boundary between contract and tort: "Generally speaking, the economic loss rule prevents the recovery of purely economic damages under a tort theory 'when a contract covers the subject matter of the dispute.'" *Chinitz v. Ally Bank*, 2020 WL 1692817, at *4 (D. Utah Apr. 7, 2020) (quoting *Reighard v. Yates*, 285 P.3d 1168, 1176 (Utah 2012)). "Therefore, 'when a conflict arises between parties to a contract regarding the subject matter of that contract, the contractual relationship controls, and parties are not permitted to assert actions in tort in an attempt to circumvent the bargain they agreed upon.'" *Id.* (quoting *Reighard*, 285 P.3d at 1176).

That principle is dispositive here. Plaintiffs do not assert physical injury to themselves or their property; rather, they seek damages only for alleged overpayments and for time, effort, and money spent on response and mitigation efforts—the same benefit-of-the-bargain losses they pursue through their contract claim. *See* Compl. ¶¶ 139–48. As shown below, irrespective of the applicable state law, plaintiffs' negligence claims are barred by the economic-loss doctrine.

***Utah***. Utah's economic-loss rule "prohibits the recovery of economic losses unless a plaintiff has suffered physical property damage or bodily injury." *Gables at Sterling Vill. Homeowners Ass'n, Inc. v. Castlewood-Sterling Vill. I, LLC*, 417 P.3d 95, 109 (Utah 2018). Plaintiffs allege neither. Their claimed injuries are purely economic and arise from the parties' contractual relationship. *See* Compl. ¶¶ 22–28, 139–48. Where, as here, "one party's allegations against another are covered by the contract between them, the contract is the exclusive means of obtaining economic recovery and traditional tort remedies are unavailable." *Legal Tender Servs. PLLC v. Bank of Am. Fork*, 506 P.3d 1211, 1222 (Utah Ct. App. 2022).

***California***. California courts define economic losses as "damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits—without

any claim of personal injury or damages to other property." *Frank M. Booth, Inc. v. Reynolds Metals Co.*, 754 F. Supp. 1441, 1449 n.4 (E.D. Cal. 1991). In California, the economic-loss doctrine bars tort claims "when they arise from—or are not independent of—the parties' underlying contracts." *Sheen v. Wells Fargo Bank, N.A.*, 505 P.3d 625, 633 (Cal. 2022). Plaintiffs' alleged losses fit squarely within that definition. Because plaintiffs do not allege any actual misuse of their data, they seek only economic losses—the "inadequate value" of the services for which they allegedly overpaid and losses related to the temporary Canvas outage. *See Reynolds Metals Co.*, 754 F. Supp. at 1449 n.4.

***Pennsylvania***. Absent a statutory cause of action, Pennsylvania's economic-loss doctrine prohibits "plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Earl v. NVR, Inc.*, 990 F.3d 310, 312–14 (3d Cir. 2021). Under Pennsylvania's economic-loss doctrine, where—as here—a "duty arises under a contract between the parties, a tort action will not lie from a breach of that duty." *Dittman v. UPMC*, 196 A.3d 1036, 1054 (Pa. 2018). Thus, plaintiffs' negligence claims here are barred because they rely on a breach of a contractual duty. *Id.* at 1054–55.

***Iowa***. Iowa follows the "well-established general rule . . . that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable." *Nebraska Innkeepers, Inc. v. Pittsburgh-Des Moines Corp.*, 345 N.W.2d 124, 126 (Iowa 1984). "Instead, the parties to a contract are assumed to have allocated that risk of economic loss as part of the contract; therefore, 'that document should control the party's rights and duties.'" *Des Moines Flying Serv., Inc. v. Aerial Servs. Inc.*, 880 N.W.2d 212, 219 (Iowa 2016). This rule forecloses plaintiffs' negligence claims under Iowa law.

***Oklahoma***. Oklahoma also recognizes the economic-loss doctrine, which "applies to the full range of unintentional torts." *United Golf, LLC v. Westlake Chem. Corp.*, 2006 WL 2807342, at *3 (N.D. Okla. Aug. 15, 2006). Because gross negligence, like negligence, is an unintentional tort, both of plaintiffs' tort claims are barred under Oklahoma's economic-loss doctrine.

In sum, regardless of which state's law applies, the economic-loss doctrine bars plaintiffs' negligence claim. Plaintiffs allege only economic losses arising from Instructure's alleged failure to perform under the parties' contracts, and they cannot repackage those contract claims as torts.

Plaintiffs' gross negligence claim is barred for the same reasons. *See Taylormade Eyecare & Optical v. Solutionreach, Inc.*, 2026 WL 884961, at *4 (D. Utah Mar. 31, 2026). This claim also independently fails because the complaint lacks factual allegations showing "an extreme departure from the ordinary standard of care," akin to an "I-don't-care attitude." *Ridgewood Manor II, Inc. v. Del. Manufactured Home Relocation Auth.*, 2014 WL 7453275, at *6 (Del. Ch. Dec. 31, 2014). The complaint itself defeats this argument, as it describes Instructure's concerted efforts to fend off a sophisticated cybercriminal organization. *See* Compl. ¶¶ 50–58. The Court should dismiss Counts 2 and 2A.

### E. The Unjust Enrichment Claim (Count 4) Fails Because an Express Contract Governs the Parties' Relationship.

Plaintiffs plead unjust enrichment in the alternative to their breach-of-contract claim. Compl. ¶¶ 214–24. To state that claim, a plaintiff must allege that the defendant (1) received a benefit, (2) appreciated or knew of the benefit, and (3) retained it under circumstances that would make retention unjust. *Jones v. Mackey Price Thompson & Ostler*, 355 P.3d 1000, 1012 (Utah 2015). But unjust enrichment is an equitable remedy, so "a plaintiff must affirmatively show a lack of an adequate remedy at law on the face of the pleading." *Thorpe v. Washington City*, 243 P.3d

500, 507 (Utah Ct. App. 2010). Plaintiffs cannot make that showing because the very contracts on which they sue govern the subject matter of this claim.

First, the parties' enforceable contracts bar this claim. Where "there is 'an enforceable contract governing the rights and obligations of the parties,' a plaintiff cannot maintain a claim for unjust enrichment." *Smith v. Lifevantage Corp.*, 2020 WL 6940735, at *5 (D. Utah Nov. 25, 2020). Plaintiffs themselves allege that the contracts govern Instructure's data-security obligations—indeed, those contracts are the foundation of Count 1. *See* Compl. ¶¶ 167–77. Plaintiffs cannot rely on the contracts to sue for breach while also claiming that no contract covers the same conduct.

Second, pleading the claim "in the event that . . . any provision of the Contracts purporting to limit, cap, or exclude damages is enforced" does not save it. *Id.* ¶ 222. "[W]hile a plaintiff is entitled to plead alternative theories of recovery, an unjust enrichment claim cannot survive a motion to dismiss where the plaintiff does not attack the validity of the contract." *Xat.com Ltd. v. Hosting Servs., Inc.*, 2017 WL 449652, at *9 (D. Utah Feb. 2, 2017); *see also Preventive Energy Sols., LLC v. nCap Ventures 5 LLC*, 2017 WL 87028, at *8 (D. Utah Jan. 10, 2017) (collecting cases).

To the extent plaintiffs attack the contracts' terms at all, they challenge a single provision—the limitation-of-liability clause—as unconscionable. *See* Compl. ¶ 205. Specifically, plaintiffs argue that the limitation-of-liability provision was "imposed on [them] on a non-negotiable, take-it-or-leave-it basis by the drafter of those terms, and having the effect of leaving [them] without any meaningful remedy for the compromise of the sensitive personal information of millions of children." *Id.* But unequal bargaining power alone does not make a contract or provision unconscionable. *See Middlesex Mut. Assur. Co. v. Del. Elec. Signal Co.*, 2008 WL 4216145, at *4 (Del. Super. Ct. Sep. 11, 2008). And plaintiffs—highly sophisticated public entities—cannot

borrow the alleged injuries of students, the Track 1 plaintiffs, to argue that a contract is unconscionable as applied to themselves. Unconscionability requires "an absence of meaningful choice and contract terms unreasonably favorable to one of the parties." *Ketler v. PFPA, LLC*, 132 A.3d 746, 748 (Del. 2016). But plaintiffs do not allege that they lacked meaningful choice, and "[t]here is no deprivation of meaningful choice if a party can walk away from the contract." *Id.* Plaintiffs, sophisticated public institutions, were free to contract with another provider or to walk away. Nor are the provision's terms "unreasonably favorable" to Instructure: The limitation is mutual, applying equally to "[e]ach party." MTC § 12. Plaintiffs' unconscionability argument thus fails on both prongs.

Plaintiffs do not contend that the contracts as a whole are invalid or unenforceable, which thus leaves an enforceable contract governing this dispute. Because unjust enrichment is unavailable "where an express contract covering the subject matter of the litigation exists," Count 4 should be dismissed. *U.S. Fid. & Guar. Co. v. U.S. Sports Specialty Ass'n*, 270 P.3d 464, 468–69 (Utah 2012).

### F. Plaintiffs' Claim for Declaratory and Injunctive Relief (Count 5) Fails Because Plaintiffs Lack Standing and It Duplicates Their Damages Claims.

Finally, plaintiffs seek declaratory and injunctive relief. Compl. ¶¶ 225–33. Declaratory and injunctive relief are remedies, not independent causes of action, so these claims fail with plaintiffs' substantive claims. They also fail on their own terms. Plaintiffs lack standing to bring their claim for injunctive relief for the reasons given above, *supra* Section I, which leaves only plaintiffs' request for declaratory relief.

The requested declaration duplicates plaintiffs' breach-of-contract and negligence claims. Plaintiffs ask the Court to declare (1) that Instructure "owe[s] a legal duty to secure [plaintiffs'] [d]ata at Instructure and to timely notify [plaintiffs] of a data breach under the common law and

their Contracts with [plaintiffs]"; (2) that Instructure "continue[s] to breach this legal duty by failing to employ reasonable measures to secure [plaintiffs'] [d]ata"; and (3) that plaintiffs "remain subject to continuing and imminent risk of . . . extortion demands and further proceedings arising from" the data breach. *Id.* ¶ 229.

Declaratory relief is "meant to define the legal rights and obligations of the parties in anticipation of some future conduct, not simply to proclaim liability for a past act." *Lawrence v. Kuenhold*, 271 F. App'x 763, 766 (10th Cir. 2008). The first two requested declarations do exactly what this rule forbids: ask the Court to find that Instructure owed a duty and breached it—the elements of plaintiffs' contract and negligence claims. And courts regularly dismiss declaratory-relief claims that duplicate claims for damages. *PeTA, People for the Ethical Treatment of Animals v. Rasmussen*, 298 F.3d 1198, 1202 n.2 (10th Cir. 2002); *see also StreamCast Networks, Inc. v. IBIS LLC*, 2006 WL 5720345, at *4 (C.D. Cal. May 2, 2006) (collecting cases). The third declaration, about speculative future "risk," simply restates the theory of injury that fails for lack of standing. *Supra* Section I. A declaration would resolve nothing that adjudicating plaintiffs' damages claims would not, so the Court should dismiss Count 5.

## CONCLUSION

For these reasons, Instructure respectfully requests that this Court dismiss the Track 2 Consolidated Class Action Complaint in its entirety and with prejudice.

Dated this 23rd day of November, 2026

Respectfully submitted,

*/s/ Devin S. Anderson*

Devin S. Anderson (18287)
Michael S. Lehr (16496)
KIRKLAND & ELLIS LLP
95 South State Street
Salt Lake City, Utah 84111
Telephone: (801) 877-8134
Facsimile: (801) 877-8101
devin.anderson@kirkland.com
mike.lehr@kirkland.com

Martin L. Roth, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
rothm@kirkland.com

Cristina M. Squiers (*pro hac vice*)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, Texas 75205
Telephone: (214) 972-1770
cristina.squiers@kirkland.com

*Attorneys for Defendant Instructure, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 23, 2026, I filed a true and correct copy of the foregoing Instructure, Inc.'s Motion to Dismiss Track 2 Consolidated Class Action Complaint via the Court's CM/ECF system, which automatically effectuated service on all parties of record in this matter.

*/s/ Devin S. Anderson*
Devin S. Anderson